# RECORD NO. 17-2218

## IN THE
## UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

CAPITAL ASSOCIATED INDUSTRIES, INC.,

*Plaintiff-Appellant,*

v.

JOSH STEIN, in his official capacity as Attorney General of the State of North Carolina, NANCY LORRIN FREEMAN, in her official capacity as District Attorney for the 10th Prosecutorial District of the State of North Carolina, J. DOUGLAS HENDERSON, in his official capacity as District Attorney for the 18th Prosecutorial District of the State of North Carolina,

*Defendants-Appellee,*

and

THE NORTH CAROLINA STATE BAR,

*Intervenor/Defendant-Appellee*

## JOINT APPENDIX – VOLUME I
### (Pages 1 to 462)

Reid L. Phillips
Jennifer Van Zant
Charles E. Coble
Craig D. Schauer
BROOKS, PIERCE, McLENDON,
 HUMPHREY & LEONARD, L.L.P.
Post Office Box 26000
Greensboro, NC 27420-6000
Telephone: (336) 373-8850

*Counsel for Plaintiff-Appellant*

Matthew W. Sawchak
David J. Adinolfi
James W. Doggett
N.C. DEPARTMENT OF JUSTICE
P.O. Box 629
Raleigh, NC 27602
Telephone: (919) 716-6500

*Counsel for Defendants-Appellees*

Alan W. Duncan
Stephen M. Russell, Jr.
MULLINS DUNCAN HARRELL
 & RUSSELL PLLC
300 N. Greene St., Suite 2000
Greensboro, NC 27401
Telephone: (336) 645-3320

*Counsel for Intervenor/Defendant-Appellee*

# **TABLE OF CONTENTS**

## **VOLUME I**

1. District Court Docket (Case No. 1:15-CV-83-LCB-JLW (M.D.N.C.)) ................................1
2. Complaint (D.E. 1)..........................................................................................................16
3. Order on Intervenor/Defendant-Appellee's Consent Motion to Intervene (D.E. 37)..........39
4. Intervenor/Defendant-Appellee's Answer (D.E. 38).........................................................41
5. Defendant-Appellees' Answers (D.E. 56) ........................................................................55
6. Memorandum Opinion and Order denying Plaintiff-Appellant's Motion for Preliminary Injunction (D.E. 54)........................................................................................................70
7. Plaintiff-Appellant's Motion for Summary Judgment (D.E. 103).....................................114
8. Intervenor/Defendant-Appellee's Motion for Summary Judgment (D.E. 112).................117
9. Declaration of Bruce Clarke (D.E. 14) ...........................................................................122
10. Declaration of Beverly Brown (D.E. 15).........................................................................125
11. Declaration of Dale Jenkins (D.E. 16)............................................................................129
12. Declaration of David Finch (D.E. 17).............................................................................133
13. Declaration of William Troxler (D.E. 18) .......................................................................138
14. Declaration of David Johnson (D.E. 41)..........................................................................142
15. Declaration of Alice Mine (D.E. 42) ..............................................................................147
16. Second Declaration of Bruce Clarke (D.E. 105-1) ..........................................................160
17. Declaration of Kim Koy (D.E. 105-2) ............................................................................181
18. Declaration of Kevin Robins (D.E. 105-3) ......................................................................197
19. Declaration of Kelly Hayden (D.E. 105-4) 213
20. Deposition Excerpts of Bruce Clarke (D.E. 101-2, 106-1, 113-1, 121-1, 123-1, 126-1, 127-2) ..................................................................................................................223

## **VOLUME II**

21. Deposition Excerpts of Dale Jenkins (D.E. 106-2, 113-2, 121-2, 123-2, 127-3) ..............463
22. Deposition Excerpts of Beverly Brown (D.E. 106-3, 113-3, 121-3, 123-3, 127-4) ..........531
23. Deposition Excerpts of William Troxler (D.E. 106-4, 113-5, 121-4, 127-6) ....................567
24. Deposition Excerpts of David Finch (D.E. 106-5, 113-4, 121-5, 123-4, 127-5)...............592
25. Deposition Excerpts of Michael Youngblood (D.E. 106-6, 113-6, 121-6, 127-7) ............632
26. Deposition Excerpts of David Johnson (D.E. 106-7, 121-7, 123-6, 126-2, 127-9)...........660
27. Deposition Excerpts of Mark Merritt I (D.E. 106-8, 113-7, 121-8, 123-5).......................719
28. Deposition Excerpts of Mark Merritt II (D.E. 106-9, 121-9, 127-8)................................768
29. Deposition Excerpts of Thomas Lunsford (D.E. 106-10, 121-10, 123-9) .........................782
30. Deposition Excerpts of Alice Mine (D.E. 106-11, 121-11, 123-7, 126-3) .......................830

## **VOLUME III**

31. Deposition Excerpts of Joshua Walthall (D.E. 106-12, 123-8) .........................................911
32. Deposition Exhibit 13 (1/10/2011 email) (D.E. 107-1)...................................................932
33. Deposition Exhibit 14 (3/9/2011 email and attachments) (D.E. 107-2) ...........................934

34.   Deposition Exhibit 17 (4/22/2011 email) (D.E. 107-3) ....................................................993
35.   Deposition Exhibit 23 (3/6/2013 email) (D.E. 107-4) ....................................................994
36.   Deposition Exhibit 25 (4/16/2013 email) (D.E. 107-5) ..................................................998
37.   Deposition Exhibit 30 (excerpt from *Disbarment Enclosed*) (D.E. 107-6) ....................1002
38.   Deposition Exhibit 36 (CAI application for PPLSP) (D.E. 107-7) .................................1016
39.   Deposition Exhibit 41 (Proposed Ethics Decision 2013-2) (D.E. 107-8).......................1040
40.   Deposition Exhibit 45 (CAI articles of incorporation) (D.E. 113-11).............................1048
41.   Deposition Exhibit 47 (CAI charter) (D.E. 113-12) ........................................................1052
42.   Deposition Exhibit 48 (CAI bylaws) (D.E. 113-13).........................................................1058
43.   Deposition Exhibit 50 (CAI website printout) (D.E. 113-14) ..........................................1068
44.   Deposition Exhibit 55 (CAI Member List - placeholder) (D.E. 113-15) .........................1072
45.   Deposition Exhibit 61 (CAI member value handout) (D.E. 113-16)................................1073
46.   Deposition Exhibit 62 (CAI recruiting handout) (D.E. 113-17).......................................1076
47.   Deposition Exhibit 63 (CAI background check handout) (D.E. 113-18) ..........................1078
48.   Deposition Exhibit 64 (CAI affirmative action plan handout) (D.E. 113-19)..................1080
49.   Deposition Exhibit 65 (CAI HR consulting handout) (D.E. 113-20) ...............................1085
50.   Deposition Exhibit 66 (CAI HR On Demand handout) (D.E. 113-21) .............................1087
51.   Deposition Exhibit 67 (CAI training bulletin) (D.E. 113-22)...........................................1090
52.   Deposition Exhibit 68 (CAI conferences handout) (D.E. 113-23) ...................................1097
53.   Deposition Exhibit 69 (CAI membership handout) (D.E. 113-24)....................................1103
54.   Deposition Exhibit 71 (IRS no-change reports) (D.E. 122-1) ..........................................1107
55.   Deposition Exhibit 73 (CAI's 2015 form 990) (D.E. 107-9).............................................1109
56.   Deposition Exhibit 76 (CAI PPLSP handout) (D.E. 113-26) ...........................................1143

# VOLUME IV

57.   Deposition Exhibit 77 (CAI catalog of member calls - redacted) (D.E. 107-10).............1146
58.   Deposition Exhibit 80 (CAI internal memorandum) (D.E. 113-28)..................................1230
59.   Deposition Exhibit 85 (CAI internal memorandum) (D.E. 107-11)..................................1233
60.   Deposition Exhibit 88 (2/2/2016 email) (D.E. 122-2) .....................................................1237
61.   Deposition Exhibit 93 (CAI internal memorandum) (D.E. 113-30)..................................1240
62.   Deposition Exhibit 96 (3/14/2013 email) (D.E. 127-1) ...................................................1242
63.   Deposition Exhibit 108 (*Access to Affordable Justice*, by Neil Gorsuch)
      (D.E. 107-12) ..................................................................................................................1244
64.   Deposition Exhibit 110 (NCCALJ Final Report) (D.E. 107-13)......................................1254
65.   State Bar Supplemental Response to CAI's Interrogatory No. 11 (D.E. 108-1) ..............1275
66.   CAI Response to State Bar Interrogatories (D.E. 108-2) .................................................1283
67.   CAI Services Corp. 2015 Tax Return (placeholder) (D.E. 113-31) .................................1299
68.   Bruce Clarke Letter (D.E. 113-32) ..................................................................................1300
69.   IRS Private Letter Ruling (D.E. 113-33) .........................................................................1303
70.   Stipulation (D.E. 101-1)...................................................................................................1325
71.   ASIS printouts (D.E. 101-4) .............................................................................................1329
72.   Memorandum Opinion and Order denying Plaintiff-Appellant's Motion for Summary
      Judgment, Denying Defendants-Appellees' Motion for Summary Judgment, and Granting
      Intervenor/Defendant-Appellee's Motion for Summary Judgment (D.E. 150)................1331
73.   Judgment (D.E. 151).........................................................................................................1375
74.   Plaintiff-Appellant's Notice of Appeal (D.E. 152)...........................................................1376

## SEALED VOLUME

75.   Deposition Exhibit 55 (CAI Member List) (D.E. 115)....................................................1379
76.   Deposition Exhibit 77 (CAI Catalog of Member Calls) (D.E. 115-1)............................1397
77.   CAI Services Corp. 2015 Tax Return (D.E. 115-2).........................................................1482

# U.S. District Court
## North Carolina Middle District (NCMD)
## CIVIL DOCKET FOR CASE #: 1:15-cv-00083-LCB-JLW

CAPITAL ASSOCIATED INDUSTRIES, INC. v. COOPER et al
Assigned to: JUDGE LORETTA C. BIGGS
Referred to: MAG/JUDGE JOE L. WEBSTER
Case in other court: 17-02218
Cause: 42:1983 Civil Rights Act

Date Filed: 01/23/2015
Date Terminated: 09/19/2017
Jury Demand: None
Nature of Suit: 440 Civil Rights: Other
Jurisdiction: Federal Question

**Plaintiff**

**CAPITAL ASSOCIATED INDUSTRIES, INC.**

represented by **REID L. PHILLIPS**
BROOKS PIERCE MCLENDON HUMPHREY
& LEONARD
POB 26000
GREENSBORO, NC 27420-6000
336-271-3116
Fax: 336-232-9116
Email: rphillips@brookspierce.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**CHARLES E. COBLE**
BROOKS PIERCE MCLENDON HUMPHREY
& LEONARD, L.L.P.
1600 WELLS FARGO CAPITOL CENTER
150 FAYETTEVILLE STREET
RALEIGH, NC 27601
919-839-0300
Fax: 919-839-0304
Email: ccoble@brookspierce.com
*ATTORNEY TO BE NOTICED*

**JENNIFER K. VAN ZANT**
BROOKS PIERCE MCLENDON HUMPHREY
& LEONARD
POB 26000
GREENSBORO, NC 27420-6000
336-271-3132
Fax: 336-232-9132
Email: jvanzant@brookspierce.com
*ATTORNEY TO BE NOTICED*

**KIMBERLY M. MARSTON**
BROOKS PIERCE MCLENDON HUMPHREY
& LEONARD, LLP
POB 26000
GREENSBORO, NC 27420-6000
336-271-3145
Fax: 336-232-9145
Email: kmarston@brookspierce.com
*ATTORNEY TO BE NOTICED*

**CRAIG D. SCHAUER**
BROOKS PIERCE MCLENDON HUMPHREY

1

& LEONARD, LLP
POB 1800
RALEIGH, NC 27602
919-573-6206
Fax: 336-232-9186
Email: cschauer@brookspierce.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**ROY COOPER**                              represented by   **DAVID J. ADINOLFI , II**
*IN HIS OFFICIAL CAPACITY AS ATTORNEY*                      N. C. DEPARTMENT OF JUSTICE
*GENERAL OF THE STATE OF NORTH*                             9001 MAIL SERVICE CTR.
*CAROLINA*                                                  RALEIGH, NC 27699-9001
                                                            919-716-6550
                                                            Fax: 919-716-6760
                                                            Email: dadinolfi@ncdoj.gov
                                                            *LEAD ATTORNEY*
                                                            *ATTORNEY TO BE NOTICED*

**Defendant**

**NANCY LORRIN FREEMAN**                    represented by   **DAVID J. ADINOLFI , II**
*IN HER OFFICIAL CAPACITY AS DISTRICT*                      (See above for address)
*ATTORNEY FOR THE 10TH*                                     *LEAD ATTORNEY*
*PROSECUTORIAL DISTRICT OF THE STATE*                       *ATTORNEY TO BE NOTICED*
*OF NORTH CAROLINA*

**Defendant**

**J. DOUGLAS HENDERSON**                    represented by   **DAVID J. ADINOLFI , II**
*IN HIS OFFICIAL CAPACITY AS DISTRICT*                      (See above for address)
*ATTORNEY FOR THE 18TH*                                     *LEAD ATTORNEY*
*PROSECUTORIAL DISTRICT OF THE STATE*                       *ATTORNEY TO BE NOTICED*
*OF NORTH CAROLINA*

V.

**Intervenor Defendant**

**NORTH CAROLINA STATE BAR, THE**           represented by   **ALAN W. DUNCAN**
                                                            MULLINS DUNCAN HARRELL &
                                                            RUSSELL, PLLC
                                                            300 N. GREENE ST., STE. 2000
                                                            GREENSBORO, NC 27401
                                                            336-645-3325
                                                            Fax: 336-645-3330
                                                            Email: aduncan@mullinsduncan.com
                                                            *LEAD ATTORNEY*
                                                            *ATTORNEY TO BE NOTICED*

                                                            **STEPHEN MCDANIEL RUSSELL , JR.**
                                                            MULLINS DUNCAN HARRELL &
                                                            RUSSELL, PLLC
                                                            300 N. GREENE ST., STE. 2000
                                                            GREENSBORO, NC 27401
                                                            336-645-3323
                                                            Fax: 336-645-3330
                                                            Email: srussell@mullinsduncan.com
                                                            *ATTORNEY TO BE NOTICED*

**2**

| Date Filed | # | Docket Text |
|---|---|---|
| 01/23/2015 | 1 | COMPLAINT against All Defendants (Filing fee $ 400 receipt number 0418-1639190), filed by CAPITAL ASSOCIATED INDUSTRIES, INC. (SCHAUER, CRAIG) (Entered: 01/23/2015) |
| 01/23/2015 | 2 | Corporate Disclosure Statement by CAPITAL ASSOCIATED INDUSTRIES, INC.. (SCHAUER, CRAIG) (Main Document 2 replaced on 1/23/2015) (Butler, Carol). (Entered: 01/23/2015) |
| 01/23/2015 | 3 | NOTICE of Appearance by attorney REID L. PHILLIPS on behalf of Plaintiff CAPITAL ASSOCIATED INDUSTRIES, INC. (PHILLIPS, REID) (Entered: 01/23/2015) |
| 01/23/2015 | | NOTICE of Docket Text/Event Modification re 2 Corporate Disclosure Statement : to replace with correct pdf document. (Butler, Carol) (Entered: 01/23/2015) |
| 01/23/2015 | 4 | NOTICE of Appearance by attorney CHARLES E. COBLE on behalf of Plaintiff CAPITAL ASSOCIATED INDUSTRIES, INC. (COBLE, CHARLES) (Entered: 01/23/2015) |
| 01/23/2015 | 5 | NOTICE of Appearance by attorney JENNIFER K. VAN ZANT on behalf of Plaintiff CAPITAL ASSOCIATED INDUSTRIES, INC. (VAN ZANT, JENNIFER) (Entered: 01/23/2015) |
| 01/23/2015 | | CASE REFERRED to Mediation pursuant to Local Rule 83.9b of the Rules of Practice and Procedure of this Court. Please go to our website under Attorney Information for a list of mediators which must be served on all parties. (Coyne, Michelle) (Entered: 01/23/2015) |
| 01/23/2015 | 6 | MOTION for Leave to File Excess Pages by CAPITAL ASSOCIATED INDUSTRIES, INC.. (Attachments: # 1 Exhibit A - Motion for Preliminary Injunction, # 2 Exhibit B - Brief Supporting Motion for Preliminary Injunction, # 3 Text of Proposed Order)(SCHAUER, CRAIG) (Entered: 01/23/2015) |
| 01/23/2015 | 7 | BRIEF re 6 MOTION for Leave to File Excess Pages . (SCHAUER, CRAIG) (Entered: 01/23/2015) |
| 01/28/2015 | 8 | NOTICE of Appearance by attorney KIMBERLY M. MARSTON on behalf of Plaintiff CAPITAL ASSOCIATED INDUSTRIES, INC. (MARSTON, KIMBERLY) (Entered: 01/28/2015) |
| 01/30/2015 | 9 | AFFIDAVIT OF SERVICE as to All Defendants. (Attachments: # 1 Exhibit 1 - Proof-of-Delivery to Defendant Cooper, # 2 Exhibit 2 - Proof-of-Delivery to Defendant Freeman, # 3 Exhibit 3 - Proof-of-Delivery to Defendant Henderson, # 4 Exhibit 4 - Copies of Summonses Issued to Defendants Cooper, Freeman and Henderson)(SCHAUER, CRAIG) (Entered: 01/30/2015) |
| 01/30/2015 | 10 | MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM , *LACK OF SUBJECT MATTER JURISDICTION, FAILURE TO JOIN NECESSARY PARTIES* by ROY COOPER, NANCY LORRIN FREEMAN, J. DOUGLAS HENDERSON. Responses due by 2/23/2015 (ADINOLFI, DAVID) (Entered: 01/30/2015) |
| 01/30/2015 | 11 | MEMORANDUM filed by Defendants ROY COOPER, NANCY LORRIN FREEMAN, J. DOUGLAS HENDERSON re 10 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM , *LACK OF SUBJECT MATTER JURISDICTION, FAILURE TO JOIN NECESSARY PARTIES* filed by ROY COOPER, NANCY LORRIN FREEMAN, J. DOUGLAS HENDERSON. (Attachments: # 1 Exhibit 1 - Unpublished Proposed Ethics Decision 2013-2)(ADINOLFI, DAVID) (Entered: 01/30/2015) |
| 01/30/2015 | 12 | MOTION Dispense with Mediation re Case Referred to Mediation by ROY COOPER, NANCY LORRIN FREEMAN, J. DOUGLAS HENDERSON. Responses due by 2/23/2015 (ADINOLFI, DAVID) (Entered: 01/30/2015) |
| 02/06/2015 | | Telephone Notice to/from Counsel for Plaintiff Craig Schauer re: Defendant's position as to 6 Motion for Leave to File Excess Pages. Defendants consent to plaintiff's 6 Motion. (Williamson, Wanda) (Entered: 02/06/2015) |
| 02/11/2015 | | Motions Submitted: 6 MOTION for Leave to File Excess Pages to JUDGE LORETTA C. BIGGS- (Williamson, Wanda) (Entered: 02/11/2015) |
| 02/12/2015 | 13 | ORDER signed by JUDGE LORETTA C. BIGGS on 2/12/2015; that Plaintiff's motion (Doc. 6 ) is **GRANTED** thereby allowing Plaintiff leave to file a brief supporting its' Motion for Preliminary |

3

| | | |
|---|---|---|
| | | Injunction that exceeds by ten pages the page limit set by Local Rule 7.3(d). **FURTHER** that Plaintiff shall file its' Motion for Preliminary Injunction, which is currently attached as Exhibit "A" to Plaintiff's Motion to Exceed Page Limit, as a separately filed document within five (5) days of the entry of this Order. (Sheets, Jamie) (Entered: 02/12/2015) |
| 02/16/2015 | 14 | DECLARATION *of Bruce Clarke* by Plaintiff CAPITAL ASSOCIATED INDUSTRIES, INC. (PHILLIPS, REID) (Entered: 02/16/2015) |
| 02/16/2015 | 15 | DECLARATION *of Beverly Brown* by Plaintiff CAPITAL ASSOCIATED INDUSTRIES, INC. (PHILLIPS, REID) (Entered: 02/16/2015) |
| 02/16/2015 | 16 | DECLARATION *of A. Dale Jenkins* by Plaintiff CAPITAL ASSOCIATED INDUSTRIES, INC. (PHILLIPS, REID) (Entered: 02/16/2015) |
| 02/16/2015 | 17 | DECLARATION *of David Finch* by Plaintiff CAPITAL ASSOCIATED INDUSTRIES, INC. (PHILLIPS, REID) (Entered: 02/16/2015) |
| 02/16/2015 | 18 | DECLARATION *of William Troxler, Jr.* by Plaintiff CAPITAL ASSOCIATED INDUSTRIES, INC. (PHILLIPS, REID) (Entered: 02/16/2015) |
| 02/16/2015 | 19 | MOTION for Preliminary Injunction *and Request for Hearing* by CAPITAL ASSOCIATED INDUSTRIES, INC. Responses due by 3/12/2015. (PHILLIPS, REID) (Entered: 02/16/2015) |
| 02/16/2015 | 20 | BRIEF *Supporting Motion for Preliminary Injunction* by Plaintiff CAPITAL ASSOCIATED INDUSTRIES, INC. filed by CAPITAL ASSOCIATED INDUSTRIES, INC.. (PHILLIPS, REID) (Entered: 02/16/2015) |
| 02/19/2015 | 21 | RESPONSE in Opposition re 19 MOTION for Preliminary Injunction *and Request for Hearing* filed by ROY COOPER, NANCY LORRIN FREEMAN, J. DOUGLAS HENDERSON. Replies due by 3/9/2015. (ADINOLFI, DAVID) (Entered: 02/19/2015) |
| 02/20/2015 | 22 | *Plaintiff's* BRIEF *in Opposition to 10 Defendants' Motion to Dismiss* by Plaintiff CAPITAL ASSOCIATED INDUSTRIES, INC. (MARSTON, KIMBERLY) Modified on 2/23/2015 to link to correct motion and remove duplicate text. (Sheets, Jamie) (Entered: 02/20/2015) |
| 02/23/2015 | | Set Reply Deadline re 10 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM, *LACK OF SUBJECT MATTER JURISDICTION, FAILURE TO JOIN NECESSARY PARTIES*: Replies due by 3/9/2015. (Sheets, Jamie) (Entered: 02/23/2015) |
| 03/05/2015 | 23 | Consent MOTION to Intervene by NORTH CAROLINA STATE BAR, THE. Responses due by 3/30/2015 (Attachments: # 1 Proposed Answer, # 2 Proposed Order)(DUNCAN, ALAN) (Entered: 03/05/2015) |
| 03/05/2015 | 24 | BRIEF re 23 Consent MOTION to Intervene by Intervenor Defendant NORTH CAROLINA STATE BAR, THE filed by NORTH CAROLINA STATE BAR, THE. (DUNCAN, ALAN) (Entered: 03/05/2015) |
| 03/05/2015 | 25 | Consent MOTION to Exceed Page Limit by NORTH CAROLINA STATE BAR, THE. (Attachments: # 1 Text of Proposed Order Granting Consent Motion to Exceed Page Limit) (DUNCAN, ALAN) (Entered: 03/05/2015) |
| 03/05/2015 | 26 | NOTICE of Appearance by attorney STEPHEN MCDANIEL RUSSELL, JR on behalf of Intervenor Defendant NORTH CAROLINA STATE BAR, THE (RUSSELL, STEPHEN) (Entered: 03/05/2015) |
| 03/06/2015 | | Motions Submitted: 25 Consent MOTION to Exceed Page Limit , 23 Consent MOTION to Intervene to JUDGE LORETTA C. BIGGS. (Winchester, Robin) (Entered: 03/06/2015) |
| 03/06/2015 | 27 | REPLY, filed by Plaintiff CAPITAL ASSOCIATED INDUSTRIES, INC., to Response to 19 MOTION for Preliminary Injunction *and Request for Hearing* filed by CAPITAL ASSOCIATED INDUSTRIES, INC.. (PHILLIPS, REID) (Entered: 03/06/2015) |
| 03/06/2015 | 28 | REPLY, filed by Defendants ROY COOPER, NANCY LORRIN FREEMAN, J. DOUGLAS HENDERSON, to Response to 10 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM , *LACK OF SUBJECT MATTER JURISDICTION, FAILURE TO JOIN NECESSARY PARTIES* filed by ROY COOPER, NANCY LORRIN FREEMAN, J. DOUGLAS HENDERSON. (ADINOLFI, DAVID) (Entered: 03/06/2015) |

| 03/09/2015 | | Motions Submitted: 12 MOTION Dispense with Mediation re Case Referred to Mediation , 19 MOTION for Preliminary Injunction *and Request for Hearing*, 10 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM *, LACK OF SUBJECT MATTER JURISDICTION, FAILURE TO JOIN NECESSARY PARTIES* to JUDGE LORETTA C. BIGGS. (Powell, Gloria) (Entered: 03/09/2015) |
|---|---|---|
| 03/12/2015 | 29 | RESPONSE in Opposition re 19 MOTION for Preliminary Injunction *and Request for Hearing* filed by NORTH CAROLINA STATE BAR, THE. Replies due by 3/30/2015. (DUNCAN, ALAN) (Entered: 03/12/2015) |
| 03/12/2015 | 30 | DECLARATION of David R. Johnson filed by Intervenor Defendant NORTH CAROLINA STATE BAR, THE re 29 Response in Opposition to Motion *for Preliminary Injunction* filed by NORTH CAROLINA STATE BAR, THE. (DUNCAN, ALAN) (Entered: 03/12/2015) |
| 03/12/2015 | 31 | DECLARATION of Alice M. Mine filed by Intervenor Defendant NORTH CAROLINA STATE BAR, THE re 29 Response in Opposition to Motion *for Preliminary Injunction* filed by NORTH CAROLINA STATE BAR, THE. (Attachments: # 1 Exhibit A (CAI Memorandum), # 2 Exhibit B (Proposed Ethics Decision 2013-2), # 3 Exhibit C (Letter to CAI))(DUNCAN, ALAN) (Entered: 03/12/2015) |
| 03/12/2015 | 32 | RESPONSE filed by Plaintiff CAPITAL ASSOCIATED INDUSTRIES, INC. re 23 Consent MOTION to Intervene filed by NORTH CAROLINA STATE BAR, THE filed by CAPITAL ASSOCIATED INDUSTRIES, INC.. Replies due by 3/30/2015. (Attachments: # 1 Text of Proposed Order)(SCHAUER, CRAIG) (Entered: 03/12/2015) |
| 03/12/2015 | 33 | REPLY, filed by Intervenor Defendant NORTH CAROLINA STATE BAR, THE, to Response to 23 Consent MOTION to Intervene filed by NORTH CAROLINA STATE BAR, THE. (DUNCAN, ALAN) (Entered: 03/12/2015) |
| 03/13/2015 | 34 | MOTION *to Set Briefing Schedule* by CAPITAL ASSOCIATED INDUSTRIES, INC. Responses due by 4/6/2015. (SCHAUER, CRAIG) (Entered: 03/13/2015) |
| 03/13/2015 | 35 | BRIEF re 34 MOTION *to Set Briefing Schedule* by Plaintiff CAPITAL ASSOCIATED INDUSTRIES, INC. filed by CAPITAL ASSOCIATED INDUSTRIES, INC. (SCHAUER, CRAIG) (Entered: 03/13/2015) |
| 03/16/2015 | 36 | ORDER signed by JUDGE LORETTA C. BIGGS on 3/16/2015; that the State Bar's motion 25 is **GRANTED**, and its response to Plaintiff's motion for preliminary injunction may exceed the page limit in Local Rule 7.3(d) by up to ten additional pages. (Sheets, Jamie) (Entered: 03/16/2015) |
| 03/16/2015 | 37 | ORDER signed by JUDGE LORETTA C. BIGGS on 3/16/2015; that the North Carolina State Bar's motion to intervene 23 is **GRANTED**, and the State Bar is hereby allowed to intervene as a defendant in this matter pursuant to Fed. R. Civ. P. 24(a)(2) and (b)(2). The Clerk of Court is directed to take those actions necessary to add the State Bar to the docket as a defendant. Within five business days of this Order's entry, the State Bar shall file its answer to Plaintiff's complaint. The State Bar may file an opposition to Plaintiff's motion for preliminary injunction within the time otherwise allowed by Local Rule 7.3, or ten days from this Order's entry, whichever is later. (Sheets, Jamie) (Entered: 03/16/2015) |
| 03/16/2015 | 38 | ANSWER to 1 Complaint by NORTH CAROLINA STATE BAR, THE. (DUNCAN, ALAN) (Entered: 03/16/2015) |
| 03/17/2015 | 39 | NOTICE by CAPITAL ASSOCIATED INDUSTRIES, INC. re 34 MOTION *to Set Briefing Schedule (Notice of Withdrawal)* (SCHAUER, CRAIG) (Entered: 03/17/2015) |
| 03/17/2015 | 40 | RESPONSE in Opposition re 19 MOTION for Preliminary Injunction *and Request for Hearing - AMENDED* filed by NORTH CAROLINA STATE BAR, THE. Replies due by 4/3/2015. (DUNCAN, ALAN) (Entered: 03/17/2015) |
| 03/17/2015 | 41 | DECLARATION of David R. Johnson filed by Intervenor Defendant NORTH CAROLINA STATE BAR, THE re 40 Response in Opposition to Motion *for Preliminary Injunction* filed by NORTH CAROLINA STATE BAR, THE. (DUNCAN, ALAN) (Entered: 03/17/2015) |
| 03/17/2015 | 42 | DECLARATION of Alice M. Mine filed by Intervenor Defendant NORTH CAROLINA STATE |

| | | |
|---|---|---|
| | | BAR, THE re <u>40</u> Response in Opposition to Motion *for Preliminary Injunction* filed by NORTH CAROLINA STATE BAR, THE. (Attachments: # <u>1</u> Exhibit A (CAI Memorandum), # <u>2</u> Exhibit B (Proposed Ethics Decision 2013-2), # <u>3</u> Exhibit C (Letter to CAI))(DUNCAN, ALAN) (Entered: 03/17/2015) |
| 04/01/2015 | <u>43</u> | REPLY, filed by Plaintiff CAPITAL ASSOCIATED INDUSTRIES, INC., to Response to <u>19</u> MOTION for Preliminary Injunction *and Request for Hearing* filed by CAPITAL ASSOCIATED INDUSTRIES, INC.. (SCHAUER, CRAIG) (Entered: 04/01/2015) |
| 04/10/2015 | <u>44</u> | NOTICE OF HEARING on All Pending Motions set for 4/30/2015 at 11:00 AM in Winston-Salem Courtroom #1 before JUDGE LORETTA C. BIGGS. (Samuel-Priestley, Tina) (Entered: 04/10/2015) |
| 04/14/2015 | <u>45</u> | Consent MOTION to Reschedule Hearing Due to Trial Conflict re <u>44</u> Notice of Hearing by CAPITAL ASSOCIATED INDUSTRIES, INC.. (Attachments: # <u>1</u> Text of Proposed Order) (SCHAUER, CRAIG) (Entered: 04/14/2015) |
| 04/14/2015 | | Motions Submitted: <u>45</u> Consent MOTION to Reschedule Hearing Due to Trial Conflict re <u>44</u> Notice of Hearing to JUDGE LORETTA C. BIGGS (Samuel-Priestley, Tina) (Entered: 04/14/2015) |
| 04/17/2015 | <u>46</u> | ORDER signed by JUDGE LORETTA C. BIGGS on 4/17/2015; that the hearing is continued to Friday, May 29, 2015, at 9:30 a.m. in Winston-Salem, North Carolina in Courtroom No. 2. (Sheets, Jamie) (Entered: 04/17/2015) |
| 04/17/2015 | | Reset Hearings: Motion Hearing set for 5/29/2015 09:30 AM in Winston-Salem Courtroom #2 before JUDGE LORETTA C. BIGGS. (Sheets, Jamie) (Entered: 04/17/2015) |
| 05/29/2015 | | Minute Entry for proceedings held before JUDGE LORETTA C. BIGGS in Winston-Salem: Motion Hearing held on 5/29/2015 re: <u>10</u> MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM , *LACK OF SUBJECT MATTER JURISDICTION, FAILURE TO JOIN NECESSARY PARTIES* filed by NANCY LORRIN FREEMAN, ROY COOPER, J. DOUGLAS HENDERSON; <u>12</u> MOTION Dispense with Mediation re Case Referred to Mediation filed by NANCY LORRIN FREEMAN, ROY COOPER, J. DOUGLAS HENDERSON; and <u>19</u> MOTION for Preliminary Injunction *and Request for Hearing* filed by CAPITAL ASSOCIATED INDUSTRIES, INC. Attorneys Phillips, Coble, Schauer, Adinolfi, Duncan, and Russell present. Arguments presented. Court takes these matters under consideration. Written Order forthcoming. (Court Reporter Joseph B. Armstrong.) (Samuel-Priestley, Tina) (Entered: 05/29/2015) |
| 06/25/2015 | <u>47</u> | Transcript of Motions Hearing held on 05/29/2015 before Judge Loretta C. Biggs. Court Reporter/Transcriber J. Armstrong, Telephone number 336-332-6034. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. **NOTICE RE: REDACTION OF TRANSCRIPTS: The parties have 5 business days to file a Notice of Intent to Request Redaction and 21 calendar days to file a Redaction Request. If no notice is filed, this transcript will be made electronically available to the public without redaction after 90 calendar days. Transcript may be viewed at the court public terminal or purchased through the court reporter before the 90 day deadline. After that date it may be obtained through PACER.** Redaction Request due 7/20/2015. Redacted Transcript Deadline set for 7/30/2015. Release of Transcript Restriction set for 9/28/2015. (Armstrong, Joe) (Entered: 06/25/2015) |
| 07/21/2015 | <u>48</u> | MOTION for Initial Pretrial Conference by CAPITAL ASSOCIATED INDUSTRIES, INC.. (SCHAUER, CRAIG) (Entered: 07/21/2015) |
| 07/21/2015 | <u>49</u> | BRIEF re <u>48</u> MOTION for Initial Pretrial Conference by Plaintiff CAPITAL ASSOCIATED INDUSTRIES, INC. filed by CAPITAL ASSOCIATED INDUSTRIES, INC.. (SCHAUER, CRAIG) (Entered: 07/21/2015) |
| 07/22/2015 | <u>50</u> | NOTICE by CAPITAL ASSOCIATED INDUSTRIES, INC. re <u>48</u> MOTION for Initial Pretrial Conference *(Proposed Order)* (SCHAUER, CRAIG) (Entered: 07/22/2015) |
| 07/28/2015 | <u>51</u> | RESPONSE in Opposition re <u>50</u> Notice (Other), <u>49</u> Brief, <u>48</u> MOTION for Initial Pretrial Conference filed by ROY COOPER, NANCY LORRIN FREEMAN, J. DOUGLAS HENDERSON. |

6

| | | |
|---|---|---|
| | | Replies due by 8/14/2015. (ADINOLFI, DAVID) (Entered: 07/28/2015) |
| 07/28/2015 | 52 | RESPONSE filed by Intervenor Defendant NORTH CAROLINA STATE BAR, THE re 48 MOTION for Initial Pretrial Conference filed by CAPITAL ASSOCIATED INDUSTRIES, INC. filed by NORTH CAROLINA STATE BAR, THE. (DUNCAN, ALAN) (Entered: 07/28/2015) |
| 08/11/2015 | 53 | REPLY, filed by Plaintiff CAPITAL ASSOCIATED INDUSTRIES, INC., to Response to 48 MOTION for Initial Pretrial Conference filed by CAPITAL ASSOCIATED INDUSTRIES, INC.. (SCHAUER, CRAIG) (Entered: 08/11/2015) |
| 08/14/2015 | | Motion Submitted: 48 MOTION for Initial Pretrial Conference, to JUDGE LORETTA C. BIGGS. (Samuel-Priestley, Tina) (Entered: 08/14/2015) |
| 09/04/2015 | 54 | MEMORANDUM OPINION AND ORDER signed by JUDGE LORETTA C. BIGGS on 9/4/2015, that CAI's Motion for Preliminary Injunction (ECF No. 19 ) is DENIED and State Prosecutors' Motion to Dismiss (ECF No. 10 ) is DENIED. FURTHER ORDERED that State Prosecutors' Motion to Dispense with Mediation (ECF No. 12 ) is GRANTED. (Butler, Carol) (Entered: 09/04/2015) |
| 09/04/2015 | 55 | ORDER signed by JUDGE LORETTA C. BIGGS on 9/4/2015, that Plaintiff's motion [ECF No. 48 ] be, and is hereby, DENIED AS MOOT. FURTHER that this matter shall proceed in the normal course after all initial pleadings have been filed or the time for such filing has expired. (Butler, Carol) (Entered: 09/04/2015) |
| 09/18/2015 | 56 | ANSWER to 1 Complaint by ROY COOPER, NANCY LORRIN FREEMAN, J. DOUGLAS HENDERSON. (ADINOLFI, DAVID) (Entered: 09/18/2015) |
| 09/18/2015 | 57 | MOTION for Judgment on the Pleadings by ROY COOPER, NANCY LORRIN FREEMAN, J. DOUGLAS HENDERSON. Responses due by 10/13/2015 (ADINOLFI, DAVID) (Entered: 09/18/2015) |
| 09/18/2015 | 58 | MEMORANDUM filed by Defendants ROY COOPER, NANCY LORRIN FREEMAN, J. DOUGLAS HENDERSON re 57 MOTION for Judgment on the Pleadings filed by ROY COOPER, NANCY LORRIN FREEMAN, J. DOUGLAS HENDERSON. (ADINOLFI, DAVID) (Entered: 09/18/2015) |
| 10/07/2015 | 59 | RESPONSE in Opposition re 57 MOTION for Judgment on the Pleadings filed by CAPITAL ASSOCIATED INDUSTRIES, INC.. Replies due by 10/26/2015. (MARSTON, KIMBERLY) (Entered: 10/07/2015) |
| 10/20/2015 | 60 | REPLY, filed by Defendants ROY COOPER, NANCY LORRIN FREEMAN, J. DOUGLAS HENDERSON, to Response to 57 MOTION for Judgment on the Pleadings filed by ROY COOPER, NANCY LORRIN FREEMAN, J. DOUGLAS HENDERSON. (ADINOLFI, DAVID) (Entered: 10/20/2015) |
| 10/21/2015 | | Motion Submitted: 57 MOTION for Judgment on the Pleadings, to JUDGE LORETTA C. BIGGS. (Samuel-Priestley, Tina) (Entered: 10/21/2015) |
| 06/01/2016 | 61 | MOTION for Scheduling Initial Pretrial Conference by CAPITAL ASSOCIATED INDUSTRIES, INC.. (SCHAUER, CRAIG) (Entered: 06/01/2016) |
| 06/01/2016 | 62 | BRIEF re 61 MOTION for Scheduling Initial Pretrial Conference by Plaintiff CAPITAL ASSOCIATED INDUSTRIES, INC. filed by CAPITAL ASSOCIATED INDUSTRIES, INC.. (SCHAUER, CRAIG) (Entered: 06/01/2016) |
| 06/01/2016 | 63 | RESPONSE in Opposition re 61 MOTION for Scheduling Initial Pretrial Conference filed by ROY COOPER, NANCY LORRIN FREEMAN, J. DOUGLAS HENDERSON. Replies due by 6/20/2016. (ADINOLFI, DAVID) (Entered: 06/01/2016) |
| 06/02/2016 | 64 | RESPONSE filed by Intervenor Defendant NORTH CAROLINA STATE BAR, THE re 61 MOTION for Scheduling Initial Pretrial Conference filed by CAPITAL ASSOCIATED INDUSTRIES, INC. filed by NORTH CAROLINA STATE BAR, THE. Replies due by 6/20/2016. (DUNCAN, ALAN) (Entered: 06/02/2016) |
| 06/07/2016 | 65 | REPLY, filed by Plaintiff CAPITAL ASSOCIATED INDUSTRIES, INC., to Response to 61 |

7

| | | |
|---|---|---|
| | | MOTION for Scheduling Initial Pretrial Conference filed by CAPITAL ASSOCIATED INDUSTRIES, INC.. (SCHAUER, CRAIG) (Entered: 06/07/2016) |
| 06/23/2016 | 66 | ORDER signed by JUDGE LORETTA C. BIGGS on 6/23/2016, that Defendant's Motion for Judgment on the Pleadings (ECF. No. 57 ) is DENIED. (Daniel, J) (Entered: 06/23/2016) |
| 06/27/2016 | 67 | WITHDRAWAL of Motion by Plaintiff CAPITAL ASSOCIATED INDUSTRIES, INC. re 61 MOTION for Scheduling Initial Pretrial Conference filed by CAPITAL ASSOCIATED INDUSTRIES, INC. (SCHAUER, CRAIG) (Entered: 06/27/2016) |
| 06/27/2016 | 68 | NOTICE of Initial Pretrial Conference Hearing: Initial Pretrial Conference Hearing set for 8/24/2016 09:30 AM in Durham Courtroom #1 before MAG/JUDGE JOE L. WEBSTER. (Garrett, Kim) (Entered: 06/27/2016) |
| 07/19/2016 | 69 | MOTION for Reconsideration re 66 Order on Motion for Judgment on the Pleadings by ROY COOPER, NANCY LORRIN FREEMAN, J. DOUGLAS HENDERSON. Responses due by 8/12/2016 (ADINOLFI, DAVID) (Entered: 07/19/2016) |
| 08/02/2016 | 70 | RESPONSE in Opposition re 69 MOTION for Reconsideration re 66 Order on Motion for Judgment on the Pleadings filed by CAPITAL ASSOCIATED INDUSTRIES, INC.. (SCHAUER, CRAIG) (Entered: 08/02/2016) |
| 08/03/2016 | | Set Motion Reply Deadline re 69 MOTION for Reconsideration re 66 Order on Motion for Judgment on the Pleadings: Replies due by 8/19/2016. (Sheets, Jamie) (Entered: 08/03/2016) |
| 08/03/2016 | 71 | REPLY, filed by Defendants ROY COOPER, NANCY LORRIN FREEMAN, J. DOUGLAS HENDERSON, to Response to 69 MOTION for Reconsideration re 66 Order on Motion for Judgment on the Pleadings filed by ROY COOPER, NANCY LORRIN FREEMAN, J. DOUGLAS HENDERSON. (ADINOLFI, DAVID) (Entered: 08/03/2016) |
| 08/10/2016 | | Motion Submitted: 69 MOTION for Reconsideration re: 66 Order on Motion for Judgment on the Pleadings, to JUDGE LORETTA C. BIGGS. (Samuel-Priestley, Tina) (Entered: 08/10/2016) |
| 08/11/2016 | 72 | Rule 26(f) Report (Joint) filed by all parties by CAPITAL ASSOCIATED INDUSTRIES, INC.. (VAN ZANT, JENNIFER) (Entered: 08/11/2016) |
| 08/12/2016 | | Motions Referred: RE: 72 Rule 26(f) Report (Joint) filed by all parties, to MAG/JUDGE JOE L. WEBSTER (Garrett, Kim) (Entered: 08/12/2016) |
| 08/12/2016 | 73 | JOINT MOTION *For Consent Order* by CAPITAL ASSOCIATED INDUSTRIES, INC.. (Attachments: # 1 Text of Proposed Order)(VAN ZANT, JENNIFER) (Entered: 08/12/2016) |
| 08/15/2016 | 74 | ORDER APPROVING JOINT RULE 26(f) REPORT signed by MAG/JUDGE JOE L. WEBSTER on 8/15/2016; The Court has reviewed the Joint Rule 26(f) Report (Docket Entry 72 ) submitted by the parties and approves it without modification. Discovery due by 2/28/2017. The Court previously granted Defendants Motion to Dispense with Mediation. See Docket Entry 54 . The parties may later engage in voluntary mediation. Plaintiff's Amended Pleadings due by 11/1/2016. Defendants' Amended Pleadings due by 11/22/2016. Joinder of Parties for Plaintiff due by 11/1/2016. Joinder of Parties for Defendant due by 11/22/2016. The parties do not consent to referral of the case to a Magistrate Judge. If needed, trial of the action is expected to take approximately 5 days. There has been no demand for a jury. (Sheets, Jamie) (Entered: 08/15/2016) |
| 08/15/2016 | | Motion Referred: RE: 73 JOINT MOTION *For Consent Order*, to MAGISTRATE JUDGE JOE L. WEBSTER. (Samuel-Priestley, Tina) (Entered: 08/15/2016) |
| 08/22/2016 | 75 | CONSENT ORDER signed by MAG/JUDGE JOE L. WEBSTER on 8/22/2016 re: 73 Joint Motion. (Sheets, Jamie) (Entered: 08/22/2016) |
| 08/29/2016 | 76 | Consent MOTION for Extension of Time *to Respond to Discovery Requests* by NORTH CAROLINA STATE BAR, THE. (Attachments: # 1 Text of Proposed Order)(RUSSELL, STEPHEN) (Entered: 08/29/2016) |
| 08/29/2016 | | Motion Referred: RE: 76 Consent MOTION for Extension of Time *to Respond to Discovery Requests*, to MAGISTRATE JUDGE JOE L. WEBSTER. (Samuel-Priestley, Tina) (Entered: 08/29/2016) |

| 08/29/2016 | 77 | Consent MOTION for Extension of Time *to Respond to Discovery Requests* by ROY COOPER, NANCY LORRIN FREEMAN, J. DOUGLAS HENDERSON. (Attachments: # 1 Text of Proposed Order)(ADINOLFI, DAVID) (Entered: 08/29/2016) |
| 08/30/2016 | | Motion Referred: RE: 77 Consent MOTION for Extension of Time *to Respond to Discovery Requests*, to MAGISTRATE JUDGE JOE L. WEBSTER. (Samuel-Priestley, Tina) (Entered: 08/30/2016) |
| 08/31/2016 | | TEXT ORDER granting 76 Motion for Extension of Time to respond to discovery requests. The North Carolina State Bar shall have up to and including October 3, 2016 to respond to Plaintiff's First Set of Requests for Admission, Interrogatories, and Requests for Production of Documents. Issued by MAG/JUDGE JOE L. WEBSTER on 8/31/2016. (Lee, Pedra) (Entered: 08/31/2016) |
| 08/31/2016 | | TEXT ORDER granting 77 Motion for Extension of Time respond to discovery requests. Defendants Roy Cooper, Nancy Lorrin Freeman and J. Douglas Henderson shall have up to and including October 3, 2016 to respond to Plaintiff's First Set of Requests for Admission, Interrogatories, and Requests for Production of Documents. Issued by MAG/JUDGE JOE L. WEBSTER on 8/31/2016. (Lee, Pedra) Modified on 9/1/2016 to correct party name. (Sheets, Jamie) (Entered: 08/31/2016) |
| 10/28/2016 | 78 | MOTION for Protective Order by CAPITAL ASSOCIATED INDUSTRIES, INC.. (Attachments: # 1 Text of Proposed Order)(SCHAUER, CRAIG) (Entered: 10/28/2016) |
| 10/28/2016 | | Motion Referred: RE: 78 MOTION for Protective Order, to MAGISTRATE JUDGE JOE L. WEBSTER. (Samuel-Priestley, Tina) (Entered: 10/28/2016) |
| 10/31/2016 | 79 | CONSENT PROTECTIVE ORDER signed by MAG/JUDGE JOE L. WEBSTER on 10/31/2016 as set out herein. (Sheets, Jamie) (Entered: 10/31/2016) |
| 12/13/2016 | 80 | MOTION to Compel by CAPITAL ASSOCIATED INDUSTRIES, INC.. Response to Motion due by 1/3/2017 (Attachments: # 1 Exhibit Plaintiff's First Discovery Requests, # 2 Exhibit State Bar's Response to First Interrogatories, # 3 Exhibit State Bar's Response to First Request for Production of Documents, # 4 Exhibit Letter Dated Nov. 1, 2016, # 5 Exhibit Letter Dated Nov. 17, 2016, # 6 Exhibit Letter Dated Nov. 23, 2016)(SCHAUER, CRAIG) (Entered: 12/13/2016) |
| 12/13/2016 | 81 | BRIEF re 80 MOTION to Compel . (Attachments: # 1 Exhibit NCSB 08225, # 2 Exhibit NCSB 08821)(SCHAUER, CRAIG) (Entered: 12/13/2016) |
| 12/23/2016 | 82 | RESPONSE in Opposition re 80 MOTION to Compel filed by NORTH CAROLINA STATE BAR, THE. (RUSSELL, STEPHEN) (Entered: 12/23/2016) |
| 12/23/2016 | 83 | SECOND DECLARATION of David R. Johnson filed by Intervenor Defendant THE NORTH CAROLINA STATE BAR, re: 82 Response in Opposition to Motion. (RUSSELL, STEPHEN) Modified on 12/27/2016 to remove duplicate text. (Daniel, J) (Entered: 12/23/2016) |
| 01/04/2017 | 84 | MOTION for Protective Order by NORTH CAROLINA STATE BAR, THE. Responses due by 1/25/2017 (Attachments: # 1 Text of Proposed Order)(RUSSELL, STEPHEN) (Entered: 01/04/2017) |
| 01/04/2017 | 85 | BRIEF re 84 MOTION for Protective Order by Intervenor Defendant NORTH CAROLINA STATE BAR, THE filed by NORTH CAROLINA STATE BAR, THE. (Attachments: # 1 Exhibit A (Notice of Rule 30(b)(6) Deposition), # 2 Exhibit B (1-3-17 Letter), # 3 Exhibit C (Authorized Practice Advisory Opinion 2002-1))(RUSSELL, STEPHEN) (Entered: 01/04/2017) |
| 01/06/2017 | 86 | REPLY, filed by Plaintiff CAPITAL ASSOCIATED INDUSTRIES, INC., to Response to 80 MOTION to Compel filed by CAPITAL ASSOCIATED INDUSTRIES, INC.. (SCHAUER, CRAIG) (Entered: 01/06/2017) |
| 01/12/2017 | 87 | NOTICE of Hearing: Master Trial Calendar: OCTOBER Bench Trial set for 10/2/2017 09:30 AM in Unassigned Courtroom; Trial Briefs, etc. deadline set for 9/11/2017. (Kemp, Donita) (Entered: 01/12/2017) |
| 01/25/2017 | 88 | RESPONSE in Opposition re 84 MOTION for Protective Order filed by CAPITAL ASSOCIATED INDUSTRIES, INC.. Replies due by 2/8/2017 (Attachments: # 1 Exhibit 1 - 2011 Authorized Practice Presentation, # 2 Exhibit 2 - Email 1, # 3 Exhibit 3 - Email 2, # 4 Exhibit 4 - Email enclosing copy of FTC Letter, # 5 Exhibit 5 - Excerpt from Lunsford Essays) (SCHAUER, CRAIG) Modified on 1/26/2017 to remove duplicate text. (Sheets, Jamie) (Entered: 01/25/2017) |

| | | |
|---|---|---|
| 02/08/2017 | 89 | REPLY, filed by Intervenor Defendant NORTH CAROLINA STATE BAR, THE, to Response to 84 MOTION for Protective Order filed by NORTH CAROLINA STATE BAR, THE. (RUSSELL, STEPHEN) (Entered: 02/08/2017) |
| 02/09/2017 | | Motions Referred: RE: 80 MOTION to Compel, 84 MOTION for Protective Order to MAG/JUDGE JOE L. WEBSTER. (Kemp, Donita) (Entered: 02/09/2017) |
| 02/10/2017 | 90 | NOTICE of Hearing: Motion Hearing as to 80 Motion to Compel; 84 Motion for Protective Order set for 2/23/2017 09:30 AM in Durham Courtroom #1 before MAG/JUDGE JOE L. WEBSTER. (Kemp, Donita) (Entered: 02/10/2017) |
| 02/17/2017 | 91 | ORDER signed by JUDGE LORETTA C. BIGGS on 2/17/2017, that Defendants' Motion for Reconsideration (ECF No. 69 ) is DENIED. (Butler, Carol) (Entered: 02/17/2017) |
| 02/23/2017 | | Minute Entry for proceedings held before MAG/JUDGE JOE L. WEBSTER: Motion Hearing held on 2/23/2017 re 80 MOTION to Compel filed by CAPITAL ASSOCIATED INDUSTRIES, INC., 84 MOTION for Protective Order filed by NORTH CAROLINA STATE BAR, THE. Attorneys Reid Phillips and Craig Schauer appeared as counsel for the Plaintiff. Attorneys Alan Duncan and Stephen Russell, Jr. appeared as counsel for the Intervenor Defendant. Oral Argument presented by the parties. The court takes matter under advisement. (Court Reporter Proceedings Recorded.) (Winchester, Robin) (Entered: 02/23/2017) |
| 02/28/2017 | 92 | Joint MOTION to Modify 74 Rule 26f (Joint),,, by CAPITAL ASSOCIATED INDUSTRIES, INC.. Response to Motion due by 3/21/2017 (Attachments: # 1 Text of Proposed Order)(SCHAUER, CRAIG) (Entered: 02/28/2017) |
| 03/01/2017 | | Motions Referred: RE: 92 Joint MOTION to Modify 74 (Joint) Rule 26f to MAG/JUDGE JOE L. WEBSTER. (Kemp, Donita) (Entered: 03/01/2017) |
| 03/01/2017 | | TEXT ORDER granting 92 Motion to Modify Joint Rule 26(f) Report). The Scheduling Order is modified to extend the date of the close of the discovery period for thirty (30) days following the Court's ruling on the Discovery Motions (Docket Entries 80 , 84 ), for the limited purpose of completing discovery on the Pending Discovery Items. Issued by MAG/JUDGE JOE L. WEBSTER on 3/1/2017. (Lee, Pedra) (Entered: 03/01/2017) |
| 03/21/2017 | 93 | ORDER signed by MAG/JUDGE JOE L. WEBSTER on 3/21/2017; that CAI's motion to compel (Docket Entry 80 ) is GRANTED IN PART AND DENIED IN PART and the State Bar's motion for a protective Order (Docket Entry 84 ) is GRANTED IN PART AND DENIED IN PART. The State Bar shall supplement its responses as stated herein no later than thirty (30) days from the date of this Order. The parties shall reconvene the Rule 30(b)(6) depositions to discuss the narrowed Topic 6 as ordered herein no later than thirty (30) days from the date of this Order. FURTHERMORE, the discovery deadline shall be extended thirty (30) days from the date of this Order for the limited purpose of completing discovery on the items discussed herein. (Sheets, Jamie) (Entered: 03/21/2017) |
| 04/13/2017 | 94 | Consent MOTION for Extension of Time to Complete Discovery by NORTH CAROLINA STATE BAR, THE. (Attachments: # 1 Text of Proposed Order) (RUSSELL, STEPHEN) (Entered: 04/13/2017) |
| 04/14/2017 | | Motions Referred: RE: 94 Consent MOTION for Extension of Time to Complete Discovery to MAG/JUDGE JOE L. WEBSTER. (Kemp, Donita) (Entered: 04/14/2017) |
| 04/17/2017 | | TEXT ORDER granting 94 Motion for Extension of Time to Complete Discovery up to and including April 27, 2017, without alteration to the current schedule for filing summary judgment motions. Issued by MAG/JUDGE JOE L. WEBSTER on 4/17/2017. (Lee, Pedra) (Entered: 04/17/2017) |
| 04/18/2017 | | Reset Scheduling Order Deadlines: Discovery due by 4/27/2017. (Sheets, Jamie) (Entered: 04/18/2017) |
| 04/28/2017 | 95 | NOTICE of Intent to File Dispositive Motions by Intervenor Defendant NORTH CAROLINA STATE BAR, THE (RUSSELL, STEPHEN) (Entered: 04/28/2017) |
| 04/28/2017 | 96 | NOTICE of Intent to File Dispositive Motions by Defendants ROY COOPER, NANCY LORRIN FREEMAN, J. DOUGLAS HENDERSON (ADINOLFI, DAVID) (Entered: 04/28/2017) |

| 05/11/2017 | 97 | JOINT MOTION *to Expand Word Limit* by CAPITAL ASSOCIATED INDUSTRIES, INC.. (Attachments: # 1 Text of Proposed Order)(SCHAUER, CRAIG) (Entered: 05/11/2017) |
|---|---|---|
| 05/11/2017 | 98 | BRIEF re 97 JOINT MOTION *to Expand Word Limit* . (SCHAUER, CRAIG) (Entered: 05/11/2017) |
| 05/12/2017 | | Motions Submitted: 97 JOINT MOTION *to Expand Word Limit* to JUDGE LORETTA C. BIGGS. (Blay, Debbie) (Entered: 05/12/2017) |
| 05/12/2017 | 99 | ORDER signed by JUDGE LORETTA C. BIGGS on 5/12/2017 denying 97 Joint Motion to Expand Word Limit. (Sheets, Jamie) (Entered: 05/12/2017) |
| 05/16/2017 | 100 | MOTION for Summary Judgment by ROY COOPER, NANCY LORRIN FREEMAN, J. DOUGLAS HENDERSON. Response to Motion due by 6/15/2017 (ADINOLFI, DAVID) (Entered: 05/16/2017) |
| 05/16/2017 | 101 | SEALED BRIEF re 100 MOTION for Summary Judgment *FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER-ECF No. 79* by Defendants ROY COOPER, J. DOUGLAS HENDERSON, NANCY LORRIN FREEMAN, Plaintiff CAPITAL ASSOCIATED INDUSTRIES, INC., Intervenor Defendant NORTH CAROLINA STATE BAR, THE. (Attachments: # 1 Sealed Unredacted Appendix 1 - Stipulation, # 2 Sealed Unredacted Appendix 2 - Deposition excerpt, # 3 Sealed Unredacted Appendix 3 - Deposition excerpt, # 4 Sealed Unredacted Appendix 4 - Criminal history printout, # 5 Sealed Unredacted Appendix 5 - Deposition excerpt)(ADINOLFI, DAVID) (Entered: 05/16/2017) |
| 05/16/2017 | 102 | SEALED UNREDACTED DOCUMENTS *Sealed Unredacted Appendix 3 - Exhibits 2-5* filed by Plaintiff CAPITAL ASSOCIATED INDUSTRIES, INC., Defendants ROY COOPER, NANCY LORRIN FREEMAN, J. DOUGLAS HENDERSON, Intervenor Defendant NORTH CAROLINA STATE BAR, THE. re 101 SEALED BRIEF re 100 MOTION for Summary Judgment *FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER-ECF No. 79* by Defendants ROY COOPER, J. DOUGLAS HENDERSON, NANCY LORRIN FREEMAN, Plaintiff CAPITAL ASSOCIATED INDUSTRIES, INC., Intervenor Defendant NORTH CAROLINA STATE BAR, THE. (Attachments: # 1 Sealed Unredacted Appendix 1 - Stipulation, # 2 Sealed Unredacted Appendix 2 - Deposition excerpt, # 3 Sealed Unredacted Appendix 3 - Deposition excerpt, # 4 Sealed Unredacted Appendix 4 - Criminal history printout, # 5 Sealed Unredacted Appendix 5 - Deposition excerpt) (ADINOLFI, DAVID). (Attachments: # 1 Sealed Unredacted Appendix 3 - Exhibit 2, # 2 Sealed Unredacted Appendix 3 - Exhibit 3, # 3 Sealed Unredacted Appendix 3 - Exhibit 4, # 4 Sealed Unredacted Appendix 3 - Exhibit 5)(ADINOLFI, DAVID) (Entered: 05/16/2017) |
| 05/18/2017 | 103 | MOTION for Summary Judgment by CAPITAL ASSOCIATED INDUSTRIES, INC.. Response to Motion due by 6/19/2017 (PHILLIPS, REID) (Entered: 05/18/2017) |
| 05/18/2017 | 104 | BRIEF re 103 MOTION for Summary Judgment . (Attachments: # 1 Appendix Index of Summary Judgment Materials)(PHILLIPS, REID) (Entered: 05/18/2017) |
| 05/18/2017 | 105 | NOTICE by CAPITAL ASSOCIATED INDUSTRIES, INC. re 103 MOTION for Summary Judgment *Filing of Declarations* (Attachments: # 1 Declaration of Bruce Clarke, # 2 Declaration of Kim Koy, # 3 Declaration of Kevin Robins, # 4 Declaration of Kelly Hayden)(PHILLIPS, REID) (Entered: 05/18/2017) |
| 05/18/2017 | 106 | NOTICE by CAPITAL ASSOCIATED INDUSTRIES, INC. re 103 MOTION for Summary Judgment *Filing of Excerpts of Deposition Transcripts* (Attachments: # 1 Bruce Clarke Deposition Excerpts, # 2 Dale Jenkins Deposition Excerpts, # 3 Beverly Brown Deposition Excerpts, # 4 William Troxler Deposition Excerpts, # 5 David Finch Deposition Excerpts, # 6 Michael Youngblood Deposition Excerpts, # 7 David Johnson Deposition Excerpts, # 8 Mark Merritt I Deposition Excerpts, # 9 Mark Merritt II Deposition Excerpts, # 10 Thomas Lunsford Deposition Excerpts, # 11 Alice Mine Deposition Excerpts, # 12 Joshua Walthall Deposition Excerpts) (PHILLIPS, REID) (Entered: 05/18/2017) |
| 05/18/2017 | 107 | NOTICE by CAPITAL ASSOCIATED INDUSTRIES, INC. re 103 MOTION for Summary Judgment *Filing of Deposition Exhibits* (Attachments: # 1 Exhibit 13, # 2 Exhibit 14, # 3 Exhibit 17, # 4 Exhibit 23, # 5 Exhibit 25, # 6 Exhibit 30, # 7 Exhibit 36, # 8 Exhibit 41, # 9 Exhibit 73, # 10 Exhibit 77, # 11 Exhibit 85, # 12 Exhibit 108, # 13 Exhibit 110)(PHILLIPS, REID) Modified on 5/22/2017 to remove duplicate text. (Sheets, Jamie) (Entered: 05/18/2017) |

| 05/18/2017 | 108 | NOTICE by CAPITAL ASSOCIATED INDUSTRIES, INC. re 103 MOTION for Summary Judgment *Filing of Other Record Materials* (Attachments: # 1 State Bar's Supplemental Response to Interrogatory No. 11, # 2 Plaintiff's Response to State Bar's First Set of Interrogatories)(PHILLIPS, REID) (Entered: 05/18/2017) |
| --- | --- | --- |
| 05/18/2017 | 109 | MOTION to Redact 107 Notice (Other),, *(Redact 107-10)* by CAPITAL ASSOCIATED INDUSTRIES, INC.. (Attachments: # 1 Text of Proposed Order)(PHILLIPS, REID) (Entered: 05/18/2017) |
| 05/18/2017 | 110 | BRIEF re 109 MOTION to Redact 107 Notice (Other),, *(Redact 107-10)* . (PHILLIPS, REID) (Entered: 05/18/2017) |
| 05/18/2017 | 111 | SEALED EXHIBITS re 109 MOTION to Redact 107 Notice (Other),, *(Redact 107-10)* by Plaintiff CAPITAL ASSOCIATED INDUSTRIES, INC., Defendants ROY COOPER, NANCY LORRIN FREEMAN, J. DOUGLAS HENDERSON, Intervenor Defendant NORTH CAROLINA STATE BAR, THE. (PHILLIPS, REID) (Entered: 05/18/2017) |
| 05/22/2017 | 112 | MOTION for Summary Judgment by NORTH CAROLINA STATE BAR, THE. Response to Motion due by 6/21/2017 (DUNCAN, ALAN) (Entered: 05/22/2017) |
| 05/22/2017 | 113 | BRIEF re 112 MOTION for Summary Judgment by Intervenor Defendant NORTH CAROLINA STATE BAR, THE filed by NORTH CAROLINA STATE BAR, THE. (Attachments: # 1 Exhibit 1 (Clarke Excerpt), # 2 Exhibit 2 (Jenkins Excerpt), # 3 Exhibit 3 (Brown Excerpt), # 4 Exhibit 4 (Finch Excerpt), # 5 Exhibit 5 (Troxler Excerpt), # 6 Exhibit 6 (Youngblood Excerpt), # 7 Exhibit 7 (Merritt Excerpt), # 8 Exhibit 8 (NCSB Supp Resp Rog 11), # 9 Exhibit 9 (CAI Rog Resp), # 10 Exhibit 10 (Dep Ex 25), # 11 Exhibit 11 (Dep Ex 45), # 12 Exhibit 12 (Dep Ex 47), # 13 Exhibit 13 (Dep Ex 48), # 14 Exhibit 14 (Dep Ex 50), # 15 Exhibit 15 (Dep Ex 55 - REDACTED), # 16 Exhibit 16 (Dep Ex 61), # 17 Exhibit 17 (Dep Ex 62), # 18 Exhibit 18 (Dep Ex 63), # 19 Exhibit 19 (Dep Ex 64), # 20 Exhibit 20 (Dep Ex 65), # 21 Exhibit 21 (Dep Ex 66), # 22 Exhibit 22 (Dep Ex 67), # 23 Exhibit 23 (Dep Ex 68), # 24 Exhibit 24 (Dep Ex 69), # 25 Exhibit 25 (Dep Ex 73), # 26 Exhibit 26 (Dep Ex 76), # 27 Exhibit 27 (Dep Ex 77 - REDACTED), # 28 Exhibit 28 (Dep Ex 80), # 29 Exhibit 29 (Dep Ex 85), # 30 Exhibit 30 (Dep Ex 93), # 31 Exhibit 31 (CAI 2015 Tax Return - REDACTED), # 32 Exhibit 32 (Clarke Ltr 2012 NCSB 8773-75), # 33 Exhibit 33 (IRS Private Ltr Ruling 201050040), # 34 Exhibit Index of Summary Judgment Exhibits)(DUNCAN, ALAN) (Entered: 05/22/2017) |
| 05/22/2017 | 114 | MOTION to Seal [If the party filing this motion is not the party claiming confidentiality, the party claiming confidentiality will have 14 days to file a Brief in accordance with Local Rule 5.4] by NORTH CAROLINA STATE BAR, THE. Response to Motion due by 6/12/2017 (DUNCAN, ALAN) (Entered: 05/22/2017) |
| 05/22/2017 | 115 | SEALED UNREDACTED DOCUMENTS filed by Plaintiff CAPITAL ASSOCIATED INDUSTRIES, INC., Defendants ROY COOPER, NANCY LORRIN FREEMAN, J. DOUGLAS HENDERSON, Intervenor Defendant NORTH CAROLINA STATE BAR, THE re 113 BRIEF re 112 MOTION for Summary Judgment by Intervenor Defendant NORTH CAROLINA STATE BAR, THE filed by NORTH CAROLINA STATE BAR, THE, 114 MOTION to Seal [If the party filing this motion is not the party claiming confidentiality, the party claiming confidentiality will have 14 days to file a Brief in accordance with Local Rule 5.4] by NORTH CAROLINA STATE BAR, THE. Response to Motion due by 6/12/2017 (DUNCAN, ALAN). (Attachments: # 1 Exhibit 27 (Dep Ex 77 - FILED UNDER SEAL), # 2 Exhibit 31 (CAI 2015 Tax Return - FILED UNDER SEAL)) (DUNCAN, ALAN) Modified on 5/25/2017 to remove duplicate text. (Sheets, Jamie) (Entered: 05/22/2017) |
| 06/05/2017 | 116 | BRIEF re 114 MOTION to Seal [If the party filing this motion is not the party claiming confidentiality, the party claiming confidentiality will have 14 days to file a Brief in accordance with Local Rule 5.4] . (Attachments: # 1 Third Declaration of Bruce Clarke, # 2 Text of Proposed Order) (PHILLIPS, REID) (Entered: 06/05/2017) |
| 06/12/2017 | 117 | RESPONSE in Opposition re 100 MOTION for Summary Judgment filed by NANCY LORRIN FREEMAN, ROY COOPER, J. DOUGLAS HENDERSON filed by CAPITAL ASSOCIATED INDUSTRIES, INC.. Replies due by 6/26/2017 (PHILLIPS, REID) (Entered: 06/12/2017) |
| 06/12/2017 | 118 | RESPONSE in Opposition re 103 MOTION for Summary Judgment filed by CAPITAL |

| | | |
|---|---|---|
| | | ASSOCIATED INDUSTRIES, INC. filed by ROY COOPER, NANCY LORRIN FREEMAN, J. DOUGLAS HENDERSON. Replies due by 6/26/2017 (Attachments: # 1 Exhibit CAI Admissions, Responses to Interrogatories)(ADINOLFI, DAVID) (Entered: 06/12/2017) |
| 06/14/2017 | 119 | REPLY, filed by Plaintiff CAPITAL ASSOCIATED INDUSTRIES, INC., to Response to 103 MOTION for Summary Judgment *(Reply to State's Response)* filed by CAPITAL ASSOCIATED INDUSTRIES, INC.. (PHILLIPS, REID) (Entered: 06/14/2017) |
| 06/16/2017 | 120 | RESPONSE in Opposition re 112 MOTION for Summary Judgment filed by NORTH CAROLINA STATE BAR, THE filed by CAPITAL ASSOCIATED INDUSTRIES, INC.. Replies due by 6/30/2017 (Attachments: # 1 Index of Materials)(PHILLIPS, REID) (Entered: 06/16/2017) |
| 06/16/2017 | 121 | NOTICE by CAPITAL ASSOCIATED INDUSTRIES, INC. re 120 Response in Opposition to Motion, (Attachments: # 1 Bruce Clarke Deposition Excerpts, # 2 Dale Jenkins Deposition Excerpts, # 3 Beverly Brown Deposition Excerpts, # 4 William Troxler Deposition Excerpts, # 5 David Finch Deposition Excerpts, # 6 Michael Youngblood Deposition Excerpts, # 7 David Johnson Deposition Excerpts, # 8 Mark Merritt I Deposition Excerpts, # 9 Mark Merritt II Deposition Excerpts, # 10 Thomas Lunsford Deposition Excerpts, # 11 Alice Mine Deposition Excerpts)(PHILLIPS, REID) (Entered: 06/16/2017) |
| 06/16/2017 | 122 | NOTICE by CAPITAL ASSOCIATED INDUSTRIES, INC. re 120 Response in Opposition to Motion, (Attachments: # 1 Exhibit 71, # 2 Exhibit 88)(PHILLIPS, REID) (Entered: 06/16/2017) |
| 06/19/2017 | 123 | RESPONSE *TO CAI'S MOTION FOR SUMMARY JUDGMENT* filed by Intervenor Defendant NORTH CAROLINA STATE BAR, THE re 104 Brief, 103 MOTION for Summary Judgment filed by CAPITAL ASSOCIATED INDUSTRIES, INC. filed by NORTH CAROLINA STATE BAR, THE. Replies due by 7/3/2017 (Attachments: # 1 Exhibit 34 (Clarke), # 2 Exhibit 35 (Jenkins), # 3 Exhibit 36 (Brown), # 4 Exhibit 37 (Finch), # 5 Exhibit 38 (Merritt), # 6 Exhibit 39 (Johnson), # 7 Exhibit 40 (Mine), # 8 Exhibit 41 (Walthall), # 9 Exhibit 42 (Lunsford), # 10 Exhibit Index of State Bar's Summary Judgment Exhibits (updated))(DUNCAN, ALAN) (Entered: 06/19/2017) |
| 06/22/2017 | 124 | REPLY, filed by Defendants ROY COOPER, NANCY LORRIN FREEMAN, J. DOUGLAS HENDERSON, to Response to 100 MOTION for Summary Judgment filed by ROY COOPER, NANCY LORRIN FREEMAN, J. DOUGLAS HENDERSON. (ADINOLFI, DAVID) (Entered: 06/22/2017) |
| 06/30/2017 | 125 | REPLY, filed by Plaintiff CAPITAL ASSOCIATED INDUSTRIES, INC., to Response to 103 MOTION for Summary Judgment *(Reply to State Bar's Response)* filed by CAPITAL ASSOCIATED INDUSTRIES, INC.. (PHILLIPS, REID) (Entered: 06/30/2017) |
| 06/30/2017 | 126 | NOTICE by CAPITAL ASSOCIATED INDUSTRIES, INC. *Filing of Excerpts of Deposition Transcripts* (Attachments: # 1 Bruce Clarke Deposition Excerpts, # 2 David Johnson Deposition Excerpts, # 3 Alice Mine Deposition Excerpts)(PHILLIPS, REID) (Entered: 06/30/2017) |
| 06/30/2017 | 127 | REPLY, filed by Intervenor Defendant NORTH CAROLINA STATE BAR, THE, to Response to 112 MOTION for Summary Judgment filed by NORTH CAROLINA STATE BAR, THE. (Attachments: # 1 Exhibit 43 (Dep Ex. 96), # 2 Exhibit 44 (Clarke), # 3 Exhibit 45 (Jenkins), # 4 Exhibit 46 (Brown), # 5 Exhibit 47 (Finch), # 6 Exhibit 48 (Troxler), # 7 Exhibit 49 (Youngblood), # 8 Exhibit 50 (Merritt v2), # 9 Exhibit 51 (Johnson), # 10 Exhibit Index of Summary Judgment Exhibits)(DUNCAN, ALAN) (Entered: 06/30/2017) |
| 07/03/2017 | | Motions Submitted: 100 MOTION for Summary Judgment , 103 MOTION for Summary Judgment , 112 MOTION for Summary Judgment , 109 MOTION to Seal, 114 MOTION to Seal to JUDGE LORETTA C. BIGGS. (Blay, Debbie) (Entered: 07/03/2017) |
| 08/04/2017 | 128 | NOTICE of Trial Calendar Bench Trial set for 10/2/2017 09:30 AM in Winston-Salem Courtroom #1 before JUDGE LORETTA C. BIGGS. (Kemp, Donita) (Entered: 08/04/2017) |
| 08/15/2017 | 129 | NOTICE of Hearing: Settlement Conference set for 9/14/2017 at 09:30 AM in Winston-Salem, Courtroom #1 before JUDGE LORETTA C. BIGGS. Each party is directed to prepare for the Court a document not exceeding three typewritten pages which sets out: (1) the perceived strength of that party's claims and/or defenses and (2) the perceived shortcomings of the opposing party's claims and/or defenses. That document shall be served on the opposing party and emailed to JBiggs@ncmd.uscourts.gov for Judge Biggs' review no later than Thursday, September 7, 2017. |

| | | |
|---|---|---|
| | | Counsel are directed to bring clients and a representative from the corporation(s) to the settlement conference. (Blay, Debbie) (Entered: 08/15/2017) |
| 08/16/2017 | 130 | Joint MOTION for Pending Motions, Settlement Conference, and Trial Status Conference *On Behalf of All Parties* by NORTH CAROLINA STATE BAR, THE. (RUSSELL, STEPHEN) (Entered: 08/16/2017) |
| 08/17/2017 | | Motions Submitted: 130 Joint MOTION for Pending Motions, Settlement Conference, and Trial Status Conference *On Behalf of All Parties* to JUDGE LORETTA C. BIGGS. (Blay, Debbie) (Entered: 08/17/2017) |
| 09/01/2017 | 131 | FINAL PRETRIAL DISCLOSURES by ROY COOPER, NANCY LORRIN FREEMAN, J. DOUGLAS HENDERSON.(ADINOLFI, DAVID) (Entered: 09/01/2017) |
| 09/01/2017 | 132 | NOTICE by NORTH CAROLINA STATE BAR, THE *of filing of NORTH CAROLINA STATE BAR'S RULE 26(a)(3) PRETRIAL DISCLOSURES* (DUNCAN, ALAN) (Entered: 09/01/2017) |
| 09/01/2017 | 133 | FINAL PRETRIAL DISCLOSURES by CAPITAL ASSOCIATED INDUSTRIES, INC.. (Attachments: # 1 Exhibit Plaintiff's Exhibit List)(PHILLIPS, REID) (Entered: 09/01/2017) |
| 09/11/2017 | 134 | NOTICE of RESCHEDULING Hearing: Settlement Conference reset for 9/21/2017 at 09:30 AM in Winston-Salem Courtroom #1 before JUDGE LORETTA C. BIGGS. (Blay, Debbie) (Entered: 09/11/2017) |
| 09/11/2017 | 135 | TRIAL BRIEF by Defendants ROY COOPER, NANCY LORRIN FREEMAN, J. DOUGLAS HENDERSON.(ADINOLFI, DAVID) (Entered: 09/11/2017) |
| 09/11/2017 | 136 | TRIAL BRIEF by Plaintiff CAPITAL ASSOCIATED INDUSTRIES, INC..(PHILLIPS, REID) (Entered: 09/11/2017) |
| 09/11/2017 | 137 | Proposed Findings of Fact and Conclusions of Law by CAPITAL ASSOCIATED INDUSTRIES, INC..(PHILLIPS, REID) (Entered: 09/11/2017) |
| 09/11/2017 | 138 | MOTION in Limine by CAPITAL ASSOCIATED INDUSTRIES, INC.. Response to Motion due by 9/18/2017 (PHILLIPS, REID) (Entered: 09/11/2017) |
| 09/11/2017 | 139 | BRIEF re 138 MOTION in Limine . (PHILLIPS, REID) (Entered: 09/11/2017) |
| 09/11/2017 | 140 | TRIAL BRIEF by Intervenor Defendant NORTH CAROLINA STATE BAR, THE.(RUSSELL, STEPHEN) (Entered: 09/11/2017) |
| 09/11/2017 | 141 | MOTION in Limine by NORTH CAROLINA STATE BAR, THE. Response to Motion due by 10/2/2017 (RUSSELL, STEPHEN) (Entered: 09/11/2017) |
| 09/11/2017 | 142 | BRIEF re 141 MOTION in Limine by Intervenor Defendant NORTH CAROLINA STATE BAR, THE filed by NORTH CAROLINA STATE BAR, THE. (RUSSELL, STEPHEN) (Entered: 09/11/2017) |
| 09/11/2017 | 143 | Proposed Findings of Fact and Conclusions of Law by NORTH CAROLINA STATE BAR, THE. (RUSSELL, STEPHEN) (Entered: 09/11/2017) |
| 09/12/2017 | 144 | Proposed Findings of Fact and Conclusions of Law by ROY COOPER, NANCY LORRIN FREEMAN, J. DOUGLAS HENDERSON.(ADINOLFI, DAVID) (Entered: 09/12/2017) |
| 09/15/2017 | 145 | OBJECTION - Other re 132 Notice (Other) by Plaintiff CAPITAL ASSOCIATED INDUSTRIES, INC.. (PHILLIPS, REID) (Entered: 09/15/2017) |
| 09/15/2017 | 146 | OBJECTION - Other re 133 Final Pretrial Disclosures by Intervenor Defendant NORTH CAROLINA STATE BAR, THE. (DUNCAN, ALAN) (Entered: 09/15/2017) |
| 09/18/2017 | 147 | OBJECTION - Other re 133 Final Pretrial Disclosures by Defendants ROY COOPER, NANCY LORRIN FREEMAN, J. DOUGLAS HENDERSON. (ADINOLFI, DAVID) (Entered: 09/18/2017) |
| 09/18/2017 | 148 | RESPONSE in Opposition re 141 MOTION in Limine filed by NORTH CAROLINA STATE BAR, THE filed by CAPITAL ASSOCIATED INDUSTRIES, INC.. Replies due by 10/2/2017 (VAN ZANT, JENNIFER) (Entered: 09/18/2017) |

| 09/18/2017 | 149 | RESPONSE filed by Intervenor Defendant NORTH CAROLINA STATE BAR, THE re 138 MOTION in Limine filed by CAPITAL ASSOCIATED INDUSTRIES, INC. filed by NORTH CAROLINA STATE BAR, THE. Replies due by 10/2/2017 (Attachments: # 1 Exhibit A (SBX 060), # 2 Exhibit B (SBX 090), # 3 Exhibit C (SBX 083), # 4 Exhibit D (SBX 076), # 5 Exhibit E (SBX 026))(DUNCAN, ALAN) (Entered: 09/18/2017) |
| --- | --- | --- |
| 09/19/2017 | 150 | MEMORANDUM OPINION AND ORDER signed by JUDGE LORETTA C. BIGGS on 9/19/2017; that State Prosecutors' Motion for Summary Judgment, (ECF No. 100 ), is DENIED. FURTHER that CAI's Motion for Summary Judgment, (ECF No. 103 ), is DENIED. FURTHER that the State Bar's Motion for Summary Judgment, (ECF No. 112 ), is GRANTED, and this case is therefore DISMISSED. A Judgment dismissing this action will be entered contemporaneously with this Order. (Sheets, Jamie) (Entered: 09/19/2017) |
| 09/19/2017 | 151 | JUDGMENT signed by JUDGE LORETTA C. BIGGS on 9/19/2017. Based on the Memorandum Opinion and Order entered contemporaneously herewith; that State Prosecutors' Motion for Summary Judgment (ECF No. 100 ) is DENIED. FURTHER that CAI's Motion for Summary Judgment (ECF No. 1 03 ) is DENIED. FURTHER that the State Bar's Motion for Summary Judgment (ECF No. 112 ) is GRANTED, and this case is therefore DISMISSED. (Sheets, Jamie) (Entered: 09/19/2017) |
| 10/17/2017 | 152 | NOTICE OF APPEAL as to 150 Memorandum and Opinion, Order,, 151 Judgment, by CAPITAL ASSOCIATED INDUSTRIES, INC.. Filing fee $ 505, receipt number 0418-2220517. (SCHAUER, CRAIG) (Entered: 10/17/2017) |
| 10/17/2017 | 153 | Electronic Transmission of Notice of Appeal and Docket Sheet to US Court of Appeals re 152 Notice of Appeal. (Sheets, Jamie) (Entered: 10/17/2017) |
| 10/18/2017 | 154 | NOTICE of Docketing Record on Appeal from USCA re 152 Notice of Appeal filed by CAPITAL ASSOCIATED INDUSTRIES, INC. USCA Case Manager: Richard H. Sewell. USCA Case Number 17-2218. (Sheets, Jamie) (Entered: 10/19/2017) |

| PACER Service Center | | | |
| --- | --- | --- | --- |
| Transaction Receipt | | | |
| 11/28/2017 16:31:12 | | | |
| PACER Login: | ltwine2013:4145376:0 | Client Code: | 108105.00001 |
| Description: | Docket Report | Search Criteria: | 1:15-cv-00083-LCB-JLW |
| Billable Pages: | 15 | Cost: | 1.50 |

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
### CIVIL ACTION No. 1:15-CV-83

| | |
|---|---|
| **CAPITAL ASSOCIATED INDUSTRIES, INC.,** | |
| **Plaintiff**, | |
| **v.** | |
| **ROY COOPER**, in his official capacity as Attorney General of the State of North Carolina; **NANCY LORRIN FREEMAN**, in her official capacity as District Attorney for the 10th Prosecutorial District of the State of North Carolina; **and J. DOUGLAS HENDERSON**, in his official capacity as District Attorney for the 18th Prosecutorial District of the State of North Carolina, | **COMPLAINT** |
| **Defendants**. | |

## INTRODUCTION

1.     This action for declaratory and injunctive relief is brought pursuant to the First and Fourteenth Amendments of the United States Constitution and Article I, section 34 of the North Carolina Constitution.

2.     Plaintiff Capital Associated Industries, Inc. ("CAI") is a nonprofit, tax-exempt business association that provides human resources-related information, advice, data, education, legislative advocacy, and other benefits and services to member organizations throughout North Carolina. Plaintiff wishes also to provide (and its

members wish to receive) efficient and low-cost legal advice and services related to human resource issues through licensed attorneys employed by CAI.

3.    Plaintiff is prevented from providing legal advice and services to its members, however, because of the threat that it will be prosecuted criminally under North Carolina law for doing so.  More particularly, N.C. Gen. Stat. §§ 84-4 and 84-5, which relate to the unauthorized practice of law (the "UPL Statutes"), proscribe the practice of law by any person other than a member of the North Carolina State Bar and by corporations, respectively.

4.    The UPL Statutes, as applied to Plaintiff, are unconstitutional for the following reasons:

   a. The UPL Statutes violate the Due Process Clause of the Fourteenth Amendment by prohibiting Plaintiff from practicing law for arbitrary and capricious reasons.

   b. The UPL Statutes violate the First Amendment by infringing on Plaintiff's associational right to provide legal advice and services to its members—a right well established by the United States Supreme Court in *NAACP v. Button*, 371 U.S. 415 (1963), and its progeny—and on Plaintiff's members' rights to associate to provide legal advice and services to one another.

   c. The UPL Statutes violate the First Amendment by prohibiting Plaintiff from speaking to its members based on (1) the content of Plaintiff's speech and (2) Plaintiff's corporate identity.

- 2 -

d. The UPL Statutes violate the First Amendment and the Fourteenth Amendment because they are impermissibly vague in that they do not adequately define "legal advice."

e. The UPL Statutes violate the First Amendment by prohibiting CAI from advertising itself as able and competent to offer legal advice and services to its members.

f. The UPL Statutes violate Article I, section 34 of the North Carolina Constitution by granting an exclusive privilege to a particular class of licensed attorneys (i.e., those practicing through particular channels such as law firms or solo practices, and *not* those employed by membership associations).

5. Plaintiff seeks a declaratory judgment that, as applied to CAI, the UPL Statutes are unconstitutional as well as preliminary and permanent injunctions enjoining Defendants from taking any action that would interfere with CAI (1) offering or delivering to its members—through CAI employees who are licensed to practice law in North Carolina—legal advice and services and (2) publicly advertising the availability of such legal advice and services for its members.

## PARTIES

6. Plaintiff CAPITAL ASSOCIATED INDUSTRIES, INC. is a nonprofit corporation organized under the laws of the State of North Carolina. It has its principal place of business in Raleigh, North Carolina, and an office in Greensboro, North

Carolina. CAI is a membership association of employers in North Carolina that have associated themselves to promote industrial development and progress.

7. CAI has standing to challenge the UPL Statutes on its own behalf because North Carolina law criminalizes the conduct, including speech, that CAI seeks to undertake but which it has foregone under the threat of criminal prosecution for the unauthorized practice of law.

8. CAI also has associational standing to challenge the UPL Statutes on behalf of its members because those members are directly affected and harmed by the inability to act collectively, through CAI, to make available to all members efficient and low-cost legal advice and services pertaining to the human resource, compliance, and management needs of their businesses.

9. Defendant ROY COOPER, Attorney General of the State of North Carolina, is the State's authorized legal representative charged with defending the interests of the State in all criminal and civil suits, and with advising district attorneys throughout the state. He is sued in his official capacity.

10. Defendant NANCY LORRIN FREEMAN, District Attorney for the Tenth Prosecutorial District of North Carolina, is responsible for the prosecution of crimes in the Tenth Judicial District, which encompasses all of Wake County, North Carolina. She is sued in her official capacity.

11. Defendant J. DOUGLAS HENDERSON, District Attorney for the Eighteenth Prosecutorial District of North Carolina, is responsible for the prosecution of

- 4 -

crimes in the Eighteenth Judicial District, which encompasses all of Guilford County, North Carolina. He is sued in his official capacity.

## JURISDICTION AND VENUE

12.     This action arises under the First and Fourteenth Amendments of the United States Constitution and Article I, section 34 of the North Carolina Constitution.

13.     This Court has original jurisdiction over this case pursuant to 28 U.S.C. § 1331 because this case arises under the Constitution and laws of the United States.

14.     The state-law claim asserted in this action by Plaintiff arises under the North Carolina Constitution and is properly joined in this action under the Court's supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

15.     Venue in this District is proper pursuant to 28 U.S.C. § 1391(b). Defendant Henderson resides in this District, and a substantial portion of the violations and harms complained of herein occurred, or will occur, in this District, where CAI has one of its two offices and where approximately thirty percent of CAI members have places of business.

## FACTUAL ALLEGATIONS

**I.      CAI is a nonprofit membership association.**

16.     The mission of CAI is to create and foster an environment in North Carolina workplaces that promotes the success of all employers through productive relationships with their employees.

- 5 -

17.     CAI is a nonprofit employers' association exempt from taxation under Section 501(c)(6) of the Internal Revenue Code. CAI's membership comprises approximately 1,080 employers across North Carolina.  CAI members, through the payment of annual membership dues, pool their resources to make available to all members of CAI efficient, low-cost human resources-related information, advice, data, education, legislative advocacy, and other benefits and services pertaining to each member's human resources, compliance, and day-to-day management needs.

18.     In furtherance of its mission, CAI currently provides its members unlimited access to an "Advice and Resolution Team" ("A&R Team") that provides non-legal advice, education, and services related to a host of issues facing employers, including, but not limited to, wage and hour, Family and Medical Leave Act, immigration, performance management, disciplinary action, termination, handbook review, surveys, labor relations, and workers' compensation issues.

19.     A&R Team staff members have substantial experience in human resources. They are available to provide non-legal advice and education to CAI members ranging from general regulatory and compliance questions to complex problems.  On average, the A&R Team fields 9,000 calls from CAI members each year.

20.     CAI provides members access to a "legal toolkit," which was written by a licensed attorney and provides general guidance and generic templates for basic and common legal documents.

- 6 -

21.     Because North Carolina law purports to prohibit the practice of law by CAI—even through licensed attorneys that it employs—the toolkit currently provides basic guidance only.  The toolkit specifically advises members to seek independent legal advice to customize each document to the specific needs of that member.

## II.     North Carolina criminalizes the "unauthorized practice of law."

22.     N.C. Gen. Stat. § 84-2.1 defines the practice of law as:

> [P]erforming any legal service for any other person, firm or corporation, with or without compensation, specifically including the preparation or aiding in the preparation of deeds, mortgages, wills, trust instruments, inventories, accounts or reports of guardians, trustees, administrators or executors, or preparing or aiding in the preparation of any petitions or orders in any probate or court proceeding; abstracting or passing upon titles, the preparation and filing of petitions for use in any court, including administrative tribunals and other judicial or quasi-judicial bodies, or assisting by advice, counsel, or otherwise in any legal work; and to advise or give opinion upon the legal rights of any person, firm or corporation: Provided, that the above reference to particular acts which are specifically included within the definition of the phrase "practice law" shall not be construed to limit the foregoing general definition of the term, but shall be construed to include the foregoing particular acts, as well as all other acts within the general definition. The phrase "practice law" does not encompass the drafting or writing of memoranda of understanding or other mediation summaries by mediators at community mediation centers authorized by G.S. 7A-38.5 or by mediators of employment-related matters for The University of North Carolina or a constituent institution, or for an agency, commission, or board of the State of North Carolina.

23.     N.C. Gen. Stat. §§ 84-4 through 84-8 prohibit the "unauthorized practice of law."   At issue here are the UPL Statutes (N.C. Gen. Stat. §§ 84-4 and 84-5), which

- 7 -

prohibit the practice of law by persons who are not members of the State Bar and the practice of law by corporations, respectively.

24. N.C. Gen. Stat. § 84-4 prohibits the practice of law in North Carolina by "any person or association of persons, except active members of the Bar of the State of North Carolina . . . ."

25. N.C. Gen. Stat. § 84-5 prohibits the practice of law by any corporation:

> It shall be unlawful for any corporation to practice law or appear as an attorney for any person in any court in this State, or before any judicial body or the North Carolina Industrial Commission, Utilities Commission, or the Department of Commerce, Division of Employment Security, or hold itself out to the public or advertise as being entitled to practice law; and no corporation shall organize corporations, or draw agreements, or other legal documents, or draw wills, or practice law, or give legal advice, or hold itself out in any manner as being entitled to do any of the foregoing acts, by or through any person orally or by advertisement, letter or circular. The provisions of this section shall be in addition to and not in lieu of any other provisions of Chapter 84.

26. Violation of either of the UPL Statutes is punishable as a Class 1 misdemeanor pursuant to N.C. Gen. Stat. § 84-8.

27. District attorneys, including Defendants Freeman and Henderson, are required to prosecute persons, corporations, or associations for alleged violations of the UPL Statutes pursuant to N.C. Gen. Stat. § 84-7, which provides:

> The district attorney of any of the superior courts shall, upon the application of any member of the Bar, or of any bar association, of the State of North Carolina, bring such action in the name of the State as may be proper to enjoin any such person, corporation, or association of persons who it is alleged are violating the provisions of G.S. 84-4 to 84-8, and

- 8 -

> it <u>shall be the duty</u> of the district attorneys of this State to indict any person, corporation, or association of persons upon the receipt of information of the violation of the provisions of G.S. 84-4 to 84-8.

(emphasis added).

28.    As the District Attorneys for Wake and Guilford counties, Defendants Freeman and Henderson have responsibility under the UPL Statutes for prosecuting violations of the UPL Statutes in the districts where CAI has its offices.

**III.    The UPL Statutes criminalize the provision of efficient, low-cost legal advice and services through licensed attorneys employed by nonprofit membership associations.**

29.    The human resources, compliance, and day-to-day management needs of CAI members often include the need for legal advice or services.

30.    Under the UPL Statutes, CAI is forbidden from offering any legal advice and services to its members because its provision of legal services, including any communications to members that contain legal advice, would constitute the unauthorized practice of law.

31.    The A&R Team often receives questions from CAI members that require answers that, arguably, require some component of legal analysis.  Because of the UPL Statutes, CAI is faced with the predicament of either giving incomplete or unsatisfactory responses to its members' questions or providing full and complete responses at the risk of facing criminal prosecution.

32.    To the extent any member now asks a question calling for legal advice or services, CAI can respond only by recommending that the member obtain its own legal

- 9 -

counsel. Because some members cannot afford the cost of seeking advice from a privately retained lawyer or instead conclude that such advice is not worth the time and cost of obtaining private counsel, they may well act without the benefit of any legal counsel at all.

33. By way of example and without limitation, CAI member ATCOM Business Technology Systems ("ATCOM"), headquartered in Durham, North Carolina, has required advice and services for human resources-related issues that necessarily required legal advice or services in addition to the information, advice, and guidance currently provided by CAI to its members. ATCOM has been unable to obtain complete, low-cost, and efficient human resources-related information, advice, education, and other benefits and services to meet its needs from CAI because even CAI employees who are licensed North Carolina attorneys must refrain from giving legal advice due to the UPL Statutes. In such situations, ATCOM typically does not seek separate advice from outside attorneys due to the time and expense. On one occasion, however, ATCOM paid more than $5,000 in attorneys' fees to respond to a straightforward EEOC charge.

### A. Licensed attorneys employed by CAI are capable of providing sound, ethical legal advice and services to CAI members.

34. Although CAI currently employs two attorneys who are both members in good standing of the North Carolina State Bar, those attorneys are prohibited by the UPL Statutes from doing what they are educated and licensed to do: give legal advice. Instead, the attorneys employed by CAI now can only provide non-legal information,

- 10 -

advice, data, education, legislative advocacy, and other benefits and services to CAI members.

35.     CAI faces a credible threat of prosecution if it engages in the lawful conduct of employing licensed attorneys to provide legal advice and services to its members.  On May 28, 2013, the North Carolina State Bar Ethics Committee issued Proposed Ethics Decision 2013-2 in response to inquiries by CAI related to its desire to provide legal advice and services to its members.  The Ethics Committee opined that if a lawyer employed by CAI were to give legal advice, it would constitute the unauthorized practice of law in violation of N.C. Gen. Stat. §§ 84-4 and 84-5.

36.     There is no rational reason to prohibit licensed North Carolina attorneys employed by CAI—a nonprofit business association—from giving legal advice and services to CAI members.  Regardless of their employment with CAI, those attorneys remain fully accountable to the North Carolina State Bar for the fulfillment of all their professional and ethical responsibilities.

37.     Licensed attorneys employed by CAI are and would be knowledgeable and experienced in employment law as well as in management and employee-relations issues that often intersect with employment-law issues.[1]  CAI attorneys could render to CAI members competent legal advice, transactional services (e.g., drafting employment agreements), and representation in administrative matters (e.g., responding to

---

[1] For example, CAI currently employs an actively licensed North Carolina attorney who has chaired the Labor and Employment law Section of the North Carolina Bar Association, was rated AV by Martindale-Hubbell while in private practice, and was first listed in The Best Lawyers in America in 2001 in the field of Labor and Employment Law.

discrimination charges before the U.S. Equal Employment Opportunity Commission (EEOC)).

38. If not prevented by the UPL Statutes from doing so, CAI attorneys are and would be familiar with the needs of member businesses through the provision of comprehensive information, advice, education, and services—both legal and non-legal.

39. CAI attorneys are and would be in a unique position to provide comprehensive, efficient, and cost-effective information, advice, and services to meet the needs of CAI members and fulfill CAI's purpose as a nonprofit membership association.

40. CAI and its members, therefore, want to utilize CAI's presently employed attorneys—and additional licensed North Carolina attorneys employed by it in the future—to provide legal advice and services without fear of criminal prosecution in conjunction with the non-legal advice and services CAI currently provides to members.

**B. The UPL Statutes presently prohibit the giving of legal advice and services by licensed attorneys employed by CAI.**

41. Because of the UPL Statutes and the threat of prosecution, CAI currently cannot and will not provide legal advice or services to its members in conjunction with the information, advice, data, education, legislative advocacy, and other benefits and services it currently provides.

42. CAI members associate, through CAI, for the purpose of helping and advising one another in matters related to their businesses' human resources, compliance, and management needs. Importantly, members join CAI in order to make available and to receive cost-effective help and advice.

- 12 -

43.     However, the UPL Statues prohibit CAI members from receiving the full extent of information, advice, and services they need and desire in a cost-effective manner to address their human resources, compliance, and management needs.  The UPL Statutes prevent CAI members from associating to secure legal advice and services well-suited to their workplace needs as effectively and economically as possible.  In lieu of receiving legal advice and services in conjunction with other information, advice, data, education, legislative advocacy, and services they obtain and share efficiently through CAI, CAI members are forced to choose between identifying competent counsel, expending the time required to engage them, and paying the hourly rates charged on the one hand, or foregoing legal counsel altogether on the other.

44.     CAI's inability—for fear of prosecution—to provide legal advice and services in conjunction with its non-legal information, advice, data, education, legislative advocacy, and services relating to members' human resources, compliance, and management needs reduces the efficiency and increases the cost of obtaining the advice and services necessary for each member to promote successful and productive relationships with their employees.

## FIRST CAUSE OF ACTION
### 42 U.S.C. § 1983:  Violation of Due Process
### (Arbitrary Restriction of the Practice of Law)

45.     The allegations contained in the foregoing paragraphs are repeated, realleged, and incorporated herein by reference as if fully set forth.

- 13 -

46. The Fourteenth Amendment to the United States Constitution provides: "No state shall . . . deprive any person of life, liberty, or property, without due process of law[.]"

47. The Due Process Clause of the Fourteenth Amendment guarantees that a State cannot prevent a person from practicing a profession for an arbitrary or capricious reason.

48. N.C. Gen. Stat. § 84-4 prohibits an unlicensed "association of persons" from giving "legal advice or counsel."

49. N.C. Gen. Stat. § 84-5 prohibits "any corporation to practice law[.]" It further provides that "no corporation shall . . . practice law, or give legal advice[.]"

50. N.C. Gen. Stat. §§ 84-4 and 84-5 prevent CAI from practicing law—by, *inter alia*, prohibiting CAI from employing licensed attorneys to offer legal advice and services to CAI's members—for arbitrary and capricious reasons.

51. In implementing and enforcing N.C. Gen. Stat. §§ 84-4 and 84-5, Defendants are, under color of state law, depriving CAI of its due process rights.

52. CAI is therefore entitled to declaratory relief pursuant to 28 U.S.C. § 2201 declaring the UPL Statutes as applied to CAI to be unconstitutional and to preliminary and permanent injunctive relief enjoining Defendants from prosecuting CAI for providing legal advice and services to its members through licensed attorneys that it employs.

53. CAI is further entitled to an award of its costs in this action, including attorneys' fees, pursuant to 42 U.S.C. § 1988.

- 14 -

## SECOND CAUSE OF ACTION
### 42 U.S.C. § 1983: Violation of First Amendment Right to Associate
### (Associational Right to Legal Services)

54.     The allegations contained in the foregoing paragraphs are repeated, realleged, and incorporated herein by reference as if fully set forth.

55.     The First Amendment to the United States Constitution provides: "Congress shall make no law . . . abridging . . . the right of the people peaceably to assemble[.]"  The First Amendment is made applicable to the States by the Fourteenth Amendment.

56.     The First Amendment guarantees an association's right to provide legal services to its members.

57.     N.C. Gen. Stat. § 84-4 prohibits an unlicensed "association of persons" from giving "legal advice or counsel."

58.     N.C. Gen. Stat. § 84-5 prohibits "any corporation to practice law[.]"  It further provides that "no corporation shall . . . practice law, or give legal advice[.]"

59.     N.C. Gen. Stat. §§ 84-4 and 84-5 deprive CAI of its right to provide legal advice and services to its member by, *inter alia*, prohibiting CAI from employing licensed attorneys to offer legal advice and services to CAI's members.  Conversely, N.C. Gen. Stat. §§ 84-4 and 84-5 deprive CAI's members of their right to associate to provide legal advice and services to one another through CAI.

60.     The Second Cause of Action is asserted by CAI both on behalf of itself and on behalf of its members.

- 15 -

61. In implementing and enforcing N.C. Gen. Stat. §§ 84-4 and 84-5, Defendants are, under color of state law, depriving CAI of its First Amendment rights.

62. CAI is therefore entitled to declaratory relief pursuant to 28 U.S.C. § 2201 declaring the UPL Statutes as applied to CAI to be unconstitutional and to preliminary and permanent injunctive relief enjoining Defendants from prosecuting CAI for providing legal advice and services to its members through licensed attorneys that it employs.

63. CAI is further entitled to an award of its costs in this action, including attorneys' fees, pursuant to 42 U.S.C. § 1988.

### THIRD CAUSE OF ACTION
### 42 U.S.C. § 1983: Violation of First Amendment Right to Free Speech
### (Censorship Based on Content and Corporate Identity)

64. The allegations contained in the foregoing paragraphs are repeated, realleged, and incorporated herein by reference as if fully set forth.

65. The First Amendment to the United States Constitution provides: "Congress shall make no law . . . abridging the freedom of speech[.]" The First Amendment is made applicable to the States by the Fourteenth Amendment.

66. The First Amendment guarantees that a State cannot prevent a person from speaking based on either (a) the content of the speech or (b) the identity of the speaker.

67. N.C. Gen. Stat. § 84-4 prohibits an unlicensed "association of persons" from giving "legal advice or counsel."

68. N.C. Gen. Stat. § 84-5 prohibits "any corporation to practice law[.]" It further provides that "no corporation shall . . . practice law, or give legal advice[.]"

- 16 -

69.     N.C. Gen. Stat. §§ 84-4 and 84-5 deprive CAI of its free-speech rights by prohibiting CAI from speaking, through licensed attorneys, to its members when the content of the speech is legal advice.  N.C. Gen. Stat. §§ 84-4 and 84-5 also deprive CAI of its free-speech rights by prohibiting CAI from offering legal advice solely because of CAI's corporate identity.

70.     In implementing and enforcing N.C. Gen. Stat. §§ 84-4 and 84-5, Defendants are, under color of state law, depriving CAI of its First Amendment rights.

71.     CAI is therefore entitled to declaratory relief pursuant to 28 U.S.C. § 2201 declaring the UPL Statutes as applied to CAI to be unconstitutional and to preliminary and permanent injunctive relief enjoining Defendants from prosecuting CAI for providing legal advice to its members through licensed attorneys that it employs.

72.     CAI is further entitled to an award of its costs in this action, including attorneys' fees, pursuant to 42 U.S.C. § 1988.

## FOURTH CAUSE OF ACTION
### 42 U.S.C. § 1983:  Violation of First Amendment and Due Process (Unconstitutionally Vague)

73.     The allegations contained in the foregoing paragraphs are repeated, realleged, and incorporated herein by reference as if fully set forth.

74.     The First Amendment to the United States Constitution provides: "Congress shall make no law . . . abridging the freedom of speech[.]"  The First Amendment is made applicable to the States by the Fourteenth Amendment.

- 17 -

75.    The Fourteenth Amendment to the United States Constitution provides: "No state shall . . . deprive any person of life, liberty, or property, without due process of law[.]"

76.    The First Amendment and the Due Process Clause of the Fourteenth Amendment guarantee that a law cannot criminalize an act—in particular, engaging in speech—in terms so vague that persons of common intelligence must necessarily guess at the law's meaning and differ as to the law's application.

77.    N.C. Gen. Stat. § 84-4 prohibits an unlicensed "association of persons" from giving "legal advice or counsel."

78.    N.C. Gen. Stat. § 84-5 prohibits "any corporation to practice law[.]"  It further provides that "no corporation shall . . . practice law, or give legal advice[.]"

79.    N.C. Gen. Stat. §§ 84-4 and 84-5 are unconstitutionally vague in that the statutes do not adequately define "legal advice" in terms that enable CAI to conform its current conduct—i.e., offering non-legal advice to its members—to the requirements of the law.

80.    In implementing and enforcing N.C. Gen. Stat. §§ 84-4 and 84-5, Defendants are, under color of state law, depriving CAI of its First Amendment and due process rights.

81.    CAI is therefore entitled to declaratory relief pursuant to 28 U.S.C. § 2201 declaring the UPL Statutes to be unconstitutional and to preliminary and permanent

injunctive relief enjoining Defendants from prosecuting CAI for providing legal advice to its members through licensed attorneys that it employs.

82.     CAI is further entitled to an award of its costs in this action, including attorneys' fees, pursuant to 42 U.S.C. § 1988.

<div align="center">

**FIFTH CAUSE OF ACTION**
**42 U.S.C. § 1983:  Violation of First Amendment Right to Free Speech**
**(Commercial Speech)**

</div>

83.     The allegations contained in the foregoing paragraphs are repeated, realleged, and incorporated herein by reference as if fully set forth.

84.     The First Amendment to the United States Constitution provides: "Congress shall make no law . . . abridging the freedom of speech[.]"  The First Amendment is made applicable to the States by the Fourteenth Amendment.

85.     The First Amendment guarantees that a State cannot prohibit non-misleading commercial speech unless the prohibition is supported by a substantial government interest, the prohibition directly advances that interest, and the prohibition is not more extensive than necessary to serve the government's interest.

86.     N.C. Gen. Stat. § 84-4 prohibits an unlicensed "association of persons" from holding themselves out as competent to give legal advice or counsel.

87.     N.C. Gen. Stat. § 84-5 prohibits "any corporation to . . . hold itself out to the public or advertise as being entitled to practice law[.]"  It further provides that "no corporation shall . . . hold itself out in any manner as being entitled to do any of the foregoing acts, by or through any person orally or by advertisement, letter or circular."

- 19 -

88. N.C. Gen. Stat. §§ 84-4 and 84-5 deprive CAI of its free-speech rights by prohibiting CAI from advertising itself as able and competent to offer legal advice and services to its members.

89. In implementing and enforcing N.C. Gen. Stat. §§ 84-4 and 84-5, Defendants, under color of state law, depriving CAI of its First Amendment rights.

90. CAI is therefore entitled to declaratory relief pursuant to 28 U.S.C. § 2201 declaring the UPL Statutes as applied to CAI to be unconstitutional and to preliminary and permanent injunctive relief enjoining Defendants from prosecuting CAI for advertising the services available to its members, including certain legal advice and services.

91. CAI is further entitled to an award of its costs in this action, including attorneys' fees, pursuant to 42 U.S.C. § 1988.

<div align="center">

**SIXTH CAUSE OF ACTION**
**(Violation of Article I, Section 34 of the N.C. Constitution)**

</div>

92. The allegations contained in the foregoing paragraphs are repeated, realleged, and incorporated herein by reference as if fully set forth.

93. N.C. Gen. Stat. § 84-4 prohibits an unlicensed "association of persons" from giving "legal advice or counsel."

94. N.C. Gen. Stat. § 84-5 prohibits "any corporation to practice law[.]" It further provides that "no corporation shall . . . practice law, or give legal advice[.]"

95. Article I, section 34 of the North Carolina Constitution states: "Perpetuities and monopolies are contrary to the genius of a free state and shall not be allowed."

<div align="center">

- 20 -

</div>

96.     Article I, section 34 prohibits the State from establishing a monopoly by granting an exclusive privilege to a limited class to earn a livelihood by a specific means.

97.     N.C. Gen. Stat. §§ 84-4 and 84-5 establish a monopoly by granting an exclusive privilege to a particular class—licensed attorneys providing professional services through particular channels such as law firms and solo practices.

98.     The State's establishment of a monopoly for licensed attorneys practicing through particular channels precludes CAI from earning revenues by employing licensed attorneys to provide legal advice and services to its members.

99.     N.C. Gen. Stat. §§ 84-4 and 84-5 are not reasonably necessary to promote a public good or prevent a public harm, rather, N.C. Gen. Stat. §§ 84-4 and 84-5 are addressed to the interests of a particular class.

100.    CAI is therefore entitled to declaratory relief pursuant to 28 U.S.C. § 2201 declaring the UPL Statutes as applied to CAI to be unconstitutional and to preliminary and permanent injunctive relief enjoining Defendants from prosecuting CAI for advertising the services available to its members, including certain legal advice and services.

**WHEREFORE**, Plaintiff respectfully prays the Court:

1.      Declare that N.C. Gen. Stat. §§ 84-4 and 84-5 violate CAI's due process rights, guaranteed by the Fourteenth Amendment, by preventing CAI from offering and providing legal advice and services for arbitrary and capricious reasons;

2.	Declare that N.C. Gen. Stat. §§ 84-4 and 84-5 violate (1) CAI of its associational right, guaranteed by the First Amendment, to employ licensed attorneys to offer legal advice and services to CAI's members and (2) CAI's members of their associational right, guaranteed by the First Amendment, to associate to provide legal services to one another;

3.	Declare that N.C. Gen. Stat. §§ 84-4 and 84-5 violate CAI's free-speech rights, guaranteed by the First Amendment, by prohibiting CAI from (1) speaking, through licensed, attorneys, to its members when the content of the speech is legal advice and (2) offering legal advice solely because of CAI's corporate identity;

4.	Declare that N.C. Gen. Stat. §§ 84-4 and 84-5 violate the First Amendment and the Fourteenth Amendment to the extent the statutes are impermissibly vague in defining "legal advice";

5.	Declare that N.C. Gen. Stat. §§ 84-4 and 84-5 violate the First Amendment to the extent the statutes prohibit CAI from advertising itself as able and competent to offer legal advice and services to its members;

6.	Declare that N.C. Gen. Stat. §§ 84-4 and 84-5 violate Article I, section 34 of the North Carolina Constitution by granting  an exclusive privilege to a particular class of licensed attorneys;

7.	Preliminarily and permanently enjoin Defendants and other state agencies—as well as their agents, officers, and employees—from taking any action that would interfere with CAI (1) offering or delivering to its members—through CAI

- 22 -

employees who are licensed to practice law in North Carolina—legal advice and services and (2) publicly advertising the availability of such legal advice and services for its members;

8.  Award CAI its costs, disbursements, and reasonable attorneys' fees incurred in bringing this action pursuant to 42 U.S.C. § 1988; and

9.  Grant such other relief the Court deems just and appropriate.

This the 23rd day of January, 2015.

/s/ Craig D. Schauer
Reid L. Phillips
   N.C. State Bar No. 7968
   Email:  rphillips@brookspierce.com
Jennifer Van Zant
   N.C. State Bar No.  21280
   Email:  jvanzant@brookspierce.com
Charles E. Coble
   N.C. State Bar No. 25342
   Email:  ccoble@brookspierce.com
Craig D. Schauer
   N.C. State Bar No. 41571
   Email:  cschauer@brookspierce.com
Kimberly M. Marston
   N.C. State Bar No. 46231
   Email:  kmarston@brookspierce.com
   *Attorneys for Plaintiff*

OF COUNSEL:
BROOKS, PIERCE, McLENDON,
   HUMPHREY & LEONARD, L.L.P.
Post Office Box 26000
Greensboro, NC  27420-6000
Telephone:   336-373-8850
Facsimile:    336-378-1001

- 23 -

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| CAPITAL ASSOCIATED INDUSTRIES, INC., | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | 1:15CV83 |
| ROY COOPER, in his official capacity as Attorney General of the State of North Carolina, NANCY LORRIN FREEMAN, in her official capacity as District Attorney for the 10th Prosecutorial District of the State of North Carolina, and J. DOUGLAS HENDERSON, in his official capacity as District Attorney for the 18th Prosecutorial District of the State of North Carolina, | ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## ORDER

This matter is before the Court on the Consent Motion to Intervene as defendant pursuant to Fed. R. Civ. P. 24, filed by the North Carolina State Bar. (Doc. 23). Plaintiff and the current Defendants consent to the State Bar's intervention as a defendant.

The Court finds that the State Bar timely moved to intervene. The Court further finds that, based on the pleadings submitted, the State Bar has shown good cause to intervene as a defendant.

IT IS HEREBY ORDERED that the North Carolina State Bar's motion to intervene is GRANTED, and the State Bar is hereby allowed to intervene as a defendant in this matter pursuant to Fed. R. Civ. P. 24(a)(2) and (b)(2). The Clerk of Court is directed to take those

actions necessary to add the State Bar to the docket as a defendant. Within five business days of this Order's entry, the State Bar shall file its answer to Plaintiff's complaint. The State Bar may file an opposition to Plaintiff's motion for preliminary injunction within the time otherwise allowed by Local Rule 7.3, or ten days from this Order's entry, whichever is later.

This, the 16th day of March, 2015.

_____/s/ Loretta C. Biggs_____
United States District Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

CASE NO. 1:15-CV-83

CAPITAL ASSOCIATED INDUSTRIES,
INC.,

        Plaintiff,

    v.

ROY COOPER, in his official capacity as
Attorney General of the State of North
Carolina; NANCY LORRIN FREEMAN, in
her official capacity as District Attorney for
the 10th Prosecutorial District of the State of
North Carolina; J. DOUGLAS
HENDERSON, in his official capacity as
District Attorney for the 18th Prosecutorial
District of the State of North Carolina; and
the NORTH CAROLINA STATE BAR,

        Defendants.

**NORTH CAROLINA STATE BAR'S
ANSWER**

Pursuant to Rules 8, 12, and 24(c) of the Federal Rules of Civil Procedure, Defendant the North Carolina State Bar, through counsel, submits this answer to Plaintiff's complaint and responds to the numbered paragraphs of the complaint as follows:

## INTRODUCTION

1.     Admitted that Plaintiff purports to seek declaratory and injunctive relief under the First and Fourteenth Amendments to the United States Constitution and Article 1, section 34 of the North Carolina Constitution. Except as specifically admitted, denied.

2.      Denied for lack of information and belief.

3.      This paragraph calls for a legal conclusion, and accordingly a response is not required.  To the extent a response is deemed to be required, it is admitted that N.C. Gen. Stat. §§ 84-4 and 84-5 speak for themselves.  Except as specifically admitted, denied.

4.      This paragraph calls for a legal conclusion, and accordingly a response is not required.  To the extent a response is deemed to be required, denied, including as to each and every subpart.

5.      Admitted that Plaintiff purports to seek injunctive relief.  Denied that Plaintiff is entitled to any relief.  Except as specifically admitted, denied.

## PARTIES

6.      Denied for lack of information and belief.

7.      This paragraph calls for a legal conclusion, and accordingly a response is not required.  To the extent a response is deemed to be required, denied.

8.      This paragraph calls for a legal conclusion, and accordingly a response is not required.  To the extent a response is deemed to be required, denied.

9.      Admitted.

10.     Admitted.

11.     Admitted.

2

## JURISDICTION AND VENUE

12.    Admitted that Plaintiff purports to bring claims under the First and Fourteenth Amendments to the United States Constitution and Article I, section 34 of the North Carolina Constitution.  Except as specifically admitted, denied.

13.    This paragraph calls for a legal conclusion, and accordingly a response is not required.  To the extent a response is deemed to be required, it is admitted that Plaintiff purports to bring claims under the United States Constitution and as to those claims it is admitted that Plaintiff has standing to bring them.  Except as specifically admitted, denied.

14.    This paragraph calls for a legal conclusion, and accordingly a response is not required.  To the extent a response is deemed to be required, denied.

15.    This paragraph calls for a legal conclusion, and accordingly a response is not required.  To the extent a response is deemed to be required, admitted that Henderson's office is in this District.  Except as specifically admitted, denied.

## ALLEGED FACTUAL ALLEGATIONS

16.    Denied for lack of information and belief.

17.    Denied for lack of information and belief.

18.    Denied for lack of information and belief.

19.    Denied for lack of information and belief.

20.    Denied for lack of information and belief.

3

43

21.     Upon information and belief, admitted that CAI may not properly practice law as such conduct constitutes a violation of North Carolina General Statutes sections 84-2.1, 84-4, and 84-5.  CAI is forbidden from offering any legal advice and services to its members because its provision of legal services, including any communications to its members that constitute legal advice, would constitute the unauthorized practice of law. Except as specifically admitted, denied for lack of information and belief.

22.     Admitted that N.C. Gen. Stat. § 84-2.1 speaks for itself.  Except as specifically admitted, denied.

23.     Admitted that N.C. Gen. Stat. §§ 84-4 and 84-5 speak for themselves. Except as specifically admitted, denied.

24.     Admitted that N.C. Gen. Stat. § 84-4 speaks for itself.  Except as specifically admitted, denied.

25.     Admitted that N.C. Gen. Stat. § 84-5 speaks for itself.  Except as specifically admitted, denied.

26.     Admitted that N.C. Gen. Stat. §§ 84-4, 84-5, and 84-8 speak for themselves.  Except as specifically admitted, denied.

27.     This paragraph calls for a legal conclusion, and accordingly a response is not required.  To the extent a response is deemed to be required, admitted that N.C. Gen. Stat. § 84-7 speaks for itself.  Except as specifically admitted, denied.

28.     This paragraph calls for a legal conclusion, and accordingly a response is not required.  To the extent a response is deemed to be required, admitted that North

4

Carolina District Attorneys, and the North Carolina State Bar, are authorized under North Carolina law to investigate and pursue issues related to the unauthorized practice of law. Except as specifically admitted, denied.

29.     Denied for lack of information and belief.

30.     This paragraph calls for a legal conclusion, and accordingly a response is not required. To the extent a response is deemed to be required, admitted that under N.C. Gen. Stat. §§ 84-4 and 84-5, CAI is forbidden from offering any legal advice and services to its members because its provision of legal services, including any communications to its members that constitute legal advice, would constitute the unauthorized practice of law. Except as specifically admitted, denied.

31.     Denied for lack of information and belief.

32.     Denied for lack of information and belief.

33.     Denied for lack of information and belief.

34.     Denied for lack of information and belief.

35.     Admitted that on 28 May 2013, the North Carolina State Bar Ethics Committee issued Proposed Ethics Decision 2013-2, which speaks for itself, in response to inquiries by CAI. Except as specifically admitted, denied.

36.     This paragraph calls for a legal conclusion, and accordingly a response is not required. To the extent a response is deemed to be required, it is averred that there are multiple rational reasons to prohibit licensed North Carolina attorneys employed by CAI from giving legal advice and services to CAI members, and it is further averred that

5

all licensed North Carolina attorneys are fully accountable to the North Carolina State Bar for the fulfillment of all their professional and ethical responsibilities. Except as specifically averred or admitted, denied.

37.     Denied for lack of information and belief.

38.     Denied for lack of information and belief.

39.     Denied for lack of information and belief.

40.     Denied for lack of information and belief.

41.     Denied for lack of information and belief.

42.     Denied for lack of information and belief.

43.     This paragraph calls for a legal conclusion, and accordingly a response is not required. To the extent a response is deemed to be required, admitted that N.C. Gen. Stat. §§ 84-4 and 84-5 speak for themselves. Except as specifically admitted, denied for lack of information and belief.

44.     Denied for lack of information and belief.

<div align="center">

**FIRST PURPORTED CAUSE OF ACTION**
**42 U.S.C. § 1983: Alleged Violation of Due Process**
**(Arbitrary Restriction of the Practice of Law)**

</div>

45.     The preceding paragraphs are incorporated by reference as if fully set forth herein.

46.     Admitted that the Fourteenth Amendment to the United States Constitution speaks for itself. Except as specifically admitted, denied.

<div align="center">

6

</div>

47. This paragraph calls for a legal conclusion, and accordingly a response is not required. To the extent a response is deemed to be required, admitted that the Due Process Clause of the Fourteenth Amendment speaks for itself. Except as specifically admitted, denied.

48. Admitted that N.C. Gen. Stat. § 84-4 speaks for itself. Except as specifically admitted, denied.

49. Admitted that N.C. Gen. Stat. § 84-5 speaks for itself. Except as specifically admitted, denied.

50. This paragraph calls for a legal conclusion, and accordingly a response is not required. To the extent a response is deemed to be required, denied.

51. Denied.

52. Denied.

53. Denied.

## SECOND PURPORTED CAUSE OF ACTION
### 42 U.S.C. § 1983: Alleged Violation of First Amendment Right to Associate
### (Associational Right to Legal Services)

54. The preceding paragraphs are incorporated by reference as if fully set forth herein.

55. Admitted that the First and Fourteenth Amendments to the United States Constitution speak for themselves. Except as specifically admitted, denied.

56. This paragraph calls for a legal conclusion, and accordingly a response is not required. To the extent a response is deemed to be required, denied.

7

57.    Admitted that N.C. Gen. Stat. § 84-4 speaks for itself.    Except as specifically admitted, denied.

58.    Admitted that N.C. Gen. Stat. § 84-5 speaks for itself.    Except as specifically admitted, denied.

59.    This paragraph calls for a legal conclusion, and accordingly a response is not required.  To the extent a response is deemed to be required, denied.

60.    Admitted that Plaintiff purports to assert this cause of action on behalf of itself and on behalf of its members.  Except as specifically admitted, denied.

61.    Denied.

62.    Denied.

63.    Denied.

### THIRD PURPORTED CAUSE OF ACTION
### 42 U.S.C. § 1983: Alleged Violation of First Amendment Right to Free Speech
### (Censorship Based on Content and Corporate Identity)

64.    The preceding paragraphs are incorporated by reference as if fully set forth herein.

65.    Admitted that the First and Fourteenth Amendments to the United States Constitution speak for themselves.  Except as specifically admitted, denied.

66.    This paragraph calls for a legal conclusion, and accordingly a response is not required.  To the extent a response is deemed to be required, denied.

67.    Admitted that N.C. Gen. Stat. § 84-4 speaks for itself.    Except as specifically admitted, denied.

8

68. Admitted that N.C. Gen. Stat. § 84-5 speaks for itself. Except as specifically admitted, denied.

69. This paragraph calls for a legal conclusion, and accordingly a response is not required. To the extent a response is deemed to be required, denied.

70. Denied.

71. Denied.

72. Denied.

**FOURTH PURPORTED CAUSE OF ACTION**
**42 U.S.C. § 1983: Alleged Violation of First Amendment and Due Process**
**(Unconstitutionally Vague)**

73. The preceding paragraphs are incorporated by reference as if fully set forth herein.

74. Admitted that the First and Fourteenth Amendments to the United States Constitution speak for themselves. Except as specifically admitted, denied.

75. Admitted that the Fourteenth Amendment to the United States Constitution speaks for itself. Except as specifically admitted, denied.

76. This paragraph calls for a legal conclusion, and accordingly a response is not required. To the extent a response is deemed to be required, admitted that the First Amendment and the Due Process Clause of the Fourteenth Amendment speak for themselves. Except as specifically admitted, denied.

77. Admitted that N.C. Gen. Stat. § 84-4 speaks for itself. Except as specifically admitted, denied.

9

78.    Admitted that N.C. Gen. Stat. § 84-5 speaks for itself.    Except as specifically admitted, denied.

79.    This paragraph calls for a legal conclusion, and accordingly a response is not required.  To the extent a response is deemed to be required, denied.

80.    Denied.

81.    Denied.

82.    Denied.

**FIFTH PURPORTED CAUSE OF ACTION**
**42 U.S.C. § 1983: Alleged Violation of First Amendment Right to Free Speech**
**(Commercial Speech)**

83.    The preceding paragraphs are incorporated by reference as if fully set forth herein.

84.    Admitted that the First and Fourteenth Amendments to the United States Constitution speak for themselves.  Except as specifically admitted, denied.

85.    This paragraph calls for a legal conclusion, and accordingly a response is not required.  To the extent a response is deemed to be required, admitted that the First Amendment speaks for itself.  Except as specifically admitted, denied.

86.    This paragraph calls for a legal conclusion, and accordingly a response is not required.  To the extent a response is deemed to be required, admitted that N.C. Gen. Stat. § 84-4 speaks for itself.  Except as specifically admitted, denied.

87.    Admitted that N.C. Gen. Stat. § 84-5 speaks for itself.    Except as specifically admitted, denied.

10

88.     This paragraph calls for a legal conclusion, and accordingly a response is not required.  To the extent a response is deemed to be required, denied.

89.     Denied.

90.     Denied.

91.     Denied.

## SIXTH PURPORTED CAUSE OF ACTION
### (Alleged Violation of Article I, Section 34 of the N.C. Constitution)

92.     The preceding paragraphs are incorporated by reference as if fully set forth herein.

93.     Admitted that N.C. Gen. Stat. § 84-4 speaks for itself.  Except as specifically admitted, denied.

94.     Admitted that N.C. Gen. Stat. § 84-5 speaks for itself.  Except as specifically admitted, denied.

95.     Admitted that Article I, section 34 of the North Carolina Constitution speaks for itself.  Except as specifically admitted, denied.

96.     This paragraph calls for a legal conclusion, and accordingly a response is not required.  To the extent a response is deemed to be required, admitted that Article I, section 34 speaks for itself.  Except as specifically admitted, denied.

97.     This paragraph calls for a legal conclusion, and accordingly a response is not required.  To the extent a response is deemed to be required, denied.

98.     Denied.

99.     Denied.

11

100.    Denied.

## FIRST AFFIRMATIVE DEFENSE

The complaint does not state any claim upon which relief can be granted.

## SECOND AFFIRMATIVE DEFENSE

Plaintiff has failed to join one or more necessary parties, including without limitation its attorney-employees who seek to render legal advice in connection with their employment with CAI.

## THIRD AFFIRMATIVE DEFENSE

To the extent Plaintiff lacks standing under applicable law, either on its own behalf or under any theory of associational standing, it is not entitled to seek relief in this action.

## FOURTH AFFIRMATIVE DEFENSE

Defendant reserves the right to assert additional affirmative defenses as the record is developed and this case proceeds.

**WHEREFORE**, having answered Plaintiff's complaint, Defendant the North Carolina State Bar respectfully prays to the Court for the following relief:

1.    That Plaintiff have and recover nothing from Defendant;

2.    That all relief sought by Plaintiff be denied, including without limitation Plaintiff's request for preliminary and permanent injunctive relief;

3.    That Plaintiff's complaint be dismissed with prejudice;

12

4.    That Defendant recover its costs and reasonable attorneys' fees to the extent permitted by law;

5.    That the Court grant Defendant such other and further relief as is just and proper.

This the 16th day of March, 2015.

/s/ Alan W. Duncan
Alan W. Duncan
N.C. State Bar No. 8736
Stephen M. Russell, Jr.
N.C. State Bar No. 35552
VAN LANINGHAM DUNCAN PLLC
300 N. Greene St., Suite 850
Greensboro, NC 27401
Telephone: 336-645-3320
Facsimile: 336-645-3330
aduncan@vldlitigation.com
srussell@vldlitigation.com

*Counsel for the North Carolina State Bar*

13

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing document was filed electronically with the Clerk of Court using the CM/ECF system, which will provide notice of filing to counsel of record.

This the 16th day of March, 2015.

/s/ Alan W. Duncan
Alan W. Duncan

Civil Action No. 1:15-CV-83-LCB-JLW

| | | |
|---|---|---|
| CAPITAL ASSOCIATED INDUSTRIES, INC., | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) ) | **ANSWER** |
| ROY COOPER, in his official capacity as Attorney General of the State of North Carolina; NANCY LORRIN FREEMAN, in her official capacity as District Attorney for the 10th Prosecutorial District of the State of North Carolina; and J. DOUGLAS HENDERSON, in his official capacity as District Attorney for the 18th Prosecutorial District of the State of North Carolina, | ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) ) | |

NOW COME the defendants, North Carolina Attorney General Roy Cooper, District Attorney for the 10th Prosecutorial District Nancy Lorrin Freeman and District Attorney for the 18th Prosecutorial District J. Douglas Henderson (hereinafter "defendants"), by and through their attorney, Special Deputy Attorney General David J. Adinolfi II, and in answer to the plaintiff's complaint, deny each and every allegation of the plaintiff corporation except as herein specifically and unequivocally admitted based upon the defendants' own knowledge (an

admission upon information and belief is not such an unequivocal admission), and submits the following:

### FIRST DEFENSE
(Failure to State a Claim against Defendants in their Official Capacities; or
Lack of Subject Matter Jurisdiction)

For and as a First Defense, defendants assert that dismissal is proper for failure to state a claim on which relief may be granted and/or lack of subject matter jurisdiction based upon the following:

1. The law is well settled in North Carolina that the UPL statutes are constitutional, which this U.S. District Court recognized in the present case in its Memorandum Opinion and Order, footnotes 6-7, pp. 20, 23 (Document Number 54); and

2. Plaintiff corporation has not interposed any factual allegations which demonstrate that the UPL statutes have been "applied" to it by the State Prosecutors, demonstrated Article III standing, or ripeness:

a. Plaintiff corporation has not alleged any facts which would tend to show that the UPL statutes have been "applied" to it by the State Prosecutors in a "concrete and clear cut form," or any form at all. Plaintiff corporation has not alleged that it has ever communicated with the State Prosecutors in any manner, that it has been subject to actual or threatened prosecution by the State Prosecutors in any North Carolina court, or that there is any investigation pending as to its past, present or proposed activities. The matter must be dismissed because the plaintiff corporation did not comply with the case and controversy requirement, and cannot demonstrate Article III standing. See Renne v. Geary, 501 U.S. 312, 111 S. Ct. 2331, 115 L. Ed. 2d 288 (1991);

b.     Plaintiff alleges only implausible, conclusory allegations which are insufficient to make out any claim against defendants;

c.     Defendants are prosecutors for the State and cannot be enjoined from performing their constitutional, statutory mandates concerning the UPL statute this Court and North Carolina Supreme Court have held is constitutional, where plaintiff has interposed no factual allegations concerning any past, pending or threatened prosecution for UPL; past or present criminal investigation of plaintiff for UPL; defendants' adoption of the State Bar Proposed Ethics Decision; any contact between plaintiff and the State Prosecutors whatsoever or any previous case(s) in which defendants have ever prosecuted or even considered prosecuting any persons or corporations for UPL.  Where there is no allegation of the existence of a pending investigation or pending case, a State Prosecutor could be removed from office for entering a blanket agreement not to prosecute for "willful and persistent failure to perform his duties" and "conduct prejudicial to the administration of justice which brings the office into disrepute." See N.C.G.S. § 7A-66;

d.     There is no First Amendment right to provide legal assistance or practice law. The practice of law is a privilege, not a fundamental right under the First Amendment. See Edelstein v. Wilentz, 812 F.2d 128, 132 (3d Cir. 1987). The practice of law is "a profession, which is properly subject to state regulation." Hawkins v. Moss, 503 F.2d 1171, 1178-1179 (4th Cir.1974);

e.     Plaintiff presents the court with purely political questions which the courts cannot adjudicate.  This Court noted that "In 2011 and 2013, bills were introduced in the North Carolina General Assembly to amend the UPL Statutes as CAI indicated in its meeting with the State Bar. (Id. ¶¶ 8–11.) If it is a change in the law that CAI seeks, rather than a vindication of

constitutional rights, CAI must follow the normal adjudicatory process." Memorandum Opinion and Order, footnote 8, p. 23 (Document Number 54);

f.    Plaintiff has attempted to raise a potential "as applied" challenge to the UPL statute, but has failed to allege any facts which would tend to show that the UPL statutes have been "applied" to it by the State Prosecutors.  In particular, plaintiff has failed to allege how (or whether) the State Prosecutors have ever "applied" the UPL statutes to CAI or any other person or entity, or given any indication that they ever intend to do so at any time;

g.    Since the UPL statutes are constitutional, which this U.S. District Court recognized in the present case in its Memorandum Opinion and Order, footnotes 6-7, pp. 20, 23 (Document Number 54), plaintiff's allegations and demand for relief would produce an absurd result which the highest court of North Carolina and the North Carolina General Assembly did not intend - namely the potential for jailing State Prosecutors for contempt of an order enjoining them from performing their official duties which are mandated under the North Carolina Constitution and General Statutes (i.e. deciding whether to prosecute and prosecuting cases under constitutional statutes). See N.C. Const. art. IV, § 18(1); N.C.G.S. § 7A-61.

<div align="center">

SECOND DEFENSE
(Answer)
</div>

For and as a Second Defense, defendant State Prosecutors hereby answer plaintiff's Complaint as follows:

1.    Admitted.

2.    Upon information and belief, the allegation in Paragraph 1 of the Complaint is admitted.

3.       It is admitted that N.C.G.S. §§ 84-4 and 84-5 (the "UPL Statutes") relate to the unauthorized practice of law.  Except as admitted, the allegations in Paragraph 3. are denied.

4.       Denied.

5.       It is admitted that plaintiff is seeking a declaratory judgment.  Except as admitted, the allegations in Paragraph 5. are denied.

6.       Upon information and belief, the allegations in Paragraph 6. are admitted

7.       Denied.

8.       Denied.

9.       It is admitted that plaintiff is suing Attorney General Roy Cooper in his official capacity.  Except as admitted, the allegations in Paragraph 9. are denied.

10.      It is admitted that plaintiff is suing District Attorney for the Tenth Prosecutorial District of North Carolina Nancy Lorrin Freeman in her official capacity, that she has mandated constitutional and statutory duties which include prosecuting criminal cases in her district which, in an exercise of her prosecutorial discretion upon review of the facts of every case, require prosecution, and refraining from prosecuting a charge that the prosecutor knows is not supported by probable cause.  Except as admitted, the allegations in Paragraph 10. are denied.

11.      It is admitted that plaintiff is suing District Attorney for the Eighteenth Prosecutorial District of North Carolina J. Douglas Henderson in his official capacity, that he has mandated constitutional and statutory duties which include prosecuting criminal cases in his district which, in an exercise of his prosecutorial discretion upon review of the facts of every case, require prosecution, and refraining from prosecuting a charge that the prosecutor knows is not supported by probable cause.  Except as admitted, the allegations in Paragraph 11. are denied.

12.     It is admitted that plaintiff claims this action arises under the First and Fourteenth Amendments of the United States Constitution and Article I, section 34 of the North Carolina Constitution.  Except as admitted, the allegations in Paragraph 12. are denied.

13.     Denied.

14.     Denied.

15.     It is admitted the defendant District Attorney Henderson resides in the Middle District.  Except as admitted, the allegations in Paragraph 15. are denied.

16.     Defendants lack information sufficient to form a belief, therefore this is denied.

17.     Defendants lack information sufficient to form a belief, therefore this is denied.

18.     Defendants lack information sufficient to form a belief, therefore this is denied.

19.     Defendants lack information sufficient to form a belief, therefore this is denied.

20.     Defendants lack information sufficient to form a belief, therefore this is denied.

21.     It is admitted that North Carolina law prohibits the unauthorized practice of law, and the UPL statutes have been held constitutional by the North Carolina Supreme Court. Except as admitted, the allegations in Paragraph 21. are denied.

22.     Admitted.

23.     Admitted.

24.     It is admitted that N.C.G.S. § 84-4 includes the quoted language in addition to considerably further definition and explanation, and the UPL statutes have been held constitutional by the North Carolina Supreme Court.  Except as admitted, the allegations in Paragraph 24. are denied.

25.     It is admitted that N.C.G.S. § 84-5 includes the quoted language in addition to

considerably further definition and explanation, and the UPL statutes have been held

constitutional by the North Carolina Supreme Court.  Except as admitted, the allegations in

Paragraph 25. are denied.

     26.     Admitted.

     27.     It is admitted that N.C.G.S. § 84-7 includes the quoted language and that District

Attorneys have mandated constitutional and statutory duties which include prosecuting criminal

cases in their districts which, in an exercise of their prosecutorial discretion upon review of the

facts of every case, require prosecution, and refraining from prosecuting a charge that the

prosecutor knows is not supported by probable cause.  Except as admitted, the allegations in

Paragraph 27. are denied.

     28.     Defendants lack information sufficient to form a belief as to the location of

plaintiff's offices, therefore this is denied. It is admitted that District Attorneys have mandated

constitutional and statutory duties which include prosecuting criminal cases in their districts

which, in an exercise of their prosecutorial discretion upon review of the facts of every case,

require prosecution, and refraining from prosecuting a charge that the prosecutor knows is not

supported by probable cause.  Except as admitted, the allegations in Paragraph 28. are denied.

     29.     Defendants lack information sufficient to form a belief, therefore this is denied.

     30.     It is admitted that N.C.G.S. §§ 84-4 and 84-5 (the "UPL Statutes") relate to the

unauthorized practice of law.  Except as admitted, the allegations in Paragraph 30. are denied.

     31.     Defendants lack information sufficient to form a belief, therefore this is denied.

     32.     Defendants lack information sufficient to form a belief, therefore this is denied.

     33.     Defendants lack information sufficient to form a belief, therefore this is denied.

34.     Defendants lack information sufficient to form a belief, therefore this is denied.

35.     It is admitted that the North Carolina State Bar Ethics Committee issued Proposed Ethics Decision 2013-2 in response to inquiries by CAI related to its desire to provide legal advice and services to its members, that the Ethics Committee opined that if a lawyer employed by CAI were to give legal advice, it would constitute the unauthorized practice of law in violation of N.C. Gen. Stat. §§ 84-4 and 84-5 and that neither the State Bar nor its Ethics Committee are responsible for criminal prosecutions in the State of North Carolina. Except as admitted the allegations in Paragraph 35. are denied.

36.     It is admitted that the North Carolina State Bar regulates the practice of law in North Carolina.  Except as admitted,  the allegations in Paragraph 36. are denied.

37.     Defendants lack information sufficient to form a belief, therefore this is denied.

38.     Defendants lack information sufficient to form a belief, therefore this is denied.

39.     Defendants lack information sufficient to form a belief, therefore this is denied.

40.     Defendants lack information sufficient to form a belief, therefore this is denied.

41.     It is admitted that N.C.G.S. §§ 84-4 and 84-5 (the "UPL Statutes") relate to the unauthorized practice of law.  Except as admitted, the allegations in Paragraph 41. are denied.

42.     Defendants lack information sufficient to form a belief, therefore this is denied.

43.     It is admitted that N.C.G.S. §§ 84-4 and 84-5 (the "UPL Statutes") relate to the unauthorized practice of law.  Except as admitted, the allegations in Paragraph 43. are denied.

44.     Defendants lack information sufficient to form a belief, therefore this is denied.

45.     It is admitted that plaintiff realleges its allegations. Except as admitted, the allegations in Paragraph 45. are denied.

46.     Admitted.

47.     States a legal conclusion which does require a response.

48.     It is admitted that N.C.G.S. § 84-4 includes the quoted language in addition to considerably further definition and explanation, and the UPL statutes have been held constitutional by the North Carolina Supreme Court.  Except as admitted, the allegations in Paragraph 48. are denied.

49.     It is admitted that N.C.G.S. § 84-5 includes the quoted language in addition to considerably further definition and explanation, and the UPL statutes have been held constitutional by the North Carolina Supreme Court.  Except as admitted, the allegations in Paragraph 49. are denied.

50.     Denied.

51.     Denied.

52.     Denied.

53.     Denied.

54.     It is admitted that plaintiff realleges its allegations. Except as admitted, the allegations in Paragraph 54. are denied.

55.     Admitted.

56.     States a legal conclusion which does require a response.

57.     It is admitted that N.C.G.S. § 84-4 includes the quoted language in addition to considerably further definition and explanation, and the UPL statutes have been held constitutional by the North Carolina Supreme Court.  Except as admitted, the allegations in Paragraph 57. are denied.

58.     It is admitted that N.C.G.S. § 84-5 includes the quoted language in addition to considerably further definition and explanation, and the UPL statutes have been held constitutional by the North Carolina Supreme Court.  Except as admitted, the allegations in Paragraph 58. are denied.

59.     Denied.

60.     It is admitted that plaintiff realleges its allegations. Except as admitted, the allegations in Paragraph 60. are denied.

61.     Denied.

62.     It is admitted that the UPL statutes have been held constitutional by the North Carolina Supreme Court.  Except as admitted, the allegations in Paragraph 62. are denied.  It is specifically denied that the UPL statutes have been "applied" to CAI by the State Prosecutors.

63.     Denied.

64.     It is admitted that plaintiff realleges its allegations. Except as admitted, the allegations in Paragraph 64. are denied.

65.     Admitted.

66.     States a legal conclusion which does require a response.

67.     It is admitted that N.C.G.S. § 84-4 includes the quoted language in addition to considerably further definition and explanation, and the UPL statutes have been held constitutional by the North Carolina Supreme Court.  Except as admitted, the allegations in Paragraph 67. are denied.

68.     It is admitted that N.C.G.S. § 84-5 includes the quoted language in addition to considerably further definition and explanation, and the UPL statutes have been held

constitutional by the North Carolina Supreme Court.  Except as admitted, the allegations in Paragraph 68. are denied.

69.     Denied.

70.     Denied.

71.     It is admitted that the UPL statutes have been held constitutional by the North Carolina Supreme Court.  Except as admitted, the allegations in Paragraph 71. are denied.  It is specifically denied that the UPL statutes have been "applied" to CAI by the State Prosecutors.

72.     Denied.

73.     It is admitted that plaintiff realleges its allegations. Except as admitted, the allegations in Paragraph 73. are denied.

74.     Admitted.

75.     Admitted.

76.     States a legal conclusion which does require a response.

77.     It is admitted that N.C.G.S. § 84-4 includes the quoted language in addition to considerably further definition and explanation, and the UPL statutes have been held constitutional by the North Carolina Supreme Court.  Except as admitted, the allegations in Paragraph 77. are denied.

78.     It is admitted that N.C.G.S. § 84-5 includes the quoted language in addition to considerably further definition and explanation, and the UPL statutes have been held constitutional by the North Carolina Supreme Court.  Except as admitted, the allegations in Paragraph 78. are denied.

79.     It is admitted that the UPL statutes have been held constitutional by the North

Carolina Supreme Court.  Except as admitted, the allegations in Paragraph 79. are denied.

80.     Denied.

81.     Denied.

82.     Denied.

83.     It is admitted that plaintiff realleges its allegations. Except as admitted, the allegations in Paragraph 83. are denied.

84.     Admitted.

85.     States a legal conclusion which does require a response.

86.     It is admitted that N.C.G.S. § 84-4 includes the quoted language in addition to considerably further definition and explanation, and the UPL statutes have been held constitutional by the North Carolina Supreme Court.  Except as admitted, the allegations in Paragraph 86. are denied.

87.     It is admitted that N.C.G.S. § 84-5 includes the quoted language in addition to considerably further definition and explanation, and the UPL statutes have been held constitutional by the North Carolina Supreme Court.  Except as admitted, the allegations in Paragraph 87. are denied.

88.     Denied.

89.     Denied.

90.     It is admitted that the UPL statutes have been held constitutional by the North Carolina Supreme Court.  Except as admitted, the allegations in Paragraph 90. are denied.  It is specifically denied that the UPL statutes have been "applied" to CAI by the State Prosecutors.

91.     Denied.

92.     It is admitted that plaintiff realleges its allegations. Except as admitted, the allegations in Paragraph 92. are denied.

93.     It is admitted that N.C.G.S. § 84-4 includes the quoted language in addition to considerably further definition and explanation, and the UPL statutes have been held constitutional by the North Carolina Supreme Court.  Except as admitted, the allegations in Paragraph 93. are denied.

94.     It is admitted that N.C.G.S. § 84-4 includes the quoted language in addition to considerably further definition and explanation, and the UPL statutes have been held constitutional by the North Carolina Supreme Court.  Except as admitted, the allegations in Paragraph 94. are denied.

95.     Admitted.

96.     States a legal conclusion which does require a response.

97.     Denied.

98.     Denied.

99.     It is admitted that the UPL statutes have been held constitutional by the North Carolina Supreme Court.  Except as admitted, the allegations in Paragraph 99. are denied.

100.    It is admitted that the UPL statutes have been held constitutional by the North Carolina Supreme Court.  Except as admitted, the allegations in Paragraph 100. are denied.  It is specifically denied that the UPL statutes have been "applied" to CAI by the State Prosecutors.

WHEREFORE, defendants, North Carolina Attorney General Roy Cooper, District Attorney for the 10th Prosecutorial District Nancy Lorrin Freeman and District Attorney for the 18th Prosecutorial District J. Douglas Henderson answer, respectfully request and move the Court

as follows:

1.      That plaintiff have and recover nothing of the answering defendant;

2.      For the dismissal of plaintiff's action in its entirety, with prejudice;

3.      For the denial of all relief sought by the plaintiff;

4.      For the cost of defending this action, including reasonable attorney's fees;

5.      For such other and further relief as the Court may deem just and proper.

Respectfully submitted, this the 18th day of September, 2015.

ROY COOPER
Attorney General of North Carolina

/s/ David J. Adinolfi II
David J. Adinolfi II
Special Deputy Attorney General
N.C. State Bar #27169
Post Office Box 629
Raleigh, North Carolina 27602-0629
Telephone: (919) 716-6500

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the 18th day of September, 2015, I served a copy

of defendants' Answer upon the persons indicated below by electronically filing the foregoing

Answer with the Clerk of Court using the CM/ECF system which will also send notification of

such filing to the following:

> Reid L. Phillips
> Brooks, Pierce, McLendon, Humphrey & Leonard, LLP
> Post Office Box 26000
> Greensboro, North Carolina  28026
>
> Alan Duncan
> Van Laningham Duncan, PLLC
> 300 North Greene Street, Suite 850
> Greensboro, North Carolina  27401

This the 18th day of September, 2015.

> ROY COOPER
> Attorney General of North Carolina
>
> /s/ David J. Adinolfi II
> David J. Adinolfi II
> Special Deputy Attorney General

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| CAPITAL ASSOCIATED INDUSTRIES, INC., | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | 1:15-cv-83 |
| ROY COOPER, in his official capacity as Attorney General of the State of North Carolina; NANCY LORRIN FREEMAN, in her official capacity as District Attorney for the 10th Prosecutorial District of the State of North Carolina; and J. DOUGLAS HENDERSON, in his official capacity as District Attorney for the 18th Prosecutorial District of the State of North Carolina, | ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

LORETTA C. BIGGS, District Judge.

Plaintiff, Capital Associated Industries, Inc. ("CAI"), brings this action for declaratory and injunctive relief, challenging the constitutionality of Sections 84-4 and 85-5 of the North Carolina General Statutes ("UPL Statutes"), which govern the unauthorized practice of law, as applied to CAI, and requesting that State Prosecutors be enjoined from enforcing said statutes against CAI. (ECF No. 1 ¶ 100.) The North Carolina State Bar ("State Bar"), though not named by CAI as a Defendant, has intervened in this action. (ECF No. 37 at 1.) Before the Court are CAI's Motion for Preliminary Injunction pursuant to Rule 65 of the Federal Rules of Civil Procedure (ECF No. 19), along with Defendants Roy Cooper, Nancy Lorrin Freeman, and J. Douglas

Henderson's ("State Prosecutors") Motion to Dismiss pursuant to Rules 12(b)(1), 12(b)(6), and 12(b)(7) of the Federal Rules of Civil Procedure (ECF No. 10) and Motion to Dispense with Mediation (ECF No. 12). The Court heard oral argument on the parties' motions on May 29, 2015. For the reasons stated below, the Court denies CAI's Motion for Preliminary Injunction and denies State Prosecutors' Motion to Dismiss.

## I.    BACKGROUND

In its Complaint, CAI describes itself as a tax-exempt, non-profit business association that provides human resources-related information, advice, data, education, legislative advocacy, and other benefits and services to approximately 1,080 member organizations throughout North Carolina. (ECF No. 1 ¶¶ 2, 17.) CAI is incorporated under the laws of North Carolina. (*Id.* ¶ 6.) Its members are employers in North Carolina that pay annual membership dues to CAI to avail themselves of its services. (*Id.* ¶ 17.) In addition to the services outlined above, CAI wishes to provide legal advice and services to its members through attorneys employed by CAI. It argues that it is prevented from doing so because of the threat it will be prosecuted under Sections 84-7 and 84-8 of the North Carolina General Statutes, which criminalize violations of the UPL Statutes. (*Id.* ¶ 44.) CAI claims that the UPL Statutes, as applied to CAI, violate its Fourteenth Amendment and First Amendment rights, are unconstitutionally vague under the First Amendment, and violate the North Carolina Constitution.

In February of 2011, representatives of CAI met with a representative of the State Bar concerning CAI's plan to provide its members with legal advice and services. (ECF No. 41 ¶¶ 5–7.) In April of 2013, CAI requested that the State Bar render an opinion on

2

whether its proposed plan to provide legal advice and certain legal services to its members would be considered the unauthorized practice of law. (ECF No. 42 ¶¶ 7–9.) On May 28, 2013, the State Bar issued a proposed ethics decision, notifying CAI that its plan would be in violation of the UPL Statutes and recommending as an alternative that CAI consider a pre-paid legal or group services plan. (*See* ECF No. 42-1; ECF No. 42-2.) On January 23, 2015, CAI filed this lawsuit, seeking, among other relief, a preliminary and permanent injunction enjoining State Prosecutors from enforcing the UPL Statutes against CAI, claiming that those statutes prevent its members from receiving the full extent of information and services they need and want in a cost-efficient manner, in violation of the United States and North Carolina Constitutions. (ECF No. 1 ¶ 43.)

## II.     THE UNAUTHORIZED PRACTICE OF LAW STATUTES

Sections 84-1 through 84-10 of the North Carolina General Statutes govern the unauthorized practice of law in North Carolina. Section 84-2.1 defines the practice of law, in pertinent part, as "performing any legal service for any other person, firm or corporation, with or without compensation, specifically including . . . assisting by advice, counsel, or otherwise in any legal work; and . . . advis[ing] or giv[ing] opinion upon the legal rights of any person, firm or corporation." N.C. Gen. Stat. § 84-2.1 (2015). Section 84-4 prohibits the practice of law by "any person or association of persons, except active members of the Bar of the State of North Carolina." *Id.* § 84-4. Section 84-5 makes it "unlawful for any corporation to practice law[,] . . . hold itself out to the public or advertise as being entitled to practice law[,] . . . draw agreements[] or other legal

3

documents, . . . or give legal advice." *Id.* § 84-5. Under the statutes governing the unauthorized practice of law, the State's district attorneys are responsible for bringing suit to enjoin persons and corporations from violating these statutes. *See id.* § 84-7. The State's district attorneys also have a statutory duty to bring criminal charges against any person or corporation that has violated Sections 84-4 through 84-8.[1] *Id.* § 84-7. Violation of these statutes is punishable as a Class 1 misdemeanor. *Id.* § 84-8.

## III.   MOTION FOR PRELIMINARY INJUNCTION

Based on CAI's allegations in its Complaint that the UPL Statutes violate its constitutional rights, CAI moves this Court for a preliminary injunction to enjoin State Prosecutors as well as all of their agents, affiliates, officers, and employees from taking any action that would interfere with CAI (1) offering or delivering to its members— through CAI employees who are licensed to practice law in North Carolina—legal advice and services and (2) publicly advertising such legal advice and services for its members.

### A.  Legal Standard

A preliminary injunction is an extraordinary remedy involving the exercise of a very far-reaching power that is only to be employed in the limited circumstances that demand it. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008); *In re Microsoft Corp. Antitrust Litig.*, 333 F.3d 517, 525 (4th Cir. 2003), *abrogated on other grounds by eBay, Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006). Whether to grant this relief is

---

[1] The State's district attorneys are required to bring criminal charges upon notification from any member of the State Bar that any person or corporation is violating Sections 84-4 to 84-8 of the North Carolina General Statutes.  N.C. Gen. Stat. § 84-7.

in the sound discretion of the court. *Winter*, 555 U.S. at 24. Courts generally employ preliminary injunctions for the limited purpose of preserving the status quo during the course of litigation in order to prevent irreparable harm and to preserve the ability of the court to render meaningful relief on the merits. *Microsoft*, 333 F.3d at 525. The Fourth Circuit has defined the status quo as the "last uncontested status between the parties which preceded the controversy." *Pashby v. Delia*, 709 F.3d 307, 320 (4th Cir. 2013) (quoting *Aggarao v. MOL Ship Mgmt. Co.*, 675 F.3d 355, 378 (4th Cir. 2012)). The party seeking a preliminary injunction bears the burden of justifying such relief. *Wagner v. Bd. of Educ.*, 335 F.3d 297, 302 (4th Cir. 2003). To prevail on a motion for preliminary injunction, a party must establish "[1] that [it] is likely to succeed on the merits, [2] that [it] is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in its favor, and [4] that an injunction is in the public interest." *Winter*, 555 U.S. at 20. "[A] clear showing" of likelihood of success on the merits and irreparable harm is required in addition to satisfying the other factors before a preliminary injunction can be entered. *Real Truth About Obama, Inc. v. FEC*, 575 F.3d 342, 346–47 (4th Cir. 2009), *vacated on other grounds*, 559 U.S. 1089 (2010).

Such a remedy "is a matter of equitable discretion; it does not follow from success on the merits as a matter of course." *Winter*, 555 U.S. at 32. "In each case, courts 'must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.'" *Id.* at 24 (quoting *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 542 (1987)). In doing so, the Supreme Court has instructed federal courts to "pay particular regard for the public consequences in

employing the extraordinary remedy of injunction." *Id.* Even in cases where a plaintiff has shown likelihood of success on the merits and irreparable harm, the balance of equities and the public interest factors can weigh in favor of denying a preliminary injunction. *See id.* at 23–24, 31 n.5.

### B. Analysis

Before turning to the four factors, as enunciated by the Supreme Court and Fourth Circuit, that a plaintiff must satisfy to prevail on a motion for preliminary injunction, the Court must briefly address the relief CAI seeks in this action. As stated above, the purpose of a preliminary injunction is to preserve the status quo to prevent irreparable harm and allow the Court to enter final, meaningful relief on the merits. The injunction that CAI seeks will necessarily alter the status quo rather than preserve it. The last uncontested status between the parties before the controversy, as the Fourth Circuit has defined status quo, is as follows: the UPL Statues, which prohibit the corporate practice of law, have been in existence in some form in North Carolina since 1931, for more than 80 years, with certain notable exceptions.[2] CAI has been in existence since 1963, for more than 50 years.[3] While CAI now wishes to provide legal advice and services to its members without the threat of prosecution, it has never been able to do so. To grant

---

[2] *See* N.C. Code § 199(a) (1935) (current version at N.C. Gen. Stat. § 84-5); N.C. Gen. Stat. § 84-5.1 (listing exceptions).

[3] *See Articles of* Incorporation of Capital Associated Industries, Inc. (1963), https://www.secretary.state.nc.us/Search/filings/4911717 (download "Articles of Incorporation"). Although neither party has made this document part of the record, the court may take judicial notice of it. *See Sec'y of State for Defence v. Trimble Navigation Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007).

CAI's requested relief and allow it to now provide legal advice and services to its members without threat of prosecution is in fact an alteration of the status quo. The Court must consider that fact, along with the other factors, in determining whether to grant CAI the extraordinary relief requested.

    1.  <u>Likelihood of Success on the Merits</u>

        a.  First Amendment Right of Association Claim

CAI brings this as-applied challenge to the UPL Statutes, alleging six constitutional claims.[4] Although CAI acknowledged all six of its claims at oral argument and stated that the Court need only find likelihood of success on one of its claims, it argued only its second claim, that the UPL Statutes, as applied to CAI, violate its First Amendment right of association by prohibiting it from providing legal advice and services to its members. CAI relied on *NAACP v. Button*, 371 U.S. 415 (1963), *Brotherhood of Railroad Trainmen v. Virginia ex rel. Virginia State Bar*, 377 U.S. 1 (1964), *United Mine Workers of America, District 12 v. Illinois State Bar Ass'n*, 389 U.S. 217 (1967), *United Transportation Union v. State Bar of Michigan*, 401 U.S. 576 (1971), and *In re Primus*, 436 U.S. 412 (1978), as support for its right of association claim. In doing so, CAI stated that it was "the clearest and the shortest path to the injunction [it] seek[s]." (ECF No. 47 at 10:6–7.) The Court disagrees. A careful reading of the cases

---

[4] Specifically, CAI claims that the UPL States violate its rights under (1) the Fourteenth Amendment because they are arbitrary and capricious; (2) the First Amendment by infringing on its right of association; (3) the free speech clause of the First Amendment; (4) the First and Fourteenth Amendments because what constitutes "legal advice" is impermissibly vague; (5) the First Amendment by prohibiting it from advertising legal services to its members; and (6) the North Carolina Constitution by granting an exclusive privilege to a particular class of licensed attorneys. (*See* ECF No. 1 at 2–3.)

7

relied upon by CAI does not compel a finding that CAI has met its burden of demonstrating a "clear showing" of likelihood of success on the merits so as to warrant a preliminary injunction.

In *Button*, the Supreme Court held that Virginia could not prohibit the NAACP from soliciting prospective litigants, stating, "In the context of NAACP objectives, litigation is not a technique of resolving private differences; it is a means for achieving the lawful objectives of equality of treatment by all government, federal, state and local, for the members of the Negro community in this country. It is thus a form of political expression." 371 U.S. at 429. The Court discussed at length the legal practices of the NAACP—including its goals, objectives, and funding—and recognized that no attorney received direct compensation from the members or clients they assisted in litigation. *See id.* at 419–22. In observing that the NAACP had engaged in its solicitation activities "openly for many years," *id*. at 423, the Court noted that the record was devoid of any evidence of the evils Virginia sought to limit as applied to the NAACP's solicitation activities, "partly because no monetary stakes [were] involved, and so there [was] no danger that the attorney [would] desert or subvert the paramount interests of his client to enrich himself or an outside sponsor." *Id.* at 443–44. The Court drew a sharp distinction between activities characterized as "oppressive, malicious, or avaricious use of the legal process for purely private gain" and activities of the NAACP, stating that "[r]esort to the courts to seek vindication of constitutional rights is a different matter." *Id.* at 443. *Button* is the first of a series of Supreme Court decisions that make clear that the First

Amendment of the United States Constitution protects collective activity to enforce constitutional rights through litigation.

*Button* was followed by *Trainmen*, where the Supreme Court held that Virginia could not prevent union members from "gather[ing] together for the lawful purpose of helping and advising one another in asserting the rights Congress gave them in . . . the Federal Employers' Liability Act." 377 U.S. at 5. The Court discussed the goal of the federal act, which was "to provide for recovery of damages for injured railroad workers and their families." *Id.* at 3. However, the Court noted that the federal statute "was not enough to assure that the workers would receive the full benefit of the compensatory damages Congress intended they should have." *Id.* The record showed that injured workers and their families "often fell prey . . . to persuasive claims adjusters eager to gain a quick and cheap settlement for their railroad employers, or . . . to lawyers . . . not competent to try these lawsuits against the able and experienced railroad counsel." *Id.* at 3–4. As a result, the union established a legal aid department to assist its members who had become injured with their claims by advising them to obtain legal advice before settling their claims and recommending them to competent lawyers to handle such claims. *Id.* at 4. The Court noted that the union's referral program was not ambulance chasing and distinguished it from anything that could be described as "commercialization of the legal profession." *Id.* at 6. The Court then explained that within the context of the union's legal referral program, those interests protected by the right of association include "the right of individuals . . . to be fairly represented in lawsuits authorized by Congress to effectuate a basic public interest." *Id.* at 7. The Court stated that "[l]aymen

9

cannot be expected to know how to protect their rights when dealing with practiced and carefully counseled adversaries," which would obviously include their employers. *Id.* As applied to the union, the Court rejected Virginia's purported interests in prohibiting the union from carrying out its legal referral plan. *Id.* at 8. Central to the Supreme Court's holding was that preventing union workers from using their cooperative plan to advise each other infringed on their ability to gain access to the courts to vindicate their legal rights. *Id.* at 7. "The right to petition the courts cannot be so handicapped." *Id.*

Then followed *Mine Workers*, in which the Supreme Court held that the right of association permits a union to hire a salaried lawyer to represent its members in workers' compensation claims. 389 U.S. at 221–22. Similar to *Trainmen*, the record showed that Illinois had passed a workers' compensation statute but the mine workers were being deprived of the statute's full benefits. *Id.* at 219. The workers "were required to pay forty or fifty per cent of the amounts recovered in damage suits, for attorney fees." *Id.* In response, in 1913, the union established a legal department, hiring an attorney to represent members and their dependents "in connection with claims for personal injury and death" under Illinois' workers' compensation statute. *Id.* The Court highlighted the terms of the attorney's employment, including the scope of legal services the attorney would provide to the union's members and the fact that the attorney received no compensation from any settlement proceeds reached on behalf of any worker. *Id.* at 219–21. The record also demonstrated that in the program's many years of operation, there was not one instance of abuse, harm to clients, or "any actual disadvantage to the public or to the profession." *Id.* at 225. In holding that the right of association protected the

union's legal program, the Court stated, "The First Amendment would . . . be a hollow promise if it left government free to destroy or erode its guarantees by indirect restraints so long as no law is passed that prohibits free speech, press, petition, or assembly as such." *Id.* at 222. Although the union members were not prevented from associating with one another, they were prevented from availing themselves of the benefits provided by Illinois' workers' compensation statute due to excessive legal fees. The Court's focus was on protecting the right of meaningful access to the courts to redress grievances, irrespective of their nature. *Id.* at 223. Thus, the Court made clear that the right of access to the courts is not confined to matters that can be "characterized as political." *Id.* The Seventh Circuit later explained that *Mine Workers* "supports the proposition that laypersons have a right to obtain meaningful access to the courts, and to enter into associations with lawyers to effectuate that end." *Lawline v. Am. Bar Ass'n*, 956 F.2d 1378, 1387 (7th Cir. 1992).

A few years later, the Supreme Court decided *United Transportation Union*. Similar to the issues before the Court in *Trainmen*, the United Transportation Union, the successor union of the Brotherhood of Railroad Trainmen, provided its members with legal advice and other services to protect them from excessive legal fees and incompetent counsel in suits brought under the Federal Employers' Liability Act. *United Transp. Union*, 401 U.S. at 577. The union also had secured commitments from lawyers representing its members that their legal fees would be capped at no more than 25% of the recovery. *Id.* at 577. The Court rejected Michigan's injunction that prevented the union from providing its injured members with legal advice on their federal claims,

11

stating, "In *Trainmen* we upheld the commonsense proposition that such activity is protected by the First Amendment." *Id.* at 580. One of Michigan's justifications for the injunction was that Michigan sought to prohibit fee sharing between the union and the recommended attorney. *Id.* at 583. The Court also rejected this justification, explaining that "[s]uch activity is not even suggested in the complaint. There is not a line of evidence concerning such practice in the record in this case." *Id.* The Court found no problem with the arrangement the union had negotiated with attorneys representing its members, which capped their legal fees at no more than 25% of recovery. As in *Mine Workers*, the Court explained that "[t]he Union . . . sought to protect its members against the same abuse by limiting the fee charged by recommended attorneys. It is hard to believe that a court . . . would deny a . . . union . . . the right to protect its injured members, and their widows and children, from the injustice of excessive fees at the hands of inadequate counsel." *Id.* at 585. According to the Court, "[a]t issue is the basic right to group legal action" to secure "freedoms guaranteed by the Constitution. *Id.* In so noting, the Supreme Court stated that "[t]he common thread running through [its] decisions in [*Button*, *Trainmen*, and *Mine Workers*] is that collective activity undertaken to obtain meaningful access to the courts is a fundamental right within the protection of the First Amendment." *Id.* The Supreme Court's interpretation of *Button* and its progeny "comports with the traditional understanding that freedom of association provides 'a right to join with others to pursue goals independently protected by the first amendment.'" *Lawline,* 956 F.2d at 1387.

Several years following *United Transportation Union*, the Court relied on *Button* in finding First Amendment protection in the solicitation activities of the ACLU. *Primus*, 436 U.S. at 426–32. At issue in *Primus* was South Carolina's decision to discipline an ACLU attorney for soliciting a woman for redress of an allegedly unconstitutional sterilization. *Id*. at 421–22. The Court rejected the state's efforts "to draw a meaningful distinction between the ACLU and the NAACP." *Id.* at 427. For the ACLU, as it was for the NAACP, "'litigation is not a technique of resolving private differences'; it is 'a form of political expression' and 'political association.'" *Id.* at 428 (quoting *Button*, 371 U.S. at 429, 431). The Court therefore rejected South Carolina's justification for disciplining the ACLU attorney under its disciplinary rules. The Court explained that the record did not support "undue influence, overreaching, misrepresentation, or invasion of privacy," as the solicitation was not in-person but rather through a follow-up letter providing information that would allow the potential litigant to make "an informed decision about whether to authorize litigation." *Id.* at 435. Although the ACLU received an award of counsel fees in cases in which it was successful, the Court noted that neither the ACLU nor its attorneys are motivated by financial gain, as the motivation for the ACLU's litigation is "vindicating civil liberties." *Id.* at 429–30. Nor did the record show a serious conflict of interest or problems related to the attorney-client relationship. *Id*. at 436. Although the Court stated these interests may be justifiable in circumstances where a commercial transaction is proposed, they were not sufficiently tailored in application to organizations such as the ACLU. *Id.* at 437–38. "[C]onsiderations of undue commercialization of the legal profession are of marginal force where . . . a nonprofit

13

organization [the ACLU] offers its services free of charge to individuals who may be in need of legal assistance and may lack the financial means and sophistication necessary to tap alternative sources of such aid." *Id.* at 437.

While this Court does not foreclose the possibility that the activities CAI and its members wish to undertake may be entitled to First Amendment protection, the record before the Court at this time does not support the conclusion that the line of cases starting with *Button* offers a clear showing of likelihood of success on the merits of CAI's right of association claim. Unlike the clear constitutional objectives advanced by the foregoing cases, CAI has indicated that, among other things, it is being precluded "from earning revenues by employing licensed attorneys to provide legal advice and services to its members." (ECF No. 1 ¶ 98.) Further, CAI has not demonstrated that its members are being deprived, either directly or indirectly, of access to the courts—a fundamental right identified in *Button* and its progeny. (*See* ECF Nos. 15, 17–18.) Nor has CAI demonstrated that it or its members are being deprived of the ability to advance a political agenda, effectuate a basic public interest, or receive legal advice from counsel when needed. Paying more than desired for the assistance of outside counsel does not place CAI and its employer-members in the same category as union workers, minorities, or other marginalized individuals who were *actually* being denied channels to vindicate rights protected by the United States Constitution or federal law. Moreover, unlike in this case, the records in *Button, Trainmen, Mine Workers, United Transportation Union,* and *Primus* were sufficiently developed such that the goals and objectives of the organizations were clear, the legal plans were clearly defined, and the specific needs

addressed were those given to members by constitution or statute. These decisions reflect a thorough, fact-intensive review of the records before the Supreme Court.

While the Court recognizes that the instant motion is one for a preliminary injunction, CAI must provide this Court with a sufficient factual record to evaluate its likelihood of success on the merits. The record before the Court has not been sufficiently developed on important factual issues needed for this Court to conclude, as CAI has argued, that the desired activities of CAI and its members fall within the collective activity protected in *Button, Trainmen, Mine Workers, United Transportation Union,* and *Primus*. Virtually all of the allegations in CAI's Complaint have been denied by the State Bar in its Answer, including whether CAI is even a non-profit corporation. (*See* ECF No. 38 ¶¶ 1–44.) The lack of an adequate factual record in this case is striking, even in the context of a preliminary injunction. (*See* ECF Nos. 14–20.) This Court knows very little about CAI, including its goals and objectives, the criteria for membership, the composition of its membership, the scope of legal services it intends to offer its employer-members, and the fees associated with such services. Out of approximately 1,080 employers who allegedly make up CAI's membership across North Carolina, CAI has provided this Court with only three very short declarations from its employer-members. (*See* ECF Nos. 15, 17–18.) Exactly who these employer-companies are, their size, and their legal needs are critical issues that have not been fully developed.

Although there are no hard rules on the amount of evidence a party must submit in support of a motion for preliminary injunction, the dearth of information before this Court does not allow for meaningful review in light of the nature of the relief sought by

CAI.  Not only do the declarations lack the level of specificity one would expect in such a complex case, but they also fail to demonstrate that CAI's members are being deprived of meaningful access to the courts to vindicate their legal rights.  Indeed, the State Bar, not CAI, provided this Court with the only document that appears to outline in some detail the type of legal services plan CAI sought to offer its members when it approached the State Bar two years ago.  (ECF No. 42-2.)  This is particularly troublesome as it would appear that much of the critical evidence that would assist this Court in evaluating CAI's claims is within CAI's control, yet it has not provided such evidence to this Court.  This, coupled with CAI's insistence that discovery is not necessary,[5] would suggest an effort to limit rather than develop the record upon which this Court must evaluate weighty claims of constitutional proportions.

Although CAI contends that this is an as-applied challenge, ordinarily, an as-applied challenge attacks the constitutionality of a statute "based on a developed factual record and the application of a statute to a specific person."  *Educ. Media Co. at Va. Tech, Inc. v. Insley*, 731 F.3d 291, 298 n.5 (4th Cir. 2013) (quoting *Richmond Med. Ctr. for Women v. Herring*, 570 F.3d 165, 172 (4th Cir. 2009)).  Even though CAI has couched its challenge as an as-applied challenge, CAI appears to be advancing a facial challenge.  A plaintiff bringing a facial attack does not have to develop a factual record

---

[5] At oral argument, CAI's attorney stated that discovery is not necessary.  "[W]hat discovery, what other information would be useful or necessary to the Court in coming to a decision in this case?  We can think of none.  The case is what it is.  The facts, I think, are pretty clearly pled. There are not other facts that we think make any difference in this case.  So we urge the Court to go ahead and make the decision at this point because, frankly, there isn't anything that we expect will change after this."  (ECF No. 47 at 18:6–13.)

because the success of such an attack requires "'that no set of circumstances exists under which the Act would be valid,' *i.e.*, that the law is unconstitutional in all of its applications." *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008). On the other hand, an as-applied challenge must be fact-specific and decided on a case-by-case basis. *Richmond Med. Ctr.*, 570 F.3d at 173 (quoting Richard H. Fallon, Jr., *As-Applied and Facial Challenges and Third-Party Standing*, 113 Harv. L. Rev. 1321, 1331 (2000)). Contrary to CAI's argument that no discovery is needed, an as-applied challenge requires a "concrete factual circumstance," and thus, it is necessary to have a developed factual record. *Id.* at 172, 180.

### b. CAI's Other Claims

While CAI declined to argue its remaining claims at the hearing on the preliminary injunction, the Court is not persuaded that those claims would fare any better in light of the sparse record. CAI's first claim is that prohibiting it from offering legal advice and services violates its substantive due process rights under the Fourteenth Amendment because North Carolina cannot show that such a prohibition is rationally related to a legitimate government interest. At a minimum, "[d]ue process requires that all laws . . . be 'rationally related to a legitimate governmental objective.'" *Stuart v. Loomis*, 992 F. Supp. 2d 585, 611 (M.D.N.C. 2014) (quoting *Multimedia Publ'g Co. of S.C. v. Greenville–Spartanburg Airport Dist.*, 991 F.2d 154, 159 (4th Cir. 1993)). "Statutes subject to rational-basis review 'bear[ ] a strong presumption of validity . . . .'" *Bostic v. Schaefer*, 760 F.3d 352, 393 (4th Cir. 2014) (alteration in original). As explained by the Fourth Circuit, "[t]his standard is quite deferential." *Wilkins v. Gaddy*,

17

734 F.3d 344, 347 (4th Cir. 2013). "[T]he fit between the enactment and the public purposes behind it need not be mathematically precise." *Id.* at 348. Even when those purposes are based on "rational speculation unsupported by evidence or empirical data," the statute will pass constitutional scrutiny. *Id.* (quoting *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 315 (1993)). A statute must be upheld on rational basis review if "there is any reasonably conceivable state of facts" to support it. *Moore-King v. Cty. of Chesterfield*, 708 F.3d 560, 572 (4th Cir. 2013) (quoting *Greenville Women's Clinic v. Bryant*, 222 F.3d 157, 172 (4th Cir. 2000)).

As the State Bar points out, there are rational reasons for prohibiting the corporate practice of law. (*See* ECF No. 40 at 10–16.) The State Bar notes, among other things, that there is the "potential for conflicts of interest and loyalty when an entity that may not be controlled by lawyers is responsible for the representation of a client" (*id.* at 10); the financial interests of the corporation may "require an increase or decrease in litigation expenditures" (*id.* at 11); "disclosure requirements may risk violation of the attorney-client privilege or work product doctrine" (*id.*); and the attorney's professional obligation to make sure that the fees are reasonable may be compromised by the corporation (*id.*). Unlike *Button*, *Trainmen*, *Mine Workers*, *United Transportation Union*, and *Primus*, where it was clear on those records that the ills the government sought to limit did not manifest themselves in a sufficient manner to justify the government's regulations, the record before this Court does not permit such an evaluation concerning CAI. Due to the absence of a sufficient factual record, CAI has failed to rebut the presumption of validity under a rational basis review of the UPL Statutes.

18

CAI's third claim is that the UPL Statutes violate its free speech rights under the First Amendment. CAI argues that "legal advice is pure speech." (ECF No. 20 at 20.) CAI further argues that the UPL Statutes "censor that speech based on its content . . . and the speaker's identity" and, thus, cannot withstand strict or intermediate constitutional scrutiny. (*Id.* at 19, 23.)

Similar to the other claims discussed, this Court is unable to evaluate the merits of CAI's free speech claim. CAI claims that the UPL Statutes infringe on its free speech rights because it cannot give "legal advice" to its members. However, CAI desires to provide legal services that extend beyond just rendering "legal advice." Therefore, whether the UPL Statutes as applied to CAI regulate speech or the practice of law is not clear on this record. It is well established that "[a] statute that governs the practice of an occupation is not unconstitutional as an abridgment of the right to free speech, so long as 'any inhibition of that right is merely the incidental effect of observing an otherwise legitimate regulation.'" *Accountant's Soc'y of Va. v. Bowman*, 860 F.2d 602, 604 (4th Cir. 1988) (quoting *Underhill Assocs., Inc. v. Bradshaw*, 674 F.2d 293, 296 (4th Cir. 1982)). Moreover, assuming that there is some protected speech that is being regulated by the UPL Statutes, the Court must still evaluate North Carolina's interest in applying the UPL Statutes to CAI. The scope of legal services CAI seeks to offer, along with the other missing facts as outlined above, are therefore very important to any constitutional analysis in this case, irrespective of the level of scrutiny that applies.

As it relates to CAI's fourth claim that "legal advice" as defined in the UPL Statutes is unconstitutionally vague, the Complaint and declarations provided by CAI fail

to suggest that CAI is unable to discern what constitutes "legal advice." To the contrary, these materials seem to indicate that CAI has been able to determine when the advice it gives to its members crosses the line into the area of "legal advice." (*See* ECF No. 15 ¶ 5; ECF No. 17 ¶ 4; ECF No. 18 ¶ 4.) That issue, like the rest of CAI's federal constitutional arguments, will need to be further developed. In addition, the Court need not address CAI's fifth claim that the UPL Statutes violate its First Amendment right to advertise since that issue is directly tied to, and dependent upon, the larger question of whether CAI has the right to provide legal services to its members.

Finally, federalism and comity principles counsel against reaching the merits of CAI's sixth claim—that the UPL Statutes violate the North Carolina Constitution—on a motion for a preliminary injunction, as that claim turns on an important issue confined to North Carolina law.[6] *See 75–80 Props., LLC v. Bd. of Cty. Comm'rs*, No. RDB 09-2977, 2010 WL 917635, at *5 (D. Md. Mar. 10, 2010) ("Where a pendent state claim turns on novel or unresolved questions of state law, especially where those questions concern the state's interest in the administration of its government, principles of federalism and comity may dictate that these questions be left for decision by the state courts." (quoting

---

[6] The North Carolina Supreme Court upheld the UPL Statues under the North Carolina Constitution in 1936 and 1986. *See Gardner v. N.C. State Bar*, 341 S.E.2d 517, 523 (N.C. 1986); *Seawell v. Carolina Motor Club, Inc.*, 184 S.E. 540, 544 (N.C. 1936). The North Carolina Business Court has also upheld the UPL Statutes against a challenge under the monopoly clause of the North Carolina Constitution. *See N.C. State Bar v. Lienguard, Inc.*, No. 11 CVS 7288, 2014 WL 1365418, at *15 (N.C. Super. Ct. Apr. 4, 2014). Though CAI attempts to distinguish these cases, the fact remains that the North Carolina courts have upheld the UPL Statutes under the North Carolina Constitution.

*Seabrook v. Jacobson*, 153 F.3d 70, 72 (2d Cir. 1998))); *see also Arrington v. City of Raleigh*, 369 F. App'x. 420, 423 (4th Cir. 2010).

In sum, CAI has failed to demonstrate that *Button*, *Trainmen*, *Mine Workers*, *United Transportation Union*, and *Primus* provide a clear path to the injunction that it seeks. While CAI has articulated broad principles from those cases, on the record before the Court, it has failed to establish the application of those principles to CAI and its members. Further, with such a skeletal record, the Court is unable to engage in a meaningful review of the merits of CAI's claims. Accordingly, the Court concludes that CAI has failed to make a "clear showing" of likelihood of success on the merits. Many courts have also denied a motion for preliminary injunction where the plaintiff has failed to make a "clear showing" of likelihood of success on the merits due to an undeveloped record. *See, e.g.*, *Dao Travels, LLC v. Charleston Black Cab Co.*, No. 2:14-cv-01967-PMD, 2015 WL 631137, at *6 (D.S.C. Feb. 13, 2015) (denying a motion for preliminary injunction due to concerns about the limited record before the court); *St. Jude Med. S.C., Inc. v. Janssen-Counotte*, No. A-14-CA-877-SS, 2014 WL 7237411, at *14 (W.D. Tex. Dec. 17, 2014) (noting that there are "far too many open questions and disputed issues of fact to conclude at this juncture" that the plaintiff had shown a substantial likelihood of success on the merits with respect to the motion for preliminary injunction); *Jones v. Hamilton Cty.*, 891 F. Supp. 2d 870, 889 (E.D. Tenn. 2012) (holding that "the record before the Court is far too underdeveloped to adequately analyze" the plaintiff's as-applied challenge to the county's prayer policy under the First Amendment); *Nat'l Black Police Ass'n v. D.C. Bd. of Elections & Ethics*, 858 F. Supp. 251, 258 (D.D.C. 1994)

21

("Absent a more developed factual record, the Court cannot find that plaintiffs have carried their burden of showing a likelihood of success on the merits.").

## 2. Irreparable Harm

Although CAI is correct that the loss of First Amendment rights constitutes irreparable harm, *Newsom v. Albemarle Cty. Sch. Bd.*, 354 F.3d 249, 261 (4th Cir. 2003), merely asserting a constitutional claim as CAI has done "is insufficient to automatically trigger a finding of irreparable harm." *KM Enters., Inc. v. McDonald*, No. 11-cv-5098 (ADS)(ETB), 2012 WL 540955, at *3 (E.D.N.Y. Feb. 16, 2012) (quoting *Donohue v. Paterson*, 715 F. Supp. 2d 306, 315 (N.D.N.Y. 2010)); *see also Pub. Serv. Co. of N.H. v. Town of West Newbury*, 835 F.2d 380, 382 (1st Cir. 1987). The Fourth Circuit has held that within the context of constitutional violations, "a plaintiff's claimed irreparable harm is 'inseparably linked' to the likelihood of success on the merits." *WV Ass'n of Club Owners & Fraternal Servs., Inc. v. Musgrave*, 553 F.3d 292, 298 (4th Cir. 2009); *Y.K. Enters., Inc. v. City of Greensboro*, No. 1:07CV0289, 2007 WL 2781706, at *3 (M.D.N.C. Sept. 21, 2007). Because CAI has failed to clearly show that it would likely prevail on the merits, for the reasons outlined above, the Court must also conclude that the same holds true for CAI's argument that it would likely suffer irreparable harm.

Even if this Court had found a likelihood of success on the merits, it is questionable whether CAI could establish irreparable harm if denied the injunctive relief requested. CAI is not before the Court in exigent circumstances. CAI did not bring this action due to a recent change in the law; nor is this matter before the Court due to deteriorating circumstances created by the State. North Carolina has prohibited the

22

corporate practice of law for over 80 years. *See Seawell v. Carolina Motor Club, Inc.*, 184 S.E. 540, 544 (N.C. 1936).[7] Throughout CAI's 50 years of existence, it has never practiced law. Further, the declarations offered by CAI do not support its claim of irreparable harm. CAI "views this lawsuit as a necessary next step because persistent efforts to have a debate and open discussion leading to a change in the law have been unsuccessful in the General Assembly of North Carolina."[8] (ECF No. 16 ¶ 6.) Only after these attempts failed did CAI file this lawsuit. Nor does CAI's delay in bringing this suit bolster its claim that it will suffer irreparable harm in the absence of a preliminary injunction. *See Doe v. Banos*, 713 F. Supp. 2d 404, 415 n.15 (D.N.J. 2010) (explaining that the plaintiff's lack of urgency in bringing the action undermines his claim of irreparable harm to his First Amendment rights); *Utah Gospel Mission v. Salt Lake City Corp.*, 316 F. Supp. 2d 1201, 1220–21 (D. Utah 2004) (noting that the plaintiffs' unnecessary delay in seeking a preliminary injunction tends to indicate their First Amendment rights will not be irreparably harmed in the absence of injunctive relief); *Costello v. McEnery*, 767 F. Supp. 72, 78 (S.D.N.Y. 1991) (explaining that the plaintiff's delay in seeking enforcement of his constitutional rights "tends to indicate at least a reduced need for such drastic, speedy action"); *Manhattan State Citizens' Grp., Inc. v.*

---

[7] In *Seawell*, the Supreme Court upheld Section 199(a) of the 1935 North Carolina Code, the predecessor statute of Section 84-5 of the North Carolina General Statutes. 184 S.E. at 544.

[8] Before approaching the North Carolina General Assembly, CAI met with representatives from the State Bar to seek the State Bar's support for its legal services plan. (ECF No. 41 ¶¶ 3–5.) In 2011 and 2013, bills were introduced in the North Carolina General Assembly to amend the UPL Statutes as CAI indicated in its meeting with the State Bar. (*Id.* ¶¶ 8–11.) If it is a change in the law that CAI seeks, rather than a vindication of constitutional rights, CAI must follow the normal adjudicatory process.

23

*Bass*, 524 F. Supp. 1270, 1276 (S.D.N.Y. 1981) (explaining that "[i]t is an unfair imposition on the defendants and on the Court to force an unnecessarily hasty decision on such an important question of constitutional law" when the plaintiff's counsel unnecessarily waited fifteen months to file suit). Courts must be vigilant to ensure that this extraordinary remedy is not used to manufacture a sense of urgency where none exists so as to allow the case to leapfrog earlier filed actions that may be of equal or greater urgency.

### 3. Balance of Equities and Public Interest

The Court rejects CAI's argument that no harm will come to the State by preliminarily enjoining State Prosecutors from enforcing the UPL Statutes and that such an injunction is in the public interest. Entering temporary relief in favor of CAI based on speculation as to the facts due to an undeveloped record has the potential to create unnecessary uncertainty within the State, the State Bar, the general public, and CAI and its members.

That North Carolina has "broad power to regulate the practice of law is, of course, beyond question." *See Mine Workers*, 389 U.S. at 222. North Carolina has delegated to the State Bar the responsibility of regulating the practice of law in North Carolina. However, the State Bar's ability to meet its obligations, which include protecting the public, would be severely hampered by a ruling in favor of CAI that does not reflect finality. In particular, the Court's interim ruling would implicate a number of rules of ethics and professional responsibility, with the impact extending much further than CAI and its members. Specifically, the Court's interim ruling would implicate Rule 5.4(a) of

the Rules of Professional Conduct, which currently prohibits lawyers from sharing legal fees with non-lawyers. Similarly, the Court's interim ruling would implicate Rule 5.4(b), which prohibits a person or entity paying a lawyer to render legal services to another person or entity from directing or regulating the lawyer's judgment in rendering such legal services. Attorney-client issues related to confidentiality would also be implicated if the Court grants CAI's motion for preliminary injunction.

Having the State Bar address these issues without the benefit of a final ruling on the merits will impair the State Bar's ability to protect the public. The Fourth Circuit has stated that "the public interest . . . is served by adherence to the State statute unless and until it is declared invalid." *Telvest, Inc. v. Bradshaw*, 618 F.2d 1029, 1036 (4th Cir. 1980). North Carolina has a long history of personal representation by attorneys of clients as opposed to corporate representation. *See Gardner v. N.C. State Bar*, 341 S.E.2d 517, 522–23 (N.C. 1986). Although upholding constitutional rights serves the public interest, as CAI notes, this case deserves to be addressed in a deliberate and thoughtful manner, which will ensure fairness, finality, and that no harm comes to the public by any changes to the UPL Statutes.

In sum, CAI has failed to demonstrate a clear showing of likelihood of success on the merits and that it will suffer irreparable harm if denied a preliminary injunction. The Fourth Circuit has made clear that a preliminary injunction is an extraordinary remedy, only to be employed in those limited circumstances that *clearly* call for it. Based on this record, or lack thereof, CAI has failed to show that its case is one calling for such extraordinary relief. Where, as in this case, "substantial issues of constitutional

dimensions" are before the court, those issues "should be fully developed at trial in order

to [e]nsure a proper and just resolution." *Wetzel v. Edwards*, 635 F.2d 283, 291 (4th Cir.

1980); *see also Price v. City of Fayetteville*, No. 5:13-CV-150-FL, 2013 WL 1751391, at

*4 (E.D.N.C. Apr. 23, 2013) ("'On an application for preliminary injunction, the court is

not bound to decide doubtful and difficult questions of law or disputed questions of fact,'

and '[a]s a prerequisite to the issuance of an interlocutory injunction, . . . [t]here must be

no disputed issues of fact.'" (alterations in original) (quoting *Gantt v. Clemson Agric.

Coll. of S.C.*, 208 F. Supp. 416, 418–19 (W.D.S.C. 1962))).  For all the reasons outlined

above, CAI's motion for preliminary injunction must be denied.

## IV.  MOTION TO DISMISS

State Prosecutors move to dismiss CAI's Complaint pursuant to Rule 12(b)(1) for

lack of subject matter jurisdiction, Rule 12(b)(6) for failure to state a claim, and Rule

12(b)(7) for failure to join a necessary party under Rule 19.

### A.  Legal Standards

#### 1.  Subject Matter Jurisdiction pursuant to Rule 12(b)(1)

Subject matter jurisdiction is a threshold question that relates to the power of the

court to hear a case and must be resolved before a court addresses the merits of a case.

*See Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 479–80 (4th

Cir. 2005).  The court has an independent obligation to assess whether it has subject

matter jurisdiction, irrespective of whether it is raised by the parties.  *Wye Oak Tech., Inc.

v. Republic of Iraq*, 666 F.3d 205, 218 (4th Cir. 2011).  The court's subject matter

jurisdiction is limited in that the court "possess[es] only the jurisdiction authorized . . . by

the United States Constitution and by federal statute." *United States ex rel. Vuyyuru v. Jadhav*, 555 F.3d 337, 347 (4th Cir. 2009). When subject matter jurisdiction is at issue, the court can make appropriate inquiry outside of the pleadings to ensure that it has the authority to entertain the case. *Id.* at 348. The burden of proving subject matter jurisdiction rests with the plaintiff, the party asserting that jurisdiction exists. *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982). If the plaintiff fails to prove subject matter jurisdiction, the court must dismiss the action. *Vuyyuru*, 555 F.3d at 347.

A court may exercise jurisdiction in a federal declaratory judgment proceeding when (1) the complaint shows that there is an actual controversy between the parties, (2) the claim arises under federal law, and (3) the exercise of jurisdiction is not an abuse of discretion. *Volvo Constr. Equip. N. Am., Inc. v. CLM Equip. Co.*, 386 F.3d 581, 592 (4th Cir. 2004).

## 2. Failure to State a Claim pursuant to Rule 12(b)(6)

The purpose of a motion made under Rule 12(b)(6) of the Federal Rules of Civil Procedure "is to test the sufficiency of a complaint." *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). To survive a motion to dismiss, a complaint must contain sufficient factual matter which, if accepted as true, states "a cognizable cause of action, 'even if . . . [the] actual proof of those facts is improbable and . . . recovery is very remote and unlikely.'" *Brown v. Target, Inc.*, No. ELH-14-00950, 2015 WL 2452617, at *8 (D. Md. May 20, 2015) (alteration in original) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)); *see Coleman v. Poff*, 497 F. App'x. 337, 339 (4th Cir. 2012). Although a plaintiff need only plead a short and plain statement of the claim establishing that he or

27

she is entitled to relief, *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992), "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. Nor is the court required to accept a plaintiff's legal conclusions. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Twombly*, 550 U.S. at 555. In other words, the complaint must contain sufficient facts to "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570.

A dismissal under Rule 12(b)(6) is appropriate only when the complaint "lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory." *Brown*, 2015 WL 2452617, at *9 (quoting *Hartmann v. Cal. Dep't of Corr. & Rehab.*, 707 F.3d 1114, 1122 (9th Cir. 2013)); *see also Brockington v. Boykins*, 637 F.3d 503, 505 (4th Cir. 2011) ("[D]ismissal is inappropriate unless, accepting as true the well-pled facts in the complaint and viewing them in the light most favorable to the plaintiff, the plaintiff is unable to 'state a claim . . . .'" (quoting *Twombly*, 550 U.S. at 570)).

### 3. Failure to Join a Necessary Party pursuant to Rule 12(b)(7)

Rule 12(b)(7) of the Federal Rules of Civil Procedure allows for dismissal when a plaintiff has failed to join a necessary party under Rule 19 of the Federal Rules of Civil Procedure. Under Rule 19, a required party must be joined as a party to the action if feasible. Fed. R. Civ. P. 19(a)(1); *see Maryland v. Universal Elections, Inc.*, 729 F.3d 370, 379 (4th Cir. 2013). A party is required if the court, "in that person's absence, . . . cannot accord complete relief among existing parties." *Universal Elections*, 729 F.3d at 379. A party is also required if

28

that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may: (i) as a practical matter impair or impede the person's ability to protect the interest; or (ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.

*Id.* The Fourth Circuit has cautioned that dismissal of a case for failure to join a required party is a drastic remedy. *Teamsters Local Union No. 171 v. Keal Driveaway Co.*, 173 F.3d 915, 918 (4th Cir. 1999).

## B. Subject Matter Jurisdiction

State Prosecutors argue that CAI has failed to establish a case and controversy pursuant to Article III of the United States Constitution. (ECF No. 10 ¶ 2.) Article III "confines the federal courts to adjudicating actual 'cases' and 'controversies.'" *Allen v. Wright*, 468 U.S. 737, 750 (1984). The Supreme Court has identified standing, ripeness, and the political question doctrine as "doctrines that cluster about Article III." *Id.* The Court addresses each of these doctrines in turn.

### 1. Article III Standing

State Prosecutors assert that CAI lacks Article III standing because CAI failed to allege any facts that would suggest State Prosecutors had anything to do with the proposed ethics decision the State Bar issued to CAI. (ECF No. 11 at 3.) State Prosecutors further assert that CAI has failed to allege facts that would "imply that defendants have ever taken any action or made any statements concerning plaintiff's business, or that defendants have any intention of ever taking any action or making any

29

statements under N.C.G.S. §§ 84-4 and 84-5 against the corporation or its (unnamed) attorneys." (*Id.*)

Although the State Bar and State Prosecutors are tasked with enforcing the UPL Statutes, the State Bar's proposed ethics opinion is not the source of harm alleged by CAI. Only State Prosecutors may initiate criminal proceedings against a party that has violated the UPL Statutes. N.C. Gen. Stat. § 84-7. The State Bar may investigate and enjoin practices that constitute the unauthorized practice of law but have no authority to criminally prosecute violations. *Id.* § 84-37. It is CAI's fear of criminal prosecution under the UPL Statutes that is the source of harm alleged by CAI. (*See* ECF No. 1 ¶¶ 40, 44.)

To determine whether a plaintiff has Article III standing, three elements must be satisfied: injury-in-fact, causation, and redressability. *Cooksey v. Futrell*, 721 F.3d 226, 234–35 (4th Cir. 2013). The Supreme Court has also explained that in First Amendment cases, the rules of standing are somewhat relaxed. *See Sec'y of State of Md. v. Joseph H. Munson Co.*, 467 U.S. 947, 956, 957 n.7 (1984); *Cooksey*, 721 F.3d at 235. This is so because "the concern that constitutional adjudication be avoided whenever possible may be outweighed by society's interest in having the statute challenged." *Munson*, 467 U.S. at 956; *see Lopez v. Candaele*, 630 F.3d 775, 781 (9th Cir. 2010) ("First Amendment cases raise 'unique standing considerations' that 'tilt[ ] dramatically toward a finding of standing.'" (alteration in original) (citation omitted)). "The leniency of First Amendment standing manifests itself most commonly in the doctrine's first element: injury-in-fact." *Cooksey*, 721 F.3d at 235.

Courts define injury-in-fact as "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Id.* (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). However, in First Amendment cases, the injury-in-fact element is often satisfied when a party engages in self-censorship—that is, "when a claimant is chilled from exercising h[is] right to free expression." *Id.* (alteration in original) (quoting *Benham v. City of Charlotte*, 635 F.3d 129, 135 (4th Cir. 2011)). The Fourth Circuit has explained:

> We have recognized that, to demonstrate injury in fact, it is sufficient to show that one's First Amendment activities have been chilled. Subjective or speculative accounts of such a chilling effect, however, are not sufficient. Any chilling effect must be objectively reasonable. Nevertheless, a claimant need not show she ceased those activities altogether to demonstrate an injury in fact. Government action will be sufficiently chilling when it is likely to deter a person of ordinary firmness from the exercise of First Amendment rights.

*Benham*, 635 F.3d at 135. Where, as in this case, "the State has not disclaimed any intention of enforcing [the challenged statute], [a plaintiff] need not actually violate [that statute], or be proactively threatened with prosecution prior to violation, in order to have standing to challenge its constitutionality." *Does 1–5 v. Cooper*, 40 F. Supp. 3d 657, 671–72 (M.D.N.C. 2014). A statute that "facially restricts expressive activity by the class to which the plaintiff belongs presents such a credible threat." *Cooksey*, 721 F.3d at 237 (emphasis omitted) (quoting *N.C. Right to Life, Inc. v. Bartlett*, 168 F.3d 705, 710 (4th Cir. 1999)).

It is undisputed that CAI belongs to the class of entities targeted by the UPL Statutes. It is a crime punishable as a Class 1 misdemeanor for CAI, a corporation, to

31

provide legal advice and services to its members. *See* N.C. Gen Stat. § 84-8 ("Any person, corporation, or association of persons violating any of the provisions of G.S. 84-4 through G.S. 84-6 or G.S. 84-9 shall be guilty of a Class 1 misdemeanor."). CAI has alleged that the First Amendment guarantees it the right to provide such services but that it has chosen not to do so out of fear of prosecution. (*See* ECF No. 1 ¶¶ 4, 41–44.) State Prosecutors have not stated that they would refrain from prosecuting CAI for violating the UPL Statutes. Nor have State Prosecutors stated that they disagree with the State Bar's proposed ethics opinion issued to CAI. To the contrary, State Prosecutors and the State Bar vigorously contend that CAI lacks the right to provide its members with legal advice and services. CAI need not subject itself to criminal prosecution to establish standing to challenge the UPL Statutes. *See N.C. Right to Life*, 168 F.3d at 710 ("When a plaintiff faces a credible threat of prosecution under a criminal statute he has standing to mount a pre-enforcement challenge to that statute."). The Court is satisfied that CAI has alleged sufficient facts to establish injury-in-fact.

With the injury-in-fact requirement satisfied, CAI clears the other two hurdles for standing: causation and redressability. To satisfy the causation requirement, there must be "a causal connection between the injury and the conduct complained of that is 'fairly traceable,' and not 'the result of the independent action of some third party not before the court.'" *Cooksey*, 721 F.3d at 238 (quoting *Frank Krasner Enters., Ltd. v. Montgomery Cty.*, 401 F.3d 230, 234 (4th Cir. 2005)). Redressability is satisfied "where there is 'a non-speculative likelihood that the injury would be redressed by a favorable judicial decision.'" *Id.*

32

Here, there is a causal connection between the injury of which CAI complains, *i.e.*, the alleged chilling of its rights under the First Amendment, and the conduct of which CAI complains, *i.e.*, the threat of prosecution by State Prosecutors. With respect to redressability, a favorable decision from this Court would mean that the UPL Statutes would be found to be unconstitutional as applied to CAI, and State Prosecutors would be enjoined from enforcing the UPL Statutes against CAI. CAI would thus have full redress because under such a scenario, CAI would be able to provide legal advice and services to its members without fear of prosecution. The Court concludes that CAI has alleged sufficient facts to establish causation and redressability and, thus, standing.

2. Ripeness

CAI argues that its claims are "ripe for review at once." (ECF No. 22 at 11 (quoting *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S 871, 891 (1990).) Specifically, CAI contends that its claims "pose legal, rather than factual, questions—they do not require the resolution of disputed facts." (*Id.* ("[T]here is no further action that is needed to develop a factual record or provide the Court with an appropriate question to review.").)

However, CAI has raised an as-applied rather than a facial challenge to the UPL Statutes. "Because the question of ripeness depends on the timing of the adjudication of a particular issue, it applies differently to facial and as-applied challenges." *Harris v. Mexican Specialty Foods, Inc.*, 564 F.3d 1301, 1308 (11th Cir. 2009) (citation omitted); *Doe v. Va. Dep't. of State Police*, 713 F.3d 745, 761–62 (4th Cir. 2013). On an as-applied challenge, a party argues that the statute is unconstitutional as applied, after developing a sufficient factual record. *See Harris*, 564 F.3d at 1308 (explaining that an

33

as-applied challenge "necessarily requires the development of a factual record for the court to consider"). In contrast, a facial challenge, which is purportedly not the type of challenge CAI has raised, contemplates "that a statute always operates in an unconstitutional manner." *Doe*, 713 F.3d at 762. Such a challenge therefore does not require the development of a factual record prior to adjudication by a court. *Harris*, 564 F.3d at 1308.

To the extent that CAI presses for a decision on the merits, it must sufficiently develop the record before its claims are ripe for review by this Court. *See Ostergren v. Cuccinelli*, 615 F.3d 263, 288 (4th Cir. 2010) ("[T]he doctrine of ripeness prevents judicial consideration of issues until a controversy is presented in clean-cut and concrete form . . . ." (quoting *Miller v. Brown*, 462 F.3d 312, 318–19 (4th Cir. 2006))); *id.* ("[P]roblems such as the inadequacy of the record . . . or ambiguity in the record . . . will make a case unfit for adjudication on the merits." (quoting *Scott v. Pasadena Unified Sch. Dist.*, 306 F.3d 646, 662 (9th Cir. 2002))). This does not, however, warrant dismissal because eventually a developed record will be before the Court. *See Jones*, 891 F. Supp. 2d at 889.

### 3. The Political Law Doctrine

State Prosecutors argue that "Plaintiff corporation, in alleging the attorneys which it employs (or may in the future employ) are treated differently than a 'privileged class,' presents this court with a political question." (ECF No. 11 at 11.) The Court disagrees.

While there are instances where "the judicial department has no business entertaining the claim of unlawfulness—because the question is entrusted to one of the

34

political branches or involves no judicially enforceable rights," *Vieth v. Jubelirer*, 541 U.S. 267, 277 (2004) (plurality opinion)—"[i]t is emphatically the province and duty of the judicial department to say what the law is," *Marbury v. Madison*, 1 Cranch 137, 177 (1803). In other words, "[a] claim presents a political question when the responsibility for resolving it belongs to the legislative or executive branches rather than to the judiciary." *In re KBR, Inc., Burn Pit Litig.*, 744 F.3d 326, 334 (4th Cir. 2014); *see Baker v. Carr*, 369 U.S. 186, 210 (1962) ("The nonjusticiability of a political question is primarily a function of the separation of powers."). In *Baker*, the Supreme Court articulated six factors that courts should consider in determining whether a case presents a non-justiciable political question:

> [1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; or [2] a lack of judicially discoverable and manageable standards for resolving it; or [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or [5] an unusual need for unquestioning adherence to a political decision already made; or [6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

369 U.S. at 217. Among the matters that have been held non-justiciable under the political question doctrine are claims involving political gerrymandering,[9] most military decisions,[10] foreign affairs,[11] and impeachment and removal.[12]

---

[9] *See, e.g., Vieth*, 541 U.S. at 281 (plurality opinion) ("[N]o judicially discernible and manageable standards for adjudicating political gerrymandering claims have emerged. Lacking them, we must conclude that political gerrymandering claims are nonjusticiable . . . .").

None of the six factors identified in *Baker* warrant dismissing CAI's claims based on the political law doctrine. CAI alleges that it has a fundamental right embodied in the Constitution to provide its members with legal services. Although State Prosecutors are correct that the State has discretion in "[d]efining the class of persons subject to a regulatory requirement," *Beach Commc'ns*, 508 U.S. at 315, the State cannot "infringe[] fundamental constitutional rights" in doing so, *id.* at 313. *See also Helton v. Hunt*, 330 F.3d 242, 246 (4th Cir. 2003) ("Given the inherent difficulties in drawing lines and creating classifications, the Supreme Court has accorded legislative enactments a strong presumption of validity so long as they do not discriminate against any protected class or burden any fundamental right."). The fact that North Carolina prefers to restrict the practice of law by corporations does not deprive this Court of the ability to determine whether the laws reflecting the State's policy preference violate any fundamental rights. Such a determination "require[s] no more than an interpretation of the Constitution."

---

[10] *See, e.g.*, *KBR*, 744 F.3d at 334 ("[T]he Constitution delegates authority over military affairs to Congress and to the President as Commander in Chief. It contemplates no comparable role for the judiciary . . . . [J]udicial review of military decisions would stray from the traditional subjects of judicial competence." (second alteration in original) (quoting *Lebron v. Rumsfeld*, 670 F.3d 540, 548 (4th Cir. 2012))).

[11] *See, e.g.*, *El-Shifa Pharm. Indus. Co. v. United States*, 607 F.3d 836, 841 (D.C. Cir. 2010) ("Disputes involving foreign relations . . . are 'quintessential sources of political questions.'" (quoting *Bancoult v. McNamara*, 445 F.3d 427, 433 (D.C. Cir. 2006))); *id.* (explaining that courts should rarely intervene in foreign policy and national security matters "[b]ecause these cases raise issues that 'frequently turn on standards that defy judicial application' or 'involve the exercise of a discretion demonstrably committed to the executive or legislature'" (quoting *Baker*, 369 U.S. at 211)).

[12] *See, e.g.*, *Nixon v. United States*, 506 U.S. 224, 229, 230–31, 238 (1993) (concluding that the case is non-justiciable because there is a clear textual commitment in Article I that gives the Senate "the sole Power to try all Impeachments").

*Powell v. McCormack*, 395 U.S. 486, 548 (1969). It is this Court's responsibility to interpret the Constitution. *See id.* at 548–49. Accordingly, CAI's claims do not present a non-justiciable political question.

### C. Failure to State a Claim

The Court must next determine whether CAI's claims survive State Prosecutors' motion to dismiss for failure to state a claim. CAI brings its claims under 42 U.S.C. § 1983. A party asserting claims under Section 1983 "must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988); *Philips v. Pitt Cty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009).

### 1. CAI's First Amendment Claims

State Prosecutors argue that "[t]here is no fundamental right to render legal assistance or practice law" under the First Amendment, relying in part on *Shaw v. Murphy*, 532 U.S. 223 (2001). (ECF No. 11 at 5–6.) They assert that rational basis review is the correct standard of review that this Court should apply to the UPL Statutes. (*Id.* at 7.) Noting that the State has a legitimate interest in regulating the legal profession, State Prosecutors conclude that the UPL Statutes pass rational basis review. (*Id.*)

State Prosecutors' argument that there is no fundamental right to practice law does not answer the question of whether CAI's proposal to provide its members with "legal advice" touches on rights protected under the First Amendment. Nor does the Supreme Court's decision in *Shaw* support State Prosecutors' argument. *Shaw* dealt with whether

the Supreme Court's deferential standard for reviewing a prisoner's constitutional claim "permits an increase in constitutional protection whenever a prisoner's communication includes legal advice." 532 U.S. at 230. The Supreme Court held that "it does not." *Id.* The Supreme Court's decision in *Shaw* has no application to this case. Moreover, whether or not the State can provide a sufficient interest that justifies restricting CAI from providing legal advice to its members is not an issue that the Court must resolve at this time. Rather, the threshold issues currently before the Court are whether the UPL Statutes, as applied to CAI, infringe any First Amendment rights, particularly as they relate to the right of association and freedom of speech as alleged by CAI.

a. First Amendment Right of Association

Related to its right of association claim under the First Amendment, CAI has alleged that it is an association comprised of members that have pooled their resources for the purpose of receiving low-cost human resources information services and advice from one another. (ECF No. 1 ¶¶ 17, 42.) By "prevent[ing] CAI['s] members from associating to secure legal advice and services," CAI alleges that the UPL Statutes prohibit CAI's members from fully receiving the advice and services they need. (*Id.* ¶ 43.) Relying on *Button* and its progeny, CAI contends that the First Amendment right of association gives it the right to provide legal services to its members. (*See id.* ¶¶ 54–60; ECF No. 22 at 11–12.) While it is true that the Supreme Court held that "[t]he common thread running through [its] decisions in [*Button*, *Trainmen*, and *Mine Workers*] is that collective activity undertaken to obtain meaningful access to the courts is a fundamental right within the protection of the First Amendment," *United Transp. Union*, 401 U.S. at

38

585, as this Court stated earlier, CAI, on the record currently before the Court, has failed to show a clear likelihood that it, its members, and the desired activities fall within the First Amendment protections afforded in those cases. However, when the Court evaluates a Rule 12(b)(6) motion, it applies a "sufficiency of the pleadings" standard, which requires a lesser showing than the "clear likelihood of success" standard applicable to motions for preliminary injunction. CAI's complaint can survive a Rule 12(b)(6) motion even if "recovery is very remote and unlikely." *See Twombly*, 550 U.S. at 556 (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)). Thus, the Court determines that CAI has alleged sufficient facts to support a cognizable claim related to its right of association claim under the First Amendment.

### b. First Amendment Right of Free Speech

Similarly, CAI has provided sufficient facts to state a claim under the First Amendment's free speech clause. CAI argues that "legal advice, standing alone, is pure speech, and the UPL Statutes impermissibly infringe on CAI's First Amendment rights by censoring CAI's speech based on its (legal) content" and based on its identity as a corporation. (ECF No. 22 at 12; ECF No. 1 ¶¶ 64–72.) Thus, the Court must determine whether "legal advice" is protected speech under the First Amendment.

A recent Supreme Court decision suggests that providing legal advice is protected to some extent as speech under the First Amendment. In *Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010), the plaintiffs challenged a federal statute that prohibited them from providing "material support," which included legal training and advice, to certain terrorist organizations. *Id.* at 10–11. The plaintiffs argued that the statute violated,

among other things, their free speech rights. *Id.* The government argued that the statute targeted conduct and not speech. *Id.* at 26. The Supreme Court rejected the government's argument, explaining that "[t]he Government is wrong that the only thing actually at issue in this litigation is conduct." *Id.* at 27. The Court stated:

> Plaintiffs want to speak to the [organizations], and whether they may do so under § 2339B depends on what they say. If plaintiffs' speech to those groups imparts a 'specific skill' or communicates advice derived from 'specialized knowledge'—for example, training on the use of international law or advice on petitioning the United Nations—then it is barred. On the other hand, plaintiffs' speech is not barred if it imparts only general or unspecialized knowledge.

*Id.* (citation omitted).

In this case, CAI has alleged that it seeks to provide its members with legal advice. To the extent that such advice is communicated, CAI has stated a cognizable claim that "legal advice" implicates some speech under the First Amendment.[13] Whether the state can regulate it to the exclusion of CAI is an issue that goes to the merits of CAI's claims. At this stage of the proceedings, CAI has alleged sufficient facts to support a cognizable

---

[13] Other courts, including the Fourth Circuit, have reached similar conclusions. *See Wollschlaeger v. Governor of Fla.*, --- F.3d ---, 2015 WL 4530452, at *16 (11th Cir. 2015); *Stuart v. Camnitz*, 774 F.3d 238, 245 (4th Cir. 2014); *King v. Governor of N.J.*, 767 F.3d 216, 224–25 (3d Cir. 2014).

40

claim under the First Amendment's free speech clause. State Prosecutors' motion to dismiss related to this claim is denied.[14]

### 2. State Prosecutors' Sovereign Immunity Argument[15]

This Court rejects State Prosecutors' argument that "[n]o one has a right to enjoin a District Attorney or the Attorney General from the performance of their constitutional and statutory duties." (ECF No. 11 at 8.) To the extent the Court concludes that the performance of their duties infringes on fundamental rights, State Prosecutors must yield to the commands of the United States Constitution, irrespective of the duties prescribed to them by statute or state constitution. Moreover, this is not a case where CAI seeks money damages from the State or State Prosecutors in their roles as state officials. Under that scenario, State Prosecutors would enjoy sovereign immunity under the Eleventh Amendment. *Edelman v. Jordan*, 415 U.S. 651, 663 (1974); *see Hutto v. S.C. Ret. Sys.*, 773 F.3d 536, 549 (4th Cir. 2014) ("State officials sued in their official capacities for retrospective money damages have the same sovereign immunity accorded to the State."). Rather, CAI seeks prospective injunctive relief against State Prosecutors in their official

---

[14] The Court need not address in detail State Prosecutors' argument for dismissing CAI's claim related to advertisement of its legal services, as that claim is tied to the larger question of whether CAI has a right to provide legal services. Further, the Supreme Court has stated that "advertising by attorneys may not be subjected to blanket suppression." *Bates v. State Bar of Ariz.*, 433 U.S. 350, 383 (1977). Because CAI has stated a claim for an alleged violation of its First Amendment rights of free speech and association, the Court finds that CAI has also stated a claim for relief with regard to its advertisement claim under the First Amendment.

[15] The Fourth Circuit has held that immunity under the Eleventh Amendment does not go to a court's subject matter jurisdiction; rather, immunity operates like an affirmative defense with the defendant bearing the burden of establishing it. *Hutto v. S.C. Ret. Sys.*, 773 F.3d 536, 543 (4th Cir. 2014).

41

capacities only.  Immunity therefore does not apply.  *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 102–03 (1984); *McBurney v. Cuccinelli*, 616 F.3d 393, 399 (4th Cir. 2010) (explaining that immunity does not bar a federal court from issuing "prospective, injunctive relief against a state officer to prevent ongoing violations of federal law, on the rationale that such a suit is not a suit against the state for purposes of the Eleventh Amendment").  Over 100 years ago, the Supreme Court stated:

> If the act which the state Attorney General seeks to enforce be a violation of the Federal Constitution, the officer in proceeding under such enactment comes into conflict with the superior authority of that Constitution, and he is in that case stripped of his official or representative character and is subjected in his person to the consequences of his individual conduct.  The State has no power to impart to him any immunity from responsibility to the supreme authority of the United States.

*Ex parte Young*, 209 U.S. 123, 159–60 (1908).  All that is required of CAI is that it allege ongoing violations of its constitutional rights, which CAI has done, and that State Prosecutors have some connection with the enforcement of the UPL Statutes, which has also been satisfied in this case.  *See S.C. Wildlife Fed'n v. Limehouse*, 549 F.3d 324, 332 (4th Cir. 2008) ("Where a state law is challenged as unconstitutional, a defendant must have 'some connection with the enforcement of the act' in order to properly be a party to the suit." (quoting *Lytle v. Griffith*, 240 F.3d 404, 409 (4th Cir. 2001))).  Thus, the Court rejects State Prosecutors' argument on this claim.

42

### D. Failure to Join a Necessary Party

Finally, State Prosecutors argue that CAI's Complaint should be dismissed under Rule 12(b)(7) for failure to join a necessary party under Rule 19, specifically the State Bar and CAI's present or future attorneys.

With the State Bar having intervened in this action, State Prosecutors' argument related to them appears moot. However, even if they were not in this action, the Court would not dismiss the Complaint for failure to join a necessary party, as dismissal for failure to join a necessary party is a drastic remedy. *See Teamsters*, 173 F.3d at 918. In addition, CAI challenges the constitutionality of the UPL Statutes, which State Prosecutors, not the State Bar, are tasked with enforcing through bringing criminal charges against a party, such as CAI, that has engaged in practices that constitute the unauthorized practice of law in North Carolina.

Further, CAI's present and future attorneys are not necessary parties to this action. CAI has alleged that the UPL Statutes restrict its rights by subjecting it to criminal penalties if it engages in activities that constitute the practice of law in North Carolina. As is true for any corporation, CAI can only act through its people, and Sections 84-7 and 84-8 of the North Carolina General Statutes identify corporations and natural persons as being subject to criminal charges for the unauthorized practice of law in North Carolina. As such, Sections 84-7 and 84-8 make clear that CAI, and not its attorneys, would face criminal penalties if it provides legal advice and services to its members. The Court must therefore deny State Prosecutors' motion to dismiss for failure to join a necessary party.

43

### E.  Conclusion

For the reasons outlined above, the Court concludes that State Prosecutors' Motion to Dismiss for lack of subject matter jurisdiction, failure to state a claim, and failure to join a necessary party must be denied.  In addition, State Prosecutors' Motion to Dispense with Mediation, in light of there being no opposition, is allowed.

<div align="center">

**ORDER**

</div>

IT IS THEREFORE ORDERED that CAI's Motion for Preliminary Injunction (ECF No. 19) is DENIED and State Prosecutors' Motion to Dismiss (ECF No. 10) is DENIED.  IT IS FURTHER ORDERED that State Prosecutors' Motion to Dispense with Mediation (ECF No. 12) is GRANTED.

This, the 4th day of September, 2015.

<div align="right">

_____/s/ Loretta C. Biggs_____
United States District Judge

</div>

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
## CIVIL ACTION No. 1:15-CV-83-LCB-JLW

| | |
|---|---|
| **CAPITAL ASSOCIATED INDUSTRIES, INC.,** | |
| **Plaintiff,** | **PLAINTIFF'S MOTION FOR SUMMARY JUDGEMENT** |
| **v.** | |
| **JOSH STEIN**, et al., | |
| **Defendants.** | |

COMES NOW Plaintiff Capital Associated Industries, Inc. ("CAI"), through counsel and pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Rule 56.1, and moves this Court for summary judgment on all of CAI's claims. CAI shows unto the Court that there are no genuine issues of material fact and that CAI is entitled to judgment as a matter of law. In support of its motion, CAI's contemporaneously submits:

(a)   Plaintiff's Brief Supporting Motion for Summary Judgment;

(b)   The declarations of Bruce Clarke (Second), Kim Koy, Kevin Robins, and Kelly Hayden;

(c)   Transcription excerpts and exhibits from the depositions of Bruce Clarke, A. Dale Jenkins, Beverly Brown, William Troxler, Jr., David Finch, Michael Youngblood, David Johnson, Thomas Lunsford, Mark Merritt, Alice Mine, and Joshua Walthall; and

(d)   Other record materials.

Respectfully submitted this the 18th day of May, 2017.

/s/ Reid L. Phillips
Reid L. Phillips
  N.C. State Bar No. 7968
  Email: rphillips@brookspierce.com
Jennifer Van Zant
  N.C. State Bar No. 21280
  Email: jvanzant@brookspierce.com
Charles E. Coble
  N.C. State Bar No. 25342
  Email: ccoble@brookspierce.com
Craig D. Schauer
  N.C. State Bar No. 41571
  Email: cschauer@brookspierce.com
  *Attorneys for Plaintiff*

OF COUNSEL:
BROOKS, PIERCE, McLENDON
 HUMPHREY & LEONARD, L.L.P.
Post Office Box 26000
Greensboro, North Carolina 27420-6000
Telephone: (336) 373-8850

2

| | |
|---|---|
| CAPITAL ASSOCIATED INDUSTRIES, INC., | |
| Plaintiff, | |
| v. | CERTIFICATE OF SERVICE |
| JOSH STEIN, et al., | |
| Defendants. | |

I hereby certify that on May 18, 2017, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following: David J. Adinolfi, II, Alan W. Duncan, and Stephen M. Russell, Jr.

Respectfully submitted,

/s/ Reid L. Phillips
Reid L. Phillips
   N.C. State Bar No. 7968
   Email: rphillips@brookspierce.com
   *Attorney for Plaintiff*

OF COUNSEL:
BROOKS, PIERCE, McLENDON
 HUMPHREY & LEONARD, L.L.P.
Post Office Box 26000
Greensboro, North Carolina 27420-6000
Telephone: (336) 373-8850

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

CASE NO. 1:15-CV-83

CAPITAL ASSOCIATED INDUSTRIES,
INC.,

        Plaintiff,

    v.

JOSH STEIN; NANCY LORRIN
FREEMAN; J. DOUGLAS HENDERSON;
and the NORTH CAROLINA STATE BAR,

        Defendants.

**STATE BAR'S MOTION FOR
SUMMARY JUDGMENT**

The North Carolina State Bar, through counsel and pursuant to Rule 56, respectfully requests that the Court enter summary judgment against Plaintiff, and in favor of all Defendants, on all claims. In support of this motion, the State Bar shows unto the Court the following:

1.      Plaintiff asks the Court to open the door for it to add a significant new line of business, in the form of employment-related legal services to be provided to Plaintiff's members by Plaintiff's attorney-employees (or by attorney-employees of Plaintiff's for-profit subsidiary), to generate additional business revenue. Plaintiff has cloaked its efforts to double its membership in the guise of claims under the United States and North Carolina Constitutions.

2.     However, the practice of law by a corporation is unquestionably prohibited by N.C. Gen. Stat. §§ 84-4 and 84-5.

3.     As discussed in the accompanying brief, the law does not support any of Plaintiff's constitutional arguments.

4.     Plaintiff cannot forecast evidence to support its claims.

5.     In these circumstances, there is no dispute as to any material fact and the State Bar (and other Defendants) are entitled to judgment as a matter of law.

6.     Among other reasons discussed in the accompany brief and in the Court's Preliminary Injunction Order (Dkt. 54), Plaintiff's claims cannot survive the application of Rule 56 because:

a.     The law is settled that a prohibition on the practice of law by a corporation is rationally related to legitimate state interests. Plaintiff may desire a different policy that would advance its current commercial interests, but it is for the legislature, not the courts, to make such a policy determination.

b.     Plaintiff and its member-businesses do not have a constitutional right to associate for the commercial purposes of increasing revenue through doubling Plaintiff's membership, or to reduce member-businesses' legal expenses by some indeterminate amount. Plaintiff and its members cannot establish an equivalency to the groups such as the NAACP, ACLU, and unions that were the subject of *NAACP*

2

*v. Button* and its progeny. Plaintiff's members already have access to reduced-cost legal services, including through the prepaid legal services plan that Plaintiff recently implemented on the State Bar's advice. Furthermore, Plaintiff has not forecast sufficient plans regarding the legal services it seeks to provide, and Plaintiff's reliance on its purported tax-exempt status as part of its false equivalency to the NAACP and other groups is misdirected.

c. Because the prohibition on corporate practice of law is constitutional as set forth above, it does not constitute an abridgement of Plaintiff's freedom of speech.

d. Plaintiff cannot establish that the term "legal advice" as used in Sections 84-4 and 84-5 is unconstitutionally vague, because the term is well-defined in law and the evidence confirms that Plaintiff understands the established definition of the term.

e. Plaintiff does not have a constitutional right to engage in advertising speech about legal services, because as set forth above Plaintiff is lawfully prohibited from offering legal services in the first place.

f. Plaintiff's claim under the Monopoly Clause of the North Carolina Constitution fails under well-established North Carolina law, which is binding on this Court on a question of state constitutional law.

3

7.     In support of this motion, the State Bar submits the accompanying brief and exhibits attached thereto, including deposition excerpts and exhibits and other discovery materials.  An index of these materials is attached to the brief.  The State Bar also relies upon several declarations filed earlier in the case (Dkts. 15, 16, 17, 18, 41, 42).

**WHEREFORE**, the North Carolina State Bar respectfully requests that the Court enter summary judgment against Plaintiff and in favor of the State Bar (and other Defendants) on all claims.

This the 22nd day of May, 2017.

/s/ Alan W. Duncan                      
Alan W. Duncan
N.C. State Bar No. 8736
Stephen M. Russell, Jr.
N.C. State Bar No. 35552
MULLINS DUNCAN HARRELL
  & RUSSELL PLLC
300 N. Greene St., Suite 2000
Greensboro, NC 27401
Telephone: 336-645-3320
Facsimile: 336-645-3330
aduncan@mullinsduncan.com
srussell@mullinsduncan.com

*Counsel for the North Carolina State Bar*

4

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that the foregoing document was filed electronically with the Clerk of Court using the CM/ECF system, which will provide notice of filing to counsel of record.

This the 22nd day of May, 2017.

/s/ Alan W. Duncan
Alan W. Duncan

5

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
### CIVIL ACTION No. 1:15-CV-_____

| | |
|---|---|
| **CAPITAL ASSOCIATED INDUSTRIES, INC.,** | |
| **Plaintiff,** | |
| **v.** | |
| **ROY COOPER**, in his official capacity as Attorney General of the State of North Carolina; **NANCY LORRIN FREEMAN**, in her official capacity as District Attorney for the 10th Prosecutorial District of the State of North Carolina; **and J. DOUGLAS HENDERSON**, in his official capacity as District Attorney for the 18th Prosecutorial District of the State of North Carolina, | **DECLARATION OF BRUCE CLARKE** |
| **Defendants.** | |

1.      My name is Bruce Clarke.  I am the CEO of Capital Associated Industries, Inc. ("CAI"), the Plaintiff in the above-captioned lawsuit.

2.      I have personal knowledge of CAI's business, and I am authorized to make this declaration on behalf of CAI.  I have read CAI's Complaint in the above-captioned lawsuit, and I verify the factual allegations contained therein to be true and correct.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on January 22, 2015.

_Bruce Clarke_
Bruce Clarke

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
CIVIL ACTION No. 1:15-CV-83

| | |
|---|---|
| **CAPITAL ASSOCIATED INDUSTRIES, INC.,**<br><br>       **Plaintiff,**<br><br>   v.<br><br>**ROY COOPER**, in his official capacity as Attorney General of the State of North Carolina; **NANCY LORRIN FREEMAN**, in her official capacity as District Attorney for the 10th Prosecutorial District of the State of North Carolina; **and J. DOUGLAS HENDERSON**, in his official capacity as District Attorney for the 18th Prosecutorial District of the State of North Carolina,<br><br>       **Defendants.** | **CERTIFICATE OF SERVICE** |

      I hereby certify that on February 16, 2015, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following:

> David J. Adinolfi, II
> NC Department of Justice
> 114 W. Edenton Street
> Raleigh, NC 27603
> *Attorney for Defendants*

                            Respectfully submitted,

                            /s/ Reid L. Phillips
                            Reid L. Phillips
                              N.C. State Bar No. 7968
                              Email: rphillips@brookspierce.com
                              *Attorney for Plaintiff*

OF COUNSEL:
BROOKS, PIERCE, McLENDON
 HUMPHREY & LEONARD, L.L.P.
Post Office Box 26000
Greensboro, North Carolina 27420-6000
Telephone: (336) 373-8850

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
### CIVIL ACTION No. 1:15-CV-_____

**CAPITAL ASSOCIATED INDUSTRIES, INC.,**

      **Plaintiff,**

      **v.**

**ROY COOPER**, in his official capacity as
Attorney General of the State of North Carolina;
**NANCY LORRIN FREEMAN**, in her official
capacity as District Attorney for the 10th
Prosecutorial District of the State of North Carolina;
and **J. DOUG HENDERSON**, in his official
capacity as District Attorney for the 18th
Prosecutorial District of the State of North Carolina,

      **Defendants.**

**DECLARATION OF
BEVERLY BROWN**

---

1.    My name is Beverly Brown and I am currently employed as Executive Director with ClientFirst Behavioral Health, located in Goldsboro, North Carolina.

2.    ClientFirst Behavioral Health has one location with about 20 employees and provides comprehensive and affordable high-quality mental health care that focuses on providing clients with a clear path to recovery and stability.

3.    ClientFirst Behavioral Health became a member of Capital Associated Industries, Inc. (CAI) on or about November 12, 2014 due to our need for solid advice regarding Human Resources related issues.

4.    On several occasions, I have relied upon the Advice and Resolution (A&R) services provided by CAI to help me consider and solve various employee issues.

5.    On or about November 26, 2014, I called CAI for help regarding a former employee who was allegedly violating her non-solicitation agreement. I was transferred to a

member of CAI's A&R team, John Gupton (whom I know to be a North Carolina licensed attorney). He told me that CAI cannot provide advice or services regarding my situation because to do so would be crossing into the realm of legal advice, which CAI is currently prevented from providing by North Carolina statute. He then referred me to the Raleigh, NC office of the Ogletree Deakins law firm, whom I retained to assist me with the above-mentioned legal matter. At the present time, this legal matter has still not been resolved.

6.     This is extremely disappointing to me because it dramatically decreases my management efficiency, having to bring an outside professional into the issue as well as significantly increases my cost to do so.

7.     I am aware CAI employs licensed attorneys. I understand CAI is prevented from providing legal advice due to a state law that restricts advice by licensed attorneys because they work for a nonprofit corporation such as CAI.

8.     I am very interested in using my association with CAI and its staff to continue to seek and obtain practical guidance on day-to-day workplace issues, and further to complete the resolution of those matters when a legal issue is involved.

9.     I believe that CAI attorneys would provide my company the legal advice I need effectively, efficiently, and at no or reduced cost compared to a traditional law firm.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

This the 5th day of January, 2015.

Beverly Brown

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
CIVIL ACTION No. 1:15-CV-83

| | |
|---|---|
| **CAPITAL ASSOCIATED INDUSTRIES, INC.,**<br><br>           **Plaintiff,**<br><br>     **v.**<br><br>**ROY COOPER**, in his official capacity as Attorney General of the State of North Carolina; **NANCY LORRIN FREEMAN**, in her official capacity as District Attorney for the 10th Prosecutorial District of the State of North Carolina; **and J. DOUGLAS HENDERSON**, in his official capacity as District Attorney for the 18th Prosecutorial District of the State of North Carolina,<br><br>           **Defendants.** | **CERTIFICATE OF SERVICE** |

I hereby certify that on February 16, 2015, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following:

> David J. Adinolfi, II
> NC Department of Justice
> 114 W. Edenton Street
> Raleigh, NC  27603
> *Attorney for Defendants*

>           Respectfully submitted,
>
>           /s/ Reid L. Phillips
>           Reid L. Phillips
>             N.C. State Bar No. 7968
>             Email:  rphillips@brookspierce.com
>            *Attorney for Plaintiff*

OF COUNSEL:
BROOKS, PIERCE, McLENDON
 HUMPHREY & LEONARD, L.L.P.
Post Office Box 26000
Greensboro, North Carolina 27420-6000
Telephone: (336) 373-8850

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
CIVIL ACTION No. 1:15-CV-_____

| | |
|---|---|
| **CAPITAL ASSOCIATED INDUSTRIES, INC.,** | |
| **Plaintiff,** | |
| **v.** | |
| **ROY COOPER**, in his official capacity as Attorney General of the State of North Carolina; **NANCY LORRIN FREEMAN**, in her official capacity as District Attorney for the 10th Prosecutorial District of the State of North Carolina; and **J. DOUG HENDERSON**, in his official capacity as District Attorney for the 18th Prosecutorial District of the State of North Carolina, | **DECLARATION OF A. DALE JENKINS** |
| **Defendants.** | |

1.       My name is A. Dale Jenkins. I am the Chair of the Board of Directors of Capital Associated Industries, Inc. (CAI). It is a volunteer role. My employer is a member company of CAI. I live and work in Raleigh.

2.       The CAI Board voted without dissent to file the captioned Complaint and seek a change in the law preventing corporate-provided legal services through licensed attorneys.

3.       The nonprofit mission of CAI includes making workplace expertise and content available to employers that may otherwise be inaccessible or very costly on an individual basis. CAI plays a major role in helping North Carolina employers understand and comply with the complex web of interlocking (and sometimes conflicting) workplace laws.

4.       Our Board believes CAI will enhance its mission and impact by providing our members with legal advice when their questions go beyond human resources answers, best


practices and regulatory education. We understand that current state law prevents CAI from doing so even though licensed North Carolina lawyers would provide that advice.

5. It is our Board's direction to CAI leadership to ensure staff attorney compliance with all ethical rules and standards of the North Carolina State Bar when providing legal services in the future. We would require all the necessary procedures regarding confidentiality, privilege, conflicts of interest, attorney judgment and others.

6. Our Board views this lawsuit as a necessary next step because persistent efforts to have a debate and open discussion leading to a change in the law have been unsuccessful in the General Assembly of North Carolina.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

This the 7th day of January, 2015.

_A. Dale Jenkins_____
A. Dale Jenkins

**130**

**CAPITAL ASSOCIATED INDUSTRIES, INC.,**

        **Plaintiff,**

    **v.**

**ROY COOPER**, in his official capacity as Attorney General of the State of North Carolina; **NANCY LORRIN FREEMAN**, in her official capacity as District Attorney for the 10th Prosecutorial District of the State of North Carolina; **and J. DOUGLAS HENDERSON**, in his official capacity as District Attorney for the 18th Prosecutorial District of the State of North Carolina,

        **Defendants.**

**CERTIFICATE OF SERVICE**

        I hereby certify that on February 16, 2015, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following:

        David J. Adinolfi, II
        NC Department of Justice
        114 W. Edenton Street
        Raleigh, NC 27603
        *Attorney for Defendants*

        Respectfully submitted,

        /s/ Reid L. Phillips
        Reid L. Phillips
         N.C. State Bar No. 7968
         Email: rphillips@brookspierce.com
        *Attorney for Plaintiff*

OF COUNSEL:
BROOKS, PIERCE, McLENDON
 HUMPHREY & LEONARD, L.L.P.
Post Office Box 26000
Greensboro, North Carolina 27420-6000
Telephone: (336) 373-8850

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
## CIVIL ACTION No. 1:15-CV-_____

| | |
|---|---|
| **CAPITAL ASSOCIATED INDUSTRIES, INC.,** | |
| **Plaintiff,** | |
| **v.** | |
| **ROY COOPER**, in his official capacity as Attorney General of the State of North Carolina; **NANCY LORRIN FREEMAN**, in her official capacity as District Attorney for the 10th Prosecutorial District of the State of North Carolina; and **J. DOUG HENDERSON**, in his official capacity as District Attorney for the 18th Prosecutorial District of the State of North Carolina, | **DECLARATION OF DAVID FINCH** |
| **Defendants.** | |

1.       My name is David Finch.  I am the President and CEO of ATCOM Business Technology Systems ("ATCOM").  ATCOM is headquartered in Durham, North Carolina, with additional offices in Greensboro and Charlotte.

2.       ATCOM has been a member of Capital Associated Industries, Inc. ("CAI") for many years.  We pay annual membership dues in order to support the efficient and low-cost provision of information, data, education and guidance on workplace issues North Carolina businesses. ATCOM benefits directly from its membership in CAI by receiving information, guidance, and services related to its human resources-related issues in a convenient and cost-effective manner.

3.       ATCOM is a regular user of CAI's Advice and Resolution Team.  We have called CAI about a number of workplace issues and rules over the years.  I have personally called CAI for help, as have other senior members of my team at ATCOM.

4.     On occasion, CAI refuses to provide all or some of the information, advice, or services necessary to completely address ATCOM's issue because CAI says to do so arguably requires it to provide legal advice or services. I have spoken with CAI's CEO, Bruce Clarke (whom I know to be a North Carolina licensed attorney with employment law experience), on several occasions and he has told me that CAI cannot provide the requested advice or services because of the North Carolina "unauthorized practice of law" statutes.

5.     Specific examples of requests by ATCOM to CAI include a request for advice regarding a response to a discrimination charge before the U.S. Equal Employment Opportunity Commission (EEOC), and for assistance with the preparation of a separation agreement for a departing employee. Bruce Clarke told me CAI employed licensed attorneys who were capable of assisting ATCOM in both of these matters, but that state law prevented CAI from doing so.

6.     Typically, when CAI is unable to go further on a matter, we do not seek other counsel due to cost, time, and logistical constraints. Employment law specialists charge upwards of $400 per hour and starting a relationship with one takes too much time. Rather than incurring such expense and loss of time, we sometimes choose to search for samples on the internet and then prepare our own document, if we believe the risks and complications of doing so are low.

7.     On one occasion, ATCOM incurred attorneys' fees of more than $5,000 for representation in a straightforward EEOC charge. I am confident that a CAI attorney could have provided ATCOM the same legal service with a lesser cost to ATCOM if CAI was not prevented from doing so under North Carolina's unauthorized practice of law statutes.

8.     On behalf of ATCOM, I believe attorneys employed by CAI could offer competent and responsive legal advice for our most common employment law-related needs in

- 2 -

**134**

conjunction with the information, advice, data, education, legislative advocacy, and other benefits and services it currently provides to ATCOM and other CAI members.

9.     ATCOM and other CAI members are currently prevented from associating and joining their resources to provide efficient and low-cost legal advice and services related to human resources issues through licensed attorneys employed by CAI. In addition to the infringement upon CAI's associational rights, the current unauthorized practice of law statutes financially injure ATCOM by preventing it from obtaining the most efficient, cost-effective legal advice and services related to its human resources issues.

10.     Although CAI has not been able to implement a plan to provide legal services because of the existing "unauthorized practice of law" statutes, I understand that CAI has given consideration to how it would offer legal services if allowed to do so.   The legal services provided by CAI would be a membership benefit included in my annual membership fee, unless a project required significant dedicated time.   In that case, I am told I would be offered a reasonable fee for that service because of my membership in the association.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on January 7, 2015.

David Finch

| | |
|---|---|
| **CAPITAL ASSOCIATED INDUSTRIES, INC.,**<br><br>       **Plaintiff,**<br><br>   **v.**<br><br>**ROY COOPER**, in his official capacity as Attorney General of the State of North Carolina; **NANCY LORRIN FREEMAN**, in her official capacity as District Attorney for the 10th Prosecutorial District of the State of North Carolina; **and J. DOUGLAS HENDERSON**, in his official capacity as District Attorney for the 18th Prosecutorial District of the State of North Carolina,<br><br>       **Defendants.** | **CERTIFICATE OF SERVICE** |

I hereby certify that on February 16, 2015, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following:

> David J. Adinolfi, II
> NC Department of Justice
> 114 W. Edenton Street
> Raleigh, NC  27603
> *Attorney for Defendants*

> Respectfully submitted,
>
> /s/ Reid L. Phillips
> Reid L. Phillips
>   N.C. State Bar No. 7968
>   Email:  rphillips@brookspierce.com
>   *Attorney for Plaintiff*

OF COUNSEL:
BROOKS, PIERCE, McLENDON
 HUMPHREY & LEONARD, L.L.P.
Post Office Box 26000
Greensboro, North Carolina 27420-6000
Telephone: (336) 373-8850

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
CIVIL ACTION No. 1:15-CV-_____

| | |
|---|---|
| **CAPITAL ASSOCIATED INDUSTRIES, INC.,** | |
| **Plaintiff,** | |
| **v.** | **DECLARATION OF WILLIAM TROXLER, JR.** |
| **ROY COOPER**, in his official capacity as Attorney General of the State of North Carolina; **NANCY LORRIN FREEMAN**, in her official capacity as District Attorney for the 10th Prosecutorial District of the State of North Carolina; and **J. DOUG HENDERSON**, in his official capacity as District Attorney for the 18th Prosecutorial District of the State of North Carolina, | |
| **Defendants.** | |

1.    My name is William F. Troxler, Jr. I am President of Troxler Electronic Laboratories, Inc. (Troxler). Troxler is headquartered in Durham County, North Carolina's Research Triangle Park.

2.    Troxler has been a member of Capital Associated Industries, Inc. ("CAI") for over 30 years. We pay annual dues in exchange for information, data, education and guidance on workplace issues.

3.    Troxler is a regular user of CAI's HR Advice and Resolution resource. We have called CAI about a number of workplace issues and rules over the years. I have personally called CAI for help as have other members of my team.

4.    I have personally called a CAI staff attorney to discuss workplace issues. When I asked that attorney to provide services which require the lawful ability to provide legal services, he told me CAI cannot lawfully provide that service. When the conversation or service requires

legal advice, the staff member told me they cannot provide that service. For example, I was told by that CAI lawyer that he cannot perform a workplace investigation for a fee because statutes restrict fee based investigations to licensed private investigators and to attorneys providing legal advice. I was also told CAI cannot lawfully provide legal advice even though it has licensed attorneys on staff. I engaged another resource outside CAI to do the investigation work we needed. It cost us about $ 2,000.00.

5.    I would have likely engaged a CAI attorney to do the work instead, and I believe at a lower cost, than the legal resource I actually engaged.

6.    As a small, family owned business, we would benefit from periodic use of CAI's future legal services. It makes no sense to me that a licensed North Carolina attorney, competent in their field of practice, is prevented from providing legal services as part of CAI's membership fee or at below market fees. I believe an employer association is the right vehicle for a shared, competent, experienced, and cost-effective legal solution to our employment law questions.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

This the 7th day of January, 2015.

_William F. Troxler, Jr._

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
CIVIL ACTION No. 1:15-CV-83

| | |
|---|---|
| **CAPITAL ASSOCIATED INDUSTRIES, INC.,** | |
| **Plaintiff,** | |
| **v.** | |
| **ROY COOPER**, in his official capacity as Attorney General of the State of North Carolina; **NANCY LORRIN FREEMAN**, in her official capacity as District Attorney for the 10th Prosecutorial District of the State of North Carolina; **and J. DOUGLAS HENDERSON**, in his official capacity as District Attorney for the 18th Prosecutorial District of the State of North Carolina, | **CERTIFICATE OF SERVICE** |
| **Defendants.** | |

I hereby certify that on February 16, 2015, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following:

> David J. Adinolfi, II
> NC Department of Justice
> 114 W. Edenton Street
> Raleigh, NC 27603
> *Attorney for Defendants*

Respectfully submitted,

/s/ Reid L. Phillips
Reid L. Phillips
  N.C. State Bar No. 7968
  Email: rphillips@brookspierce.com
  *Attorney for Plaintiff*

OF COUNSEL:
BROOKS, PIERCE, McLENDON
 HUMPHREY & LEONARD, L.L.P.
Post Office Box 26000
Greensboro, North Carolina 27420-6000
Telephone: (336) 373-8850

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

CASE NO. 1:15-CV-83

CAPITAL ASSOCIATED INDUSTRIES,
INC.,

        Plaintiff,

    v.

ROY COOPER, in his official capacity as
Attorney General of the State of North
Carolina; NANCY LORRIN FREEMAN, in
her official capacity as District Attorney for
the 10th Prosecutorial District of the State of
North Carolina; and J. DOUGLAS
HENDERSON, in his official capacity as
District Attorney for the 18th Prosecutorial
District of the State of North Carolina,

        Defendants.

**DECLARATION OF
DAVID R. JOHNSON**

---

DAVID R. JOHNSON hereby declares:

1.    I am over the age of 18 and am competent to make this declaration.

2.    I am a licensed attorney and a member in good standing of the North Carolina State Bar.

3.    I am employed by the North Carolina State Bar as a deputy counsel in the Office of Counsel. Among my responsibilities is serving as counsel to the Authorized Practice Committee of the North Carolina State Bar.

4. The Authorized Practice Committee is a standing committee of the North Carolina State Bar Council that reviews complaints about the unauthorized practice of law and decides on enforcement actions.

5. In or about early February 2011, I received a telephone call from Bruce Clarke with Capital Associated Industries ("CAI"). Mr. Clarke indicated that he wanted to meet with me as counsel to the Authorized Practice Committee about an issue concerning the unauthorized practice of law. I agreed to meet.

6. The meeting was held on February 14, 2011. Mr. Clarke and another representative of CAI attended the meeting.

7. During the meeting, I was told by the CAI representatives that CAI wanted to start providing legal services as a member benefit. Mr. Clarke provided a copy of a memorandum from The Brocker Law Firm, which CAI had retained, arguing that Section 84-5 was unconstitutional and that North Carolina law should be amended to allow CAI's proposed member benefit. I was told that CAI planned to ask the General Assembly to amend the statute to permit their proposed member benefit. I was asked if the State Bar would either support or acquiesce in the planned amendment. I explained that I could not commit the State Bar and that the State Bar Council would have to make that decision. I further explained that the State Bar Council would not meet again until April.

8. On March 22, 2011, identical bills were introduced in each house of the General Assembly, House Bill 714 and Senate Bill 706. The bills were entitled: "An Act To Allow Nonprofit Corporations Operating As A Professional And Trade Association

2

Or A Business League To Provide Legal Services To Its Members Using Attorneys Duly Licensed To Practice Law In This State." The bills proposed an amendment to N.C. Gen. Stat. § 84-5, as indicated by Mr. Clarke during our February 2011 meeting.

9. CAI was invited to make a presentation of its proposed member benefit and the above-referenced proposed legislation at the meeting of the Issues Committee of the State Bar Council on April 20, 2011. Mr. Clarke appeared and addressed the Committee.

10. On May 12, 2011, House Bill 714 was reported favorably by the House Judiciary Subcommittee A. On June 9, 2011, House Bill 714 was withdrawn from the House Calendar and referred to the Committee On Rules, Calendar, and Operations of the House. The House took no further action on House Bill 714. The Senate took no action on the companion bill, Senate Bill 706.

11. On April 4, 2013, House Bill 582, a modified bill with the same purpose as the bills introduced in 2011, was introduced in the General Assembly during its 2013-14 session. This bill proposed to amend N.C. Gen. Stat. §84-5.1 rather than §84-5. The bill was referred to committee. The General Assembly did not act on House Bill 582 during 2013 or 2014.

12. The rules and regulations of the State Bar require all prepaid legal services plans offered in North Carolina to be registered with the State Bar. The Authorized Practice Committee is responsible for overseeing registrations of prepaid legal services plans. I have reviewed the prepaid legal services plans registration records. As of the date

3

of this declaration, the State Bar has not received an application for registration of a prepaid legal services plan from CAI.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

This the 11ᵗʰ day of March, 2015.

David R. Johnson

4

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing document was filed electronically with the Clerk of Court using the CM/ECF system, which will provide notice of filing to counsel of record.

This the 17th day of March, 2015.

/s/ Alan W. Duncan
Alan W. Duncan

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

CASE NO. 1:15-CV-83

CAPITAL ASSOCIATED INDUSTRIES,
INC.,

        Plaintiff,

    v.

ROY COOPER, in his official capacity as
Attorney General of the State of North
Carolina; NANCY LORRIN FREEMAN, in
her official capacity as District Attorney for
the 10th Prosecutorial District of the State of
North Carolina; and J. DOUGLAS
HENDERSON, in his official capacity as
District Attorney for the 18th Prosecutorial
District of the State of North Carolina; and
the NORTH CAROLINA STATE BAR,

        Defendants.

**DECLARATION OF
ALICE M. MINE**

Alice M. Mine declares as follows:

1. I am over the age of 18 and am competent to make this declaration. I make this declaration of my own personal knowledge.

2. I am a licensed attorney and a member in good standing of the North Carolina State Bar.

3. I am employed by the North Carolina State Bar as Assistant Executive Director. Among my responsibilities is serving as counsel to the Ethics Committee of the North Carolina State Bar.

4. The Ethics Committee is a standing committee of the North Carolina State Bar Council that issues opinions interpreting and applying the Rules of Professional Conduct.

5. On April 10, 2013, Bruce Clarke of Capital Associated Industries ("CAI"), Keith Kapp, the president of the State Bar at the time, Tom Lunsford, the Executive Director of the State Bar, and I met in the offices of the Williams Mullins Law Firm in Raleigh.

6. During the meeting, I orally conveyed to Mr. Clarke information regarding the establishment of a group legal services plan as defined in Rule 7.3(d)(1) of the Rules of Professional Conduct, and regarding the option of establishing a lawyer referral service under Rule 7.2(d).

7. I also recommended that CAI submit a written request for an opinion to the Ethics Committee of the North Carolina State Bar Council on the question of how a trade association might ethically and legally facilitate the provision of legal services to association members.

8. I subsequently received a memorandum dated April 16, 2013 from Mr. Clarke. A copy of the memorandum is attached as Exhibit A.

9. The inquiry set forth in Mr. Clarke's memorandum was submitted to the Ethics Committee at its meeting on April 18, 2013. The committee agreed that an opinion should be issued on the matter. I prepared a proposed ethics decision that was then circulated to the members of the State Bar Council for comment.

10. A copy of the proposed ethics decision is attached as Exhibit B.

11. An ethics decision is "a written ethics opinion issued by the council in response to a request for an ethics opinion which, because of its special facts or for other reasons, does not warrant issuance of a formal ethics opinion. Ethics decisions shall be designated by the letters "ED", numbered by year and order of issuance, and kept on file at the Bar." 27 N.C.A.C. 1D, Rule .0101(8).

12. On May 28, 2013, I sent a letter to Mr. Clarke explaining that a proposed ethics decision was being issued by the Ethics Committee. A copy of the letter transmitting a copy of the proposed ethics decision is attached as Exhibit C.

13. No negative comment was received in response to the circulation of Proposed Ethics Decision 2013-2 to the members of the State Bar Council. At the meeting of the Ethics Committee on July 18, 2013, the committee voted to recommend the adoption by the council of Proposed Ethics Decision 2013-2.

2

14. At the meeting of the State Bar Council on July 19, 2013, pursuant to the recommendation of the Ethics Committee, the State Bar Council adopted the proposed ethics decision, rendering it a final opinion of the council.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

This the 11th day of March, 2015.

_____
Alice N. Mine

3

<u>**CERTIFICATE OF SERVICE**</u>

The undersigned hereby certifies that the foregoing document was filed electronically with the Clerk of Court using the CM/ECF system, which will provide notice of filing to counsel of record.

This the 17th day of March, 2015.

<div align="right">

/s/ Alan W. Duncan
Alan W. Duncan

</div>

4

**150**

To:    Alice Neece Mine
       Assistant Executive Director
       NC State Bar
From:  Bruce Clarke, JD
       Capital Associated Industries, Inc.
       919 713 5243; bruce.clarke@capital.org
Date:  April 16, 2013
Re:    Providing Legal Services Directly to Association Members

I enjoyed meeting with you, Tom and Keith on April 10. I appreciate your focus on protecting the public in your role as regulator. Of course, the public and employers also need effective, knowledgeable, accessible and affordable legal services at key points in time. Thank you for working to see if we can find a good system to meet our member needs.

You asked me to set forth "what we want to do" to see if that can be accommodated under the current system. This memo presents a modified alternative on pages 2 and 3 to meet some of the concerns and perceptions raised and in the spirit of seeking a compromise that works. To this point, we have received advice from our counsel and your staff discouraging a similar model.

Of course, our preference is the statutory recognition that all licensed NC lawyers are held to the same standards of ethics, professionalism and competent service, and our staff lawyers should be treated the same (and have the same rights to practice) even though they are employed by a trade association. This model works well nationally in all 50 states (for labor unions and public interest groups providing legal service), in 46 states for insurance companies, in many where there is no rule or opinion and in six where there is a specific trade association rule. There is no evidence of new problems caused for state regulators and ethics committees.

<u>An Integrated, Staffed, Attorney-Provided Legal Service Financed Primarily by Membership Dues and Operating as a Natural Part of (and Extension to) the Existing HR Advice and Information Model:</u>

Key components of a future, integrated model would include:

1) Quick answers during a short contact that may have an HR or a legal component: a decision needs to be made now
2) Extended answers and/or multiple conversations on more involved matters or those involving two or more managers
3) Agency matters/claims that require HR advice first and legal advice second, or potentially more time (responding to unemployment claims/phone hearings, EEOC charges, and such)
4) Reviews and opinions on practices and company positions: sometimes it is HR only and sometimes a legal review is needed
5) Education one-on-one, one-on-several, and one-to-many that run a spectrum from HR/education to legal grey areas to clear legal service needs



6) Internal staff education and training on new rules and regulations (such as Health Care Reform); external education for members
7) Content writing for news and website use
8) Pointing/referring to an outside lawyer when the issue requires specialized legal services, pre-litigation or litigation
9) Projects that are primarily HR related, but can include a legal component and benefit from the attorney/client privilege (such as policy handbooks and affirmative action plans)
10) Application of the thousands of state and federal workplace rules to workplace scenarios
11) Reduce the employer tendency to "Google" and self-serve their basic employment law needs vs. seeking expensive or inaccessible outside counsel (such as severance and release agreements during a termination)

We want staff attorneys (subject to all requirements and disclosures) who can work in all the areas above and bring regular legal expertise to the table so our members get these advantages. Sometimes an issue will be 100% HR-oriented. Sometimes it will be 100% legal. More often, as it is in most employment law practices, it will involve some combination of HR advice (what works and how to do it) with legal advice when needed (applying a legal solution to specific facts). The point is, this is not the standard "hand off" of a "matter" to a referral list or a pre-paid legal service, and very rarely is litigation involved.

The value to members of staff legal services comes from this integrated model, from the deep expertise in a niche area of the law, from the removal of all unnecessary access impediments, from the affordability of the membership dues structure and from a smooth transition to lawyer from a HR professional. We cannot approach this integrated value to members by referring them to law firms (which we do today). We cannot practically or economically do so through a pre-paid legal services plan by an outside law firm even if the firm and attorneys are hand selected.

If I understand the Bar's primary concerns, they include ensuring independent advice, preserving confidences and eliminating the potential for divided loyalties. To address that group of related concerns in a compromise fashion, we would consider a model with these features similar to the insurance company-related law practices allowed in 46 states:

1) A dedicated law firm made up of staff attorneys established under an LLC (or other acceptable format) with a managing partner or executive who is an attorney in good standing in NC.
2) Governing documents and policies would make it clear the LLC's attorney/leader has the final say on matters of legal ethics, professionalism and client impacting decisions.
3) The LLC would have a budget approved by the association and payroll/benefits would be handled by the association with a financial management agreement allocating and paying costs appropriately. Where a member exceeds an established level of service and wishes more individual services beyond the membership model, the LLC can bill for that, with any excess of revenue over expense serving to reduce expense reimbursements needed from the association.

4) When attorneys do work that is not legal advice, such as training or doing a non-attorney-client investigations, their work can be billed by and inure to the association, a subsidiary or other entity in the structure.

5) All needed disclosures would be made to ensure compliance with relationship disclosures, how costs are handled, how conflicts are checked and handled, how confidential information is segregated and when legal services are beginning and ending.

6) The LLC would accept only engagements from member organizations (no individuals as clients). Actual and perceived conflicts between a member company and other member companies on employment law matters are very rare. Where they do happen (such as perhaps a non-compete issue) the conflict resolution or withdrawal process would occur.

7) The staff attorneys in the LLC would have ethically labeled and identified signature lines on email, business cards and letterhead (and their equivalents). If there is non-attorney support staff shared outside the LLC, processes and training must reinforce all the commitments above.

8) These staff attorneys would be onsite working alongside/near the other professional staff to heighten the practical integration needed. However, they would have offices, software and equipment that preserve confidentiality as you must in any law setting.

9) We would not handle transactions that create the need for a trust account.

10) We will appear before state and federal agencies, but would not appear in the General Court of Justice or Federal Courts in NC (except on our own behalf if needed). This will not inconvenience member/clients since relatively few workplace issues become lawsuits. We would use our referral list for litigation and be an even better referral partner than we are today, given our heightened awareness of member company legal issues.

11) We will carry professional liability insurance.

You will have questions and I will have additional thoughts on this possible model. Please call me at your convenience to discuss.

153

**Proposed Ethics Decision 2013-2**
**Prepaid Legal Service Plan for Trade Association**
**May 28, 2013 [as authorized by the Ethics Committee at its meeting on April 18, 2013, prepared by staff and approved by Mark Merritt and Michael Robinson]**

**Inquiry #1:**

HR Association, Inc. is a trade association that provides human resources (HR) information, non-legal advice, and support to its members. It would like to provide legal services to its members as a natural extension of the human resources advice and information currently provided to the association's members. HR Association's management believes that providing legal services to members will reduce the tendency of members to "self-serve" their legal needs by relying on information on the Internet and would also reduce the cost to members for outside legal counsel. The legal services would be financed primarily through membership dues.

The association envisions providing the following services to its members:

1) Quick answers during a short contact that may have an HR or a legal component.
2) Extended answers and/or multiple conversations on more involved matters or matters that involve multiple managers.
3) Agency matters/claims that require HR advice first and then legal advice (responding to unemployment claims and EEOC charges, etc.).
4) Reviews and opinions on practices and company positions (sometimes involving only HR advice and sometimes requiring legal review and advice).
5) Educational services for HR Association staff members and association members which would include education on new government rules and regulations and run the spectrum from HR education to legal education.
6) Writing content for news and website use.
7) Identifying and referring members to outside lawyers when an issue requires specialized legal services, pre-litigation or litigation services.
8) Projects that are primarily HR related, but can include a legal component and would benefit from the protection of the attorney/client privilege (such as policy handbooks and affirmative action plans).
9) Advice on the application of state and federal workplace rules to workplace scenarios.

May any of these services be provided to association members by lawyers employed by the association without violating the prohibition in N.C. Gen. Stat. §84-4 on the unauthorized practice of law, or the prohibition in N.C. Gen. Stat. §84-5 on the practice of law by corporations?

**Opinion #1:**

As long as no specific legal advice is given to a member of the association, lawyers and non-lawyers employed by the association may do any of the following: provide information and advice about human

EXHIBIT
B

resources issues including reviewing practices and policy manuals of member organizations; educate member organizations and association staff on HR issues, agency rules and regulations, and other employment law matters; write content for news and website use; and make referrals to outside lawyers. However, if a lawyer employed by the association gives legal advice to a member of the association about the member's specific legal problem, it would be the unauthorized practice of law. N.C. Gen. Stat. §§84-4 and 84-5. This prohibition on the provision of legal services to third parties by a lawyer employed by a corporation helps to ensure the following: that the lawyer's professional judgment is not compromised by loyalty to his/her employer as opposed to loyalty to the client; confidential information of clients does not fall into the hands of non-lawyers in the organization who have no duty of confidentiality; and the attorney-client privilege attaches to communications between the lawyer and his/her client.

**Inquiry #2:**

In most employment matters, some combination of HR advice (what works and how to do it) and legal advice (applying a legal solution to specific facts) is needed to resolve a problem. HR Association would like to provide its members with an "integrated model" of service delivery, in which legal advice is readily available to members of HR Association in conjunction with HR advice. It believes that such a model should provide its members with expertise in niche areas of the law, remove unnecessary impediments to access to legal advice, be affordable because of the membership dues structure, and allow for a smooth transition from a HR professional to a lawyer.

As an alternative to the employment of lawyers who would provide legal advice and representation to members, HR Association would like to establish a "dedicated" law firm staffed and managed by North Carolina lawyers. The governing documents and policies of the firm would specify that the managing lawyer or lawyers have the final word on matters of legal representation or professional responsibility. The association proposes that the law firm be organized and managed in the following manner:

1) The association would approve the law firm's budget and administer payroll/benefits pursuant to a financial management agreement with the law firm to allocate and pay costs appropriately. When an association member exceeds an established level of service and wishes requests services beyond the membership model, the law firm would bill the member for those services. Any excess of revenue over expenses would be used to reduce expense reimbursements from the association.

2) When a firm lawyer does work that is not legal advice or representation, such as HR training or education, the association would bill for that work and receive any payment for that work.

3) The association and the law firm would each disclose the relationship between the law firm and the association to each association member that uses the services of the law firm. These disclosures would include how fees and costs are handled, how conflicts are checked and handled, how confidential information is protected from disclosure, and what legal services would be provided through the firm.

4) The law firm would accept only engagements from member organizations (no individuals as clients). Conflicts between the representations of member organizations would be resolved by withdrawal of the law firm from the representation of either organization.

5) The firm lawyers would work in the offices of HR Association, near the professional staff of the association, to heighten the practical integration needed. However, they would have separate offices, software and equipment to preserve confidentiality.

6) The firm would not handle transactions that create the need for a trust account.

7) The firm lawyers would appear on behalf of member organizations before state and federal agencies, but would not appear in state or federal court. Member organizations with litigation matters would be referred to other legal counsel.

8) The association would carry professional liability insurance for the lawyers of the firm.

May a North Carolina lawyer be a principal or an employee of such a law firm?

**Opinion #2:**

No. Rule 5.4 expresses the traditional limitations on permitting a third party to direct or regulate a lawyer's professional judgment in rendering legal services to another. The limitations in the rule include prohibitions on sharing legal fees with a non-lawyer and on allowing a non-lawyer to direct or control the lawyer's professional judgment. From the association's approval of the firm's budget and payment of the lawyers' salaries to the association's control over which clients the firm may represent, the law firm proposed by HR Association would be, essentially, the captive of the association. Any lawyer working for the firm would be in violation of Rule 5.4. Although the inclusion of measures intended to protect the lawyer's professional independence are laudable, as a practical matter, professional independence in such a firm would not be possible.

**Inquiry #3:**

Is there any arrangement by which HR Association can assist its members to obtain North Carolina legal services related to human resources issues?

**Opinion #3:**

There is an alternative arrangement that would provide members of HR Association with ready access to legal services but would not result in violations of the Rules of Professional Conduct by lawyers providing those services to association members.

Rule 7.3(d) allows a lawyer to participate in a prepaid or group legal services plan. Such a plan is defined in Rule 7.3(d)(1) as follows:

> A prepaid legal services plan or a group legal services plan ("a plan") is any arrangement by which a person, firm, or corporation, not otherwise authorized to engage in the practice of law, in exchange for any valuable consideration, offers to provide or arranges the provision of legal services that are paid for in advance of any immediate need for the specified legal service ("covered services"). In addition to covered services, a plan may provide specified legal services at fees that are less than what a non-member of the plan would normally pay.

The North Carolina legal services offered by a plan must be provided by a licensed lawyer who is not an employee, director or owner of the plan.

HR Association may establish such a group legal services plan (the plan) for its members. Member dues could be used to pay for members to participate in the plan. A participant in the plan would receive the legal services described in Inquiry #1 above from lawyers with an independent law firm that has agreed to provide legal services to association members in exchange for compensation from the plan. For example, the law firm may agree to provide members with unlimited access to its lawyers for a set fee per month or year. Plan participants could receive legal services "on demand" and the cost for those legal services could be discounted by agreement with the association. To provide the integrated approach favored by the association, a lawyer or other qualified professional may be employed by the association specifically to transition matters that will require legal advice or representation from the HR professional employed by the association to a lawyer with the participating law firm. However, apart from identifying matters that require legal representation and providing background information to a lawyer in the group legal services plan firm, this employee of the association may not give legal advice to association members.

In addition, the offices of the firm may be located in the same building as the association provided the offices are sufficiently isolated to insure that the firm is identified as a separate entity from the association and that the confidential information of member-clients is protected from disclosure to anyone who is not a lawyer or employee of the firm.

The law firm must be independent of the association with regard to its formation, ownership, and operation; its budget; and the compensation and benefits it provides to its lawyers and employees. There can be no fee splitting or fee sharing with the association regardless of whether the fee is earned for training or other "non-legal" services (see item 2 in Inquiry #2 above). If the firm handles client funds, it must establish a trust account.

Finally, in order for a lawyer or law firm to participate as a service provider in a group legal services plan, the plan must also satisfy the other requirements of Rule 7.3(d) set forth below:

(2) Conditions for Participation.

(A) The plan must be operated by an organization that is not owned or directed by the lawyer;

(B) The plan must be registered with the North Carolina State Bar and comply with all applicable rules regarding such plans;

(C)The lawyer must notify the State Bar in writing before participating in a plan and must notify the State Bar no later than 30 days after the lawyer discontinues participation in the plan;

(D) After reasonable investigation, the lawyer must have a good faith belief that the plan is being operated in compliance with the Revised Rules of Professional Conduct and other pertinent rules of the State Bar;

(E) All advertisements by the plan representing that it is registered with the State Bar shall also explain that registration does not constitute approval by the State Bar; and

(F) Notwithstanding the prohibitions in paragraph (a), the plan may use in-person or telephone contact to solicit memberships or subscriptions provided:

> (i) The solicited person is not known to need legal services in a particular matter covered by the plan; and

> (ii) The contact does not involve coercion, duress, or harassment and the communication with the solicited person is not false, deceptive or misleading.



# The North Carolina State Bar

ALICE NEECE MINE
Assistant Executive Director
217 E. Edenton St.
PO Box 25908
Raleigh, North Carolina 27601
Telephone: 919/828-4620
Fax: 919/821-9168

May 28, 2013

Mr. A. Bruce Clarke
CAI
2900 Highwoods Blvd.
Raleigh, NC 27604

RE: Proposed Ethics Decision 2013-2-*Prepaid Legal Service Plan for Trade Association*

Dear Bruce:

At the meeting of the Ethics Committee of the North Carolina State Bar on April 18, 2013, the committee authorized me to prepare a proposed ethics decision to issue to you during the interim between quarterly meetings. The approval of the Ethics Committee chair (Mark Merritt) and the Authorized Practice Committee chair (Michael Robinson) were required by the Ethics Committee prior to the circulation of the attached proposed Ethics Decision 2013-2 to the members of the Council and to you. I apologize for the delay in issuing the proposed opinion. For various reasons, it took longer than I had anticipated. I hope that the delay did not inconvenience you.

An ethics decision is an unpublished opinion of the Ethics Committee. It must be finally approved by the Council at its next quarterly meeting in July. In the event that the Council chooses to reject or modify the opinion in July, you will be informed. In the more likely event that the decision is adopted by the Council upon the Ethics Committee's recommendation, you will receive no notice and may assume that the decision has been approved.

Please let me know if you have any questions about the proposed ethics decision or the process for adoption.

Sincerely yours,

Alice Neece Mine
Assistant Executive Director

Attachment
anm/lvh



EXHIBIT
C

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
CIVIL ACTION No. 1:15-CV-83-LCB-JLW

CAPITAL ASSOCIATED
INDUSTRIES, INC.,

                    Plaintiff,

          v.

JOSH STEIN, *et al.*,

                    Defendants.

SECOND DECLARATION OF
A. BRUCE CLARKE

I, A. Bruce Clarke, declare as follows:

1.      I am the President and Chief Executive Officer of Plaintiff Capital Associated Industries, Inc. ("CAI"). I have held my current position since 2001.

2.      I am a licensed North Carolina attorney in good standing. I graduated from law school at the University of North Carolina in 1983. I was admitted to the North Carolina Bar later that year. I practiced law with a law firm in Raleigh from 1983 to 2001, focusing on labor and employment law. I left the law firm to take my current position at CAI.

3.      I have served as President of Association Executives of North Carolina and as a Board Member at the National Association of Manufacturers (NAM). I am on the Board of WorldatWork, an international human resources association with more than 20,000 members. I served as Chair of the National Association of Manufacturer's Labor and Employment Law Subcommittee for eight years, and I am a past Chair of the North

Carolina Bar Association's Labor and Employment Law Section. I am incoming Chair of Dental Delta of North Carolina (a nonprofit dental insurance organization), I am Vice-Chair of the Capital Area Workforce Development Board, and I serve on the Board of the Tammy Lynn Center for Developmental Disabilities in Raleigh.

## A.    Capital Associated Industries, Inc.

4.    CAI is a North Carolina non-profit corporation. It is a membership organization, and its members pay annual dues.

5.    CAI was formed on October 2, 1963. It was organized as—and always has been—a North Carolina non-profit corporation pursuant to Chapter 55A of the North Carolina General Statutes. As a non-profit corporation, CAI is forbidden from having stockowners. If CAI has net income, none of it may be distributed to members, directors, or officers. Employees are eligible to receive small annual bonuses based on the profitability of CAI as part of their compensation.

6.    CAI was chartered by approximately two dozen Raleigh-area employers, including Carolina Power & Light and the News & Observer. CAI was established to help employers navigate the information, regulations and best-practices needed to do their work effectively.

7.    CAI's purpose is to improve employment relationships for its members and across North Carolina. CAI accomplishes this goal by preventing conflict between employers and employees, preventing disputes with regulators, preventing workplace

2

mistakes that lead to claims and lawsuits, maximizing managerial skills, and helping members identify competitive levels of pay and benefits.

8.      CAI serves member employers in many industries including manufacturing, banking, healthcare, and professional service firms.  Currently, CAI has more than 1,100 member employers operating at more than 2,000 locations primarily in central and eastern North Carolina.  Membership is focused on companies with locations in North Carolina. Some of these members also have operations or employees out of state, and there are a few members in border areas such as southern Virginia.  CAI's members include law firms such as Brooks Pierce, Ogletree Deakins and Smith Debnam.

9.      CAI is governed by its Board of Directors which is composed of senior executives of member companies.  Board members are volunteers and are not paid for their board service.

10.     CAI is a member of Employer Associations of America, a nationwide network of approximately thirty similar non-profit employers' associations.  I am currently Chair of the group's board of directors.

11.     CAI is a tax-exempt 501(c)(6) organization.  It files an annual IRS Form 990 and 990T, which report its finances and list the members of its Board of Directors.  CAI pays taxes on a portion of its income as determined by its accountants. Membership organizations can apply for exemption from federal taxation under 26 U.S.C. 501(c)(6). To my knowledge, CAI has been tax exempt from its beginning.  Other 501(c)(6)

organizations include the North Carolina Bar Association, the North Carolina Chamber, the American Bar Association, and the American Medical Association.

12.    CAI is tax exempt under section 501(c)(6) because its mission is to improve the effectiveness of North Carolina workplaces and grow their collective economic activity and impact. The Internal Revenue Service permits 501(c)(6) organization to engage in business activity that is unrelated to the organization's purpose, but there is an unspecified limit on the level of such activities. Unrelated activities are also taxable.

13.    Because there is no bright-line test on unrelated activities, CAI chose to be conservative and create a taxable subsidiary to perform the bulk of its taxable, unrelated business activities. CAI's wholly-owned, for-profit subsidiary is called CAI Services Corporation ("CAISC"). The use of for-profit subsidiaries is a common best-practice for non-profit trade associations with taxable services.

14.    CAI and CAISC are voluntarily audited annually by a large regional public accounting firm, Dixon Hughes Goodman, at the direction of our Audit Committee and Board.

15.    CAISC provides members with fee-based services related to criminal background records searches, employment verification, and workplace investigations. The net revenues from CAISC are taxed. Any remaining profits may be distributed to CAI as a dividend. Any such funds stay within CAI and are used to advance the mission of CAI.

16.    CAI employs about sixty-five people.

4

17.     CAI employs experienced human resource professionals and advisors, facilitators, compensation professionals, a licensed private investigator, criminal background specialists, two attorneys, survey and data specialists, affirmative action plan specialists, administrative support, a certified public accountant, and information technology specialists.  CAI contracts with outside resources for government relations and to provide (or supplement) the skills, time, and knowledge of CAI staff.  Some members of CAI's staff have registered as lobbyists with the North Carolina General Assembly; their efforts focus on improving workplace regulations, laws, and rules on behalf of all members.

18.     The amount of dues for membership in CAI depends on the number of employees the member has.  Annual dues range from $900 per year for smaller organizations to $8500 per year for large ones.

19.     Understanding and complying with complex employment and labor laws and regulations is very important to our members.  Human resources professionals face both voluminous and complex laws, regulations, and compliance challenges.  More than half of our member organizations have fewer than one hundred employees.  Most of these smaller members do not have a full-time human resources manager, and instead assign the human resources function to employees who also handle finance, operations, or office management.  Many of the mid-sized and larger members do not have enough HR support or compliance expertise within their organizations.

20.     CAI provides members with unlimited access to experienced human resource professionals and to a large reservoir of local, current workplace practices and

compensation data. We provide real-time guidance and education for human resource and workplace practices questions, compensation and benefits data, tools to better the workplace or meet compliance rules, a virtual community for idea and best practice exchange, legally required workplace posters, a bi-annual publication of state and federal laws regulating the workplace, and public policy advocacy on workplace topics. Members make one annual dues payment for unlimited access to these resources. This model allows members to improve their respective workplaces without concern for cost. The unlimited access model is key to who we are and how we serve.

21. CAI's interests in providing services to its members are identical to the interests of its members in receiving such services.

## B. What CAI Does

22. CAI provides members content and expertise in four broad categories: 1) compliance education and assistance; 2) workplace best practices and data; 3) development of managerial "soft skills" and HR skills; and 4) public policy advocacy. Our approach is to learn and gather useful information and then to share that information with our members, whether it be in one-on-one settings, classrooms, conferences, publications, or on websites. Use of our associational model allows us to provide better information at a lower cost. The combination of these four mutually-supportive categories, at the cost charged, is unique.

<u>Compliance Assistance</u>

23. Our real-time compliance assistance is primarily provided by our Advice and Resolution Team ("A&R Team"). At least one member of this team is available 24 hours

a day, seven days a week to answer calls and emails, and to conduct live computer chats with members. The A&R Team receives approximately 7,000 to 9,000 of such inquiries a year. The questions posed in these interactions range from simple to complex. The following are examples of inquiries that the A&R Team fields:

- An employee has left owing us money. What do the North Carolina rules say about withholding money from his or her last paycheck?

- An employee's former spouse keeps coming to the workplace. What steps might we take to protect our staff and workplace? What do others do?

- We have received an unemployment insurance claim for an employee we fired for poor work. What should we say on the form we just received from the State?

- An employee is on leave, and is not responding to our calls. What are my options?

Questions often address issues regarding worker's compensation, discrimination and harassment prevention, unemployment, family and medical leave, wage and hour, disability, rights of military members, and other important employee rights. These are the kinds of compliance questions HR professionals confront and answer every day for their employers.

24. When helpful, CAI calls regulators and government agencies to seek guidance on behalf of members without identifying the member. A primary goal of CAI is to help employers stay in compliance with laws, rules, and official interpretations from

governmental agencies. These regulators understand and support our function. As an example, Richard Blaylock, District Director of the U.S. Department of Labor's Wage and Hour Division, recently visited CAI's office in Raleigh. He and his team thanked us for the work we do in helping employers understand the rules so they can comply.

25. When members seek guidance, CAI works hard to educate the members on the rules and interpretations of rules that could apply to the situation at hand so that the member can make confident decisions about how to proceed. In other words, CAI provides the assistance and education that an internal Human Resources manager would provide. CAI does not make decisions for members, we do not provide legal advice, and we do not engage in privileged conversations.

26. From my experience in the human resources field, including serving on four boards of human-resources-related organizations, I know that the compliance assistance offered by CAI is consistent with compliance assistance provided by human resources professionals inside employers.

<u>Best Practices and Data</u>

27. Companies often need assistance in understanding the broader marketplace for compensation and benefits for their employees. CAI offers that assistance to members. We annually produce or co-produce about a dozen surveys to provide companies with data about compensation, health benefits, retirement benefits, paid time off, and HR policies for different levels of employees. These surveys are supported by data received from over 1,000 employers in response to various survey topics. For example, we host, compile, and

8

produce the North Carolina Wage and Salary Survey each year. The 2015 report had data from 846 unique employers for over 400 job titles across the state. It is by far the most comprehensive source of local wage data from the broadest employer base in this state.

28. One survey in particular, the 2014 North Carolina Policies and Benefits Survey asked 320 questions in nine topic areas such as pay practices, time off, and termination/layoff practices. Over 380 employers submitted data.

29. CAI offers training on workplace best practices. These seminars are designed to help employers provide productive environments for their employees. CAI teaches classes and hosts conferences on workplace-law topics to help employers comply with applicable rules. Recent examples include: "FMLA Leave and More: An Overview of Legally Protected Leave," "EEO and Lawful Hiring," "I-9 Compliance: Verifying Employment Eligibility of US and non-US Citizens," and "Preventing Harassment in the Global Workplace." Outside attorneys often lead these classes. We provide a two-day employment law update program presented by the law firm of Ogletree Deakins and attended by about 450 employers each year. The Constangy Brooks firm presents a one-day version of this program to about 175 employers each year.

30. CAI has an Affirmative Action team that assists employers in preparing affirmative action plans and in helping employers comply with affirmative action requirements for federal contractors.

9

**168**

<u>Development of Managerial "Soft Skills"</u>

31.     We use the term "soft skills" to mean those skills that allow a person to work effectively with other people.  Sometimes referred to as "people skills," these include use of common sense, empathy, the ability to negotiate, coaching, dealing with difficult people problems, and adaptability.  Effective managers need these soft skills, and employers who promote and develop those soft skills see better retention levels and increased productivity.  CAI offers training to its members on soft skills for managers.  Several thousand individuals receive soft-skills training at CAI every year.

<u>Public Policy Advocacy</u>

32.     CAI has advocated for its membership before the North Carolina General Assembly, the North Carolina Industrial Commission, the Division of Employment Security, the Department of Commerce, and the North Carolina Department of Labor on specific and general workplace issues affecting our members.  We do this work through a contract government relations specialist as well of through staff members who are registered lobbyists.  We do not operate a Political Action Committee nor do we engage in partisan support.  All of our lobbying activity is directed toward workplace issues such as wage provisions, safety regulations, e-verify rules, workers' compensation, medical and indemnity schedules, unemployment insurance changes, retaliation and discrimination rules, and employee benefit requirements.  Our members are unified behind our efforts to treat employees fairly (to keep and reward good people) while maintaining a reasonable

10

level of regulation and costs, and our lobbying activity is directed toward issues that will further our members' collective interests.

33.     We also advocate for our membership at the federal level.  For example, in advance of the new rule from the United States Department of Labor regarding compliance with the Fair Labor Standards Act's provisions on overtime pay, CAI worked with the National Association of Manufacturers, the Coalitition for a Democratic Workplace, and WorldatWork to ensure small and mid-market employer concerns were heard by the drafters of the rule before the proposed rule was issued.  In addition, we prepared our members for the anticipated changes by answering phone calls, publishing articles, surveying members about their compliance decisions, conducting webinars on the topic, and hosting a meeting for our members where the former head of the Department of Labor's Wage and Hour Division explained the new rule to members.

## C.  What We Want to Do

34.     To further its mission and purpose, CAI seeks to provide employment-related legal advice and services to its members through licensed North Carolina attorneys.  CAI will not represent parties in litigation or undertake to resolve legal disputes between parties.  Rather, CAI seeks to make legal guidance available to members in an easily accessed, cost-effective format.

35.     At present, whenever a situation appears to call for any legal advice, CAI must end the conversation and refer the member to an outside attorney even though the North Carolina licensed attorneys we employ (and would employ in the future) know or

could answer the member's question. CAI attorneys could competently and efficiently answer or resolve the issue but for the prohibitions under North Carolina law against a corporation's providing legal advice and services to members.

36.     As part of the lawsuit, CAI produced a catalog of instances, from 2013 to 2016, in which our A&R Team was forced to refer members to outside counsel or a related compliance resource. This catalog (which appears as Deposition Exhibit 77) includes 58 instances in which Medical Mutual members called the A&R Team. Medical Mutual is a member of CAI, and it pays a fee to CAI so that its members can access CAI's A&R Team under an initiative we call HR Experts. When CAI is permitted to offer legal services, these Medical Mutual members would not be allowed to receive legal advice unless they become independent members of CAI. When you subtract these Medical-Mutual-member inquires from the catalog, there are still over 500 inquiries that required CAI to refer members to outside counsel and resources.

37.     When CAI refuses legal help to a member due to North Carolina's current laws, the member has three choices: 1) seek its own counsel, 2) use the prepaid legal services plan discussed below, or 3) venture on its own without the benefit of legal advice. All of these choices are problematic. The first choice would cause delay, and it would be inefficient because the member must start the description of the events at the beginning, and with a lawyer who is unfamiliar with the member's background and needs. The second choice—use of the prepaid legal services plan—is problematic for the reasons described more fully below. The third choice—foregoing legal advice—is, simply put, dangerous.

12

We want to help our members make informed decisions that will benefit them and their employees. Leaving members with no guidance exposes them to costly mistakes.

38. CAI will provide better compliance advice to its members when it is permitted to give of legal advice through North Carolina licensed attorneys. Answering a question about discrimination, for example, involves the law, regulations, interpretations by the EEOC and courts; but, as importantly, it involves the people involved, company culture, the manager's efforts (or lack of effort) to date, whether the problem is really an employee or manager problem, whether the employee is voicing their real concern or using the wrong label, what the employee wants to happen, and countless other facets to the problem. The best solutions happen when the manager's response considers the applicable law and the complete context of the situation. When permitted to offer legal services, CAI will be able to give legal advice regarding the applicable law with superior knowledge of the problem's context. The advice will be at no additional charge to the member. Thus, the member will receive effective advice without additional cost or delay. In contrast, now when a member needs legal advice, the member must stop mid-story and go find a different source for legal advice. And the third-party attorney must learn all of the necessary background information. This is inefficient and does not serve the employer, the employee, or public policy.

39. From my legal experience and my experience with CAI and in the human resources industry, I conclude that most of the inquiries CAI receives that implicate legal advice can be solved in a short conversation or two with an experienced attorney who is

13

knowledgeable about the client and the background of the situation. I also believe that an employment attorney in private practice would do the same thing as a CAI attorney would but would charge as much as $1,000 to learn about the situation and to give the appropriate legal advice. I am familiar with rates charged by North Carolina employment lawyers. Employment partners at Brooks Pierce, CAI's law firm in this matter, charge between $285 and $455 per hour, depending on their experience. Employment partners in my former law firm charge between $350 and $600 an hour depending on their experience. The cost of legal advice prohibits CAI's members from seeking legal guidance when needed. This creates a gap in the legal services that are available to CAI's members. CAI wishes to fill that gap by providing the needed legal services at a cost-effective price. In addition, we hope that legal services will allow CAI to grow its membership base, which would ensure our sustainability, penetrate into additional workplaces, and gain resources to expand service offerings—thereby advancing CAI's mission of improving employment relationships throughout North Carolina.

40. The definition of legal advice is unclear. It can be difficult at times for CAI to determine when the employer is seeking legal advice. Because of the uncertainty, CAI trains the A&R Team to be conservative and err on the side of avoiding to offer help if it appears it might require legal advice. This restriction further limits the assistance CAI can give its members.

41. In seeking to provide legal services to its members, CAI has carefully considered the obligations attorneys have to their clients, and CAI has considered

14

organizations offering similar legal services in other states where associations are allowed to provide legal advice to members.

42. If allowed to offer legal services, CAI will require our attorneys to be licensed by and to remain in good standing with the North Carolina State Bar and to adhere to the Rules of Professional Conduct of the North Carolina State Bar. CAI will develop protocols for maintaining confidentiality of communications between the attorney and the member. CAI will implement a screening method for identifying and avoiding conflicts of interest. Further, CAI will require that no one other than a North Carolina licensed attorney will control the manner or course of the legal services provided.

43. CAI pays a salary to its current attorneys. It plans to continue that structure. Their future compensation will not be affected by the results of any legal advice they are permitted to give. The attorneys will understand that their obligations are to their clients. CAI will not oversee the content of the legal advice, and members will be informed that they can hire an outside attorney.

44. CAI proposes to offer basic legal advice to its members as part of the existing membership fee. Additional legal services that will be provided for an additional fee would include drafting of employment agreements, drafting of separation agreements, drafting non-compete agreements, review of workplace policies, and representation of members in charges before the Equal Employment Opportunity Commission. Currently CAI anticipates charging members $195 per hour for those future services. Should there be a question about whether a legal service falls within the existing membership dues or should

15

be charged at an additional fee, an attorney will make the decision on whether or not to charge an additional fee. An attorney will also approve all advertisements regarding CAI's legal services.

## D. Association-Provided Legal Services Do Not Raise Ethical Concerns

45.     In my position at CAI, I have reviewed and am familiar with the models used by other associations to provide legal services to their members. The NAACP, national and local labor unions, the ACLU, and other public interest associations operating in North Carolina already provide legal services to their members or to members of the public. It is my understanding that the North Carolina State Bar has not challenged any of these associations for providing legal services directly to their members, and I am not aware of any ethical challenges raised by the North Carolina State Bar with regard to those services.

46.     National groups operating out of the District of Columbia such as the National Federation of Independent Businesses provide attorney-staffed legal advice hotlines for use by their nationwide membership base.

47.     Non-profit employer associations (similar to CAI) in Illinois (The Management Association), Pennsylvania (Mid-Atlantic Employers Association), Oregon (Vigilant), Washington (Vigilant and Archbright), Utah (Utah Employers Council), and Colorado (Mountain States Employers Council, which also operates in Arizona and Wyoming), provide legal services directly to members through staff attorneys. I have inquired, and I do not know of any unique or increased ethical concerns, confidentiality

issues or other violations of ethical rules in these settings. I am aware of no reports of harm to members of the public from the operations of these organizations.

**E. Obstacles faced by CAI**

48.     Again, CAI seeks to offer legal advice and services to its members on human resources and employment law matters only through North Carolina licensed attorneys. Those attorneys are bound by the Rules of Professional Conduct.

49.     Before filing this suit, CAI worked to achieve its goals without resorting to litigation. It did so in two ways.

50.     The North Carolina State Bar invited CAI to inquire about whether CAI could provide legal services to its members without a change in the law. On May 28, 2013, the North Carolina State Bar provided CAI with a Proposed Ethics Decision 2013-2 entitled "Prepaid Legal Service Plan for Trade Associations." The Proposed Ethics Decision stated that if an "HR Association" gave "legal advice to a member about the member's specific legal problem, it would be the unauthorized practice of law." The Proposed Ethics Decision provided no guidance on what "legal advice" or a "specific legal problem" meant.

51.     CAI also sought legislation to allow its attorneys to provide legal services and advice to its members. As a result of its efforts, House Bill 714 and related Senate Bill 706 were introduced during the 2011-12 session of the North Carolina General Assembly. Those bills would have allowed a professional trade association such as CAI to provide legal services to its members. The House Judiciary Committee gave approval to the legislation but House Bill 714 was never presented to the full House. Senate Bill 534 was

filed on March 30, 2017 during the 2017-18 session of the North Carolina General Assembly. The bill was voted on favorably from the House Judiciary Committee but was sent to the Appropriations Committee where it failed to receive a vote before the cross-over deadline. CAI's bills have been opposed by Representatives Leo Daughtry and Tim Moore, two legislators who are also attorneys in private practice.

52.     I do not understand why the State Bar criticizes CAI for seeking means other than litigation to resolve this matter. CAI filed suit only after other means to be able to provide legal services to its members failed, and CAI continues its legislative efforts in an effort to realize its constitutional rights and the constitutional rights of its members.

## F.  Prepaid Legal Services Plan

53.     The State Bar urged CAI to sponsor a prepaid legal services plan to provide legal services to members. CAI applied to sponsor a plan as an interim, stopgap measure due to the length of time litigation requires. The CAI PrePaid Legal Services Plan (the "Plan") was registered on November 4, 2016. CAI contracted with a third-party law firm to provide limited, specified legal services to its members. CAI cautiously started to roll out the Plan in March of 2017. A prepaid legal services plan is, at best, a partial solution to our members' needs.

        a. Under the Plan, when a member needs legal advice, CAI is forced to refer the member out to the third-party law firm. CAI is then no longer engaged in the process of solving its member's problem. The member loses the benefit of CAI's experience and knowledge of the member and its problem.

18

b. CAI pays that firm based on the actual hours an attorney is made available to the Plan with a minimum payment of $2975 per week for a block of availability between 35 and 39.75 hours for that week. A payment of that size is necessary to ensure availability of an outside attorney to answer issues raised by members, but it is too expensive to be sustainable for a nonprofit association which does not pass the costs on to its members.

c. The third party law firm does its own staffing and hiring. CAI is familiar with its clients and their needs and would be able to manage the relationship better if it were providing the legal advice itself. If there is any difficulty in the relationship between the third party law firm and the member, CAI will not be able to intervene and address the situation. CAI's only option is to terminate the contract.

d. CAI has difficulty monitoring the quality of client service for legal services provided by the Plan.

e. CAI cannot use its own staff attorneys to supplement the services provided by the third-party law firm, and it cannot integrate the legal advice into the package of services it offers. A member may have an issue that requires a blend of legal advice and human resources services. For example, a member may want an employee handbook or a compensation review, both of which could combine legal advice with human resources services. Being forced to

19

use the Plan to assist the member prevents CAI from providing blended, seamless services to its member.

   f. Because all fee-based work is done by a third-party law firm, CAI cannot use fee-based work to offset the cost of providing free legal advice to members.

## G. Conclusion

54. CAI seeks to provide legal services and advice to its members through salaried and licensed North Carolina attorneys. Its model would be efficient, low-cost, and effective while preserving the ethical obligations of the attorneys involved and providing members with the benefits of the attorney-client privilege. CAI is unable to meet these needs of its members, and its rights and the rights of its members are being restrained.

55. As part of the litigation, CAI produced a catalog of instances in which the A&R Team was forced to refer a member to outside counsel or resource (Deposition Exhibit 77). The catalog contains sensitive information. CAI carefully protects the identities of its members and its compliance communications. CAI keeps its member list confidential to prevent other companies, including employer trade associations, from soliciting our members. CAI keeps its compliance communications confidential to encourage members to ask compliance questions. Disclosure of a member's communications with CAI would jeopardize the A&R Team's ability to assist members in complying with employment regulations. The confidentiality of this information is critical to CAI's success as a resource for compliance advice.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on _May 17_, 2017.

_[signature]_

A. BRUCE CLARKE

180

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
## CIVIL ACTION No. 1:15-CV-83

| | |
|---|---|
| **CAPITAL ASSOCIATED INDUSTRIES, INC.,** | |
| **Plaintiff,** | |
| **v.** | **DECLARATION OF KIMBERLEY S. KOY** |
| **ROY COOPER**, et al., | |
| **Defendants.** | |

1.     My name is Kimberley Koy.  I am over the age of 18 and under no disability.  I have personal knowledge of the matters set forth in this affidavit and I am competent to testify to them.

2.     I am a Vice President of Mountain States Employers Council, Inc. ("MSEC").  I joined MSEC in 2000 as a staff attorney.  In 2005, I was promoted to Director of our Colorado Springs, CO, office, a role in which I managed the staff in the Colorado Springs office, including attorneys.  In 2014, I became a Vice President of MSEC.  In my current role, I oversee the legal departments and attorneys employed by MSEC.

3.     I am licensed to practice law in Colorado.

4.     MSEC is a 501(c)(6) non-profit  employers association headquartered in Denver, Colorado.  MSEC offers cost-effective resources to employers in the areas of employment law, human resource consulting, training, and surveys.

5.      MSEC was founded in 1939 as the Colorado Employers Council. It was founded in response to the National Labor Relations Act, to provide employers guidance on the newly enacted NLRA. At that time, membership was about 100 employers. These employers joined to seek guidance on how to comply with the changes associated with the NLRA.

6.      Since our founding, MSEC has grown to over 3,800 members. We serve small start-up companies, with as few as a 5 employees, as well as large employers with thousands of employees. The majority of our members, however, are small business with 20 to 200 employees.

7.      The Denver Bar Association is a member of MSEC.

8.      MSEC has 196 employees, with 58 of those employees being licensed attorneys.

9.      Our attorneys are licensed in Colorado, Utah, Arizona, California, Idaho, Nebraska, New Mexico, North Dakota, Texas, Wyoming, Florida, Minnesota, Georgia, New York, and Virginia.

10.     MSEC, in addition to its Denver headquarters, has offices in Fort Collins, CO, Colorado Springs, CO, Scottsdale, AZ, and Salt Lake City, UT. Although the majority of our members are located in Colorado, Utah, and Arizona, we are able to provide legal services to our members for issues that arise in most of the Western states.

11.     We have always provided legal services to our members. Indeed, our association was founded as employers assembled together to obtain cost-effective legal

advice regarding the NLRA. Our current legal services are the evolution of MSEC's initial purpose: As employment practices became more heavily regulated, members continued to turn to MSEC for cost-effective advice on legal compliance.

12. All of our attorneys report to attorneys. All of the staff attorneys report to a manager or director that is also an attorney, and the directors report to me or William Smith, who is also a licensed attorney and is the Vice President of Regional Offices. Mr. Smith and I report to MSEC's Chief Executive Officer, Michael G. Severns, who is also a licensed attorney.

13. In addition to all of our attorneys being supervised by attorneys, the members of our Board of Directors are obligated to comply with a Board policy that recognizes and protects the professional independence of the MSEC attorneys. Board members are not allowed to influence an attorney's decision to select legal matters or the legal advice or services rendered to the member. A true and accurate copy of the Board policy is attached as **<u>Exhibit A</u>**.

14. All of our attorneys are paid a salary. Attorneys (as well as every other employee at MSEC) also receive a uniform annual bonus that is determined by MSEC's financial performance. Attorneys receive no income or compensation that is contingent on the legal services the attorney provides to members. All fees for legal services are collected by MSEC.

15. MSEC members pay annual membership dues that range from $1,300 to $5,200, based on the member's number of employees. We also have a reduced

membership fee ($750 per year) for very small companies with fewer than 10 employees (Small Employer Members).

16.     As part of these annual dues, members (other than Small Employer Members) receive unlimited annual employment services from MSEC ("due services"). These dues services may be either legal services or non-legal services. All of our employees—both attorneys and non-attorneys—who service members are required to record the time spent on assisting a member. Small Employer Members who pay the reduced fee ($750) receive 10 hours of annual dues services and agree to pay an hourly rate for services that exceed the 10 hour threshold.

17.     MSEC's services are only offered to members.

18.     If a member (other than a Small Employer Member) consistently uses more than 30 hours of dues services in a year, the member is asked to transition to the Related Member Assessment (RMA) program. A member who participates in the RMA program is entitled to 30 hours of dues services, but also agrees to pay an hourly rate for services that exceed the 30-hour threshold.

19.     Annually, MSEC attorneys provide over 90,000 hours of legal services to its members. Of those hours, approximately 76,000 hours are counted under the dues services that our members receive for no additional cost.

20.     All MSEC client-service employees are assigned a billable rate. The billable rate of our (non-attorney) HR professionals ranges from $110 to $200. The

- 4 -

billable rate for our attorneys ranges from $180 to $260 (with one exception described below).

21.    The legal services covered within the dues services (or the RMA program) include, among other things, employment-related legal advice, employment contract negotiations, responding to EEOC or other agency charges, handbooks or policy drafting and review, non-compete agreements, separation agreements, settlement agreements, and regulatory compliance.

22.    Members who have specialized legal needs can elect to have an MSEC attorney provide those specialized legal services on an hourly rate basis.  Such special legal needs include immigration issues, internal investigations, affirmative action planning, ERISA plans, and Wage and Hour audits.  Given that many of our members will not use these categories of legal services, we do not offer them as part of our dues services.  The hourly rate for these legal services ranges from $175 to $250 an hour, with the exception of our dedicated ERISA attorney, who charges $300 an hour.

23.    We refer a member to outside counsel if the legal issue is related to state- or federal-court litigation, corporate governance, mergers and acquisitions, or another non-employment-law issue.  We do not provide those services.

24.    The hourly rates charged by our attorneys are significantly below hourly rates charged by a law firm that would offer similar legal services.  For our members, the customary rate of for an employment lawyer would range from $350 to $750 per hour.

25.     We do not have a formal hotline that members can call to obtain HR advice.  Rather, each of our members is assigned an attorney or an HR professional depending on the specific needs of the member.    However, our attorney and HR professionals will answer in-bound calls of any member on a day to day basis.

26.     MSEC works closely with outside counsel to ensure that we are complying internally with the attorneys' professional independence obligations and ethical requirements.

27.     All of our employees are obligated to abide by MSEC's business ethics code.    The business code addresses, among other things, attorney-client privilege, member confidentiality, attorney professional independence, attorney file maintenance and retention, and conflicts of interest.  A true and accurate copy of the 2016 Business Ethics Code is attached as **Exhibit B**.

28.     Although both the HR professionals and the attorneys who provide services record their time serving members, the attorneys' time entries are privileged so that only attorneys can see the entries.

29.     If an HR professional identifies that a member needs legal advice on an issue, the HR professional politely discontinues the conversation and transfers the member to an attorney.

30.     We have an excellent record of compliance with our professional obligations.  I am aware of only two ethical complaints that have been filed against

MSEC or an MSEC attorney in the history of the organization. Both were filed by members of the plaintiffs' bar. Both were dismissed.

31.     I am not aware of a single instance in which MSEC's interests conflicted with the members' interest. Indeed, MSEC exists to serve its members. MSEC's members' interests are MSEC's interests.

32.     On occasion, we have represented two members who may have competing interests in an employment-related dispute. In each of these situations, our attorneys, upon identifying the client conflict, discuss the conflict with both members, and advise the members accordingly, which might involving withdrawing representation of either member or advising the members that MSEC cannot represent the members without a conflict waiver. If the members both consent, and the attorney feels it is appropriate to move forward, the attorney will prepare a conflict waiver to allow MSEC, through two different attorneys, to represent both members in the dispute.

33.     We carry professional liability insurance for our attorneys.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on ___February___ ___3___, 2017.

_Kimberley Roy_

# EXHIBIT A

**Board Policy 01-2016**
**Mountain States Employers Council, Inc.**

Attorney Professional Independence

1. The corporation's in-house attorneys shall be allowed to exercise their independent professional judgment in providing legal services to the corporation's members without any interference by non-lawyer personnel of the corporation, including the Board of Directors.

2. The Board of Directors shall only establish broad policies of the corporation with respect to the employment of the corporation's in-house attorneys that, at the same time, allow the corporation's in-house attorneys to provide legal services to the corporation's members without interference in such relationships by non-lawyer personnel of the corporation.

3. This Board Policy 01-2016 supersedes any other board rule, regulation or policy on the topics covered herein.

Board Policy
Approved by the Board of Directors August 25, 2016.

1

Case 1:15-cv-00083-LCB-JLW   Document 105-2   Filed 05/18/17   Page 10 of 16

190

# EXHIBIT B

**BUSINESS ETHICS: Code of Conduct for Attorneys**

Every licensed attorney is obligated to abide by the Rules of Professional Conduct. Attorneys shall comply with all obligations and duties imposed on attorneys by the ethical rules, canons or similar codifications applicable to attorneys by virtue of the attorney's license or licenses to practice law.

All MSEC attorneys must adhere to the following policy. Non-lawyers must also adhere to the following policy to the extent it applies to them. See also the Business Ethics section of the MSEC Employee Handbook. If an MSEC attorney (or non-lawyer) has any issue or concern regarding ethical or legal practice obligations, he or she is encouraged to raise such matters with his or her Department Director, Vice President, or the President of MSEC.

**Attorney Professional Independence**

MSEC has the right to set policies with respect to employment at MSEC, provided such policies do not conflict with an attorney's independent professional judgement in providing legal services. Attorneys recognize they have the responsibility to maintain their own professional independence and MSEC recognizes and respects the importance of MSEC's in-house lawyers exercising their independent professional judgement in providing legal services to MSEC members.

MSEC's in-house attorneys shall exercise their independent professional judgement in providing legal services to MSEC members without any interference by non-lawyer personnel of MSEC, including the MSEC Board of Directors.

Nothing in this Code of Conduct is meant to limit a supervising attorney from overseeing and managing an attorney's provision of legal services.

**Preserving the Attorney-Client Privilege and the Rule of Confidentiality**

"Client" denotes a person who receives legal services. All members of MSEC have the potential of receiving legal services and so should be considered "clients" for purposes of this policy.

The *attorney-client* privilege applies in judicial and other proceedings in which a lawyer may be called as a witness or otherwise required to produce evidence concerning a client. The rule of *client-lawyer* confidentiality is broader. The confidentiality rule applies not merely to matters communicated in confidence by the member but also information relating to the representation, whatever its source. A lawyer may not disclose such information except as authorized by the client or required by the Rules of Professional Conduct or other law.

**Attorney Client Privilege**

1. MSEC lawyers must act in a manner that preserves the evidentiary privilege. This means that lawyers must not share confidential information unless permitted by the privilege.
2. MSEC lawyers must avoid professional discussions in the presence of persons to whom the privilege does not extend, such as non-lawyers. A lawyer owes an obligation to advise the client of the attorney-client privilege and timely assert the privilege unless the client waives it. In the case of handbook reviews, an attorney who feels that a member may wish to consider preserving privilege with respect to a legal review of a handbook should initiate discussion with the member and take appropriate steps to preserve such privilege, i.e., mark the document and not disseminate the legal review comments to a non-legal reviewer.
3. A lawyer is impliedly authorized to make disclosure about a member legal issue when appropriate in carrying out the

representation, except to the extent that the member's instructions or special circumstances limit that authority.

4. The lawyer may not counsel or assist a client in conduct that is criminal or fraudulent. The lawyer has professional discretion to reveal information in order to prevent criminal conduct.

**Confidentiality**

MSEC lawyers may not reveal to non-lawyers information relating to representation without the client's consent or implied authorization. MSEC lawyers must not allow non-lawyer professionals to treat privileged information in a manner that would fail to preserve the privilege. A lawyer may disclose privileged information to non-lawyer experts and professionals or non-lawyers working under their supervision without destroying the privilege if the non-lawyer is an agent of the lawyer who facilitates the representation. MSEC lawyers must take appropriate precautions to prevent members from divulging privileged information when interacting with anyone not required to effectuate representation.

1. MSEC lawyers must clarify with the member the available attorney-client relationship and attendant expectations and duties of confidentiality. A written advisory is included with the member application, which reads:
   "Mountain States Employers Council ("MSEC" ) safeguards the confidential information of its members. Please note, however, that protection from disclosure of confidential information can be lost if members share communications with non-attorney staff at MSEC."
2. To preserve privilege, MSEC lawyers must not share member information with non-lawyers unless permitted by the privilege or consented to by the member.
3. MSEC lawyers must inform members of the potential loss of the privilege when non-lawyers are included in consultation between the lawyer and member.
4. Electronic communications (including E-mail and Facsimile) Confidentiality Disclaimers should be used in confidential correspondence:
   "This email [facsimile] message is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message."
5. Attorneys must assure that metadata is removed or restricted as appropriate from all written or electronic communications shared with opposing counsel, non-lawyers or third parties outside of MSEC.

Attorney-client privilege may not apply to each and every interaction an attorney has with a member. Nevertheless, all MSEC staff, including attorneys, shall use good business judgement regarding confidentiality and comply with MSEC confidentiality rules and guidelines.

**File Maintenance and Retention**

Documentation of all legal matters must be created and maintained in a confidential manner. Non-lawyers should not be provided access to this confidential information. Files related to legal matters must be maintained to prevent access by non-lawyers unless special exception for purposes of adequate representation is specifically provided by a lawyer or Department Director. Member files addressing legal matters are maintained separately from files addressing non-legal matters. Legal matters include any

documentation related to a lawyer's representation of a member before the NLRB, EEOC, DOL, OSHA, CDOL or similar state or federal agency, as well as arbitration files, employment agreements or other documentation created or maintained in the lawyer's counsel to members applying law to particular facts.

1. Documents that are confidential and are created pursuant to the attorney client relationship are to be marked ATTORNEY-CLENT PRIVILEGED or ATTORNEY WORK PRODUCT. These marks should be added to e-mails, fax cover sheets or other correspondence as appropriate.

2. Legal files must be segregated and marked or stamped: "CONTAINS ATTORNEY-CLIENT PRIVILEGED INFORMATION/ATTORNEY WORK PRODUCT—This file may only be accessed by an MSEC attorney or other person working directly under that attorney's supervision. Other non-attorneys may access this file only: (1) with express consent of that attorney; (2) if that attorney is unavailable, with the express consent of a managing attorney or Legal Department Director; or (3) with a written waiver from the Member."

3. Legal Files must be maintained with restricted access in ShareNet. In cases where a physical file is maintained, these files must be locked in the MSEC vaults. The vaults provide restricted access to legal files. Attorneys must ensure that all confidential member files, including desk files, are adequately locked and safeguarded both during and after work hours. Any employee seeking to review a legal file is subject to the restrictions contained in the paragraph set forth above.

**Settlement Offers**

MSEC attorneys are to mark written settlement offers with the designation that they are submitted under the auspices of CRE 408 or FRE 408. This prevents member settlement offers from being introduced into the stream of discovery or at court as evidence of the member's culpability. Add the same to fax cover sheets, e-mail advisories or captions when transmitting such to the opposing party.

**Existing Insurance Coverage**

MSEC attorneys must advise members to ascertain whether they have insurance coverage for employment law actions and whether they are required to contact their insurance carrier in a timely manner for purposes of triggering such coverage. Two sample letters address this requirement. (▤ Word template tab: LRGRLTRS |Template name: INSURANCE ALERT LETTER.DOT or INSURANCE ALERT LETTER—CIVIL RIGHTS.DOT.)

**Letters of Representation**

MSEC attorneys engaging in a specific project requiring legal representation to a member shall draft a Letter of Representation outlining the relationship with the client/member, the scope of the representation, any fees associated with the representation, the attorney-client privilege, the name of the lawyer providing the legal service, and any other pertinent information regarding the representation. If you are unsure about whether a Letter of Representation is necessary, consult with your Department Director.

**Avoiding Conflicts of Interest**

All members of MSEC are considered clients of the lawyers at MSEC regardless of whether the member is receiving legal services from MSEC. MSEC lawyers may be prohibited from representing member clients whose interests are or become adverse to the interests of any other MSEC member.

1. MSEC lawyers should identify actual and potential conflicts arising from the provision of legal or non-legal services by MSEC. The MSEC Personify system is an accurate means of identifying current and former members.
2. The lawyer's duty to promote the member's best interest always supersedes any obligation to advance the business interests of MSEC, including development of legal or non-legal services.
3. Where MSEC lawyers advise or represent members in regard to interpreting or enforcing restrictive covenants or other issues that might impact other employers, the lawyer must determine whether the issue affects another employer-member and consider whether a potential or present conflict results. This analysis should occur at the inception of the issue.
4. The member is the corporate entity and not any individual representative of the member company. MSEC lawyers should identify actual and potential conflicts arising between the member company and the company representative.

## Supervising the Work of Non-lawyers

A lawyer having direct supervisory authority over a non-lawyer must make reasonable efforts to ensure that the person's conduct is compatible with the professional obligations of the lawyer. A lawyer who supervises a non-lawyer is responsible for the conduct of the non-lawyer that would violate the rules of professional conduct when the lawyer knows about the conduct, but fails to take reasonable remedial action.

1. MSEC lawyers supervising assistants should give assistants appropriate instruction and supervision concerning the ethical aspects of their employment. This is particularly true regarding the obligation not to disclose information relating to representation of members.
2. Non-lawyer assistants must appreciate the obligation to maintain confidentiality in all work-related matters, including guardianship of files or other documents in their control or temporary possession.
3. Because assistants to lawyers are expected to conduct themselves in a manner compatible with the professional obligations of the lawyers, these expectations are on-going as with lawyers.
4. MSEC lawyers must monitor the conduct of assistants to ensure that assistants consistently treat documents and information in a manner consistent with the lawyer's professional obligations. This is particularly true whenever assistants are supporting work of an especially sensitive nature, such as financial reports, legal settlements, charges of discrimination or other administrative actions.
5. Where MSEC lawyers observe instances of inappropriate behavior by assistants, the matter should be promptly reported to the Department Director. The Department Director will investigate the matter and take appropriate remedial action.

## Requests or Demands for Information

If any third party requests or demands, by subpoena or otherwise, any materials held by MSEC on behalf of any member, the MSEC attorney representing the member in the matter will immediately notify the member and take all steps necessary to permit the assertion of all applicable rights and privileges with

respect to said materials, and shall cooperate fully with counsel for the member in any judicial proceeding relating to the disclosure of such materials.

If a member must disclose confidential information to a governmental agency, the MSEC attorney representing the member should specifically request: (1) confidential treatment be accorded the documents, correspondence or submissions provided on behalf of the member by MSEC; (2) require the agency to notify the member or MSEC of third-party requests for such information; and (3) state that any inclusion of privileged information is inadvertent and does not constitute a waiver of the attorney-client privilege or any other applicable privilege.

**Legal Records Hold**

MSEC has a Document Retention and Destruction policy that sets forth record retention and destruction schedules. Employees should note the following general exception to any stated destruction schedule:

If the employee believes, or if MSEC informs the employee, that MSEC records are relevant to litigation, or potential litigation (i.e., a dispute that could result in litigation), then

1. the employee must preserve those records until the Legal Vice President or President determines the records are no longer needed, and
2. contact the Legal Vice President or President immediately so that appropriate arrangements may be made to preserve the documents for production.

This exception supersedes any established destruction schedule for those records. If the Employee believes that the exception may apply, or has any question regarding the possible applicability of that exception, the employee should contact the Legal Vice President.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
### CIVIL ACTION No. 1:15-CV-83

| | |
|---|---|
| CAPITAL ASSOCIATED INDUSTRIES, INC., | |
| Plaintiff, | |
| v. | **DECLARATION OF KEVIN ROBINS** |
| ROY COOPER, et al., | |
| Defendants. | |

1.      My name is Kevin Robins.  I am over the age of 18 and under no disability. I have personal knowledge of the matters set forth in this affidavit and am competent to testify to them.

2.      I am the Chief Executive Officer of Mid-Atlantic Employers Association ("MEA").  I have been in this position since 2011.

3.      I am licensed to practice law in Pennsylvania.

4.      MEA is a 501(c)(6) non-profit trade association headquartered in King of Prussia, Pennsylvania.   MEA provides a variety of HR-related services to its members, including training, compliance advice, recruitment and compensation consulting, benefit consulting, and employment-related legal services.

5.      MEA was founded in 1904 by a group of manufacturers that decided to work together to resolve common employment-related issues.

6.      Since its founding, MEA has grown to over 535 members.

7.    MEA has 23 employees, three of whom are licensed attorneys.

8.    MEA serves members located primarily in Pennsylvania, New Jersey and Delaware. We also serve some clients in Maryland.

9.    MEA started providing members legal advice and services in 2015. We currently have two staff attorneys who are licensed to practice law in Pennsylvania and New Jersey. Given the members' growing demand for our legal services, we hired a second staff attorney who started on January 3, 2017. I do not provide any legal services to our members.

10.    MEA decided to offer legal services through a staff attorney because of member frustrations with MEA's previous inability to provide comprehensive legal advice through our member hotline.

11.    All of MEA's members have access to our advice hotline, which is included as part of our annual membership dues. Our annual dues range from $995 a year for members with fewer than 25 employees to $3,950 for employees with more than 400 employees.

12.    Our member hotline is staffed by HR professionals. We receive approximately 3,000 calls a year on our hotline.

13.    At all times, including the present, the HR professionals on the hotline never provide legal advice. Rather, they only provide responses in the form of general information, and always disclaim that the information provided: (a) does not constitute legal advice and should not be relied upon as legal advice; (b) is provided for

- 2 -

informational purposes only; and (c) that if the member company wishes to seek legal advice related to the issue, it should seek advice from counsel.

14. Before hiring its first staff attorney, MEA retained an outside law firm to answer any legal questions that arose from the hotline which the HR professional was unable to answer. If an HR professional received a call that involved a legal component, the HR professional would then call the law firm for general legal guidance and then relay that general guidance to the member with the appropriate disclaimers as outlined above. If the member's issue required rendering legal advice, such as performing specific legal analysis, rendering legal opinions, or the drafting or review of a communication or any legal document, the HR professional would have to stop the conversation, and ask the member to seek legal advice from an attorney. Not only was the process inefficient and wasteful for the members, but the outside attorney typically lacked the long-term relationship and member-familiarity that MEA has with our members.

15. Legal advice and services are not included within our annual membership dues. When a member needs legal advice or seeks legal services, the member can engage our staff attorneys on an hourly basis. Our staff attorneys' hourly rate is $225. The average hourly rate for an employment attorney in the Tri-State Area varies, but is usually no less than $275 and can often exceed $500. A member who seeks legal advice or services will sign an engagement letter with MEA that makes clear the member is represented by the staff attorney, and outlines other terms and conditions of

- 3 -

representation as required by the rules of professional responsibility   A true and accurate copy of MEA's form engagement letter is attached as **Exhibit A**.

16.     In addition to offering legal advice, our staff attorneys will prepare legal documents, conduct internal investigations, and represent the members before employment agencies (but not court proceedings).   On average, 80% of the staff attorneys' legal services to members consist of legal advice and counseling regarding an employment issue, such as an employee termination, a group layoff, an ADA accommodation, or other employee issues.   These staff attorneys' advice may result in preparing a legal document for the member.   The remaining 20% of the staff attorneys' time is dedicated to representing members before employment agencies and conducting internal investigations.

17.     Our staff attorneys do not provide members with legal assistance concerning state- or federal-court litigation or any non-employment related matters.   In addition, our staff attorneys do not offer legal services related to ERISA compliance.   If a member seeks legal assistance for such matters, our staff attorneys refer them to outside counsel.

18.     To handle our legal services (and other fee-for-service offerings), MEA has created a wholly owned for-profit subsidiary.   Our staff attorneys are employees of the subsidiary.   I am the chief executive officer of the subsidiary.

19.     As employees of the subsidiary, the staff attorneys receive their paycheck from the subsidiary.

- 4 -

20.    The subsidiary carries professional liability insurance for the staff attorneys.

21.    Our staff attorneys reports to me regarding managerial issues.  However, I do not supervise our staff attorneys on any legal-related matters.  Our staff attorneys have complete professional discretion over engaging members, what legal advice and services to render to a member, whether there is a conflict of interest, and all other professional decisions they encounter.  Nobody at MEA has any authority or influence over our staff attorneys' legal matters, and at all times they retain professional discretion to act in the client's best interests.  Indeed, our staff attorneys have never discussed a legal matter with anybody at MEA.

22.    To protect the attorney-client privilege and avoid other confidentiality concerns, all of the attorneys' files are stored on a separate, secured drive that only the attorneys can access.  Once a member engages one of our staff attorneys, the staff attorneys do not update any HR professionals (or anybody else) on the status or outcome of the matter.  In addition, the attorneys advise the member that, in order to protect privilege and confidentiality, they should not discuss any of the aspects of the representation with anyone else at MEA.

23.    We also have a thorough ethics code that we following regarding attorney-client privilege, member confidentiality, attorney professional independence, attorney file maintenance and retention, and conflicts of interest.  A true and accurate copy of our ethics code is attached as **Exhibit B**.

- 5 -

24. Before engaging a member, our staff attorneys run a conflict check to ensure there is not member-to-member conflict. I have never been informed of a conflict of interest between MEA and one of its members.

25. We have never had an ethical issue arise because of MEA's legal services.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on _____ 1/25 _____ , 2017.

_____
Kevin Robins

# EXHIBIT A



**[ATTORNEY NAME], Esquire**
**[TITLE]**

[DATE]

<u>**Via E-Mail**</u>
[NAME]
[ADDRESS]

> ***Re: Engagement letter[MATTER NAME]***

Dear [NAME]:

This confirms [COMPANY]'s retention of [ATTORNEY NAME], Esquire on behalf of Midatlantic Employers' Association ("MEA") in connection with employment-related advices. The nature of services outlined in this engagement agreement (the "Agreement") are ***in addition*** to the services you already receive under your current MEA membership, and will not in any way affect those membership services.

<div align="center"><u>**Scope of Legal Representation**</u></div>

The scope of our representation is limited solely to [DESCRIBE SCOPE], among other reasonably-related advices. While all employment-related matters could potentially form the basis of a lawsuit in federal or state court, be advised that the scope of my representation in this or any other matter will **<u>not</u>** extend to court proceedings or litigation. We can however represent you in connection with claims filed with the Equal Employment Opportunity Commission (EEOC), and other federal or state agencies.

<div align="center"><u>**Retainer**</u></div>

There is no retainer for our representation in this matter.

<div align="center"><u>**Fees and Billing Policy**</u></div>

You will be billed for my work on this matter at a rate of $225 per hour. Any non-attorney time spent on this matter will not be billed. I will itemize my time and charge you in ¼ hour increments. Any work performed under ¼ hour will not be billed. We will also bill you for all reasonable and necessary expenses related to this matter, including filing fees, copying and travel costs, courier charges, etc. We will also provide you details regarding any such expenses incurred on your behalf in this matter. We will bill you for the above services and expenses, monthly, and you agree to pay our invoices upon presentation.



*Today's HR Solutions*

[ATTORNEY NAME], Esquire
[TITLE]

Our billings, together with communications with you through telephone conversations, meetings, letters, emails, and facsimiles, serve to inform you of the work being performed on your behalf. However, should you have any questions or comments about hours charged, billing practices, or expenses, we strongly encourage you to contact us promptly.

If you request or require any changes to the format of our billings, including the amount of detail or itemization of our work, or if you have concerns with the accuracy or amount of any billing to you, you agree to notify us in writing within 60 days of receipt of the billing of any such concern, request, requirement or objection. Upon the expiration of the 60-day period, all billings not previously objected to in writing shall be deemed accepted and a part of this Agreement.

### No Guarantee

We can not guarantee the outcome of any legal dispute. Thus, although I may offer an opinion about possible results regarding any matter, we do not and cannot guarantee any particular result. Moreover, we cannot predict in advance what the total amount of fees will be for our services. You acknowledge that we have made no promises about the outcome, including the costs and expenses incurred in this matter, and that any opinion offered or budget provided by us will not constitute a guarantee.

==[IF LITIGATION MATTER OR POTENTIAL FOR LITIGATION]==:

### Retention and Preservation of Documents and Other Records

Until we speak further on this subject, you must take immediate steps to preserve all of the documents, records, objects and other evidence in your possession or control that in any way pertain to the subject matter of this dispute or potential dispute. This applies both to pre-existing materials, as well as materials that are generated hereafter. The law provides that if such materials are lost or destroyed, you may be barred from pursuing your claims and defenses, and this could result in severe prejudice to your position in this case.

Please also note that this requirement applies to materials that may be stored in computer media, such as documents, e-mails, notes, calendars, etc. Often, computer systems are set up to delete such materials periodically, and/or individuals may innocently delete such materials as part of their ordinary business activities. It is crucial that you intervene at the earliest possible time and prevent this from happening now and in the future.

I will communicate with you as needed in order to further clarify these requirements. Even if we are able to limit these requirements for purposes of this lawsuit, however, you should keep in mind that you may still be obligated to retain certain materials for other purposes including, for instance, tax and regulatory compliance. In the interim, should you have any questions, please contact me.

Unless otherwise instructed in writing by you, we reserve the right to destroy any file seven years after a matter is closed.

2



[ATTORNEY NAME], Esquire
[TITLE]

### Attorney/Client Privilege, Confidentiality, and Communications

All communications with me throughout this process are protected by attorney-client privilege and confidentiality. Please take steps to preserve this privilege by limiting communication about this matter **only** to those individuals authorized by [COMPANY] to receive legal advice. Importantly, if you have previously discussed this matter with any other MEA non-attorney staff, including through the hotline, you should **not** have any further communications with any MEA non-attorney staff about this matter unless you first thoroughly understand how any such communications and disclosures could waive the privilege and confidentiality of our legal representation and advice.

Depending on your preferences, we may communicate about this matter from time-to-time via email. There is a risk, however remote, that a confidential email could be intercepted by a third-party. Consequently, the Rules that govern conduct of attorneys require that I obtain your consent to our email communications. Unless you advise me otherwise, I assume that you have no objection to our use of email.

If you have any questions about this Agreement, please let me know and I will be happy to discuss with you. Otherwise, please sign a copy of this Agreement where indicated, evidencing your assent to the above terms, and return the same to me via email. I look forward to working with you, and we thank you for the opportunity to represent [COMPANY] in this matter.

Very truly yours,

[ATTORNEY NAME], Esquire

I HAVE READ THE ABOVE AGREEMENT, AND I AGREE TO ALL OF ITS TERMS AND CONDITIONS:

**[COMPANY]**

By:_____          Date:_____
      [NAME]

3

# EXHIBIT B

**BUSINESS ETHICS: Code of Conduct for Attorneys**

Every licensed attorney is obligated to abide by the Rules of Professional Conduct. All MEA attorneys must adhere to the following policy. Non-lawyers must also adhere to the following policy to the extent it applies to them. If an MEA attorney (or non-lawyer) has any issue or concern regarding ethical or legal practice obligations, he or she is encouraged to raise such matters with the Director of Legal and Compliance Services, or with the CEO.

**Preserving the Attorney-Client Privilege and the Rule of Confidentiality**
"Client" denotes a person who receives legal services.

The *attorney-client* **privilege** applies in judicial and other proceedings in which a lawyer may be called as a witness or otherwise required to produce evidence concerning a client. This privilege bars privileged information from disclosure during such proceedings if the information was provided to the attorney in confidence.

The rule of *client-lawyer* **confidentiality** is broader. The confidentiality rule applies not merely to matters communicated in confidence by the Member but also information relating to the representation, whatever its source. A lawyer may not disclose such information except as authorized by the client or required by the Rules of Professional Conduct or other law.

**Attorney Client Privilege**

1. MEA lawyers must act in a manner that preserves the evidentiary privilege. This means that lawyers must not share confidential information unless permitted by the privilege.

2. MEA lawyers must avoid professional discussions in the presence of persons to whom the privilege does not extend, such as non-lawyers. For example, this means that any information obtained from a client shall **not** be shared by the MEA lawyer with MEA's hotline after the Member formally has engaged the attorney, even if hotline discussed the *same* issue with the Member prior to the attorney-client relationship being formed. A lawyer owes an obligation to advise the client of the attorney-client privilege and timely assert the privilege unless the client waives it.

3. The lawyer may not counsel or assist a client in conduct that is criminal or fraudulent. The lawyer has professional discretion to reveal information in order to prevent criminal conduct.

1

**Confidentiality**

MEA lawyers may not reveal to non-lawyers information relating to the representation without the client's consent or authorization. MEA lawyers must not allow non-lawyer professionals to treat privileged and confidential information in a manner that would fail to preserve the privilege. A lawyer may disclose privileged information to non-lawyer experts and professionals or non-lawyers working under their supervision without destroying the privilege **if** the non-lawyer is an agent of the lawyer who facilitates the representation. MEA lawyers must take appropriate precautions to prevent members from divulging privileged and confidential information when interacting with anyone not required to effectuate representation.

1. MEA lawyers must clarify with the Member the available attorney-client relationship and attendant expectations and duties of confidentiality. A written advisory is included in each MEA engagement letter.

2. To preserve privilege, MEA lawyers must not share member information with non-lawyers unless permitted by the privilege or consented to by the member.

3. MEA lawyers must inform Members of the potential loss of the privilege when non-lawyers are included in consultation between the lawyer and Member.

4. Electronic communications (including E-mail and Facsimile) Confidentiality Disclaimers should be used in confidential correspondence.

5. Attorneys must assure that metadata is removed or restricted as appropriate from all written or electronic communications shared with opposing counsel, non-lawyers or third parties outside of MEA.

**File Maintenance and Retention**
Documentation of all legal matters must be created and maintained in a confidential manner. Non-lawyers should not be provided access to this confidential information. Files related to legal matters must be maintained to prevent access by non-lawyers unless special exception for purposes of adequate representation is specifically provided by a lawyer or Legal Services Department Director. Member files addressing legal matters are maintained separately from files addressing non-legal matters. Legal matters include any documentation related to a lawyer's representation of a member before the NLRB, EEOC, DOL, OSHA, PHRC, or similar state or federal agency, as well as arbitration files, employment agreements or other documentation created or maintained in the lawyer's counsel to Members applying law to particular facts.

1. Documents that are confidential and are created pursuant to the attorney client relationship are to be appropriately marked, identified, or stored in appropriate locations not accessible to non-lawyers. These marks should be added to e-mails, fax cover sheets or other correspondence as appropriate.

2. Legal files must be segregated and appropriately marked or stamped. This file may <u>only</u> be accessed by an MEA attorney or other person working directly under that

attorney's supervision. Others may access this file only: (1) with express consent of that attorney; (2) if that attorney is unavailable, with the express consent of the Legal Services Department Director; or (3) with a written waiver from the Member.

3. Legal Files must be maintained in a lawyer's office or other restricted locations only. Attorneys must ensure that all confidential Member files, including desk files, are adequately safeguarded both during and after work hours. Any employee seeking to review a legal file is subject to the restrictions contained in the paragraph set forth above.

## Settlement Offers

MEA attorneys are to mark written settlement offers (and all settlement negotiations) with the designation that they are submitted under the auspices of "All federal and state rules of evidence applicable to the inadmissibility of settlement communications." This prevents Member settlement offers from being introduced into the stream of discovery or at court as evidence of the Member's culpability. Add the same to fax cover sheets, e-mail advisories or captions when transmitting such to the opposing party.

## Existing Insurance Coverage

MEA attorneys must advise members to ascertain whether they have insurance coverage for employment law actions and whether they are required to contact their insurance carrier in a timely manner for purposes of triggering such coverage.

## Avoiding Conflicts of Interest

MEA lawyers may be prohibited from representing Member clients whose interests are or become adverse to the interests of any other Member client.

1. MEA lawyers should identify actual and potential conflicts arising from the provision of legal services by MEA, in accordance with all applicable Rules of Professional Conduct. This analysis should occur at the inception of the issue.

2. The lawyer's duty to promote the client Member's best interest always supersedes any obligation to advance the business interests of MEA.

3. Where MEA lawyers advise or represent Members in regard to interpreting or enforcing restrictive covenants or other issues that might impact other employers, the lawyer must determine whether the issue affects another employer-Member and consider whether a potential or present conflict results. This analysis should occur at the inception of the issue.

4. The member is the corporate entity and not any individual representative of the Member company. MEA lawyers should identify actual and potential conflicts arising between the Member company and the company representative.

3

**Supervising the Work of Non-lawyers**

A lawyer having direct supervisory authority over a non-lawyer must make reasonable efforts to ensure that the person's conduct is compatible with the professional obligations of the lawyer. A lawyer who supervises a non-lawyer is responsible for the conduct of the non-lawyer that would violate the rules of professional conduct when the lawyer knows about the conduct, but fails to take reasonable remedial action.

1. MEA lawyers supervising non-lawyers should give assistants appropriate instruction and supervision concerning the ethical aspects of their employment. This is particularly true regarding the obligation not to disclose information relating to representation of members.

2. Non-lawyer assistants must appreciate the obligation to maintain confidentiality in all work-related matters, including guardianship of files or other documents in their control or temporary possession.

3. Because assistants to lawyers are expected to conduct themselves in a manner compatible with the professional obligations of the lawyers, these expectations are on-going as with lawyers.

4. MEA lawyers must monitor the conduct of assistants to ensure that assistants consistently treat documents and information in a manner consistent with the lawyer's professional obligations. This is particularly true whenever assistants are supporting work of an especially sensitive nature, such as financial reports, legal settlements, charges of discrimination or other administrative actions.

5. Where MEA lawyers observe instances of inappropriate behavior by assistants, the matter should be promptly reported to the Legal Services Department Director. The Department Director will investigate the matter and take appropriate remedial action.

**Requests or Demands for Information**

If any third party requests or demands, by subpoena or otherwise, any materials held by MEA on behalf of any Member, the MEA attorney representing the member in the matter will immediately notify the member and take all steps necessary to permit the assertion of all applicable rights and privileges with respect to said materials, and shall cooperate fully with counsel for the member in any judicial proceeding relating to the disclosure of such materials.

If a Member must disclose confidential information to a governmental agency, the MEA attorney representing the member should specifically request: (1) confidential treatment be accorded the documents, correspondence or submissions provided on behalf of the Member by MEA; (2) require the agency to notify the member or MEA of third-party requests for such information; and (3) state that any inclusion of privileged information is inadvertent and does not constitute a waiver of the attorney-client privilege or any other applicable privilege.

4

**Engagement Letters**

All engagement letters formalizing the attorney-client relationship shall set forth all required disclosures as outlined above, including any other information required by the Rules of Professional Conduct, including information regarding the fee arrangement, etc.

**Provision of Non-Legal Services**

Any work that an MEA lawyer does for a Member who is not a client must include the following disclaimer at the top of the communication to the Member (e.g., in the case of a handbook review or handbook drafting project):

[MEMBER NAME] sought MEA's guidance pertaining to [DESCRIBE PROJECT] (the "Project").  The company did not retain me or any other lawyer affiliated with MEA as its attorney in respect to this Project.  Accordingly, the Rules of Professional Conduct for attorneys require that we advise you as follows: (a) we do **not** have an attorney/client relationship in respect to this Project; (b) the attorney/client privilege therefore does not exist with respect to the below guidance or any of our discussions pertaining to same; (c) we will attempt to maintain the confidentiality of your information to the extent possible, but are not required to do; and (d) any recommendations, including those provided below, do **not** constitute legal advice.  The below is for informational purposes only.

5

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
## CIVIL ACTION No. 1:15-CV-83

| | |
|---|---|
| **CAPITAL ASSOCIATED INDUSTRIES, INC.,**<br><br>    **Plaintiff,**<br><br>    **v.**<br><br>**ROY COOPER**, et al.,<br><br>    **Defendants.** | **DECLARATION OF KELLY HAYDEN** |

1.      My name is Kelly Hayden.  I am over the age of 18 and under no disability. I have personal knowledge of the matters set forth in this affidavit and am competent to testify to them.

2.      I am the Chief Legal Counsel for Management Association.   I joined Management Association in August of 2000 as a staff attorney.  In December 2011, I was promoted to General Counsel.   In approximately January of 2014, I was promoted to Chief Legal Counsel.

3.      I am licensed to practice law in Illinois.

4.      Management Association is a 501(c)(6) non-profit trade association.  Our members are employers.  We provide human resources, compensation, legal and training services to our members.

5.    Management Association is headquartered in Downers Grove, Illinois, approximately 15 miles west of Chicago, Illinois.  We serve members located primarily in Illinois.

6.    Management Association was founded in 1898 by a group of manufacturing employers that were seeking to share information and improve training for their managers.

7.    Over the years, our membership has grown and diversified to over 1,000 employers from a variety of industries.

8.    Management Association has twenty-five regular employees and twelve employees who perform project work on an as needed basis.

9.    Of Management Association's twenty-five regular employees, three (including me) are attorneys licensed to practice law in Illinois.

10.   Management Association carries professional liability insurance for its three attorneys.  We have never had to file a claim on our professional liability insurance.

11.   Management Association started offering legal services in the 1980s.  At the time, we were offering human-resources advice, and members wanted that advice to expand into human-resources legal advice.  In response to member demand, we hired two licensed attorneys who started to offer legal services to our members.

12.   We offer legal services only to our members.

- 2 -

13.    Members pay annual dues to belong to Management Association.  As part of their dues, members receive unlimited access to our HR hotline, which includes access to legal advice from our three attorneys.

14.    When a member calls our HR hotline, the call is answered by an administrative professional who will triage the call. The member may ask to speak directly with an attorney or may simply state that he/she has a hotline call, in which case the call is directed to an HR professional or an attorney, depending upon availability. If the call is forwarded to an HR professional, he or she will begin to triage the member's employment issue.  If the HR professional determines that the member is seeking legal advice, the HR professional forwards the call to an attorney.

15.    If a hotline call involves an unusual amount of legal assistance, the attorney will advise the member that in order to assist the member, Management Association will have to charge the member special-project fees above the annual membership dues.

16.    We do not charge special-project fees unless the member consents in writing to pay for these additional fees. Special-project fees are charged at an hourly rate. The hourly rate for these special-project services is currently $265 per hour.  Our hourly rate is far below the customary rate of approximately $500 to $750 per hour for an employment lawyer in the Chicago area.

17.    Management Association also charges special-project fees when our attorneys conduct internal investigations for our members or help members respond to audits initiated by the Department of Labor.

18. Our attorneys assist in HR training that Management Association offers its members. The attorneys speak to the legal issues that arise in the workplace.

19. Our attorneys are available to represent members before the Equal Opportunity Employment Commission and the Illinois Department of Human Rights. If a member receives a charge from either of these agencies, we review the charge, assist in collecting documents and conducting investigations, prepare written statements that are submitted to the agencies, participate in mediation, and represent the member at a fact finding conference.

20. In over 50% of the EEOC and IDHR charges we handle, our staff is familiar with the member and we have been actively advising them previously on compliance with discrimination laws. This existing relationship helps build trust with the member, which facilitates our ability to collect necessary documents, conduct internal investigations, and guide the member to a resolution.

21. We do not represent members in state or federal court. If members need such litigation services, we ask if they have a preferred law firm and otherwise give them two or three referrals that they can call.

22. We also offer several legal services for flat-rate fees. We review employee handbooks, non-compete agreements, separation agreements, settlement agreements, and other routine legal documents for flat rates. If a member asks us to represent them in the negotiation of a legal agreement, we provide these services at an hourly rate due to the additional resources we must commit to the project.

- 4 -

23.    On average, I estimate that the HR Hotline accounts for 40% of the time our attorneys spend offering legal services.  After the HR Hotline, I estimate that we spend the next 30%–40% of our time on special projects—although this can vary greatly if a couple of members have time-intensive projects in a certain year.  The remainder of our time is dedicated to assisting in training presentations and some administrative duties.

24.    Our attorneys are paid salaries.  All of the fees our attorneys charge for their legal services are collected by Management Association.  The attorneys do not receive any additional compensation or bonus based on the level of special-project fees we charge members.

25.    The two other attorneys at Management Association report to me.  I report to our President and CEO, Mary Lynn Fayoumi, on limited issues.  Ms. Fayoumi is not an attorney.  Therefore, I report to her on budget issues, strategic goals, and the need for resources.  However, Ms. Fayoumi has no oversight regarding the section of legal projects on which the attorneys assist, the specific cases the attorneys are handling, and the particular advice or services given to a member.

26.    Each of our attorneys signs a statement that makes clear that they are subject to Rule 5.4(d)(3) of the Illinois Rules of Professional Conduct.  Specifically, this rule states that a non-lawyer does not have the right to direct or control the professional judgement of a lawyer.  As the Chief Legal Counsel, I personally discuss this Rule with new hires and remind my direct reports of it from time to time during department meetings.  A true and accurate copy of our statement is attached as **Exhibit A**.

27.    In the history of Management Association, we have only had two ethical inquires.  First, in 2009, an ethical complaint was filed with the Attorney Registration and Disciplinary Committee against the former General Counsel accusing her of practicing law in an association and commingling between attorneys and non-attorneys.  The complaint was dismissed as meritless.  Second, in 2012, an identical complaint—nearly verbatim—was filed against me shortly after I started in my new position.  This complaint was likewise dismissed as meritless.

28.    Outside of these two meritless ethical complaints, I am not aware of any ethical issues (either formal violations under the Rules of Professional Conduct or informal ethical dilemmas) for the attorneys at Management Association.

29.    To protect attorney-client-privileged communications and attorney work product, we have secured all attorney documents so that only attorneys and their dedicated assistants can view the documents.  We also log all HR Hotline calls, and the attorneys have the ability to make their logs private if they contain attorney-client-privileged communications.  Finally, if an HR professional asks an attorney to join a call with a member, the attorney accepts the call but asks the HR professional to drop off so as to protect any attorney-client-privileged communications.  All attorney files are private and secured.

30.    When training our attorneys and HR professionals, we instruct them on the special ethical and confidentiality issues that arise for attorneys working for Management

- 6 -

Association and the steps employees should take to ensure there are not ethical or confidentiality breaches.

31.     I work with our web designer and marketers to review all advertising to ensure that a representation regarding Management Association's legal services complies with the Rules of Professional Conduct.

32.     I am not aware of any conflicts that have ever arisen between Management Association's interests and a member's legal interests.

33.     We rarely encounter client conflicts because our only clients are our employer members, and their legal matters almost always concern issues regarding employees or agencies (not other members).  On occasion, we will advise members on non-compete and trade-secret issues, in which a member could be adverse to another employer; we confirm that we do not have a conflict before representing a member on such issues.

34.     We have never had a client conflict to my knowledge.  We have never asked a member to waive a client conflict.  If we did have a conflict, we would disclose the conflict and either remove ourselves from the representation or obtain an appropriate waiver.

35.     Our ability to offer cost-effective legal services through licensed attorneys is an invaluable asset to our employer members.  Indeed, when members solicit new employers to join Management Association, the prospective member often joins as soon as it learns that it can obtain routine employment-related legal advice through our HR

- 7 -

Hotline for no additional charge. This is especially true for smaller prospective members who do not have the resources to pay an attorney to guide them on compliance with the numerous employment regulations.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on _January 24_____, 2017.


_Kelly Hayden_____
Kelly Hayden

# EXHIBIT A

# Acknowledgement and Receipt

1 You understand that employment with the Association is "at will".

2 You have received a copy of the Association's employee handbook.

3 You acknowledge that you are responsible for being familiar with the policies and procedures in this Handbook.

4 You understand that provisions of this Handbook are guidelines, statements of policy and procedure. The policies discussed in this Handbook are not guaranteed and may be changed by the Association without your consent or prior knowledge; however, you will be notified of such changes.

5 You understand that this Handbook is the property of the Management Association, to be held in confidence and returned to the Association upon termination of your employment.

6 You understand that you while employed in your capacity as a lawyer at the Association, no nonlawyer has the right to direct or control the professional judgment of you in accordance with Rule 5.4 (d) (3) of the *Illinois Rules of Professional Conduct.*

Received this day of _____ day of _____.

_____

Signature of Employee (Lawyer)

| | |
|---|---|
| 1 | IN THE UNITED STATES DISTRICT COURT |
| | FOR THE MIDDLE DISTRICT OF NORTH CAROLINA |
| 2 | CIVIL ACTION NO. 1:15-CV-83-LCB-JLW |

CAPITAL ASSOCIATED INDUSTRIES,    )
INC.,                             )
                                  )
        Plaintiff,                )
                                  )
    vs.                           )
                                  )
ROY COOPER, et al.,               )
                                  )
        Defendants.               )

Deposition of
A. BRUCE CLARKE
VOLUME I - Pages 1 - 313
(Taken by Defendants)
150 Fayetteville Street, Raleigh, North Carolina
January 30, 2017, 9:36 a.m.

Reported in Stenotype By
Margaret M. Kruse, CSR, RMR, CRR
Transcript produced by computer-aided transcription

1          DEPOSITION of A. BRUCE CLARKE, a witness called on

2     behalf of Defendants, before Margaret M. Kruse, Registered

3     Merit Reporter, Certified Realtime Reporter, and Notary Public

4     in and for the State of North Carolina, at 150 North

5     Fayetteville Street, Raleigh, North Carolina, on January 30,

6     2017, commencing at 9:16 a.m.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              (Witness administered an oath.)
 2                    A. BRUCE CLARKE,
 3    having been first administered an oath, was examined
 4                  and testified as follows:
 5                         EXAMINATION
 6    BY MR. DUNCAN:
 7         Q.   Good morning.  How are you?
 8         A.   Good morning.  Hope you're well.
 9         Q.   Thank you.
10              Would you please state your name for the
11    record.
12         A.   My name is Alan Bruce Clarke.
13         Q.   Your home address?
14         A.   9512 Swepstone Lane, Raleigh.
15         Q.   And your business address?
16         A.   It's 3150 Spring Forest Road, Suite 116,
17    Raleigh.
18         Q.   Have you ever had your deposition taken
19    before?
20         A.   Yes, I have.
21         Q.   How many times?
22         A.   Once.
23         Q.   And what was that in conjunction with?
24         A.   It was a civil dispute that I was a witness
25    to some of the facts.  I was not involved in the
```

1 **dispute.**

2     Q.   So you weren't a party, you were a third

3 party to the dispute?

4     **A.   A third-party witness, yes.**

5     Q.   Have you also taken and/or attended

6 depositions in the past?

7     **A.   Yes.**

8     Q.   So without taking a lot of time on it, if

9 you would do the following things, if we can agree,

10 if you have a yes-or-no-type answer, if you would

11 clearly articulate that for the record, as opposed to

12 a nod or uh-huh.

13     We'll both try to wait to finish the

14 question and the answer, and I will work with you as

15 well. If I interrupt you, I will apologize

16 immediately. I'm not intending to do that. I'll

17 probably think you're finished.

18     If you don't understand a question, if you

19 could ask it to be repeated. If you didn't hear it

20 or understand it, ask it to be repeated or clarified

21 so we can rely on your answer.

22     If you need a break at any point in time, if

23 you could just indicate and let us either finish that

24 question or some immediate line of questioning that's

25 involved with it, and then we'll take a break if you

1  need one.

2          Is that fair enough?

3      **A.    Yes.   Those are fair.**

4          MR. DUNCAN:   Let me mark as the first

5  exhibit the Notice of Deposition as Exhibit 44.

6          (Whereupon, Clarke Deposition Exhibit 44 was

7          marked for identification.)

8  BY MR. DUNCAN:

9      Q.   Let me first confirm that you are the

10 designee for all 19 of the topics that are listed on

11 Exhibit 44?

12     **A.   Yes.**

13     Q.   You have seen this document before

14 obviously?

15     **A.   Yes.**

16     Q.   What have you done to prepare in order to

17 testify?

18     **A.    A few things.**

19          **One, certainly to read this and to believe**

20 **in myself and convince myself whether or not I was**

21 **appropriate to be the 30(b)(6) witness on these**

22 **topics.   Many of these topics are topics that came up**

23 **in documents or are related to documents produced in**

24 **discovery.   So I've looked at those documents either**

25 **because I pulled them for discovery or reviewed them**

1  settlement of business controversies and

2  misunderstandings amongst its members or between

3  members or other businesses or organizations"?

4  **A.  Yes.**

5  Q.  In those purposes, it does not say to offer

6  legal services that you see, does it?

7  **A.  I do not see the word "legal" in here.**

8  Q.  Does it appear in any way to address

9  controversies between businesses and individuals, for

10  example, an employee or former employee?

11  **A.  It speaks for itself.**

12  Q.  I understand that, but while it speaks for

13  itself, do you see in any place a specific mention

14  that one of its purposes is to address controversies

15  between a business and an individual such as an

16  employee or a former employee?

17  **A.  Yes.**

18  Q.  Where do you see that?

19  **A.  Because businesses and organizations only**

20  **exist through their employees, they can only act**

21  **through their employees.**

22  Q.  Can you show me the language you're

23  referring to specifically, please?

24  **A.  Sure.  The last phrases of 3(b).**

25  Q.  Where it says, "misunderstandings among its

1  members or between members and other businesses or

2  organizations"?

3      A.   Yes.

4      Q.   So it's your interpretation of that language

5  that that would include controversies that may exist

6  between a business who would be a member of CAI and

7  an individual such as an employee or even a former

8  employee of that business?

9      A.   Yes, it could.   Yes.

10     Q.   Do you see anywhere in the purpose where it

11 addresses other legal services outside of a

12 "controversy"?

13     A.   I don't see the word "legal services."   I

14 don't see that pairing.

15     Q.   Looking further down in that page, I think

16 in subsection 5, does it establish that the members

17 vote on directors and directors vote on revisions to

18 bylaws?

19     A.   Point where you're looking.   Point to me

20 where you're looking.

21     Q.   Paragraph 5.   For members voting on

22 directors, that point, does that appear to establish

23 that point?

24     A.   No, I don't think it does.

25     Q.   It says, "Directors of the corporation shall

1 incorporation, the amendments.  Are you aware of

2 anything before this document in 1984, that is

3 Exhibit 46, that would have amended the articles of

4 incorporation to make it clear that the directors

5 were going to be elected by the board of directors as

6 opposed to the members of the organization?

7     A.    I believe I'm not aware of an amendment to

8 the articles of incorporation.  I believe I'm aware

9 to some changes in the bylaws that were produced in

10 this lawsuit.

11     Q.    With respect to the bylaws, what changes are

12 you aware of that would influence the answer on

13 behalf of CAI on this topic as to how the board of

14 directors were elected?

15     A.    Specifically I'd have to look at the

16 document, but I think it's generally true that the

17 bylaws and the articles in many ways address the same

18 topics.  So it's very possible there's one exactly on

19 point.  I just need to see the document.

20     (Whereupon, Clarke Deposition Exhibit 47 was

21     marked for identification.)

22 BY MR. DUNCAN:

23     Q.    I'm going to ask you next to look at what's

24 been marked as Exhibit 47 and ask you if that appears

25 to be the restated charter of CAI?

1       A.    Yes, it does.

2       Q.    Looking at the third page of this document,

3  does it appear that this restated charter is dated

4  May 29, 1984?

5       A.    Yes, it does.

6       Q.    Which is the same date as Exhibit 46, the

7  amendments to the articles of incorporation; is that

8  right?

9       A.    Yes.  Yes.  It's the same signature and

10 date, yes.

11      Q.    Do you know what the purpose of restating

12 the charter was?

13      A.    I do not.

14      Q.    Do you know who at CAI would have any

15 information about the purpose of restating the

16 charter?

17      A.    There would be no one at CAI that would know

18 that.

19      Q.    To your knowledge in 1984 -- and I believe

20 you were a member of the bar by 1984?

21      A.    Yes, sir.

22      Q.    (Continuing) -- did North Carolina law allow

23 for a trade association to offer legal services to

24 its members, to your knowledge?

25      A.    To my knowledge, no.

1    Q.   In paragraph 3, it sets out the purposes of

2  the entity on page 397, going to Bates stamp page

3  398.  Do you see those A, B, C, D points underneath

4  that?

5    A.   Yes.

6    Q.   Anywhere in there, do you see that one of

7  the purposes of the entity as set forth in the

8  restated charter is to offer legal services?

9    A.   I do not see the pairing of the words "legal

10  services."

11    Q.   The language appears again, as we saw in the

12  original charter from 1963, that it seeks to address

13  controversies among its members or between members

14  and other businesses or organizations.  That language

15  seems familiar from the original articles of

16  incorporation; does it not?

17    A.   It does.

18    Q.   Are you alleging with respect to this

19  document, the restated charter, on behalf of CAI that

20  that language means that CAI has in its restated

21  charter the ability to address controversies between

22  a business and an employee or a former employee of

23  that business?

24    A.   Would you state that again?

25    Q.   Yes.

1           Are you alleging on behalf of CAI that that

2    language suggests that one of the purposes of CAI is

3    to address a controversy between a member and an

4    employee or former employee of that member?

5        A.   Of that same member?  Yes, I think that it

6    does forecast that purpose.

7        Q.   Can you tell me how that language forecasts

8    that purpose?

9        A.   All right.  "To assist and encourage the

10   members of this corporation in their businesses."  I

11   think that forecasts that purpose.

12           "To promote the friendly exchange of

13   information among them."  I think that forecasts that

14   purpose.

15           "To encourage the settlement of business

16   controversies and misunderstanding among its members

17   or between its members and other businesses or

18   organizations."  It forecasts that purpose.

19       Q.   What's the difference between actually

20   having a purpose, as stated in the document, and

21   forecasting a purpose, the language you've used in

22   responding to that question?

23       A.   Well, I believe you and I both found in law

24   that phrases and paragraphs and sentences have

25   meaning beyond their literal language and wording,

```
 1   and that's what I mean by that.

 2       Q.    In paragraph 5 of this document, it also

 3   allows for the directors to be elected by the board

 4   of directors; is that fair?

 5       A.    Yes.

 6       Q.    In paragraph 9 it also says the board of

 7   directors can amend the bylaws?

 8       A.    Yes.

 9       Q.    In paragraph 10, it appears to say that the

10   board of directors can amend or repeal the articles

11   of incorporation?

12       A.    Yes.

13       Q.    The language there to read it says, "These

14   articles of incorporation and any provisions thereof

15   may be amended, repealed or restated in any fashion

16   by a majority vote of the members then in office of

17   the corporation's board of directors"?

18       A.    Yes.

19       Q.    It makes reference to members, but it seems

20   to restrict the reference to members, only those

21   members who happen to be in the office of the board

22   of directors at the time.  Am I reading that the way

23   it has been carried out in operation?

24       A.    Yes.  And it's a significant reason why

25   early on the first articles of incorporation I
```

1  individual, it says "association or individual
2  engaged in manufacturing, processing" and then it
3  goes on?
4      A.   Yes.
5      Q.   Are you suggesting that any governmental
6  entity fits that description of the listing of things
7  that follows?
8      A.   Yes.  I'm suggesting that it's inclusive.
9  I'm not suggesting that the word "government" is
10 included there.  I don't mean to have that kind of
11 discussion.
12          I am suggesting that words like "utilities,"
13 words like "servicing," words like "distribution,"
14 the government does many of the same things that
15 every employer does, every workplace does, every
16 business does or can't do.
17     Q.   Under the laws of North Carolina, are
18 governmental entities referred to solely as
19 "corporations," to your knowledge?
20     A.   I'm just not an expert on that.
21     Q.   Under Section 1, are you aware of any
22 language there in terms of membership that would
23 suggest medical practices could fit the description
24 for what would be those entities that would qualify
25 for "membership"?

1     A.   Yes.

2     Q.   Where is that language?

3     A.   Corporation, partnership, firm, association

4 or individual.

5     Q.   What about law firms?  Is there any language

6 in Section 1 that would bring law firms into being

7 eligible to be a "member" of CAI?

8     A.   Yes.

9     Q.   What's that language?

10    A.   Corporation, partnership, firm, association,

11 and to each of these, as included in the last

12 question, that the words that follow are broadly

13 inclusive of the things that all sorts of firms and

14 businesses perform.

15    Q.   For purposes of membership, to define the

16 scope of members for CAI, if you are a corporation or

17 a partnership or even an individual, you're eligible

18 for membership if you engage in anything that could

19 be loosely or clearly defined as manufacturing,

20 processing, converting, distributing, financial,

21 utilities, retailing, servicing or construction work

22 in North Carolina?

23    A.   Yes.  And to be fair and of assistance to

24 you, the way we view it is any employer.

25    Q.   Is there any kind of entity that would not

```
 1   be eligible in North Carolina?
 2       A.   There's a provision -- and, forgive me, I
 3   don't know that I can cite the exact document it's
 4   in, but I suspect it's in one of these that we're
 5   looking in -- that says, I believe, the president can
 6   reject an application for membership.  I have never
 7   rejected an application for membership, but I believe
 8   I have the power to do so.
 9       Q.   What would be the grounds for rejection for
10   CAI?
11       A.   It's never happened.  I can try to be
12   helpful with some examples that might or could.
13       Q.   Well, you're charged with this
14   responsibility?
15       A.   Yes.
16       Q.   Have you given it any thought during the
17   time you've had that responsibility?
18       A.   Yes.
19       Q.   Can you provide for us then what has gone
20   through your mind, realizing you haven't had it
21   approved by the board of directors or anything else?
22       A.   That's fair.  I've given it thought.
23            I think an organization that might also be
24   an employer but that has purposes that we or our
25   members believe are either in fact or appearance are
```

1    antithetical to most employers.

2           I would give an example of a labor union.  I

3    think it would be unlikely that we would allow a

4    labor union to join CAI because of that cross-purpose

5    to the class of employers.

6       Q.    Other than a labor union, have you thought

7    of any other entity that would not be qualified in

8    North Carolina or individually?

9       A.    Really that's the only significant example I

10   can think of.

11      Q.    All right.  To your knowledge, still looking

12   at Section 1, are there any individuals that are

13   members of CAI?

14      A.    To the best of my belief, and I looked to

15   try to determine that, that we don't have an

16   individual per se as a member.  I do believe we have

17   a few sole proprietors.  So just to be fair, I'm not

18   sure if that's included in your definition of an

19   individual.

20      Q.    With respect to those sole proprietors, do

21   you know if all of them have employees?

22      A.    I believe all of them do, but I believe it

23   is possible that one or more of them could be a sole

24   proprietor with only themselves working for the

25   entity.

1  Article III still in effect today without any further
2  amendment, to your knowledge?
3      A.   Yes.
4      Q.   Is there any requirement that board members
5  be lawyers?
6      A.   No.
7      Q.   Are there any lawyers on the board of
8  directors, as it's constituted today?
9      A.   Yes.
10     Q.   How many board of directors are there, as
11 it's constituted today?
12     A.   12.
13     Q.   And how many are lawyers on the board of
14 directors, to your knowledge?
15     A.   One for sure.  A Yale-educated former
16 legislator here.
17     Q.   Who is that?
18     A.   Norwood Bryan.  And I think that's it.  I
19 believe that's it.
20     Q.   Similar to the articles of incorporation in
21 the charter, there's no reference to the 1984 bylaws
22 that suggests that a purpose is to provide legal
23 services to members?
24     A.   I do not see the words paired "legal
25 services."

1     Q.    Are there any drafted bylaw amendments not
2  yet implemented, to your knowledge?
3     A.    **Not to my knowledge.**
4     Q.    Are these the most current bylaws?
5     A.    **I believe so.**
6     Q.    So you still abide by these 1984 bylaws in
7  Exhibit 48?
8     A.    **Yes.**
9     Q.    To your knowledge, on behalf of CAI -- so
10 I'm not asking for your personal knowledge, I'm
11 asking for CAI's knowledge -- was there any planning
12 in 1984 to offer legal services to its members?
13    A.    **There's no one there at CAI that was there**
14 **in 1984 that would know the answer to that question.**
15    Q.    Asked a different way, is there any
16 information that has come to your attention that
17 would suggest the answer to that question is yes,
18 there were plans to offer legal services at that
19 time?  Have you seen anything?
20    A.    **The more you talk about it -- help me with**
21 **the word "plans."  What do you mean by "plans"?**
22    Q.    A corporation vision statement, a statement
23 of future purpose, anything that would indicate
24 something as of that time frame, 1984, that you've
25 seen in writing that would suggest that?

1      A.    That example, yes.

2      Q.    Are there any set intervals for any other

3  parts of the website of which you are aware?

4      A.    Not presently, no.  I'm not presently aware.

5          (Whereupon, Clarke Deposition Exhibit 50 was

6          marked for identification.)

7  BY MR. DUNCAN:

8      Q.    Let me show you what's been marked as

9  Exhibit 50, which appears to be a portion of the

10  website that is captioned, "Benefits of CAI

11  Membership"?

12      A.    Yes.

13      Q.    About halfway through the first page of this

14  three-page document, there's a section called, "What

15  Our Members Are Saying."  Do you see that?

16      A.    Yes.

17      Q.    Does CAI make the choice as to which of

18  these member comments are going to be posted on its

19  website?

20      A.    Yes.

21      Q.    And CAI would not post a comment that it

22  believed did not accurately describe the

23  organization, would it?

24      A.    We would not consciously post a statement

25  that we thought was false.

1    A.    Yes.

2    Q.    Or came to a conclusion?

3    A.    Yes.

4    Q.    How did that happen?

5    A.    What happened was, as in all litigation, we

6    endured some legal fees up to our deductible amount

7    and paid nothing.   We paid nothing as part of the

8    resolution, but it was resolved between the member

9    company and plaintiff.

10   Q.    When you say you paid legal fees up to your

11   deductible, that implies that you have insurance

12   coverage for your organization?

13   A.    Yes.

14   Q.    What is your deductible?

15   A.    I believe for that type of claim that was

16   $50,000.

17   Q.    And the deductible may vary for other kinds

18   of claims?

19   A.    It may.

20   Q.    Has CAI been involved in litigation over the

21   past 10 years on anyone else's behalf, that is, for a

22   member organization or for anyone else?

23   A.    Yes.

24   Q.    Can you tell me about that?

25   A.    At least the way I interpret that question,

1   we are, I'm going to say, quite often, although I'm

2   going to have to define often, we quite often find

3   that there's an issue in the public or in the

4   legislature -- not so much legislature in this

5   example, but in the public and in the court system

6   that matters to employers.  And we are quite often an

7   amicus on an appellate court brief.  Typically, an

8   appellate amicus on an issue of importance to our

9   employer members.

10      Q.   Does it have to be a member for you to enter

11   an amicus brief, or have you done amicus briefs even

12   when it wasn't a member because you thought the issue

13   was important to your members?

14      A.   Yes.  I would say there's two categories of

15   amicus that occur.  Both categories share the

16   characteristic that it's important to members

17   broadly.  In other words, I cannot think of a

18   situation we have nor can I think of one that we

19   would file an amicus primarily for their individual

20   benefit or interest.  So there's that common thread

21   on every one that's filed.

22         Some of them arose in the context of a

23   member company's legal battle.  Most of them do not.

24   Most of the amicus that we have participated were not

25   member companies that were at the root of the

```
 1   conflict.
 2       Q.   So using the last 10 years as a marker,
 3   approximately how many amicus briefs have been filed
 4   by CAI and on behalf of an employer's interest?
 5       A.   I'd say about a half dozen.
 6       Q.   Do you employ outside counsel in order to
 7   file those amicus briefs?
 8       A.   We have, yes.  And we have done so as a
 9   member of a group that was doing the amicus together
10   where we didn't literally employ them, but we were
11   part of the group that employed.
12       Q.   Has it always been as a member of a group,
13   or in some instances has CAI directly paid the
14   outside counsel who is preparing and submitting the
15   amicus brief?
16       A.   I believe we've always had a group of some
17   kind.  It could have been a small group or two or
18   three or a much larger group.
19       Q.   Do you know which courts these amicus briefs
20   have been filed in?
21       A.   Yes.  Certainly the North Carolina Court of
22   Appeals and the North Carolina Supreme Court.
23       Q.   How about any federal courts?
24       A.   Not in the last 10 years that I can recall.
25       Q.   Has there ever been a time when you wanted,
```

```
1        A.    No.

2        Q.    Mr. Shelton, who I understand was the

3   previous president/CEO, was he a lawyer?

4        A.    No, he was not.

5        Q.    So far as you know, are you the first

6   president/CEO of CAI that has also been a lawyer?

7        A.    Yes.

8        Q.    Of course, one of the reasons you might have

9   familiarity with this case is that you represented

10  CAI in it; is that fair?

11       A.    In the early phases.

12       Q.    Once it got to the Fourth Circuit, you were

13  not involved?

14       A.    Actually, I became uninvolved earlier than

15  that when it became clear that there was insurance

16  coverage that would attach, and then insurance

17  counsel was hired.

18       Q.    On page 5 in the very last paragraph, the

19  Court appears to conclude that CAI is a consumer

20  reporting agency that is subject to the FCRA, which

21  is the Fair Credit Reporting Act; is that correct?

22       A.    Yes.

23       Q.    Does CAI still consider itself to be a

24  consumer agency subject to the Fair Credit Reporting

25  Act?
```

```
 1            MR. PHILLIPS:  Objection, form.
 2  BY THE WITNESS:
 3      A.    We do have that function.  It is within a
 4  subsidiary, but it is within the umbrella owned by
 5  CAI, I guess.
 6      Q.    Who is the subsidiary that you just referred
 7  to?
 8      A.    CAI Services Corp.
 9      Q.    Is CAI Services Corp a tax-exempt
10  organization?
11      A.    No, it's not.
12      Q.    And you said it's under the umbrella.  Can
13  you tell me what you mean by that?
14      A.    Yes.  Not being a corporate structure or
15  attorney, so don't test me too much there because I
16  don't want to vague out on you, but it is a wholly
17  owned for-profit subsidiary of CAI.
18      Q.    Does CAI have any other entities under the
19  umbrella, I think is the term you used?
20      A.    No, we don't.
21      Q.    So the only related entity under the
22  umbrella or otherwise would be CAI Services Corp?
23      A.    Yes.
24      Q.    And unlike CAI, it is a for-profit entity?
25      A.    Unlike CAI, it is a for-profit entity.
```

1      Q.    CAI claims tax-exempt status, which is

2   different than a for-profit entity; is that correct?

3      A.    That's true.

4      Q.    Does CAI Services Corp have its own board of

5   directors?

6      A.    It does.

7      Q.    Is that different in any way from the board

8   of directors?  Is the composition of the CAI Services

9   Corp board of directors different in any way than the

10  composition of the CAI board of directors?

11     A.    Yes.

12     Q.    What are the differences?

13     A.    Two significant differences.

14           One is that the CAI Services Corp board is

15  comprised of a subset of the CAI board.  I believe

16  it's three people; don't hold me exactly to that.

17  And then there's a fourth person who's an outside

18  director that's not related to CAI in any way.

19     Q.    Are you on the CAI Services Corp board?

20     A.    I am not.

21     Q.    Do you recall who the three directors from

22  CAI are who are on the CAI Services Corp board

23  presently?

24     A.    Yes.  Dale Jenkins, Jim Perry, Earl Johnson

25  Jr., and Sharon Bryson.  The fourth person is an

```
 1   two examples were multipliers of $100 per facility.
 2   This last one, the larger employee with the 850
 3   employees and eight facilities, there's a discount to
 4   $500 on the facilities.   Instead of eight times 100,
 5   it's just 500.   Is that because 500 is the cap on
 6   that number?
 7        A.   It is the cap.
 8        Q.   So then the minimum dues that anyone could
 9   owe would be $880 and the maximum dues anybody could
10   owe would be $8,300; is that right?
11        A.   Yes, in this example, in 2016.
12        Q.   Is there a reason CAI charges a different
13   membership rate to employers of a different size?
14        A.   I have an understanding.   I wasn't obviously
15   there when this method was created.   I can give you
16   that understanding.
17        Q.   On behalf of the company, whatever the
18   understanding is, yes.
19        A.   It's an attempt to be in a fair way to
20   roughly allocate the cost providing the data
21   information and knowledge that we provide out to our
22   member companies.   It's an acknowledgment perhaps
23   that a smaller employer would draw less on that data
24   information and knowledge, get less benefit from it,
25   have less impact on their workplace.   And a larger
```

Case 1:15-cv-00083-LCB-JLW   Document 113-1   Filed 05/22/17   Page 15 of 127

248

1  employer would have more impact and draw more on that

2  data information and knowledge.

3       (Whereupon, Clarke Deposition Exhibit 54 was

4       marked for identification.)

5  BY MR. DUNCAN:

6       Q.    I'll show you what's been marked as Exhibit

7  54.  I ask you if this appears to be an application?

8       A.    It does appear to be an application.  I do

9  believe this is still a draft.  The reason I say that

10  is this language near the end of the second page

11  about the prepaid legal service plan, my memory is

12  that this was prepared, in part, to show the North

13  Carolina State Bar what we would say on our

14  membership allocation about the prepaid plan but done

15  in advance of the registration of that plan.

16       Q.    You can tell from the Bates-stamp number

17  this was a document produced by the State Bar that

18  was part of the prepaid plan?

19       A.    Yes.

20       Q.    Other than that, does this appear to look

21  like what the membership application would look like?

22       A.    It does.  Again, just out of completeness, I

23  am not sure what other language may have changed in

24  that lower right-hand corner in order to suit the

25  purposes or the needs of the State Bar.  Outside of

1    Q.    Private businesses.

2    A.    **There are private business, yes.**

3    Q.    Are there nonprofits who are members?

4    A.    **Yes, there are.**

5    Q.    Are there governmental entities who are

6    members?

7    A.    **Yes.**

8    Q.    Are there any state governmental entities

9    who are members?

10    A.    **Yes.**

11    Q.    Who or which ones?

12    A.    **The -- well, I said yes, before the**

13    **election.  There may be a change of a lot of things**

14    **post election.**

15         **Before the election, the North Carolina**

16    **Office of Human Resources, I believe it's called, was**

17    **a member of CAI.**

18    Q.    Any other state agencies or departments?

19    A.    **I believe there was another agency, but I**

20    **believe it was considered part of that membership of**

21    **the North Carolina office.**

22    Q.    Do you remember any counties that are

23    members of CAI?

24    A.    **Yes, I believe so, whether they're current**

25    **or not or have been.  Either Wake County or Raleigh**

```
 1   City; I honestly am not sure which.  One of the two
 2   is a member.  I believe Onslow County is a member.  I
 3   know that Fayetteville Public Works is a member.  I'm
 4   not sure if that's a county entity or a city entity.
 5   Durham County or City is a member, one of the two,
 6   maybe both.  Orange Water and Sewer is a member.
 7   That's a county entity.
 8           So I'm trying to be responsive to your
 9   question.
10       Q.   You've also already said some city entities?
11       A.   Yes.  It's just unclear which is the
12   ultimate responsible entity.  There's some examples.
13       Q.   All right.  And I take it you have some
14   city -- you've already given me some examples and
15   there may be some others?
16       A.   Yes.
17       Q.   Do you have medical groups as members?
18       A.   Yes.
19       Q.   Do you have manufacturing companies as
20   members?
21       A.   Yes.
22       Q.   Do you have retailers as members?
23       A.   Yes.
24       Q.   Do you have law firms as members?
25       A.   Yes.
```

1    Q.   How many?

2    **A.**   **Roughly 10.**

3    Q.   Where are they located?

4    **A.**   **Throughout this territory that we're**

5 **discussing.**

6    Q.   The 65-county area that you discussed?

7    **A.**   **Yes.**

8    Q.   Do you have accounting firms as members?

9    **A.**   **Yes.**

10    Q.   Are they located in any central place or are

11 they spread also?

12    **A.**   **Spread, as far as I know.  I'm less familiar**

13 **with that category of member.**

14    Q.   How about any architectural firms?  Do you

15 have any architectural firms who are members?

16    **A.**   **We do, yes.**

17    Q.   How about locations on that, if you know?

18    **A.**   **I can't say.**

19    Q.   How about financial institutions?  Do you

20 have any financial institutions as members?

21    **A.**   **Yes.**

22    Q.   Other than any entity that may employ

23 individuals, is there any other common feature of

24 CAI's members, other than this employment feature?

25    **A.**   **Yes.**

Case 1:15-cv-00083-LCB-JLW   Document 121-1   Filed 06/16/17   Page 17 of 134

1    Q.    What is that?

2    A.    Typically, it's that they are in

3 North Carolina.  Typically, and I believe this is

4 very, very true, is that typically they have a

5 mindset of compliance.  They have a mindset that we

6 want to know what the rules are and we want to follow

7 the rules.

8         That could be because they think that makes

9 a great workplace and makes them more effective and

10 efficient as an employer, makes them a better member

11 of the community, makes the economy grow better,

12 makes them grow better, benefits all.  Or it could be

13 that they're risk-averse.  But that thread is fairly

14 common to our membership, that they want to be --

15 they want to know -- they want information that's

16 going to help them be a good employer.

17    Q.    Anything else?

18    A.    (No response.)

19    Q.    That's sort of a subset of the

20 North Carolina employers is that you believe at least

21 most of the members have a mindset of wanting to be

22 good employers under the rule?

23    A.    Yes, but I mean, honestly, not in a trifling

24 way.  I distinguish from the North Carolina issue.

25 There are employers in North Carolina that really

1    don't need, care, or want the data, information and

2    knowledge that we have for their own reasons or that

3    they don't have the intentions that I mentioned.

4        Q.    So those are how you would say those are the

5    common features?

6        A.    The ones that come to mind, yes.

7        Q.    What are the primary services that CAI

8    offers its members?

9        A.    So we distinguish services and it sort of

10   depends on how you define services, but we

11   distinguish services from data, information and

12   knowledge.  So the kind of data, information and

13   knowledge that we present to employers is described

14   generally in one of the documents we just looked at

15   moments ago.  It describes several of those kinds of

16   subcategories.  And we could use that document and go

17   down and talk through if you like, or I can do it

18   from memory.

19            And then we also do what I would call

20   services or fee for service for individual members on

21   specific projects.

22       Q.    Any common business interests, to your

23   knowledge?

24       A.    Yes.

25       Q.    What is that?

1  overview of the capabilities summary to highlight for

2  the board the major initiatives in the organization

3  to support 2X."

4         Did I read that correctly?

5     A.    You did.

6     Q.    What does support 2X refer to or mean?

7     A.    So 2X is our strategic plan, longer term

8  strategic plan, to double our size, our impact, our

9  reach, our role in improving workplaces in

10  North Carolina.  It's to double all those categories

11  of things.  That's what -- 2X is a shorthand for

12  that.

13     Q.    Was the providing of legal services by CAI

14  to be part of the 2X strategic plan?

15     A.    Yes.  If we can obtain that, right.  Yes.

16     Q.    Do you know if you produced the 2X plan as

17  part of the discovery production in this case based

18  on your involvement with that on behalf of the

19  corporation?

20     A.    I'm certain we produced documents that

21  describe the 2X plan that have pieces of it.  It

22  would be overstating it to say there's one document,

23  you know, in a notebook that is the 2X plan.

24     Q.    Are you satisfied as the corporate

25  representative and having reviewed the document to

1   where we stood on the strategic plan, particularly on

2   the super membership part of it, but on the other

3   supporting items as well, to say which items had been

4   done or which were yet to be done or that there were

5   changes in the strategy.

6       Q.   For the legal services part of the 2X

7   strategic plan, when is it checked as an item?

8       A.   When we get a final judgment from a federal

9   court that orders that the part of chapter 84 is

10  unconstitutional.

11      Q.   If you get a prepaid legal services plan up

12  and running, as you forecast for March of this year,

13  is that not a check for providing legal services to

14  members of the organization should they desire to

15  utilize that service?

16      A.   It's an important but partial and incomplete

17  solution.

18      Q.   I attempted to ask the obvious question, but

19  I'll come back to it.

20      A.   Okay.

21          (Whereupon, Clarke Deposition Exhibit 61 was

22          marked for identification.)

23  BY MR. DUNCAN:

24      Q.   Let me show you what's been marked as

25  Exhibit 61.  This is a CAI two-page document

1  think it's right to say to any employer that you're

2  going to save $48,000 if you join us.

3       Our purpose there, and you can see on the

4  second page, is to state that if these things happen

5  to you or if you either choose affirmatively to do

6  these things, like a handbook review, or if these

7  other things happen to you and they cost what we

8  footnote the cost to be, that's roughly what the

9  total cost would be.

10       It's not an attempt to say that you will

11  experience that.  It's to say that if this set of

12  assumptions occurred, it could cost you that.

13       Q.  Moving then to the set of assumptions that

14  you characterized.  Would those be items 1 through 9

15  on the second page?

16       A.  I think it was 1 through 9.  I think it was

17  one for each of the numbered items on page 1.

18       Q.  Looking at the second one, which I think

19  refers to avoidance of one basic state or federal

20  discrimination charge.

21       A.  Item 2, okay.

22       Q.  What are you defining there as a basic state

23  or federal discrimination charge?

24       A.  The typical example would be an EEOC charge

25  at the federal level or a RITA or retaliation claim

1  at the state level.

2     Q.   You put under No. 2, 20 hours of attorney

3  time at $400 an hour, or a total of $8,000, as a

4  recent example from a CAI member; is that correct?

5     A.   I don't know that that came from a recent

6  example of a CAI member that I know of.

7         I apparently did from the individual that

8  authored this, and I can easily see that to be the

9  case.  I just can't tell you who that was.

10     Q.   That was my question.

11         Who is that member?

12     A.   I don't know that.

13     Q.   What was the nature of the claim?

14     A.   I don't know that, other than what it says

15  in No. 2, which is a basic state or federal

16  discrimination charge.

17     Q.   Do you know what member of the staff did do

18  this?

19     A.   I'm not certain who wrote the footnote.  It

20  would be a relatively common occurrence that a member

21  of ours might have a state or federal charge and it

22  cost that much or more.  So it would be an easy thing

23  to honestly write, but I don't know exactly who wrote

24  that and I don't know the member specifically that it

25  was based upon.

```
 1        Q.    What I'm asking is the easiest of all
 2   things.   There's a reference to a specific member and
 3   I'm asking who it was.
 4        A.    I don't know that.
 5        Q.    Do you know who on your staff would know
 6   that?
 7        A.    I can speculate or who could find out.
 8        Q.    Who do you believe would know it?
 9        A.    I would say Doug Blizzard would know or
10   could find out.
11        Q.    What is Mr. Blizzard's position in the
12   organization?
13        A.    He's a vice president of member services.
14        Q.    On No. 4 it says, "average cost for attorney
15   or consultant review service."
16              Do you see that?
17        A.    Yes, I do.
18        Q.    That's for professional review of your
19   handbook.
20              Do you see that?
21        A.    Yes, sir.
22        Q.    And it appears it's assessing $3,000 for
23   that?
24        A.    Yes.
25        Q.    Do you know if that service can be provided
```

Case 1:15-cv-00083-LCB-JLW   Document 106-1   Filed 05/18/17   Page 10 of 81

259

```
 1   from an outside provider?
 2       A.   Do I know if it can be provided by someone
 3   other than us?
 4       Q.   Yes.
 5       A.   Yes, it can.
 6       Q.   Do you know if there are outside providers
 7   who offer to provide that service at money less than
 8   what the CAI membership valuation is?
 9       A.   I don't believe that you'll find many less
10   than that, but you probably could.  That wouldn't be
11   the market price.
12       Q.   No. 5 says, "2 percent of the $1 million;
13   your estimated savings will equate to 2 percent of
14   your payroll."
15            Did I read that correctly?
16       A.   Yes.
17       Q.   And that's a $20,000 item under No. 5 for
18   minimized turnover and overpayment with local market
19   survey data.
20            Do you see that?
21       A.   Yes.
22       Q.   There are members that you have that have
23   significantly less than a million-dollar payroll; are
24   there not?
25       A.   Sure.  Yes.
```

Case 1:15-cv-00083-LCB-JLW   Document 106-1   Filed 05/18/17   Page 11 of 81

260

1  turnover.  Most of those will tell you it's going to

2  be more than 2 percent.

3      Q.  Also an enormous amount of information on

4  the Internet that's garbage in and garbage out.  So

5  I'm really looking for a recognized peer-reviewed

6  source if you know of one that was used for purposes

7  of using it in this document?

8      A.  I do not know of the peer-reviewed source

9  that was used to draft this document if, in fact, one

10  was used.

11      Q.  That's all I was looking for.  I'm trying to

12  find out what was relied on.

13      A.  Sure.

14          (Whereupon, Clarke Deposition Exhibit 62 was

15          marked for identification.)

16  BY MR. DUNCAN:

17      Q.  I need to ask you to look at what's been

18  marked as Exhibit 62.  This document appears to be a

19  marketing piece, if you will, for CAI services in the

20  area of recruiting titled, "The CAI Recruiting

21  Advantage"; is that correct?

22      A.  Yes.

23      Q.  What percentage of CAI's overall business --

24  I'm talking about here a revenue stream of

25  business -- is created by purchase of recruiting

1   services?

2       A.    Overall revenue?

3       Q.    Yes.

4       A.    We could look at a chart of accounts and be

5   more specific.  I can give you a ballpark.

6       Q.    If you could give me your good-faith

7   estimate number for that.

8       A.    I would say 7 percent or so.

9       Q.    And this is one of those services where the

10  member would pay an additional fee, correct?

11      A.    Yes.

12      Q.    How is that fee calculated?  Is it hourly or

13  some other kind of set fee?

14      A.    It can be an hourly fee.  It can be a

15  project fixed cost fee.

16      Q.    Are there expenses associated with this

17  service?

18      A.    Yes.

19      Q.    Is there staff time associated with this

20  service?

21      A.    Yes.

22      Q.    Overall, is it your experience that the

23  revenue exceeds the expenses for CAI in providing

24  this service?

25      A.    Not every year, but most years.

Case 1:15-cv-00083-LCB-JLW   Document 121-1   Filed 06/16/17   Page 23 of 134

262

1  Q. How does a member initiate this service?

2  A. **How do they request it?**

3  Q. Yes.

4  A. **They can call directly to the staff that**

5 **leads HR on Demand. You'll see that moniker**

6 **underneath our logo, HR on Demand. They can call**

7 **that staff directly.**

8   **They can speak to a member services**

9 **representative about the general need and be directed**

10 **there.**

11   **They could read a postcard or get an email**

12 **and make a contact by email if they like or by call.**

13 **They can go to that web page that's listed what**

14 **appears to be a postcard and make an email contact**

15 **through that web page.**

16   **So there's many ways.**

17  Q. Is this service provided by CAI employees or

18 is it outsourced to some other --

19  A. **They are employees.**

20  Q. And it's not a CAI services core initiative?

21  A. **This is not.**

22  Q. Is this service available from other

23 providers in the marketplace?

24  A. **Not that I'm aware in the way that we do it.**

25 **There certainly are recruiting services in the**

```
 1  marketplace.
 2      Q.   I guess that was really my question.   There
 3  are recruiting services; are there not?
 4      A.   Yes.
 5      Q.   Do you know if you're any more price
 6  effective one way or the other than other recruiting
 7  services that exist in the market?
 8      A.   Yes, we do.
 9      Q.   How do you know that?  What studies, if any,
10  have you done?
11      A.   It's really by member feedback and
12  appreciation.
13      Q.   So have you done any data-driven studies?
14      A.   I haven't done a market survey.
15          (Whereupon, Clarke Deposition Exhibit 63 was
16           marked for identification.)
17  BY MR. DUNCAN:
18      Q.   Let's go to what's been marked as
19  Exhibit 63.
20          I ask you if this appears to be a CAI
21  document with the heading, "Avoid costly hiring
22  mistakes with CAI"?
23      A.   Yes.
24      Q.   Is this relating to background checks
25  primarily?
```

```
1        A.    I believe so, but let me review it.
2              Yes, it is.
3        Q.    What percentage of CAI's overall business
4    revenues-wise is generated by this service?
5        A.    None.
6        Q.    Is that because it's part of CAI Service
7    Corp.?
8        A.    Yes.
9        Q.    And how long has that been true?
10       A.    For a long period of time.  I'm not sure.
11       Q.    Was it ever part of CAI and not part of CAI
12   Service Corp.?
13       A.    I really don't think so.  I really don't
14   think so.
15             The most significant part of this service
16   was managed by and led by a gentleman that worked for
17   PAI.  So that when we took over operations of PAI and
18   worked as part of the former membership of PAI, he
19   came to CAI.
20             About that time -- and I don't know it's
21   precisely that time, but about that time, probably a
22   little bit after he came, we put that service, this
23   background service, into the for-profit subsidiary.
24             Before he came, before PAI and CAI made that
25   arrangement, CAI had some background checking service
```

1  on a very small scale, independent of PAI.  And I

2  believe it was not in the Services Corp.; I believe

3  it was within CAI.  I believe I'm correct about that.

4  I don't have a fresh recollection of that history.

5      Q.   So it's your best recollection that you had

6  this service before under CAI, but you believe it was

7  of a different type or nature than the service being

8  provided after PAI was acquired?

9      A.   A little bit different type or nature.  It

10  was really more about the volume.  It was just a

11  small volume, just a small quantity of it under the

12  CAI only umbrella.

13     Q.   Does CAI Services Corp., which you indicated

14  earlier is a for-profit entity and does this

15  particular service, does it return a profit?

16     A.   Yes.

17     Q.   Where does that profit go that it returns?

18     A.   First of all, to income tax.  And then the

19  second component is often left there within Services

20  Corp., both to allow further investment in equipment

21  or space or systems, or transfer through methods I

22  can't completely, from a GAAP perspective, describe

23  to you but can be moved to CAI as needed.  But some

24  of it stays in Services Corp.

25     Q.   In fact, profits from CAI Services Corp.

1   has been moved to CAI?

2       A.   Yes, I believe they have, yes.

3       Q.   And do you generally budget for that on an

4   annual basis, that as part of the budget for CAI

5   there will be some income received or revenue

6   received from CAI Services Corp.?

7       A.   I would say no in the sense that you stated

8   it.  The way that it is budgeted is in terms of a

9   combined entity.  In other words, if you look at

10  audited statements, you'll see a consolidated audit

11  and you'll see an audit therein with CAI Services

12  Corp.  So it gets combined there, if that answers

13  your question.

14      Q.   So the overall budget is there, by

15  definition, dependent in some degree upon the

16  revenues --

17      A.   To a large degree, I think that's a fair

18  description.

19      Q.   Is Kevin van der Lippe referred to here as

20  CAI employee, a CAI Services Corp. employee, or both?

21      A.   He is payrolled under CAI.  And then there's

22  an administrative or management services agreement

23  between the entities that allocates his expense

24  appropriately between those two entities.  But his

25  paycheck comes from CAI and he has CAI benefits.

1          What percentage of revenue is received by

2    CAI ultimately from this area of work by CAI Service

3    Corp., if you know?

4          A.    If you consolidated the two entities and you

5    took a consolidated look at revenue, then it would be

6    about 15 percent, 12 to 15 percent.

7          Q.    How does a member initiate that particular

8    service?

9          A.    In ways not too different than we described

10   earlier, that a member might initiate contact with

11   the HR on Demand recruiting service, by a phone call,

12   an email, a response to an email or a postcard.

13          In this case, Kevin van der Lippe does quite

14   a bit of speaking.  There may be a personal contact

15   made at a speech or a talk that he gives.

16          Q.    When you put on educational programs for

17   members, is he one of the speakers that does the

18   programs frequently?

19          A.    He has been a speaker at some of those

20   no-charge programs I mentioned.

21          Q.    Is this service available from other

22   providers in the marketplace?

23          A.    Background checking services are available

24   in the marketplace.

25          Q.    Do you have any external data studies that

1    suggest whether CAI does this any more efficiently or
2    inefficiently than any other provider in the
3    marketplace?
4        A.    Yes.
5        Q.    What data do you have on that?
6        A.    Member reaction and retention and repeat
7    work.
8        Q.    All right.  So I guess what I'm asking is,
9    do you have any outside look from an external
10   standpoint where your charges fall versus where
11   charges by other providers?
12       A.    Yes.  I do not.  Kevin, I would say, would
13   be able to say what other providers charge if that's
14   your specific question.
15       Q.    Yes.
16       A.    And our charges could be higher than a few
17   and less than some.
18       Q.    All right.
19           (Whereupon, Clarke Deposition Exhibit 64 was
20           marked for identification.)
21   BY MR. DUNCAN:
22       Q.    Let me ask you to look at what's been marked
23   as Exhibit 64.
24           Again, is this a CAI marketing-type document
25   captioned, "Take the agony and uncertainty out of

1    your affirmative action plan today"?  Did I read that

2    correctly?

3         A.   Yes.

4         Q.   Is this a service that's provided by CAI or

5    is it provided by CAI Services Corp.?

6         A.   **This is provided by CAI as a taxable**

7    **service, yes.**

8         Q.   By "taxable service," you mean a member

9    would have to pay additional money to get this

10   service?

11        A.   **What I meant by that is that it's not tax**

12   **exempt.**

13        Q.   Would, in fact, a member have to pay

14   additional amounts of money in order to get this

15   service?

16        A.   **Yes.  It is a fee-for-service item.**

17        Q.   In terms of revenue produced, I assume the

18   revenue goes to CAI, the tax-exempt entity, but it

19   has to be placed in a nontax-exempt account?

20        A.   **Yes, in general, that's correct.**

21        Q.   I assume there's some expenses that CAI

22   incurs for this?

23        A.   **Yes.**

24        Q.   I assume there's some staff time that CAI

25   also has for this?

```
1        A.    Yes.
2        Q.    Is the revenue for this service on an annual
3   basis typically exceeding expenses?
4        A.    Yes.
5        Q.    And so that results in a net profit but one
6   that's required to be taxed under the CAI tax return?
7        A.    Well, as I understand GAAP and tax law, and
8   I'm not an expert in it, that it's not a micro look
9   at this one service.
10            It would, for example, be placed in a pool
11  with other taxable services that are operated by CAI,
12  like the recruiting service.  And so it's not, as I
13  understand it, taxed in that kind of micro and narrow
14  way.  It's taxed along with the net or loss of that
15  group of services.
16       Q.    The annual revenue produced by this service,
17  approximately what percentage does it make of CAI's
18  annual revenues?
19       A.    Maybe 3 percent.
20       Q.    What are CAI's annual revenues
21  approximately?
22       A.    Between 9 and $10 million in operating
23  revenue.
24       Q.    So put in perspective, 3 percent would be
25  somewhere around $300,00?
```

1  acknowledged by any outside source is what I'm trying

2  to ask you?

3      A.   Yes, we do some plans for nonmembers, too.

4      Q.   And because you did a plan for them, have

5  any of them written you and said, "I believe you are

6  an AAP expert"?

7      A.   A nonmember?  I'd have to go look.  I can't

8  pull that from my memory.

9      Q.   You mentioned that Miss Ferrara worked for a

10 national company that did AAP plans.  What was that

11 company?

12     A.   Yes.  It was locally based.  I'm trying to

13 think of what the name was at the time.  It was

14 PeopleClick and it has become PeopleSoft, I think.  I

15 can confirm that.  But it's a large software provider

16 in this area who one of their core businesses is the

17 software used by people who do affirmative action

18 plans.

19     Q.   Do you know if they have any legal oversight

20 with respect to plans that are done at the company

21 where Miss Ferrara formerly worked, PeopleClick or

22 PeopleSoft?

23     A.   Did they have legal oversight?

24     Q.   If there was anyone involved in reviewing

25 the plans being produced from a legal standpoint.

1    A.    I'd say that's fair.

2    Q.    Is this service provided by CAI employees or

3    CAI Service Corp. employees?

4    A.    CAI employees.

5    Q.    And is this a taxable service or is it

6    something other than a taxable service?

7    A.    It is taxable.

8    Q.    So it's accounted for the same way we just

9    discussed with respect to affirmative action plans

10   and investigation?  Let's stick with affirmative

11   action plans.

12   A.    Yes, I would say so.

13   Q.    What percentage of CAI's revenue

14   approximately does the HR consulting aspect account

15   for?

16   A.    It's hard for me to separate this out from

17   recruiting revenue.  I'll try because it's run by the

18   same people and generally accounted for in the same

19   area, but I'll try.

20   Q.    Why don't you give me what consulting and

21   recruiting are together, if that's easier and then

22   we'll backtrack?

23   A.    Yes.  In that $1 million, $1.2 million range

24   together.

25   Q.    So that would be 10 to 12 percent, somewhere

Case 1:15-cv-00083-LCB-JLW   Document 121-1   Filed 06/16/17   Page 31 of 134

273

1  in that range, a little over 10 percent?

2      A.    Roughly, but I think we have records that

3  could give a better answer, but that's a rough

4  estimate.

5      Q.    And you think more of that is

6  from recruiting or consulting?

7      A.    When I say that 10 percent, I'm talking

8  about this combined number that we identified earlier

9  that has the revenue in the for-profit subsidiary

10 combined with the revenue in the nonprofit

11 corporation.  I'm using that percentage of that

12 combined revenue.

13     Q.    And the revenue percentage to CAI and the

14 nonprofit corporation, the tax-exempt entity, would

15 be you're using the same criteria as you use for

16 CAI Service Corp., that is, at the end of the day

17 it's about $10 million, 9 to $10 million and you're

18 taking that as a percentage?

19         MR. PHILLIPS:  Objection to form.

20         MR. DUNCAN:  I just want to make sure I

21 understand the answer.

22 BY MR. DUNCAN:

23     Q.    Is that right?

24     A.    I'm a little confused.  I don't mean to be

25 confused.

1    Q.   We talked about CAI Service Corp. and you

2  ultimately gave a percentage of what that was to the

3  total number.  And I'm assuming you were taking that

4  from the 9 to $10 million; am I right about that?

5    **A.   Yes.  Because, for example, background**

6  **checking is 100 percent of the for-profit**

7  **subsidiaries' revenue, but then only X percent of the**

8  **combined revenue, yes.**

9    Q.   In this instance, even though it's done

10 within CAI, it's done within a CAI taxable services

11 part of the organization?

12   **A.   HR consulting, yes.**

13   Q.   So when you give me the 10 to 12 percent,

14 somewhere in that range, number you're calculating

15 against the same CAI 9 to $10 million number; is that

16 fair?

17   **A.   Yes.**

18   Q.   So we're comparing, in terms of the

19 percentage, apples to apples and that's something

20 different; is that right?

21   **A.   I think so.  I think so.**

22   Q.   Can you give me a general description of

23 what the available -- strike that.

24        Any services for HR consulting, I assume,

25 are extra fees for members?

1      A.    Yes.

2      Q.    And how is that determined?  Is that hourly

3  or some other preset arrangement?

4      A.    Very similar to the recruiting service, it

5  can be hourly or it can be fixed.

6      Q.    When it's hourly, what are your hourly rates

7  for these service, recruiting and consulting?

8      A.    Recruiting ranges from under $100 an hour to

9  just around $100 an hour.  So I'm going to say the

10  $85 to $110, $115, kind of range.  It's somewhat

11  dependent on the role that's being recruited for.

12      Q.    Okay.

13      A.    Consulting can have that range at the low

14  end or, on a rare occasion, for something really,

15  really targeted and specialized, it could head on up

16  to $150 an hour or so.

17      Q.    And what are the services that are provided

18  by HR consulting?

19      A.    Well, there's good examples there on

20  Exhibit 65.

21      Q.    I was going to ask if those are the basic

22  outline of the services provided.

23      A.    Good examples.  I would still say, to be

24  fair in that response, that I think it's still true,

25  it has been true and I believe it's still true in

1    2016 that most of the revenue from HR on Demand is

2    recruiting, that these consulting bullet points on

3    the right-hand side of Exhibit 65 are a lesser amount

4    than the recruiting revenue.

5        Q.    Of that 10 to 12 percent, you think

6    recruiting is more than half of that?

7        A.    I do.  Half to more than half, yes.

8        Q.    Is there any part of the HR consulting that

9    would include assisting members in preparing or

10   revising employee handbooks?

11       A.    Yes, it can.

12       Q.    How about helping members dealing with

13   hiring and firing employees?

14       A.    It could.  That would be a secondary event,

15   not a project purpose.

16       Q.    How about supporting members' efforts at

17   improving employee relations or relationships?

18       A.    Yes, it could.

19       Q.    How about designing employee appraisals?

20       A.    Yes, it could.

21       Q.    Does a member initiate this service the same

22   way you have described for initiation of these other

23   services we've discussed, or is there something

24   distinctive about this one?

25       A.    Yes, in the same general ways we've

1   pass that directly through as a reduced fee or have

2   somewhat of an administrative markup.  It's not

3   typically significant, but yes, there can be a

4   markup.

5       Q.   Would that be true about any of these

6   services that are outsourced, that there could be an

7   administrative markup associated with them?

8       A.   I think that's the first one we've looked at

9   that had that outsourced potentially.

10      Q.   Let's go to Exhibit 66.

11           Let me ask you, does this appear to be

12  another one of these marketing pieces?  And this

13  one's for CAI's HR on Demand service?

14      A.   Yes.

15      Q.   And you referred to HR on Demand a little

16  bit up to now.

17           Is HR on Demand a service that there's an

18  outside charge for, over and above the membership

19  fee?

20      A.   Yes.

21      Q.   What is that charge?

22      A.   HR on Demand is the broader label for things

23  such as we've just looked at.  HR consulting is part

24  of HR on Demand.  Recruiting is part of HR on Demand.

25  When you see the list of items on the right, you're

```
 1  going to see duplication somewhat from those other
 2  materials that you've shown me.
 3     Q.   Is HR on Demand covered by all CAI
 4  employees?
 5     A.   Does it exclusively use CAI employees?
 6     Q.   Yes.
 7     A.   No.  We talked about the primary exception
 8  to that a moment ago.
 9     Q.   So HR on Demand is sort of the umbrella over
10  all of this?
11     A.   Over HR consulting and recruiting, yes.
12  Yes.
13     Q.   What about background checking?
14     A.   No.
15     Q.   What about affirmative action plans?
16     A.   No.
17     Q.   What about training?
18     A.   No.  No, not in the sense that we need
19  training.  There could be within a project a small
20  slice of training, but that's not the major purpose
21  of the projects.
22     Q.   What about advice resolution and hotline?
23     A.   It is not within HR on Demand.
24     Q.   Okay.  In order to assess what the revenue
25  contribution is to HR on Demand, you would be adding
```

1  somewhere in the range you've already described for

2  us?

3      A.   Yes.

4      Q.   Are most of the projects done on an hourly

5  rate or on a flat-fee-type basis, if you know?

6      A.   I would say most are hourly.

7      Q.   Is any of this work outsourced beyond what

8  you've already described for HR consulting services?

9      A.   Not that I can recall.

10      Q.   Are these kind of services, that is, the

11  HR on Demand services, available from other providers

12  in the marketplace?

13      A.   These bullet points are addressed by other

14  providers in the marketplace.

15      Q.   I think you've already addressed recruiting

16  as being associated with HR on Demand and

17  HR consulting; is that fair?

18      A.   Recruiting and consulting report to our part

19  of HR on Demand.

20      Q.   We've already talked about the revenue

21  associated with that for CAI as a whole in our

22  previous discussion about HR consulting.  Does

23  recruiting, again, use all CAI employees?

24      A.   Yes.

25      Q.   Are there any outside consultants used or

```
 1          (Whereupon, Clarke Deposition Exhibit 67 was

 2          marked for identification.)

 3   BY MR. DUNCAN:

 4      Q.   I ask you to look at what's been marked as

 5   Exhibit 67.

 6           Does this appear to be an October 2016

 7   training bullet document put out by CAI?

 8      A.   Yes, it does.

 9      Q.   Is this representative or do the contents of

10   this document represent the training programs put on

11   by CAI each month?

12      A.   It's the highlights of that month, yes.

13      Q.   The CAI provide this as a member benefit or

14   is there an extra charge associated with this

15   training exercise or efforts?

16      A.   There are charges for this.  I'm looking to

17   see.  There may be some in here that are free like we

18   mentioned earlier.  Primarily there are charges for

19   this.

20      Q.   Are these customized to the needs of a

21   specific business when you go and undertake a

22   training program?

23      A.   Very rarely.  Very rarely.  Almost none.

24      Q.   When there are charges associated with the

25   training, how are they calculated?  Is there a set
```

Case 1:15-cv-00083-LCB-JLW   Document 121-1   Filed 06/16/17   Page 32 of 134

**281**

1  fee, typically?

2      A.    Typically, and you can tell by this

3  bulletin, typically when it's what we call public

4  program, that means someone is coming to our class on

5  a per-ticket basis.  Typically there is a session or

6  seminar fee ascribed to that.

7      Q.    All right.

8      A.    You can see that in the handout.

9      Q.    Right.

10     A.    If we go on to somebody's work site and do

11  the same program in the some way and the same

12  content, then there's not a public class fee, there's

13  an on-site fee, it's called, that's either a half a

14  day or a day.

15     Q.    Would the amount of revenue generated by a

16  site fee typically be more than the program where you

17  pay a ticket price to come and receive the training

18  program at the CAI site?

19     A.    Sometimes, yes.  Sometimes, no.  It really

20  depends entirely on how many people are in the room.

21     Q.    Does CAI provides this service as one of the

22  services that are deemed a taxable service?

23     A.    No, unless it's customized.  If it's

24  customized, then that's just not what we choose to do

25  or want to do or do in any measurable way.  No, these

1    are in the tax-exempt entity.

2        Q.    In terms of revenue on an annual basis, what

3    percentage of the CAI revenue is made of these

4    training, noncustomized services?

5        A.    Okay.  Using that overall number that we

6    talked about?

7        Q.    Yes.

8        A.    30 percent or so.

9        Q.    Are these services available from other

10   providers in the marketplace?

11       A.    I'm going to say no, and I'm saying that a

12   little bit out of pride and a little bit out of

13   knowledge of how we do it.  I don't know of another

14   provider the way we do it, but it is true that

15   training services on topics like this are available

16   in the marketplace.

17       Q.    So other providers provide training

18   services.  It's just your personal pride and the

19   quality of your service, you think nobody exactly

20   duplicates what you do.  Is that a fair way to do

21   that?

22       A.    Yes.  It's pride and quality and method of

23   delivery, but yes, that's a fair description.

24       Q.    So if I wanted to, I could find somebody

25   else and you would contend, from a marketing

1  standpoint, nobody does it as well as you do?

2      A.  I wouldn't say on every topic.  I mean, we'd

3  have to go through.

4      Q.  We don't need to.

5      A.  Just to be thumbnail-ish about it?

6      Q.  Sure.

7      A.  Can you find management soft skills training

8  through other providers, yes.

9          (Whereupon, Clarke Deposition Exhibit 68 was

10         marked for identification.)

11  BY MR. DUNCAN:

12     Q.  Let's go to Exhibit 68.

13         Does this appear to be a CAI document

14  captioned, "Conferences," and then has what they

15  called marketing material for certain conferences

16  that CAI will put on?  Does that appear accurate to

17  you as a description of this document?

18     A.  Yes.

19     Q.  And these appear to be talking about some

20  programs that are planned already for 2017; is that

21  right?

22     A.  Yes.

23     Q.  And are there going to be more than just the

24  ones shown here, or does this look like a pretty full

25  slate for the year?

1      A.    The way we define "conferences," we do four

2   a year.   So this would be the full slate for 2017, it

3   appears, yes.

4      Q.    And these would then, I think as you've just

5   said, these would be pretty representative of what it

6   would look like year to year for CAI on these kinds

7   of issues; is that right?

8      A.    Yes.

9      Q.    Are these conferences open to nonmembers?

10     A.    Yes.

11     Q.    And is there a different charge for

12  nonmembers to come?

13     A.    Yes.

14     Q.    Is there a charge for members to attend?

15     A.    Yes.

16     Q.    Is this viewed as a tax-exempt

17  revenue-producing service, that is, the production of

18  these conferences by CAI?

19     A.    Yes.

20     Q.    What percentage of your revenues, using the

21  same marker that we've been using up until now, are

22  generated by putting on these four conferences

23  annually?

24     A.    I already put them in that 30 percent.   I

25  was putting all training.

```
 1      Q.   So that's a component of the training?
 2      A.   Yes.
 3      Q.   That you've already given us?
 4      A.   Yes.
 5      Q.   Very good.
 6           These conferences, it appears at least some
 7      instances, they're put on by not just CAI employees.
 8      It looks like at least two different law firms are
 9      involved?
10      A.   Yes, and quite a number of outside
11      presenters.   None of these are primarily CAI
12      employees.
13      Q.   So CAI is the organizer of the conference,
14      but has outside speakers from CAI come in and be
15      presenters at the conference.   Is that a fair way to
16      put it?
17      A.   In part.   One or two of these has more CAI
18      employees than the other.   So it's a blend or a mix,
19      depending on the conference.
20      Q.   Did any of these conferences include CLE
21      credit?
22      A.   Yes.
23      Q.   And would that be the ones where the law
24      firms are part of the conference?
25      A.   Yes.
```

286

```
 1  one or more of them could get also credits in that
 2  area for CPAs?
 3      A.   It could be yes.
 4      Q.   Are conferences such as this available from
 5  other providers in the market?
 6      A.   Really, no.  In the case of two of them, you
 7  could say yes.  So I would say the no's are, there's
 8  nothing this HR management conference in this market,
 9  meaning the market we're sitting in where this one is
10  held in Raleigh.  And there really is nothing that I
11  know of like the compensation benefits conference in
12  this market.
13      Q.   Is this market Raleigh that you're referring
14  to?
15      A.   Where they're both held, yes, in that
16  broader market that Raleigh pulls from that people
17  will drive to.  I don't know of a competitor for
18  those two.  There might be, I don't know of it.
19           On the lawyer-led conferences, I don't know
20  of something exactly like that.  Do I know that some
21  law firms do events for clients and such and for
22  nonclients?  Yes, I do.
23      Q.   So you believe there are other providers for
24  those, but you don't have as much information about
25  what those might be.
```

1      A.    That's more vague.  I think the two I
2  mentioned are relatively clear, the HR and the
3  compensation benefits.
4      Q.    The advice and resolution hotline, is that a
5  service for which there's a charge to members?
6      A.    No.  That's part of membership dues.
7      Q.    Is that service provided by CAI employees?
8      A.    Yes.
9      Q.    How many employees are involved in the
10  staffing of that service?
11      A.    On any one day, there's two or three people
12  in that.  We have times when there's four or five.
13  And we have people that can serve as backup but that
14  are not regularly assigned to that function --
15      Q.    So if you're looking at --
16      A.    -- plus the management of that function.
17      Q.    I apologize.  I thought you were finished.
18            As you look for your purpose of budgeting,
19  are you planning on three full-time employees in that
20  position or some number different than that?
21      A.    Oh, no.  When you said HR advice or
22  resolution, you're helping me be a little more clear.
23            When you go back and add, which we should,
24  go back and add those things from super membership we
25  discussed earlier where we were going to have people

```
 1            In the membership service where the
 2    membership dues pay for a handbook service, what that
 3    pays for is one of these HR adviser to review it
 4    from an HR perspective and highlight gaps and
 5    potential edits.  That's very different than
 6    providing you a handbook or writing it for you or
 7    having you use the one that the PEO supplies that's
 8    required to be an employee of the PEO.  Those are two
 9    very, very different things.
10         Q.   Are you personally familiar with IRS
11    regulations related to 501(c)(6) status?
12         A.   Generally, yes.
13         Q.   Is CIA a business league under 501(c)(6)
14    regulations, or is it some other denomination of
15    category?
16         A.   Yes, it's a business league.  My
17    understanding is that that encompasses trade
18    associations and other related business associations.
19         Q.   How long has CAI filed its taxes as a
20    501(c)(6) entity?
21         A.   I believe from the beginning.
22         Q.   Has CAI ever been audited by the IRS?
23         A.   I believe we've had some inquiries, not in
24    my time.
25         Q.   You believe the answer is yes, but before
```

```
 1    2001?
 2        A.    Well, I can't describe it as an audit.   I
 3    don't know that.   In fact, I don't really believe
 4    that.   But inquiries, and I don't know how to
 5    describe it any more than that.   It's before my time.
 6        Q.    Let me ask you first, during the time you
 7    have been there, has the IRS ever investigated the
 8    legitimacy of CAI status as a 501(c)(6) entity?
 9        A.    During my tenure?
10        Q.    Yes.
11        A.    No.   No.
12        Q.    Do you know if that ever happened prior your
13    the tenure?
14        A.    I don't know.   I believe there's been some
15    inquiry, I just don't know the extent of it.
16        Q.    During your tenure, has CIA or anyone acting
17    on CIA's behalf had any discussions with the IRS
18    about the legitimacy of CAI's 501(c)(6) status?
19        A.    During my tenure?
20        Q.    Yes.
21        A.    No.
22        Q.    What about before?
23        A.    I don't know.
24        Q.    You seem to have some reference that there
25    was some kind of discussions, but you don't know the
```

1   details of it. Am I paraphrasing that accurately?

2     A.   Exactly. You are. You are. You're

3   paraphrasing it accurately. I just don't have

4   anything that says we had an audit and here was the

5   result of an audit.

6         In conversation with George Shelton or

7   somebody, was there ever an inquiry? I believe so.

8   But I just cannot describe for you the extent of it

9   and what its official nature was.

10     Q.   Do you know if there are any records about

11   whatever inquiry -- any correspondence or anything

12   like that about any inquiries you may have had prior

13   to the time you arrived?

14     A.   Yes. I think we produced some of that,

15   where an IRS document said you're -- I think we did.

16   Although it was late discovered, so I'm not sure we

17   have produced it yet, but I think we have. It's, I

18   believe, a communication from the IRS that says yes,

19   you may continue to file as a 501(c)(6) exempt

20   organization. I just can't tell from that what was

21   done to conclude that. Was it an audit? Was it an

22   inquiry? I just don't know.

23         MR. DUNCAN: I ask this only because there

24   seems to be a lack of clarity in the witness' mind.

25   Has that document been produced?

```
 1            MR. PHILLIPS:  I'm not sure what he's
 2   referring to, so we'd have to check.
 3            MR. DUNCAN:  Okay.
 4        (Whereupon, Clarke Deposition Exhibit 71 was
 5         marked for identification.)
 6   BY MR. DUNCAN:
 7     Q.   Let me show you what's been marked as
 8   Exhibit 71.
 9            Is that what you were referring to?
10     A.   Yes.
11     Q.   Does this appear to be IRS letters --
12   there's two documents here -- one from 1981 and one
13   from 1977?
14     A.   Yes.
15     Q.   And both these letters have a box that's
16   been X'd that says, "There is no change relating to
17   the status or reliability for the unrelated business
18   income tax."
19            Do you see that?
20     A.   I do.
21     Q.   Have you made inquiry as to anything beyond
22   what's reflected in the two pages we have here?
23     A.   I've made no inquiry.
24     Q.   Are you aware of any other similar letters
25   about CAI's tax-exempt status since the most recent
```

1    Q.   Annual wage and benefits survey, free

2  services provided to all members who participate in

3  the survey.  Survey is available for purchase to

4  nonparticipating members and nonmembers for a fee.

5         Just start with the annual wage and benefits

6  survey.  Do you do that?

7    A.   We do that.  We may have some different

8  rules on nonparticipating members and stuff.  But

9  yes, we do wage surveys for members.

10    Q.   Do you ever sell that information to

11  nonparticipating members or nonmembers for a fee?

12    A.   We can and have.  That's not a regular part

13  of the. . .

14    Q.   But it's something that you have done?

15    A.   Yes.

16    Q.   Including during the time where you served

17  as president and CEO?

18    A.   Yes.

19    Q.   Under "employment services," it talks about

20  offering of free listing of job openings on the web

21  side, allowing candidates to post a brief resume on

22  the website.

23         Is that something that is part of any

24  services provided by your business?

25    A.   That's available to a member that wants to

1  post, yes.

2      Q.   On page 4, under the mission, about a third

3  of the way down.

4      A.   Okay.

5      Q.   It says:

6           "ORG's primary mission is provide

7  high-quality information, advice, training and

8  services to employers in the areas of human resource

9  management and operational effectiveness.  ORG will

10  remain responsive and adaptive to its members'

11  needs."

12          Obviously that's not a word-for-word mission

13  statement for anything CAI's written, but does that

14  generally mirror CAI's mission with respect to its

15  member employees?

16      A.   No.

17      Q.   Would you classify CAI's operational mission

18  as broader than that?

19      A.   I would say it's broader, yes.

20      Q.   Is it inconsistent with CAI's mission to

21  provide high-quality information, advice, training

22  and services to employers in the areas of human

23  resource management and operational effectiveness?

24      A.   It's not inconsistent with our mission.

25      Q.   Is it, in fact, consistent with your

1  mission?

2      A.   Well, yes and no.  The yes part is that it

3  helps the employer have a better workplace.  But the

4  actual mission of the Texas entity is not that.  The

5  actual mission is broader or bigger than that.  These

6  are methods to get there, but this is why we were

7  organized.  We were not organized to provide any one

8  of those specific things.  We were organized to

9  accomplish an end goal.

10     Q.   Second sentence in that was, "ORG will

11 remain responsive and adaptive to its members'

12 needs."

13          Is it not true that CAI would seek to remain

14 responsive and adaptive to its members' needs?

15     A.   Yes, as a whole.  Yes.

16     Q.   Does CAI Services Corporation file a

17 separate tax return?

18     A.   Yes.

19          MR. DUNCAN:  Off the record for a second.

20          (Off the record.)

21          (Recess at 1:07 p.m. until 1:49 p.m.)

22          MR. DUNCAN:  Mr. Clarke, I'm going to pass

23 you what will be marked as Exhibit 73.

24

25

1          (Whereupon, Clarke Deposition Exhibit 73 was

2          marked for identification.)

3     BY MR. DUNCAN:

4          Q.    I ask you if this appears to be the 2015 tax

5     return for CAI.

6          A.    It appears to be the 990 and 992, which are

7     our tax returns.

8          Q.    Who prepares CAI's tax returns, if you know?

9          A.    Dixon Hughes Goodman.

10         Q.    Who at CAI, that is, what CAI employees are

11    involved in the preparation of those tax returns?

12         A.    Nicole Hendron is our chief financial

13    officer or head of the financial area and then she

14    has staff as well.

15         Q.    Is CAI provided with a draft return?

16         A.    I don't see the draft.  I bet there is, but

17    I don't see it.

18         Q.    So far as you know, does CAI have the

19    opportunity to comment on the drafts or comment on

20    information going into the preparation to ensure its

21    accuracy?

22         A.    I believe so.  I believe that would be the

23    practice; I'm not involved in that detail.

24         Q.    To your knowledge, the company's knowledge,

25    has CAI told its accountant anything in the 2015 tax

1  return that is not accurate?

2      A.    I don't know that.

3      Q.    If somebody in the financial area had seen

4  the 2015 return and thought there was something

5  inaccurate about it, do you think that would be

6  brought to the CEO's attention?

7      A.    No, not if it was corrected, but it could be

8  brought to my attention.

9      Q.    Do you agree that CAI, under the law at

10 least, is ultimately responsible for the content of

11 its tax returns?

12     A.    I believe so.

13     Q.    I'm going to ask you to look and see

14 page CAI1024 on this return.

15     A.    Okay.

16     Q.    And there's some language that's on this

17 page starting up at the top, "briefly describe the

18 organization's mission."

19     A.    Yes.

20     Q.    Do you know who prepared the language on

21 this page to describe CAI's mission?

22     A.    No.

23     Q.    Do you take issue in any way with what's

24 described?

25     A.    I think it's too narrow, but I think it's

1   accurate in its narrowness.

2       Q.   If you were to describe it in order to take

3   away how narrow it is, what more would you have in

4   there?

5       A.   It would be back to that broad description

6   that I think we talked about earlier today, which is

7   that our general mission that's in our bylaws and in

8   our charter about promoting the general business

9   environment and the quality of that environment that

10  employers face in operating it imparts, in its narrow

11  way, that they can have a good workplace and be

12  successful.

13      Q.   If we go further down under 4A, 4B, 4C,

14  there's some descriptions.

15           Under 4A it's got membership?

16      A.   Yes.

17      Q.   And then it has a number of -- it appears

18  really to be a continuation -- well, let me retract

19  that.

20           It appears to be a summary of membership in

21  that section.  Is that what it appears to you to be?

22      A.   An attempt to summarize it, yes.

23      Q.   Do you agree with the accuracy of that

24  summarization?

25      A.   Insofar as it goes, yes.

1　together, they're just not the same.

2　　Q.　All right.　Back to 1028, let's look at

3　16(a).

4　　　　"Did the organization invest and contribute

5　assets to a participating and joint venture or

6　similar arrangement with a taxable entity during the

7　year."　And the answer marked was no; is that

8　correct?

9　　A.　True.

10　　Q.　Do you know why the answer to that question

11　is no in light of the relationship CAI has with CAI

12　Service Corporation?

13　　A.　I have a belief on that without being a tax

14　attorney or a specialist in the 990 is that this

15　is -- because it asks in other places about a wholly

16　owned subsidiary, that this is additive to that.

17　That is, an entity that you do not necessarily own

18　but you've invested in, contributed to or have formed

19　a joint venture.　And we haven't done that,

20　particularly consistent with our answer about that

21　there is another entity that we spoke of above.　I

22　think those reconcile that way.

23　　Q.　That's your understanding?

24　　A.　That's my understanding.

25　　Q.　Let's look at 1029.　Let's look at line 11

1  on this table that actually refers to you personally.

2     A.    Yes.

3     Q.    It says that "Bruce Clarke spends 40 hours a

4  week at CAI and 20 hours a week at CAI Services

5  Corporation."

6           Do you see that?

7     A.    I see that.

8     Q.    Is that an accurate divide of your time?

9     A.    Let's see.  Wait a second here.  Let me get

10  specific here.

11          Where is the reference to the CAI Services

12  Corporation?  Well, listing the hours for related

13  organizations?

14     Q.    Yes.  Perhaps I assumed that.  So let me

15  take back that supposition and ask you, would the

16  other 20 hours be for CAI Services Corporation, or is

17  there another --

18     A.    I imagine there's some percentage of it,

19  yes.  But what's confusing me just in terms of

20  consistency is I don't see any hours for

21  Nicole Hendron on that, and she does some work on the

22  financials, at least with the auditor on CAI Services

23  Corp.

24          So what I'm getting at is I'm not certain

25  that that's limited to CAI Services Corp.  I can

300

1    think of other entities that I spend time on that we

2    don't known or invest in, we're not a subsidiary.

3        Q.    Do you get compensation from those others

4    because this refers to the compensation?

5        A.    No.  I don't get compensation from them, no.

6        Q.    Well, it indicates here that the reportable

7    income from the organization based on a W-2, which I

8    assume is CAI, is $613,798.  Do you see that?

9        A.    Yes.

10        Q.    Then under column F it says, "Estimated

11    amount of other compensation from the organization

12    and related organizations," and that amount is

13    $155,117.  Is that all CAI compensation, additional

14    compensation or is that some from CAI Services?

15        A.    I don't get any compensation from CAI

16    services.  So that must be all CAI.

17        Q.    Okay.

18        A.    Some of it, however, might be reallocated

19    back.  Some of that expense might be reallocated

20    back.

21        Q.    Internally?

22        A.    Internally.

23            So I'm struggling with you a bit.  I don't

24    have facts to dispute or to confirm a real specific

25    conclusion on the 40 and the 20.  I'd have to inquire

1   just a bit further.  I believe it would address CAI

2   Services Corp. to some degree, but my hesitancy

3   somewhat is based on that I don't see any hours for

4   Nicole Hendron.

5       Q.    In order to get to your total compensation

6   for your services, you'd have to add the $613,798

7   column with the $155,117, and that would be

8   compensation paid to you all by CAI and not any by

9   CAI Services Corp.?

10      A.    Right.  There's not anything paid by CAI

11  Services Corp.

12      Q.    Let's look at page --

13      A.    I don't want to mislead you.  I do believe

14  there's an allocation of some of my expense to that.

15  I guess in that way, CAI Services Corp. supports me

16  in some way, but I don't get a paycheck from it or a

17  benefit directly from it, if that makes any sense to

18  you.

19      Q.    All right.  So if we look at page CAI1044,

20  that page at the top appears -- I mean, the first --

21  you're the first listed person there.  That appears

22  to actually break down your compensation to total at

23  $768,915, but does so without any compensation

24  reportable from any other entity.  Is that how it

25  appears to you?

```
 1   other individuals that do some of these contract
 2   services, the agreement with them is they cannot use
 3   our content in our venues, but they can train in
 4   other venues and do.  And David Siler does other
 5   kinds of human resource services on his own, beyond
 6   training.
 7       Q.   Let me ask you to take a look at page 1031
 8   of this document, under Section 2.
 9       A.   Okay.
10       Q.   There's four categories:  Membership dues,
11   training, HR consulting, and product solutions.
12       A.   Yes.
13       Q.   And the first two are placed under related
14   or exempt function revenue.  That would be the
15   membership dues and the training.  Do you see that?
16       A.   Yes, I do.
17       Q.   Do you know how CAI determined that that
18   should be treated as related as opposed to unrelated
19   business revenue?
20       A.   Yes.
21       Q.   And how was that determined?
22       A.   Through advice.
23       Q.   So are you saying the determination was made
24   by CAI after receiving advice from a tax consultant
25   of some sort?
```

Case 1:15-cv-00083-LCB-JLW   Document 113-1   Filed 05/22/17   Page 51 of 127

303

```
 1        A.    Primarily a tax attorney.
 2        Q.    So without telling me what the advice was,
 3  you're saying you sought a tax attorney's advice with
 4  respect to preparation of the return?
 5        A.    Yes, I did.
 6        Q.    When I say you, you mean CAI did?
 7        A.    CAI did.  Whether or not to this particular
 8  return, I can't say.  But to that concept and to that
 9  delineation that you noted, yes.
10        Q.    Would the answer be the same as to why
11  HR consulting and product solutions were placed in
12  the unrelated business revenue category?
13        A.    Yes, it would.
14        Q.    What does "product solutions" mean?  What is
15  that referring to?
16        A.    That's primarily those affirmative action
17  plans, and then HR consulting.
18        Q.    If we go to Section 11 on this same page,
19  there's a line for miscellaneous revenue.  Do you see
20  that?
21        A.    Yes.
22        Q.    Do you know what "miscellaneous revenue" is?
23        A.    I'm familiar with the concept.  I couldn't
24  sit here and line item that and even tell you or even
25  tell you the biggest item on that.  I could not
```

1      A.    No.  I don't believe so, no.

2      Q.    You believe they are allocated to CAI, not

3  the Services Corp.?

4      A.    It could be some to both, but I'm not sure

5  all to CAI Services Corp.

6      Q.    Let's look at page 1035 if we could.  This

7  appears to be the start of a section about political

8  campaign lobbying activities.  Do you see that?

9      A.    Yes.

10     Q.    You mentioned before you don't know why

11 there wasn't any statement of lobbying expense.

12 Let's look at page 1037.

13     A.    Yes, I see that.

14     Q.    It indicates for the current year that there

15 were lobbying expenses of $3,000, or lobbying and

16 political expenditures.  Do you see that?

17     A.    Yes.

18     Q.    Is there some contract that you have with

19 some lobbyist for $3,000?

20     A.    No.  No.  No.  We have a contract with a

21 contract lobbyist.  It's for more than that.  That's

22 the amount that was allocated to -- as we were

23 advised, that was allocated to the IRS definition of

24 what lobbying is as opposed to what our lobbyist

25 primarily does, which is not lobbying as the IRS

Case 1:15-cv-00083-LCB-JLW   Document 127-2   Filed 06/30/17   Page 5 of 30

305

1  defines it.

2        So, in other words, an allocation was made

3  of what part of that contract is lobbying under that

4  IRS definition.

5     Q.   How much does your contract for lobbyists

6  total that?

7     A.   We share that with a couple more entities.

8     Q.   Who are those entities?

9     A.   An entity in Charlotte called the Employers

10  Association and an entity in Asheville called WCI.

11     Q.   Is that Western Carolina Industries?

12     A.   Yes.  But I think they use WCI exclusively

13  now.

14        Our three organizations operate an

15  unincorporated entity called Employers Coalition of

16  North Carolina.  That's the name the label through

17  which we do lobbying at the state legislature.

18     Q.   You said that's unincorporated?

19     A.   It's an unincorporated entity,

20  unincorporated association.  And Connie Wilson is the

21  lobbyist.  The agreement is with her and Employers

22  Coalition.

23        That's why this long-winded thing.  We split

24  the expense of that three ways.  So our one-third of

25  her expense has been parsed in part this way, the

```
 1   $3,000 of our one-third is direct lobbying expense.
 2       Q.   What's the total of your one-third other
 3   than what's reported here?
 4       A.   I would say to Connie it's around --
 5   approximately $60,000 a year is the total, so ours
 6   would be $20,000.  So we're saying that $3,000 of
 7   that $20,000 is direct lobbying.
 8       Q.   And 15 percent?
 9       A.   Yes.
10       Q.   If we're sticking with page 1037, it says,
11   "Dues, assessments and similar amounts for members,"
12   it totals at $2,905,322?
13       A.   Yes.
14       Q.   And is that $3,000 that was attributable to
15   the -- the part under the IRS definition you deemed
16   CAI could appropriately attribute on this return, is
17   that the amount that is attributed to the dues that
18   are paid, that is, the $2,905,000?
19       A.   It's dues-plus -- fairly certain of this.
20   And I believe that's why it's on this document or
21   this form.  It's dues plus similar amounts for
22   members.  And that similar amount in our case is we
23   don't have assessments, so similar amounts is what
24   I'm going on here from this phrase.
25            That's similar amount is voluntary
```

```
1   contributions to the Employer's Coalition.  So we
2   give the opportunity on our annual membership dues
3   invoice for a member to contribute a voluntary amount
4   for these governmental relations activities.
5       Q.   What's the amount received on an annual
6   basis typically for that check-off opportunity?
7       A.   For us, around $40,000 or so, $45,000.  The
8   other two entities, they're the same thing, make the
9   same thing available.  It's not a mandatory amount.
10  It's a voluntary amount.
11      Q.   If I understood correctly, $20,000 of that
12  45 would be used as part of your one-third share to
13  the employees -- is it ECNC employees coalition?
14      A.   In part.  We have other expenses.  There's
15  an administrative.  There's other expenses.  So,
16  roughly speaking, that 40 or 45 just about covers our
17  outlay.
18      Q.   Part of that outlay would be the $20,000?
19      A.   Yes.
20      Q.   What would the other 25 be?
21      A.   The administrative assistant that we all
22  share, the three of us share, the office space, the
23  software systems and subscriptions that we have to
24  support that mission.  Other things that come along
25  as expenses.
```

1    Q.   Let's go to page 1045.  Part 1, line 7 talks

2 about a bonus plan.  It says, "All employees

3 participate in an annual bonus plan based on the

4 operating performance of the organization."

5        Did I read that correctly?

6    A.   Yes.

7    Q.   What does that mean, that is, the operating

8 performance of the organization as to how that would

9 be plugged into any determination, whether a bonus

10 was valid or appropriate?

11    A.   Okay.  As I understand it, in a (c)(6) and

12 maybe in other forms of tax exempt, you can

13 distribute some portion of the gain and net assets to

14 employees, as long as that distribution doesn't take

15 their compensation beyond the tax-exempt compensation

16 guidelines.

17       So in our cases, this is a very small thing

18 with tight, maximum limits that's more of a -- I'll

19 say thank you than it is a substantial compensation

20 bonus.

21    Q.   If CAI were to ultimately be permitted to

22 offer legal services, would that be a charged for

23 service?

24    A.   Primarily not.

25    Q.   Would there be situations where it would be?

```
 1      A.   Well, I hope so at some point in the future.
 2  I think that the early stages of it, as it was
 3  introduced and as it was staffed, is that it would
 4  be -- and I think it says somewhere in the document
 5  we produced.  Our estimate is that 70 or 80 percent
 6  of it would be allocated to membership.  That is,
 7  70 or 80 percent of the time of those staff attorneys
 8  would be provided to members within that membership
 9  basket of services and there would be no extra fee
10  charged.
11          We believe, based on seeing other peer
12  organizations around the country that do legal
13  services and states that allow that to happen, that
14  there would be some fee for service.  And what that
15  does, in essence, is just help reduce the cost of
16  providing the member service, that it's not so much a
17  profit on its own; it's more of an expense reduction
18  to the membership service side.
19      Q.   I'm looking at the bonus plan description on
20  page 1045.  That's for all employees.  That appears
21  to make a point to say it's for all employees
22  participating; is that right?
23      A.   Part 1, line 7, yes.
24      Q.   So if there was any income that was
25  generated by any provision of legal services by the
```

Case 1:15-cv-00083-LCB-JLW  Document 121-1  Filed 06/16/17  Page 52 of 134

**310**

1 corporation, if there was revenue generated from it,

2 then that would be revenue that would go into the

3 amount that's reviewed for whether or not a bonus,

4 annual bonus would be justified is the total amount

5 that would be utilized for that?

6     A.   Part of that, no.  And part of that is in

7 the future, to be determined in the future.

8          The part of that that is no is that it's not

9 a revenue share.  You used the word "revenue."  To

10 the extent that there's a bonus, there has to be

11 a -- as a necessary precedent to that, there has to

12 be a net income.  There has to be a revenue above

13 expense.  So it's not a revenue type of share.  So

14 that part I would say no to.

15          The part that remains to be seen in the

16 future is in what entity or in a future entity, an

17 entity that doesn't yet exist that would be formed in

18 the future, would for-fee legal service sit, and

19 whether or not that entity would have any financial

20 relationship to CAI.  That's just not a thing that's

21 decided.

22     Q.   It's a paid-for service, if it were a

23 paid-for service?

24     A.   Yes.

25     Q.   Would that be taxable or not taxable?

```
 1        A.    Taxable, I believe.

 2        Q.    And you base that on what?

 3        A.    That at that point, in my view, to be

 4   conservative about it and there may be an argument to

 5   the other side, but I wouldn't want to be

 6   conservative about it.  It has become a specific

 7   project that was unique to that individual employer

 8   and that that took it outside of the tax-exempt

 9   delivery, in my view.

10        Q.    If there were used that way, would the

11   service then be part of the taxable services provided

12   by CAI, unless some other entity was formed?

13        A.    I think it would be taxable if there was a

14   net income from the service.  I just don't know what

15   entity or in what way would it be accounted for.

16        Q.    Why do you mention the possibility of

17   another entity being formed for this in your

18   response?  Is that something that's actively on the

19   drawing table?

20        A.    It's not actively on the drawing table.

21   It's a mode of operation that I proposed to the

22   State Bar in a letter I wrote to them a couple years

23   ago.

24        Q.    The analogy would be to the captive

25   liability insurance firm?
```

Case 1:15-cv-00083-LCB-JLW   Document 121-1   Filed 06/16/17   Page 54 of 134

312

```
1        A.   Yes, or a captive law firm, let's say.   Just
2   an additional way to ensure segregation and
3   confidentiality and other standards are met.   Whether
4   or not that's required, I can't say today.   But it
5   would be a way to be conservative and to keep that
6   service in another entity to be conservative.
7        Q.   So that entity would be under the umbrella
8   of CAI?
9        A.   In some way on some level, I would think it
10  would have to be.
11       Q.   If it was profitable, then the revenues
12  would pass to CAI and the consolidated return, as
13  it's been done up until now?
14       A.   They wouldn't have to pass.   They could stay
15  there as a from or a to, but in some way they would
16  sit underneath that umbrella.
17       Q.   And they would participate to the amount of
18  money available in the bonus pool, assuming it was a
19  year where there was a bonus pool?
20       A.   No.   That would have to be decided.   The
21  bonus pool is a certain defined set.   It doesn't come
22  from everything already, and so it would be very
23  normal and easy for that bonus pool not to be
24  involved in legal services.
25       Q.   What is left out from the bonus pool right
```

1    Q.    So if you were writing it, you would add

2    more to it than was there?

3    A.    I would, knowing that the purpose of this

4    document is also narrow.

5    Q.    Do you know why Capital Associated

6    Industries Service Corp. is consolidated on this

7    financial statement with CAI?

8    A.    I believe it's required by GAAP.

9    Q.    If you look at page 7. Under "income

10   taxes," it notes in the first paragraph under that

11   subsection that "CAI is exempt from federal income

12   taxes under 501(c)(6) of the Internal Revenue Code."

13   Do you see that?

14   A.    Yes.

15   Q.    Do you know if Dixon Hughes Goodman sought

16   to make any kind of independent determination that

17   CAI satisfied the criteria of 501(c)(6)?

18   A.    Yes, I believe they did, as public

19   accounting firm providing an audit from which a bank

20   or other entity must rely or could rely. Yes, they

21   have made themselves comfortable and aware and

22   confident in what they say here.

23   Q.    In the independent auditor's report, there's

24   no such finding made. Do you recall that? You can

25   certainly look. It's at page 1000 and 1001.

```
 1        A.    I think that is a finding right there, that
 2   CAI is exempt from federal income tax.  I don't see
 3   the detailed analysis, but I see a finding.
 4        Q.    All right.  So your testimony is that they
 5   have made an independent determination based on that
 6   sentence I just read?
 7        A.    I believe they have.  That "independent" is
 8   throwing me a little bit.  I believe they've made an
 9   analysis and a determination to meet the requirements
10   of their professional auditing standards.  I would
11   call that an independent analysis.  I'm not sure what
12   the profession calls it.
13        Q.    Do you know if Dixon Hughes Goodman
14   independently evaluated what categories of income may
15   or may not be directly related to CAI's tax-exempt
16   purpose?
17        A.    Yes.
18        Q.    When you say that, what's your basis for
19   saying that --
20        A.    Because I had been --
21        Q.    -- that such an independent evaluation was
22   made?
23        A.    Because I've been in some of those
24   discussions with Dixon Hughes Goodman.
25        Q.    On page 10, there's a section on leasing
```

1    health benefits broker that rented space from us in

2    Greensboro.

3        Q.   I thought you also said CAI Services Corp.?

4        A.   **Good catch.  So CAI Services Corp. would pay**

5    **rent to CAI on an allocation.**

6        Q.   That's in both offices?

7        A.   **That would be in both offices, yes.**

8        Q.   The Employers Coalition of North Carolina,

9    which has space in your Raleigh office still?

10       A.   **Yes.**

11       Q.   Is that in a separate, segregated office

12   space area, or is that just part of your space?

13       A.   **It's in a work station, but among other work**

14   **stations, yes.**

15       Q.   So it's a work station among other CAI work

16   stations?

17       A.   **Yes.**

18       Q.   There's not a separate sign or separate

19   entrance or anything like that?

20       A.   **No, not for ECNC.**

21       Q.   What do they pay in terms of leasing?

22       A.   **I'm sure it's nominal.  It's a square**

23   **footage thing.  It can't be much.**

24       Q.   And so you're describing something about the

25   size of an office cubical or so?

```
 1      A.    Yes.   Yes.   And likely some allocation of
 2  the CAI staff member who is that administrative
 3  person's liaison, because some of his time gets
 4  allocated to the lobbying effort, because he and I
 5  have been registered lobbyist and occasionally do
 6  what's defined as lobbying.  So some of his space is
 7  likely allocated to ECNC.
 8      Q.    Who is that person?
 9      A.    That would be George Ports.
10      Q.    Are they permitted to use conference room
11  areas in the office if they're holding a meeting?
12      A.    They can.  I don't think we've allocated
13  cost to that.
14      Q.    But that's happened?
15      A.    Yes, it has.
16      Q.    And obviously people who come to see him, so
17  they come to your reception desk, and the reception
18  desk notifies him that there's someone here to visit
19  with ECNC?
20      A.    Rarely, yes.
21      Q.    What do you understand to be the business of
22  ECNC?
23      A.    The Employers Coalition of North Carolina is
24  a method and a mechanism for three employers
25  associations that operate in the state to get
```

```
 1   important things done on behalf of employers, to get
 2   important legislative and policies objectives met and
 3   other things that are hurdles and impediments, either
 4   prevented or removed, for the benefit removed of the
 5   general business climate.
 6        Q.   Is that done through lobbying efforts?
 7        A.   In part, yes.
 8        Q.   You mentioned, I think, Connie Wilson?
 9        A.   Connie Wilson.
10        Q.   Is Miss Wilson a registered lobbyist?
11        A.   Yes.
12        Q.   Is anyone else employed NC who is a
13   registered lobbyist or associated or affiliated in
14   some way?
15        A.   I am.
16        Q.   Okay.
17        A.   George Ports is registered as our principal.
18   You have to register with a principal.  I don't think
19   he's registered as a lobbyist any longer.  He rarely
20   attends the legislature.  And I don't think
21   Jennifer Edwards, who is the administrative person,
22   we don't register her.  She might independently
23   register herself.
24        Q.   Are you familiar with Tammy Fitzgerald?
25        A.   Sure.
```

318

1　very few hours to us, and we're replacing her in that

2　role.　So that's in transition.　The role will still

3　exist.

4　　　　Leanne Graham in the far right is no longer

5　with us.　She's gone off to do other things.

6　　　　Jackie Jenkins in verification has been

7　replaced.　The role exists.

8　　　Q.　All right.　Any others?

9　　　A.　I believe that we have one or two additional

10　HR on Demand folks.　I don't have their names with

11　me, but I believe there would be another box or two

12　there.

13　　　Q.　All right.

14　　　A.　Gerri Beland has left us to go to work for

15　our member company.　She's one of the HR on Demand

16　there on the list.

17　　　Q.　Okay.

18　　　A.　Jamie Roberts had a long-time -- an extended

19　period of time with us to transition to another

20　employer.　And there's another person in that peer

21　community leader slot.

22　　　　I told you John Gupton's on military leave,

23　but that was true then as well.

24　　　Q.　When is his anticipated return date?

25　　　A.　He has annual renewals of that leave.　It

1  will come up again in the spring.  We'll see.  He's

2  gone through two one-year tours.  He's unsure whether

3  it will be renewed.  I think he wants to renew it.

4       Q.   To stay in the military for another year?

5       A.   I think he does.

6       Q.   So you're not anticipating he'll be back

7  this year?

8       A.   I don't think he will be.  Military leave,

9  we'll honor his wishes there.

10      Q.   Okay.

11      A.   And then there's -- I'm going to struggle

12 with the name of the role, but Elizabeth Creasing

13 left this accounting and HR assistant role and went

14 over to the Jamie Roberts role.  So she took that

15 role.

16           And there's a new person in Elizabeth's old

17 role which is -- I keep going with these.  I'm not

18 sure they're significant.  Do you want me to keep

19 going with those?

20      Q.   No, I think you've covered it.

21           I was focused on the ones that are higher in

22 the chart, which I think you've hit.

23      A.   Okay.

24      Q.   But if there's one else like John Gupton

25 that might not be higher in the chart, but I think

1          The executive committee is where I would
2    inform on anything that had happened outside of the
3    norm, like that lawsuit that we were a defendant in,
4    the Midstate Ventures lawsuit.  I would bring that to
5    the committee so that they knew.  Those sorts of
6    things.
7         Q.   I think that question was the authority of
8    the executive committee.  I believe you may have
9    answered with what the activities are of the
10   executive committee.  I want to make sure I have
11   both.  Do I now have both?
12        A.   I think you do.
13        Q.   In terms of the authority of the CEO, what
14   was the authority of the CEO as you understand it
15   within the CAI organization?
16        A.   I'm responsible for the people there.  I'm
17   responsible for who works there, who doesn't work
18   there.  I'm responsible for effectiveness and
19   efficiency of our operations.  I'm responsible
20   overall for membership, number of members, that type
21   of thing, the quantifiable indicators of growth and
22   shrinkage in an organization.
23          I'm responsible for being the one that
24   thinks the most about the members' needs and
25   viewpoints, as opposed to our own internal thinking,

1    what we might want to do, but rather what they need

2    and what they want.

3         I'm the one that's going to sign significant

4    commitments like leases, other kinds of contracts.

5    I'm the one that interfaces with our lawyers at

6    various times, currently more than normal.  Many

7    other things.

8       Q.  All right.  Does that cover your activities

9    as well as your authority, or are other things you

10   would say that would go under the activities?

11       A.  The activities, I would have to keep going.

12       Q.  Which I don't want you to keep doing.  Just

13   a thumbnail.

14       A.  A lot of community activities.  I was at a

15   charity gala last night.  Just a lot of community

16   activity, a lot of involvement, a lot of writing,

17   traveling to visit with these peers of ours to learn

18   from them, on and on.

19       Q.  Is it true that you serve at the pleasure of

20   the board of directors?

21       A.  That would be true.

22       Q.  I believe you indicated earlier that CAI

23   Services Corp. employs a private investigator who's

24   also paid, however, through CAI?

25       A.  Yes.  Kevin van der Lippe is a licensed

1     How many CAI employees are also employees of

2 CAI Services Corp.?

3     A.   Kevin -- remember, with the caveat that

4 everyone is paid payroll and benefitted through CAI.

5     Q.   Does that include the Brial Early down

6 people?

7     A.   Yes.

8     Q.   So you would say they're 100-percent

9 employees of CAI Services Corp., however, because of

10 the way the payroll is set up, they're paid through

11 CAI; is that accurate?

12     A.   Yes.

13     Q.   Mr. van der Lippe, his time is allocated

14 between the two corporations?

15     A.   Yes, I believe it is, because he will do

16 some things for the CAI entity.  Most of his work

17 would be in the subsidiary, but he will do some

18 things for the entity, an example being those no-cost

19 webinars that he does on background checking.

20     Q.   Your time is allocated, I think, among other

21 reasons, the tax return suggests it, but I think you

22 said that you have some allocation of your time; is

23 that correct?

24     A.   That's true.

25     Q.   Who else, if anyone, has allocation of the

1 time to both entities, as you look at this chart of
2 which you are comfortable saying?
3     A.    I believe Nicole Hendron, because of her
4 role in finance and accounting, that she does
5 accounting and finance for both entities.
6     Q.    Anyone else?
7     A.    I believe that Kate Frederick, lead
8 accountant, that some of her time may be allocated
9 there.
10    Q.    Okay.
11    A.    I believe that our HR manager may have some
12 time allocated there because of recruiting work for
13 verification specialist roles.
14    Q.    When you say your HR manager, there are a
15 number of titles here.  Can you define for me who
16 that is?
17    A.    That says Melissa Short there.
18    Q.    Thank you.
19    A.    Sometimes CAI Services Corp., if it had an
20 open role, would fill that role through an
21 HR on Demand consultant, but through an accounting
22 transaction would pay CAI for that.  Those are the
23 ones that come to mind.
24    Q.    All right.  So a relatively limited number
25 of people on this chart are allocated as between both

1 entities; is that right?

2     A.   I'm going to say between 8 or 10, so I

3 wouldn't call that limited.

4     Q.   All right.  Is this Soule Law Firm the law

5 firm that existed before the prepaid plan existed?

6     A.   Yes.

7     Q.   How long has it been in existence?

8     A.   Three to five years.

9     Q.   And have you had any prior relationship with

10 the Soule Law Firm?

11     A.   Before the prepaid plan was registered?

12     Q.   Yes.

13     A.   Yes.

14     Q.   What was that?

15     A.   Awareness of Martha Soule's, or Mimi Soule,

16 involvement in the community, her representation in

17 the community, the type of client that she serves and

18 the service mentality that she brings to that

19 service, friends and acquaintances of mine that know

20 her and recommend her.

21     Q.   Have you ever had Ms. Soule or anyone in her

22 law firm -- is she a solo or are there other lawyers

23 in the firm?

24     A.   She was a solo.  She's hiring a lawyer who

25 is going to be assigned to the plan.

```
 1      Q.    Have you had any prior working relationship
 2  with her with respect to legal services?
 3      A.    She's not done a legal service for CAI.
 4      Q.    Or for you personally?
 5      A.    No, not for me personally.
 6      Q.    Where are the Soule Law Firm's offices?
 7      A.    In Raleigh.
 8      Q.    Do you know what areas of law that the firm
 9  practices in?
10      A.    Yes.   She limits her practice to employment
11  law.
12      Q.    Often employment lawyer practitioners either
13  do work for employees or for employers but always for
14  both.   Does she have any limitation in her practice
15  in that regard, to your knowledge?
16      A.    I believe she's exclusively an employer
17  counsel.   There may be a minor exception to that, but
18  that's her business model.
19      Q.    Under the prepaid plan proposal that is
20  approximately a month or so away from being
21  initiated, who provides the legal services under this
22  proposed plan?
23      A.    Literally, it's participating plan
24  attorneys, attorneys that have been designated as
25  participating and forms have been filed with the
```

Case 1:15-cv-00083-LCB-JLW   Document 121-1   Filed 06/16/17   Page 59 of 134

326

```
 1   North Carolina State Bar.  So Mimi Soule,
 2   Martha Soule is one of those; she was filed with the
 3   implication.  And then this new attorney would be
 4   field when that's completed.
 5        Q.   Any plans for there to be any other
 6   attorneys other than the two attorneys in the Soule
 7   former to be designated under the prepaid plan?
 8        A.   Not immediately, but I certainly hope it's
 9   going to fill the gap that I hope it will fill.
10        Q.   Are any CAI employees involved in providing
11   legal services under the plan?
12        A.   No.
13        Q.   After the proposed ethics decision was
14   issued in 2013, and during the time you had some
15   conversation with Alison Mine and others at the
16   State Bar, do you recall that you sent an email that
17   said, "The prepaid plan might meet some of our
18   needs"?
19        A.   Yes.
20        Q.   And can you tell me what the needs are that
21   the prepaid plan approach, which is authorized by
22   law, as we sit here today, correct?
23        A.   Yes.
24        Q.   What needs would be met by a prepaid plan as
25   you observed it and as you observe it now on behalf
```

Case 1:15-cv-00083-LCB-JLW   Document 113-1   Filed 05/22/17   Page 62 of 127

327

1  of CAI?

2       A.   Okay.   Despite a number of limitations and,

3  I think, challenges with using a third-party entity

4  to provide legal services to our members in the

5  context of which we think it needs to be done,

6  despite those hurdles and provisions, we're hopeful

7  that the prepaid plan methodology will allow a member

8  who has an HR-related matter and HR compliance

9  related matter that goes beyond an HR conversation

10 and goes into a really specific application of law or

11 into the development of a document such as a

12 severance agreement, say, as an example, that that

13 member will be able to get that done in -- not only

14 get it done, that's an important point -- get

15 something done that I think more often than not they

16 simply did not do.  They did not go and seek that

17 lawyer to do that relatively basic next step, but, in

18 fact, get it done by a qualified attorney and, in my

19 words, tie a bow on that issue or that challenge they

20 were facing in the workplace through that prepaid

21 legal service plan.

22      Q.   When the prepaid legal services plan goes

23 into effect, will there be any increase in membership

24 dues?

25      A.   No.

```
1      Q.    And how long a period of time will that hold
2   true?
3      A.    That is a great question, because you're
4   forecasting in your question a problem that I have,
5   which is a problem with the prepaid plan methodology.
6   It's a very expensive way and a way that we found
7   that we can do it, but a very expensive way to
8   provide attorney counsel available on an unlimited
9   basis on a business-hour availability basically to be
10  engaged to wait to get that question or contact.  As
11  opposed to waiting for a call in an otherwise varied
12  practice with a lot of different business clients.
13         So it's a very expensive way of doing that.
14  So how long we can sustain that, I don't know.  One
15  of the many motivators to continue this lawsuit is
16  that in order to really complete to fill this gap and
17  to fill it in an ineffective way, I'm not sure it is
18  financially sustainable long term on this prepaid
19  plan methodology.  What is going to be required to
20  make it sustainable, and it's unknowable today, would
21  be growth in membership.
22     Q.    What do you contend CAI could do if it were
23  allowed to provide legal services as a corporation
24  that a prepaid legal services plan does not already
25  accomplish?
```

1    A.   There are so many things, and I believe that

2  in discovery we provided a document that has a list

3  of those things.  So I'd like to say I can't remember

4  all of those sitting here today, but I know you have

5  a document that does a more complete job of listing

6  those, both why a prepaid plan is not a sufficient

7  solution but why it does do some things we would like

8  to do and why it's potentially economically

9  unsustainable, among other things.

10       So refresh me of the question.  I went off

11  on my own eloquence there.

12    Q.   That's all right.

13       What do you contend that if you were

14  successful in this lawsuit in a corporation that

15  practiced law in North Carolina, what that would do

16  for your membership that a prepaid legal plan does

17  not provide for?

18    A.   Okay.  All right.  Again, with that caveat

19  that there is that document that may be more complete

20  and really the letter to Alice Mine was a recently

21  good effort to explain that to her in writing.  I

22  would refer you to that as well where we talked about

23  why the prepaid plan methodology doesn't meet these

24  three or four or five things.

25       One is the economic challenge I just

```
1   mentioned to you.  I've got no ability to do any
2   fee-for-service to defer any of the out-of-pocket
3   costs for providing this extended, unlimited
4   membership benefit.  That's a significant one.
5            Another based on Alice's response, and I
6   still to this day don't really understand it,
7   although I respect her and know she's a smart lady,
8   is that we cannot even use time or blocks of time
9   purchased through a prepaid plan to do nonlegal tasks
10  for CAI; that is, to do let's say training classes
11  that don't require a lawyer, to provide a training
12  class on law and rules.  We cannot do that because
13  the person works for that third-party entity, I
14  believe, in Alice's view.
15           So there's another significant problem for
16  us, because I would typically use, as you could
17  probably tell by how we've talked today, typically
18  use someone with talent in multiple ways.  So if I've
19  got a lawyer with that expertise in employment law,
20  I'm going to use them to train, educate, teach.
21  They're going to be in programs.  They're going to be
22  doing video clips to help educate companies.  They
23  are going to be doing a lot of things.  Some of that
24  at no extra fee to the member.  Some of it might be
25  at a fee, like a specific class for that member on
```

1  workplace laws or some such thing.

2          Another problem is that what really happens

3  here, what the reality is and the reality is with

4  groups like ours around the country, is that these

5  member organizations, generally speaking, want to get

6  their issue resolved, and their issues are common to

7  all of these employers.  That's what's so wonderful

8  about this association model is that when this

9  employer calls about this termination issue, it's the

10  same issue 150 other members had that year.  And our

11  expertise is so deep in this and it's so easy to

12  provide the parameters around that issue that if it

13  does need that legal service to tie that knot into

14  it, the members not typically -- and we've talked to

15  them about this -- they're not typically concerned

16  about attorney-client privilege.  Now, they could be

17  in a given case, but that's not usually their

18  concern.  Usually what they would like is to have the

19  HR advisor who had been talking to them already bring

20  the lawyer in, get the legal opinion added to the

21  scenario to tie the bow on it, and then be able to on

22  their own go execute that back at their workplace,

23  rather than be focused on privilege issues and such

24  that are important but are not going to be of value

25  to most of these scenarios.

1    But with a third-party law firm, and

2  certainly if I were the third-party law firm, I would

3  require that we are going to go through that at each

4  conversation.  Now, when we send a member or direct a

5  member to that prepaid plan, they are going to go

6  through, rather than start solving the problem, with

7  awareness of no privilege with an HR advisor in a

8  room.  We're going to have a conflicts check.  We're

9  going to do all the things required to be done and

10  they will, but it's a lesser level of service at

11  greater time and expense.

12    So those are the essential things that

13  really come in those two buckets, the quality of the

14  service, the integrated nature of the service.  And

15  the second bucket being the economics of providing

16  the service.  Both are much better under a staffing

17  model.

18    Q.    Was a prepaid legal payment plan something

19  CAI had affirmatively considered before it was

20  suggested by the State Bar during the meetings in

21  April 2013?

22    A.    Yes.

23    Q.    And what, if any, conclusion had you reached

24  about it as of that time?

25    A.    I got legal advice on it on the advisability

1  or availability.  It wasn't Mr. Phillips, but it was

2  another lawyer.  And so I'm not sure what I should

3  tell you from that.

4      Q.  You don't need to tell us about that legal

5  advice.

6      A.  I got advice.

7      Q.  Okay.  So really my question is, what had

8  you concluded about it?  I'm not looking to find out

9  what legal advice was given to you at all.

10      A.  That it was probably not available to us,

11  probably not available to us in one key respect.  In

12  the key respect that membership dues could not be

13  used to pay the cost of the prepaid plan.

14      Q.  So I'm not asking for attorney advice, but

15  I'm trying to figure out who said that to you, the

16  membership dues --

17         MR. PHILLIPS:  Was it your counsel?

18         THE WITNESS:  Yes.

19  BY MR. DUNCAN:

20      Q.  Or was it somebody at the State Bar?

21      A.  No.  Counsel.  Counsel.

22      Q.  And you still believe that to be true now?

23      A.  No.  In fact, Alice Mine said you can use

24  membership dues to pay for it.

25      Q.  So you understand you have the ability to

```
 1   use both membership dues you receive now and you
 2   always have a right to consider whether there's an
 3   increased in the membership for whatever reasons, for
 4   whatever services that are being provided that may
 5   justify that?
 6        A.   It's my belief now.
 7             (Whereupon, Clarke Deposition Exhibit 76 was
 8             marked for identification.)
 9   BY MR. DUNCAN:
10        Q.   Let me show you what's been marked as
11   Exhibit 76.
12             Does that appear to be a two-page document
13   headed, "Exclusively for CAI Members:  Prepaid Legal
14   Advice on Employment Law Topics"?
15        A.   Yes.
16        Q.   And it starts, "We have great news for CAI
17   member organizations exclamation point!"
18        A.   Yes.
19        Q.   In it, it talks about the prepaid legal
20   services for the next page and a half; is that fair?
21        A.   That's fair.
22        Q.   Did you draft this document?
23        A.   I did.
24        Q.   So do you believe the information in this
25   document to be accurate?
```

Case 1:15-cv-00083-LCB-JLW   Document 106-1   Filed 05/18/17   Page 21 of 81

335

1     A.    That would be one way of doing that.

2     Q.    And you're not restricting yourself and

3  don't have any kind of exclusivity agreement with

4  Ms. Soule or her firm that that would be the only

5  source of firms that would be involved in prepaid

6  legal plans, do you?

7     A.    I do not.

8     Q.    Would you agree that the prepaid plan is

9  made below market cost at CAI members?

10    A.    No.  That's the whole problem with the

11 economic side of a prepaid plan.  CAI is paying more

12 for this prepaid plan capability than for this

13 engage-to-wait mechanism that we cannot use

14 efficiently and effectively in other ways.

15 Therefore, the membership, through its dues, is

16 paying for more this prepaid plan than it should

17 compared to a staffing model, and it's fairly

18 dramatic.  It's not as big of a deal or issue with

19 one lawyer.  But if you get to three or four, it's

20 significant.

21    Q.    If I'm hearing that answer right, the only

22 way you come to that answer is to say that the

23 members' dues are going up; otherwise, they have

24 additional services available to them, the prepaid

25 legal services that are discussed in Exhibit 76, and

```
 1    you said there's not an immediate change in dues, if
 2    I heard you correctly from your earlier testimony?
 3        A.   Well, that was not my intent.  I'm not sure
 4    how you heard it.
 5             My intent is because we are overpaying for
 6    this third-party legal service, consciously and
 7    admittedly nobody forced me to do that, other than I
 8    have no other alternative to provide the service
 9    today.
10             The fact that we're overpaying for that
11    means we're not doing something else for members.
12    We're not able to supply something else.  We're not
13    able to add a capability and in another zone.  We
14    won't add another one of these strategic HR advisors
15    that we did back there in super membership ramp-up.
16    Those kind of things are needed; I won't be able to
17    do that.
18             And the only way that I'm going to be able
19    to go back and finance other areas and pay for other
20    things that these employers need and gaps that need
21    to be filled is to have success in generating
22    additional memberships.  If I can do that, then I
23    think I can balance this.
24        Q.   So what are you paying for this prepaid
25    legal plan?
```

1  services?

2      A.   We allocate expense.  If your question is --

3  we allocate expense, and that's what I understand

4  we're required to do on a good-faith basis, so that

5  we're allocating expense to a taxable line properly

6  and to a nontaxable line properly, and that we've

7  done so in a good-faith way that would withstand

8  scrutiny and our accounts spend a significant amount

9  of time, our outside accounts, on that.

10     Q.   When you referred a couple minutes ago to

11 you had documentation about members who were asking

12 for whether or not there was legal advice available,

13 were you referring to the A&R hotline 11-by-17 sheets

14 that were provided during discovery?

15     A.   Primarily, yes.  That would be the bulk that

16 I'm aware of that were collected.

17     Q.   So those were compiled by people on your

18 staff, correct?

19     A.   By Doug Blizzard.

20     Q.   What I was asking, to be real clear, was

21 there anyone who had written you a letter or provided

22 an email communication, as opposed to some summary of

23 a phone call done by somebody on your staff, had any

24 memory written a letter or some email communication,

25 a tangible document that said, "I am leaving CAI

 1   because you don't provide legal services"?

 2       A.   "I'm leaving CAI"?

 3       Q.   Yes, sir.

 4       A.   "Because you don't provide legal services"?

 5       Q.   Yes, sir.

 6       A.   I don't recall that.

 7       Q.   Has anyone written such a letter or email

 8   complaining to you that CAI does not provide legal

 9   services?

10       A.   Yes.

11       Q.   And has that been produced in discovery?

12       A.   Yes, I believe it has.

13       Q.   Who was that from?

14       A.   Well, some of those that are in front of

15   you.

16       Q.   I'm not talking about what's in the A&R

17   hotline.  I'm talking about a tangible, you received

18   a letter or you received an email.

19       A.   Yes.  So if you let me finish.

20            Some of those are from emails.  A number of

21   the approaches that we get for advice and resolution

22   are generated by email and answered by email, also by

23   live chat.

24       Q.   Have you produced the emails or the live

25   chat documents from which these summaries and/or

1  snippets come from?

2      A.    Yes.  In reviewing that, I would say yeah.

3  I couldn't say 100 percent.  But I could say by

4  reviewing those what the advisors were doing was copy

5  and paste the text into the notes section of our

6  software.  So the actual email from Outlook, no, but

7  the content of the email, yes, without 100-percent

8  certainty.

9          The other category that is very tangible,

10 and I think we could have just kept going with it,

11 but we have three declarations from members that say

12 I want that service and you told me you could not

13 provide it.

14     Q.    Are all those members still members?

15     A.    Yes.

16     Q.    With respect to the 11-by-17 sheet, when you

17 say cut and paste and that some emails may have gone

18 in there, do you know if the entirety of the email

19 was duplicated in there, as opposed to cut and paste,

20 of your own knowledge as you sit here today and

21 testify for the corporation today?

22     A.    I could not promise you that.

23     Q.    That's my question.

24         Do we have the entirety of any such written

25 communications that have been produced in discovery,

1  either letter or emails?

2      A.   I don't think you have the entirety of the

3  conversations that began as an email that connect to

4  a note that's in the 11-by-17 documents.  I think

5  this was the compromise that we presented to you, and

6  I think you accepted it or maybe there's still a

7  battle over it, I'm not certain, that represents that

8  category.

9      Q.   I would not characterize acceptance as our

10 position with respect to that, but that's neither

11 here nor there.

12         MR. PHILLIPS:  Since you referred to it

13 several times, why don't you give the Bates number on

14 that document.

15         MR. DUNCAN:  Well, what I have is one that's

16 been sorted by organization name from the original --

17         MR. PHILLIPS:  Give the CAI Bates.

18         MR. DUNCAN:  971 is the Bates number.

19         (Whereupon, Clarke Deposition Exhibit 77 was

20         marked for identification.)

21 BY MR. DUNCAN:

22     Q.   So our record is clear, is Exhibit 77 the

23 document that you're referring to that had, I think

24 you said in some instances, cut and paste and in

25 other instances summaries of conversations?

```
 1        A.    Yes.
 2              I believe an example -- this doesn't look
 3   like the question, but this is an example of what I'm
 4   talking about, is that on page of 84 of Exhibit 77,
 5   that is -- without going to confirm in the system, I
 6   can almost assure you that that is a cut and paste of
 7   what Lindsay at HCW said provided by email to our
 8   advisor and the advisor transmitted that information
 9   to the caller.  So, you know, it's not exactly what
10   you asked, but an example of that category.
11        Q.    You indicated that there will be available
12   to CAI members what you would like to do or provide,
13   that is, if CAI was providing the service, that there
14   would be instances in which it would not be a
15   member's benefit, but that the member would have to
16   start paying for it, that there would be a fee
17   assessed with it?
18        A.    Yes.
19        Q.    Who at CAI would decide when the member has
20   to start paying for legal services as opposed to it
21   being a member service?
22        A.    It would be decided in two ways.  One is by
23   the description of the scope of service that we
24   promised, what the policy is to members.  So that
25   scope of service would be drafted at the leadership
```

1 level, with consultation likely with the attorneys on

2 staff.  But then execution and interpretation of that

3 scope where there are gray lines and fuzzy

4 intersections which I'm sure would occur would be up

5 to the attorney to decide.

6    Q.   Who would be supervising the attorney on

7 those decisions?

8    A.   I would.

9    Q.   Suppose you're not in that position anymore,

10 who would?

11    A.   I'm going to be with my grandchildren.

12    Q.   Would it be your successor as CEO and

13 president who would?

14    A.   I don't know.  It would have to be assessed

15 and assigned to someone who understands the

16 obligations and the rules, someone who will keep the

17 organization and its members' needs congruent and

18 upfront.  There could be many ways of doing it.

19    Q.   There's no requirement that the president or

20 CEO be an attorney, is there?

21    A.   No.

22    Q.   It just happens to be part of the talents

23 you bring to your position in the job?

24    A.   Talent or liability, yes.

25    Q.   You believe it's a liability being an

1    attorney?

2        A.    I do think sometimes it is, yes.

3        Q.    Who will decide whether CAI can or cannot

4    provide legal services to a member on a particular

5    issue?

6        A.    Who will decide?

7        Q.    Yes.

8        A.    I think I answered that with that there'd be

9    a scope of service, and in the gray zone, the

10   attorney would decide, the attorney providing the

11   service would decide.

12       Q.    This is not really a scope-of-service

13   question, this whether or not you could provide that

14   legal service at all?

15       A.    That is a scope-of-legal-service question.

16       Q.    So the answer's the name in your mind?

17       A.    Yes.

18       Q.    Who will evaluate conflicts of interest

19   under the rules of professional conduct?

20       A.    In the first and most important instance,

21   the attorney confronting the conflict of interest.

22       Q.    Who will have the final word or authority

23   about how CAI should handle a specific legal matter

24   for a member?

25       A.    In regards to conflict of interest, the

1  attorney and/or a supervisor of the attorney in
2  conjunction who's also an attorney, and/or a
3  relationship with outside counsel hired or contracted
4  with to provide that.
5      Q.   What is the authority of the board of
6  directors or management with respect to that?
7      A.   With respect to which piece, the conflict of
8  interest?
9      Q.   Any of those pieces.
10     A.   A lot.
11          Under the prepaid plan, we have a number of
12  things that we're going to have to make sure that we
13  do to respect that attorney judgment, the third-party
14  attorney judgment.  And those involve, typically,
15  making sure that everybody understands what the rules
16  are and that we have agreements and ethics agreements
17  signed and in place.
18          But if we were to go to further, if we had
19  to staff an attorney, I think there's about eight,
20  nine or 10 things that we would consider and likely
21  do, starting with what we put in the legislative
22  proposal, the bills that we had in 2012 and 2013.
23  Both of those contained protections that guide how
24  the service is delivered by a staff attorney,
25  describe the board's responsibility in governance,

1   describe that there would be a governance document

2   that would prevent a nonattorney from supplanting the

3   judgment of an attorney on a matter of

4   responsibility.   There are a number of things in

5   those statutes.

6        I can tell you eight or 10 of the things

7   that we would consider, some of which we would

8   definitely do, some of which would depend on the

9   ultimate resolution.   And whether this ultimate

10  resolution is by federal court order or by some other

11  resolution may affect what we are asked to do or

12  willing to do or think is appropriate to do.   But

13  there's a wide range of things that can be put in

14  place to further reduce the risk providing legal

15  services in this model beyond the already reduced

16  risk.   And I think this is a very important point

17  that a lot of people haven't given much thought to.

18       Beyond the point that the context that we

19  provide these services is already a risk-reduced

20  context, and that's because if you think about a

21  staff attorney serving a group of members on a narrow

22  area of the law where every member is an employer,

23  where the times that I've seen an employer in a

24  battle with another employer over a workplace issue,

25  infinitessimal.   They exist, but they're very small,

1  given that the mentality of these members and one of
2  the greatest utilities of what we do is to help them
3  understand and be in compliance with the law-thick
4  world that we live in, as opposed to the litigation
5  mindset or an almost emergency room mindset where an
6  injury has occurred or a decision has been made.
7          For all those reasons, this is already a
8  risk-reduced, risk-minimalized environment, but we
9  offer to layer in additional considerations,
10 additional risk reductions.  We offer to repeat
11 legislative activity that the rules of professional
12 conduct apply to attorneys, which they already did.
13 But, great, we're glad to reemphasize that.
14         And then I've got eight or 10 other things
15 that I can we can do, and I'd be glad to go through
16 some of those with you.
17     Q.   I think the question was, what would the
18 authority of the board of directors or management be
19 with respect to?  Is that your answer, or is there
20 something else you need to tell me in responding to
21 that?
22     A.   All of these things are the responsibility
23 of management and the board of directors.  These are
24 the things.  These are the things.  These are the
25 things.

1     Q.   And all of that's with no requirement that

2   either the board or management of the company have

3   any licensed attorneys as part of their membership?

4     A.    **As part of their membership?**

5     Q.   Yes.

6         You have one attorney on the board of

7   directors right now.  How many total board of

8   directors did you say?

9     A.    **12.**

10     Q.   So 11 who are not.

11         And if that board of director happened to

12   not be reelected at some point in time, you would

13   have no attorneys on your board of directors,

14   correct?

15     A.    **Possibly.**

16     Q.   And if you retire at some point in time or

17   decide to take another position somewhere, then

18   there's no assurance that the executive director or

19   president would be an attorney either, is there?

20     A.    **No.  No, of course not.  I think what's a**

21   **certainty though is that the attorney who provides**

22   **the service is an attorney, and until they lose their**

23   **license will be an attorney.  If they want to keep**

24   **their license, they're not only going to apply with**

25   **the rules of professional conduct, but if they want**

1  to keep their job on the staff of CAI, they're going

2  to follow internal rules that are meant to buttress

3  and enhance their compliance with ethical standards.

4      Q.   So who would conduct annual reviews of that

5  attorney employee?

6      A.   Certainly, I would.

7      Q.   I'm talking about if there's no attorneys on

8  either the CEO position on the board, who would

9  conduct the annual reviews?

10     A.   In the first instance, the attorney

11 themselves are going to know and going to talk to

12 their manager.

13          I believe that the likelihood is that when

14 we have three to five attorneys on staff, that there

15 will be a lead attorney that manages that group.  And

16 that will be the immediate manager of those attorneys

17 and would handle that day-to-day and month-to-month

18 set of questions.

19     Q.   Who would provide the review for that

20 attorney?

21     A.   On some level, who they report to.

22     Q.   Who would be a nonattorney?

23     A.   It could be a nonattorney.

24     Q.   But there's no requirement that you have an

25 attorney either on the board of directors or as in

1   the position as president, correct?

2      A.   **Nor the ethical rules.**

3      Q.   So we should assume that it's possible that

4   you're not going to be in this position forever, it's

5   possible that someone who doesn't hold your position

6   as an attorney is holding that role; is that a fair

7   assumption? People before you were not, correct?

8      A.   **Certainly, it can be. Recall, I said**

9   **there's eight or 10 things we could do. One of those**

10   **is the selection of an outside counsel for that**

11   **purpose if there was no inside attorney leadership.**

12      Q.   So you would have someone outside the

13   organization and outside counsel come and do an

14   annual review for CAI of the performance of that

15   attorney? Would that be the thought?

16      A.   **I would say it was less about the**

17   **performance and more about the ethical compliance and**

18   **to provide an outlet to that attorney on staff.**

19   **This, I think, is above and beyond what anybody**

20   **requires, even states that allow this process. I've**

21   **never seen this imposed in any other state.**

22       **But it's possible to layer that outside**

23   **attorney in as an outlet for an inhouse counsel that**

24   **felt some sort of pressure or some sort of inadequate**

25   **supervision.**

Case 1:15-cv-00083-LCB-JLW   Document 121-1   Filed 06/16/17   Page 79 of 134

1      Q.   Who would determine the attorney employee's

2  salary?

3      A.   The organization, as they determine

4  salaries, would determine the lawyer's salary.

5      Q.   Who would set the budget for the legal

6  department?

7      A.   The organization, along with the lawyers on

8  staff.

9      Q.   Who would have to approve the expenditures

10  over the budget?

11      A.   If it was to exceed the budget of the

12  organization?

13      Q.   Yes.

14      A.   Unless we've gotten to the size that there

15  is a lawyer manager who has a budget exceeding

16  authority.

17      Q.   When you said "the organization," would that

18  ultimately be the president and the board of

19  directors?

20      A.   Yes.  Day-to-day, it's the president.  And

21  the board manages the president.

22      Q.   Who at CAI would have access to privileged

23  communications between an attorney-employee and a

24  member?

25      A.   Attorneys only.

1  have been discussed.  I couldn't identify a company

2  or a name.

3      Q.   If the member were to call the A&R hotline

4  and raise an legal issue, would they be transferred

5  to the legal department?

6      A.   Transferred to an attorney if they need

7  legal advice, yes.

8      Q.   How would the member know they were being

9  transferred to the legal department?

10     A.   Well, there's going to have to be a

11 discussion, and, to some degree, it's similar to the

12 prepaid plan process.  There's going to have to be a

13 lot of clarity about that transfer; that we're now

14 leaving an HR conversation with a nonlawyer and

15 you're going to a conversation with a lawyer.

16          There has to be some level of conflicts

17 analysis there, based on the context.  And there's

18 going to have to be, and there will be in the prepaid

19 plan scenario and likely would be in the staff

20 scenario, an engagement of sorts, a proportional

21 engagement letter, let's call it that, that

22 identifies -- in this case, it's the Soule employment

23 law firm, it's a third party -- what the terms of the

24 engagement are and what the terms are to establish

25 and to protect an attorney-client privilege; what the

1 promises are around the confidential of the

2 conversation; the materials; the information and

3 anything that might get transmitted; what the

4 confidentiality is around systems vis-a-vis nonlawyer

5 staff or, in the case of a prepaid plan,

6 nonthird-party lawyers and other things.

7     Q.  Would the discussions between the member and

8 CAI that is on the A&R hotline, before being

9 transferred to the legal department under the plan

10 you would have for this, would those conversations be

11 privileged?

12     A.   Which ones?  The ones before the transfer?

13     Q.   Yes.

14     A.   No, they are not privileged.  In my opinion.

15 In my opinion.

16     Q.   So they wouldn't be treated that way by CAI?

17     A.   True.  They're in the system, just like this

18 Exhibit 77 that you have in front of you.

19     Q.   What kind of engagement letter would the

20 legal department need to send to a member before it

21 could engage in legal services, if you had thought

22 about that at all?

23     A.   Yes, we have.  I think I described what an

24 engagement communication might contain.

25     Q.   I think you did for the Soule firm.  I'm not

Case 1:15-cv-00293-LGP JLW Document 121-1 Filed 06/16/17 Page 82 of 134

353

1    sure if you did under the plan, whatever that plan

2    might be for a practicing law firm as a corporate

3    entity?

4        A.    Oh, for if we can staff it?

5        Q.    Yes.

6        A.    I think it would have similar elements.  I'm

7    just not there yet.  What I can commit to certainly

8    is that it would be compliant, with an extra measure

9    of compliance beyond requirements, but we're just not

10   there yet.

11       Q.    You forecast a question that I was shortly

12   going to ask, so I'll go ahead and ask it.

13             Do you have any kind of plan for how it

14   would operate if CAI were permitted to have counsel

15   who would be providing services directly to members

16   of the association?

17       A.    Yes.  So I think it fits nicely here.  I'll

18   go through these eight or 10 things that we've

19   thought about that are in the vein of ensuring

20   compliance.

21       Q.    I want you to do that, let me get a clean

22   answer to this question if I could first.

23             Do you have a written plan, as it sits here

24   right now, about how you would go about that?

25       A.    Yes.

1    Q.    And where with they find that written plan?

2    A.    I think the most comprehensive one is the

3    letter I wrote to Alice Mine.  I described, I think,

4    fairly clearly to her and completely to her, at least

5    in the kind of detail required in that context, of

6    why we want to do this, what we want to do, how we

7    want to do it, and confidentiality ideas that we had

8    in that, quote, captive law firm idea.  So yes, I

9    think that document is responsive to your question.

10    Q.    And that document specifically referred to a

11    captive law firm-type approach, similar to what

12    insurance companies have tried to use in some states?

13    A.    Yes.

14    Q.    Okay.

15    A.    And so the amendment to that would be that

16    if we were allowed to provide the service directly,

17    it no longer needs to be a captive law firm but could

18    be treated in most respects in that same way, in that

19    way to provide segregation, in that way to provide

20    all the things that we need to be assured that we do.

21    Q.    And I know you're aware there's an appellate

22    decision in North Carolina that specifically

23    prohibits that mode of practice at present?

24    A.    Prohibits?

25    Q.    The captive law firm approach that you

355

1    Q.   Well, how you would propose to do it and act

2  in a ethical manner, is there anything else written

3  down about that other than the letter to Miss Mine in

4  terms of a plan?

5    A.   Yes.

6    Q.   What is that?

7    **A.   I'm going to say it's an eight or 10**

8  **different documents, and I believe that you have**

9  **them.  I saw them in reviewing documents that were**

10  **produced.**

11    Q.   Can you give me some idea or description

12  about what those eight to 10 documents are?

13    **A.   Yes.  This last Exhibit 76 has some of that**

14  **in there.  We tell members what we would do, that we**

15  **would shut down the prepaid plan and we would do this**

16  **on a staff basis.  So that's part of that plan.**

17    Q.   That's not very detailed about what the plan

18  would be.  I understand that's a writing that says

19  that.

20        I'm asking, do you have details about how

21  the plan would work?  When I ask you that, I'm trying

22  to get the specifics of how you would do a conflicts

23  check or how a review would be done.  Those are the

24  kinds of things I'm asking about.  It sounds to me

25  like you don't have that plan finalized yet?

1      A.     I'm not agreeing with you.   I have eight or

2  10 things here that speak to that.   In the letter to

3  Alice we talked about conflicts checks.

4           For example -- it's written down.   For

5  example, that the issue around conflicts checks is

6  not only made manageable and made more doable in this

7  environment because of the reasons I stated, because

8  of the relatively homogenous nature of the group of

9  an employers in the context of serving them with

10  basic employment law.   But also the fact, and I

11  believe it's a fact, that a conflicts check is not

12  required until the lawyer's engaged.   So that makes

13  it very manageable and very much a one-off scenario

14  to do that conflicts check when that lawyer's

15  engaged.   That's what the Soule law firm will do as a

16  prepaid plan process, and we would do that in the

17  staff lawyer concept.

18      Q.     So you would propose to take cases and take

19  the engagement before you were in a conflicts check?

20      A.     No.   No.   No.

21      Q.     Maybe I misunderstood what you said.   Could

22  you repeat that?

23      A.     Sure.   Sure.

24           That a conflicts check would be required,

25  but only upon the need for the engagement.   In other

1   eight or 10 specifically, intensely in the Alice Mine
2   document and intensely in the prepaid plan document.
3       Q.   So those are the key ones to look at and
4   then look for references such as what you suggested
5   in, I believe, Exhibit 76?
6       A.   Yes, and other things we provided in
7   discovery.
8       Q.   All right.
9            MR. PHILLIPS:  Is now a good time for a
10  break?
11           MR. DUNCAN:  That would be fine.
12       (Recess at 4:39 p.m. until 4:47 p.m.)
13  BY MR. DUNCAN:
14       Q.   I think you had wanted to tell me your eight
15  to 10 things.  I promised I'd give you that
16  opportunity because I wanted to hear them.  I wanted
17  to clarify what they were directed to.  I think we've
18  completed those clarifications.
19           So if you could tell me your eight to
20  10 things that you think are important to put into
21  this equation, I'd like to hear them.
22       A.   I'm sure they'll be incomplete, but I'm just
23  going to try to give you a flavor for the gist of
24  your question, which is how would you people do this,
25  keep this in compliance, do a good job, honor the

1  attorneys's role, honor the attorney's obligations,

2  honor the attorney's relationship to their client,

3  honor the attorney's duties around nonattorney staff.

4  All these things that we've touched on in some way,

5  whether either implicitly or explicitly.

6          I'll go through some that we've talked about

7  internally.

8      Q.   Can I stop you?  When you say "we" talked

9  about internally, who is "we"?

10     A.   Well, some of it would be with counsel.  So

11 I want to identify which ones are that.  But I would

12 say that they're not really at the counsel advice.  I

13 would say another is with members of my leadership

14 team around how we would do this; it would be a

15 natural topic of conversation.

16     Q.   Thank you for that definition.

17     A.   Okay.  I would say that the first thing that

18 comes to mind is that we would do the kind of

19 training that we should do and need to do with the

20 lawyers on staff as well as and particularly the

21 nonlawyer staff to understand these boundaries.  Some

22 of these lawyer obligations are intuitive, but many

23 are not.  Many are borne out from years of experience

24 with problems in the profession or with the public

25 and are not obvious.  So I think people need to be

1    trained.  They need to understand and they need some
2    repetition in that regard.
3            And we need to take situations where we've
4    fallen short and use those as examples to do that
5    better, someone what a law firm would do for
6    nonattorney staff.  But I think it's heightened in
7    the environment where most of the staff is
8    nonattorneys.
9            I think another area that's important is
10   ensuring the independence of the attorney.  We've
11   talked about a number of things that buttress the
12   independence of the attorney, both from a governance
13   perspective as well as their own individual
14   obligations under rules of professional conduct.
15           But in as many ways as we creatively and
16   effectively can, work to ensure that independence,
17   that there's not untoward influence of an attorney
18   applying his or her judgment to a client's scenario
19   and issue.
20           Then there's confidentiality.  I think
21   confidentiality comes neatly behind those first two.
22   I think confidentiality, from a mechanical sense, is
23   not that difficult because of how systems are today,
24   how software systems are today, how note-taking
25   systems are today and how relatively easily

1   mechanically they are separated and access is
2   restricted or allowed.  So that part is relatively
3   easy.  But I think there are other things that we
4   would have to creatively address.
5           Even though attorneys might be in a segment
6   of the office, where are the overlaps?  Where are the
7   common conference rooms?  Where are the walls?  Those
8   kind of things have got to be looked and addressed.
9   Much like any law firm that had other kinds of
10  businesses next door or common lobbies or whatever,
11  we have to be careful about that.
12          And another thing that I really believe
13  firmly in is that we should not and would not handle
14  trust accounts.  We would not handle client funds.
15  Not only is it irrelevant to the -- literally
16  irrelevant.  I can't think of a scenario, at least in
17  my history and practice in employment law, that trust
18  account funds were required or necessary to complete
19  the service and do an excellent job for the client.
20          You can take trust money from a client, but
21  in that environment, I just never did and saw no need
22  for it.  So one of the things we think through is
23  that we would not accept money that should be in a
24  trust account.  Would not open or manage a trust
25  account.

1          Another area is, you know, all the rules
2    around advertising, all the rules around what you
3    say, what you can't say, we would have to figure out.
4    I'm not expert today in it, but we would have to
5    figure out or the leadership, if it's an attorney,
6    would have to figure out, or we'd have to get outside
7    advice to figure out what parts of those rules apply
8    and how to comply with those rules where it's less
9    about perhaps advertising to the general public and
10   more about communicating to the members.  To some
11   degree, communicating with prospective members, where
12   legal services a line item on a list of services
13   available.
14          So we'd have to figure that out.  It's not
15   the classic billboard lawyer scenario or the classic
16   post-traffic ticket scenario.  But there are issues
17   related that we'd have to figure out or solve.
18          Conflicts, we've talked about a little bit.
19   I think conflicts -- I've read some rules around
20   conflicts checks in this sort of scenario, this sort
21   of multimember association scenario.  And I
22   understand and believe in the fact that a conflicts
23   check needs to be done in that scenario, but also in
24   the rules indicated that the conflicts check can be
25   in some way tailored to the context of that check.

1  And so we'd have to find out what that tailoring is.

2  To what degree can it be tailored or streamlined and

3  still be effective and compliant.  So that kind of

4  thing has got to be worked out.

5       We have peer organizations around the

6  country that provide legal services through their

7  corporate structure, through their (c)(6) structure.

8  This is not an uncommon thing and there are models

9  there, and we have had some discussions with them

10  about how do you do this.  And certainly if the day

11  comes that we're allowed to do this, we're going to

12  spend more time with them and engage with them on

13  what has worked well for them and what hasn't.  But

14  that's certainly a topic area that has to get a lot

15  of energy.

16       I would say then we would also, to be

17  abundantly cautious, provide malpractice coverage.

18  It could be under a professional liability policy,

19  maybe not titled malpractice.  Maybe it is titled

20  malpractice.  We'd have to investigate that.  The

21  point is we'd need to find out what we should do

22  there, what provides protection to that member

23  organization.

24       Yet again in the context of less possibility

25  for a claim arising in this practice area in this

```
 1    context.  Certainly that was my experience in private
 2    practice.
 3           I'm going to say that we would have offices
 4    that are segregated, that are separate.  We're
 5    certainly intent on that and have already done that
 6    physically in the prepaid plan context, but I think
 7    it's a good practice to continue into the law
 8    practice context.
 9           In the prepaid context, not only are these
10    offices provided separate from and separated by
11    conference space, as opposed to office space, from
12    other offices in our building.  And we'll be
13    separately labeled on the glass to each office about,
14    in this case Soule employment law firm, but in the
15    future case it is labeled as "attorney offices."
16           The hallway in our current office is labeled
17    with prepaid plan services provided by Soule
18    employment law firm.  So that kind of mentality has
19    got to continue in the right way, in the relevant
20    way, into the providing of legal services by staff
21    counsel.
22           And then let's see.  I think that's it.
23    Q.    All right.
24    A.    I think that's it.  But it's that type of
25    thing, and a number of those are addressed in these
```

1  documents I've referred to you today.

2     Q.    One thing I want to make sure I understood

3  on the last point.  Is the Soule Law Firm going to

4  have offices within CAI's offices?

5     A.    The Soule Law Firm's office will not be in

6  CAI's offices.  But the attorney that the plan has

7  engaged away will be, and that was a provide in

8  Alice's letter, yes.

9     Q.    So the Soule Law Firm primary office will be

10 at another site or location?

11    A.    Yes.

12    Q.    But they will have an attorney who will be

13 working full time within the CAI offices?

14    A.    Yes, working for the Soule Law Firm but

15 located in the CAI offices.

16    Q.    I didn't understand that.  So thank you for

17 that clarification.

18        Would CAI consider every member who has paid

19 its membership fee to be a client, the

20 attorney-employee from the beginning of the

21 membership?

22    A.    I don't think so.  That's one of the things

23 we would have to iron out with good ethics advice.  I

24 don't think so.

25    Q.    When would client status arise?

365

```
 1        A.   When the request and the need for legal
 2   advice arises and the appropriate checks and
 3   gatekeeping has occurred.
 4        Q.   So in the period of time where legal advice
 5   was being received by the member, they would have
 6   client status?
 7        A.   I'm not sure I follow you.
 8        Q.   For the period of time that the member was
 9   receiving legal services, they would have client
10   status, as you're stating it?
11        A.   Yes.  It would be a client of the lawyer and
12   the legal service.
13        Q.   And whatever that legal services matter was
14   came to a conclusion and was a period of time before
15   they next needed legal services, would they be a
16   client or not then?
17        A.   My hope is -- I can't answer your question
18   until we get there and spend money and time figuring
19   this out.  My belief and hope is that once an
20   engagement has occurred and that conflicts check has
21   occurred, that for some reasonable period of
22   time -- and we'd have to be conservative within our
23   view of this -- that client is prequalified for
24   another call without the same level of conflicts
25   check and engagement.  In other words, "prequalified"
```

Case 1:15-cv-00083-LCB-JLW  Document 121-1  Filed 06/16/17  Page 94 of 134

1   is my word.  That may not be a word in the rules.

2   But much like you would in a law firm, you wouldn't

3   do a check on the next conversation; you might on the

4   next piece of litigation with parties involved.  So

5   that's my belief and my current intent, subject to

6   getting advice on that.

7       Q.   If CAI had a member who was a client with an

8   active matter, in this scenario that you're

9   requesting the court to follow, but did not pay its

10   membership dues for the next year and the matter was

11   still active, whatever it was, would CAI continue to

12   provide legal services to the member or would some

13   other course be followed?

14       A.   Well, two things on that.

15       One is that it's going to be in this

16   scenario very rare to have an active matter that has

17   that kind of length to it, that has that sort of

18   litigation length to it.

19       Assuming that it did.  Assuming there was

20   something that went beyond relatively isolated

21   questions and issues, which is the division and the

22   reality in these kind of scenarios to date around the

23   country, but it had an extended nature and the client

24   stopped paying its membership dues, my belief is

25   that, as you would in any civil matter, if you're

```
 1    going to stop being paid and can't make alternate
 2    arranges, such as a fee-for-service arrangement to
 3    continue it, that you could withdraw from that matter
 4    within ethical bounds.
 5        Q.    So part of the plan would be to withdraw in
 6    that context?
 7        A.    Within in ethical bounds, yes.
 8        Q.    What if a member tried to obtain legal
 9    services, but over time, or every time for that
10    matter, there was some conflict that would prevent
11    CAI from providing services, would the membership fee
12    or some portion thereof be refunded to the client?
13        A.    That's not our plan.
14        Q.    If CAI were to be successful in this case,
15    should the judgment be dependent upon CAI maintaining
16    the current corporate form?
17        A.    In what sense?
18        Q.    Exactly the sense I stated.
19        A.    I don't understand the question.
20        Q.    You're asking, I believe, for injunctive
21    relieve.  So would the injunctive relief be dependent
22    on CAI keeping the exact same corporate form, or do
23    you know?
24        A.    Well, the reason I'm hesitating is that I
25    think I forecasted to you that if we're successful in
```

```
 1   the litigation and it enhanced our ability to comply
 2   with the rules and prevent any potential issues with
 3   service within ethical bounds, there may be a
 4   desirability to set up an additional entity.  I just
 5   am not there yet.
 6       Q.   Would that be a not-for-profit entity or a
 7   tax-exempt entity, or would that be a for-profit
 8   entity?
 9       A.   I can't say.  My belief is that if it's gone
10   to project work by a lawyer, that it's probably
11   taxable and shouldn't be tax exempt.
12       Q.   So it would be a for-profit?
13       A.   Probably.  Probably.  That is, the
14   fee-for-service part, right?
15       Q.   Actually, the question contemplated not just
16   the fee-for-service part.
17       A.   I'm glad I said that.
18       Q.   You meant the taxable part?
19       A.   Yes.
20       Q.   Yes, I'm sorry.
21            If you had a separate entity, would it be
22   set up for profits?
23       A.   To handle the taxable fee-for-service
24   scenario.
25            The service under the membership side, the
```

Case 1:15-cv-00083-LCB-JLW   Document 121-1   Filed 06/16/17   Page 97 of 134

369

1    telephone advice that we've described that scope of

2    service, my intention is that that would remain in

3    the tax-exempt side.

4         Q.   All right.  So I can talk, but these are

5    your entities, not mine.

6              You contemplate that the legal services

7    would be provided by CAI that were part of the

8    membership services and would not go to a separate

9    entity, but the matters that went to a separate

10   entity would be for profit and that would be a

11   taxable entity.  Am I understanding you right now

12   what you're thinking?

13        A.   Generally.  Let me see if I understand by

14   restating that.

15        Q.   Restate what you intend to do and that would

16   be perfect.  I didn't follow it the first time.

17        A.   This is all subject to additional analysis

18   and advice.  The intent is to be compliant.  To the

19   extent any piece of this is not, it would no longer

20   be part of a plan.

21             The intent is that -- very close an analogy

22   to what we do with an advice HR advice and resolution

23   person today within the membership side, that that

24   person gives unlimited, essentially, telephone

25   advice, sometimes email, et cetera, and that that's a

1  membership service.

2        But when that becomes something customized

3  and narrowed to a customer for a fee for service,

4  they become a customer really as opposed to just a

5  member, then that goes outside of membership and that

6  goes to a taxable line of businesslike like we talked

7  about with HR on Demand.

8        That's the idea I've got today anyway with

9  lawyers, is that to the extent that they provide data

10  information, knowledge, tie a bow kinds of service on

11  an unlimited question call environment, that that's

12  within membership.

13        To the extent they do something fee for

14  service, it's either going to be become taxable as

15  UBIT within the tax-exempt entity or become taxable

16  in a for-profit subsidiary, the existing one or

17  future one.  In some way, we have to respect those

18  matters of the tax code.

19        Q.  So using your scenario that if a call came

20  in, not much different than the A&R hotline, and in

21  this instance, the hotline was for legal services

22  within CAI, and a lawyer responded to a specific

23  member's specific issue and then provided advice

24  either on a call or some continuing amount of advice

25  that was based on the member's specific facts, do you

1  think that would be nontaxable?

2      A.    Let's see.  Let me unpack that and make sure

3  I'm doing it due justice here.

4          To the extent that the lawyer does what we

5  are attempting to do and will do within the prepaid

6  plan -- let's analogize it that to that, that might

7  be better -- the membership included no additional

8  fee service from a prepaid plan, that's what I

9  envision being within membership on a staffed basis.

10         The fee for service kicks in when it becomes

11 a project and it's going to take a significant amount

12 of time and expertise.

13         So as opposed to a more general conversation

14 about what the law is in a way that a lawyer is

15 needed to describe, but now we're going to apply

16 that, we're going to take action based on that,

17 here's how we're going to do this employment

18 agreement to resolve that, we're going to do this

19 noncompete agreement to resolve that, then we're

20 going to fee for service and, in my opinion, taxable.

21         Now, whether that happens as UBIT or within

22 a different entity or whether it happens with a

23 management services agreement, like it does when

24 people cross entities, I can't say for sure.

25     Q.    In terms of the preliminary injunction that

```
 1  prohibited from going to court; that there was some

 2  restriction.  That would be a good example.

 3         It's certainly not my intention, nor do any

 4  of theses peers that I list here, go to court on

 5  behalf of members.  But in sitting down with a group

 6  of associations that may or may not want to -- for

 7  example, Farm Bureau, I believe, was in this

 8  meeting -- they may or may not want to litigate or

 9  defend matters.

10         So in that context, our intent is not to

11  create a second class of lawyer.  I believe that's

12  what -- I believe that's a fairly complete

13  description of what I meant there.

14    Q.   So is that full spectrum goal set out what

15  CAI's goal was in this litigation?

16    A.   No.  This was a goal in respect to

17  legislation.  This was all in the context of

18  legislation.

19    Q.   Is CAI receiving any financial support from

20  any other entities, whether for profit or nonprofit,

21  with respect to the cost of the litigation here in

22  this case?

23    A.   No, not directly.  In using Connie Wilson,

24  we're using some time that the Employers Coalition

25  has purchased for her.
```

1    generally accurate but more narrow.

2        Q.    You mean the opportunity is broader than

3    that is set out there today?

4        A.    Yes.

5        Q.    Background?

6        A.    Background is a good example list of things

7    we might do.  There are additional things.

8        Q.    All right.

9        A.    That is with a staff attorney.  This is not

10   a good prepaid plan concept.

11            The method is limited but accurate.

12       Q.    You would broaden that?

13       A.    Yes.  Certainly our methods would be much

14   more complex and extensive, as we've discussed today.

15            The financing, I think, was a discussion.

16   Today's intention is different.  We don't have an

17   intention to have an additional fee for that member

18   scope of service.

19       Q.    At least not presently?

20       A.    Yes, that's true.

21       Q.    You reserve the right to do that at some

22   other point in time?

23       A.    I'm sorry?

24       Q.    You reserve right that CAI may decide to do

25   that at some other point in time, but you do not have

1   a presently have a plan?  Is that a fair way to put

2   it?

3      A.   We don't presently have a plan.

4          What we wouldn't do on the second page is

5   still largely true.  I think once we can build the

6   attorney staff that we would, in fact, become

7   involved in employee benefits issues, Affordable Care

8   Act being an example, and I think an example that

9   wasn't in existence at the time of this memo, if I

10   recall correctly.  This was still W's time frame, I

11   think.

12         And structure, as I understand it, that idea

13   is not available to us.  And that's, in part, the

14   captive law firm idea that I'm calling for shorthand

15   purposes the captive law firm that we spoke with

16   Alice Mine about.  So I think that's not in the plan.

17      Q.   All right.

18      A.   And then the questions are questions.

19      Q.   Right.

20         And the "background" part, you said you

21   can't do what's in the background with the prepaid

22   legal plan?

23      A.   Which one?

24      Q.   The 10 points that were listed in

25   "background."

1  you.  You're a member.  This is what we're going to

2  do.

3          I just don't have that kind of day-to-day,

4  in-the-moment ability to expand the scope of service

5  on a prepaid plan.

6      Q.   Just so I'm clear, under a prepaid legal

7  plan, are you saying any of these 10 points you're

8  prohibited from doing?

9      A.   I don't think I'm legally prohibited.  I

10 think it's a practical problem.  Not all of them.

11         I'm going to say that we could do a legal

12 opinion on handbooks.  I think that piece is part of

13 the scope of service in the prepaid plan.  Certainly

14 amending templates is part of the scope of service in

15 the prepaid plan.

16     Q.   But if you wanted to, you could put together

17 a prepaid plan that could do all of these 10 things;

18 there's nothing by law that prohibits you from doing

19 that, just to be clear?

20     A.   Well, unfortunately, I'm afraid even No. 8

21 is just how very restrictive the Bar's interpretation

22 is of a prepaid plan.

23         No. 8, "better target legal issues to

24 members' needs in dues, content and programming."

25         In Josh's opinion -- I, again, respect his

1  judgment and his knowledge -- is that we cannot

2  obtain enough information from the Soule employment

3  law firm, from our third-party provider in the plan,

4  in order to do what I said there in No. 8, that

5  that's prohibited in a plan context.

6        So that's a good example of something

7  important and unavailable in a preplan plan

8  environment.

9     Q.   What was done on this issue between this

10  2008 memorandum and 2011 legislative efforts?

11     A.   At some point -- and I'm trying to think of

12  a sequence here again -- I sought legal advice.

13     Q.   Other than seeking legal advice, did you do

14  anything else up until 2011?  And the "you" here is

15  CAI, it's not you personally being clear.  We're

16  sticking with our definitions.

17     A.   Okay.  Oh, sure, yes.  So 2011 was the year

18  that we filed the first bill in the legislature.  So

19  yes, I'm sure I discussed it with my board chairman,

20  our board of directors, many conversations,

21  Connie Wilson, Tammy Fitzgerald, the sponsor of the

22  bill.

23     Q.   So as you came up to 2011, you worked on

24  just the legislation that was put forward in 2011?

25  Is that what your primary focus was between those two

Case 1:15-cv-00083-LCB-JLW   Document 121-1   Filed 06/16/17   Page 104 of 134

1        IN THE UNITED STATES DISTRICT COURT
       FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
2        CIVIL ACTION NO. 1:15-CV-83-LCB-JLW

3  CAPITAL ASSOCIATED       )
   INDUSTRIES, INC.,        )
4                      )
       Plaintiff,      )
5                      )
      vs.              )
6                      )
   ROY COOPER, et al.,     )
7                      )
       Defendants.     )
8

9

10                Deposition of
11              A. BRUCE CLARKE
        VOLUME II - Pages 311 - 493
12          (Taken by Defendants)
   150 Fayetteville Street, Raleigh, North Carolina
13        February 20, 2017, 9:16 a.m.

14

15

16

17

18

19

20

21

22

23

24           Reported in Stenotype By
       Margaret M. Kruse, CSR, RMR, CRR
25  Transcript produced by computer-aided transcription

```
 1                    (Witness previously administered

 2               an oath.)

 3                    A. BRUCE CLARKE,

 4    having been previously administered an oath, was

 5    examined and testified further as follows:

 6                    EXAMINATION (Resumed)

 7    BY MR. DUNCAN:

 8         Q.   Good morning, Mr. Clarke.

 9         A.   Good morning.

10         Q.   We're going to continue the Rule 30(b)(6)

11    deposition for which you've been designated on behalf

12    of CAI this morning.  Thank you for being here.

13              As a reminder, you will recall that for

14    Rule 30(b)(6) purposes, the word "you" means CAI

15    unless I designate you personally.

16         A.   Yes.

17         Q.   You'll recall that was one of our ground

18    rules last time.

19         A.   Yes.

20         Q.   And you recall the other ground rule is

21    we're going to try not to talk over each other and

22    make sure we have an answer that the court reporter

23    can get down on the record.

24              If you need a break, let me know.  If you

25    have any trouble with any of my questions, please ask
```

Case 1:15-cv-00083-LCB-JLW   Document 121-1   Filed 06/16/17   Page 106 of 134

1      A.   Yes, I believe so.

2      Q.   Is there anything in particular that you

3  focused on in terms of the materials you looked at?

4      A.   Some things with counsel.  Other than that,

5  I would say the only thing that stands out in my mind

6  is refreshing myself on how -- the exhibit number

7  escapes me, but the large stack of calls that you

8  have there, how that was prepared.  Some refreshing

9  in my mind about how that information was pulled and

10  prepared.

11      Q.   That would be Exhibit 77 that you're

12  referring to?

13      A.   That would be Exhibit 77.

14      Q.   All right.  And when you went to refresh

15  yourself on how it was prepared, what did you learn?

16      A.   It wasn't so much a learning as a

17  refreshment of the original learning was that that

18  exhibit was prepared by really two primary methods.

19           One was to pull through our notes or

20  database system every item in that time period that

21  was marked or the box was checked "referral."  So if

22  that box was checked in that conversation or that

23  record of that conversation, then it was pulled and

24  placed in Exhibit 77.

25           And then the other primary of pulling

1  Exhibit 77's contents was to word search in that same
2  database for attorney -- the words such as attorney,
3  legal, lawyer, so that it would pull up records of
4  conversations where our advisor had referenced
5  attorney, legal or lawyer, which would tend to, we
6  believe, capture most or all of those situations
7  where our advisor says, "You need to talk to an
8  attorney.  This has become legal; you need to see
9  your lawyer."
10        So it was those two primary methods of
11  pulling the data in Exhibit 77.
12     Q.   Let me ask you about the first method.
13        Was that a paper document or an electronic
14  checking of a referral box that you referred to?
15     A.   Yes.  The box is in an electronic software
16  as a service-type system.
17     Q.   And so for all the calls that come in, they
18  go into an electronic system to make a record of all
19  the calls you received?
20     A.   That's where the advisors log their calls.
21  So nothing will automatically happen.  It's not
22  connected to the phone system.  It wouldn't record
23  that a call came in, for instance.  It's going to
24  depend on that advisor to open up that member's
25  record and type information or cut and paste

1  information.

2      Q.   As an advisor gets a call, your

3  understanding of the system is they are supposed to,

4  in fact, open up in the system a record for that

5  call?

6      A.   It requires a person to open it.  It won't

7  open automatically as some do.  This one does not.

8          Some advisers will pull the record up

9  contemporaneously with the call as it happens.

10  Others will take a note for the day, and at the end

11  of the day or middle of the day, either one, log

12  their calls.

13      Q.   But your understanding is every call that

14  they got ultimately is supposed to be logged into

15  this system?

16      A.   That's the intention.  Always and never are

17  big words.

18      Q.   So you believe that to be the case, there

19  may be some relatively rare exceptions where somebody

20  forgets to do it or something like that is I think

21  what you're saying?

22      A.   Yes.

23      Q.   Have you read the transcript of the first

24  part of your deposition testimony?

25      A.   I have not.

1  asking about.

2      Q.    You don't know that it was inaccurate, but
3  it was testimony that surprised you?

4      A.    Yes.

5      Q.    Anything else that you can think of right
6  now?

7      A.    I think Dale also said -- Dale Jenkins also
8  said -- I believe said he had not read the bylaws or
9  the -- I forget if it was the bylaws or the charter
10 or both of CAI, and I know that he and I have gone
11 over them together in the past.  Whether he's read it
12 cover to cover in the past, I'm not sure.  But he and
13 I have gone over it.  I would say that was an
14 inconsistency that I observed.

15     Q.    Would you put that under the category that
16 he was testifying inaccurately or just something that
17 surprised you?

18     A.    Just probably a reflection of memories,
19 different memories.

20     Q.    You recall Dale Jenkins testified that
21 Medical Mutual members are able to use CAI services?

22     A.    I recall he talked about a service we
23 provide his policyholders, yes.

24     Q.    Can you tell me what the extent of the
25 services are that were available?

1      A.    Yes.

2            CAI provides a limited service to

3    policyholders of Medical Mutual that Medical Mutual

4    designate.  Medical Mutual designates that

5    policyholders eligible for this service, so I don't

6    think it's all of their policyholders, but it's some

7    substantial number of them.  And those are -- we're

8    provided the information on those policyholders,

9    their identity, so we know they are eligible for the

10   service.

11           And then we provide those policyholders

12   access to essentially a hotline, essentially a phone

13   number, an 800 number or a triple 8 number under the

14   name HR Experts.  It's called HR Experts.  It's not

15   called CAI.

16           And these policyholders are able to call

17   that 800 number -- typically it's the practice

18   manager at a doctor's practice -- and ask

19   workplace-related questions of the adviser.

20     Q.    So in addition to getting the name of the

21   policyholders that are qualified or eligible for this

22   additional service through Medical Mutual, do you

23   have contact names within those policyholders?

24     A.    I believe we do.

25     Q.    So that if I say I'm Joe Smith from X, Y, Z

1   practice, you can check and see that Joe Smith is an

2   authorized contact person for the X, Y, Z practice?

3        A.   We work hard to do that.  Some will provide

4   it, some don't engage actively with it.

5        Q.   Are there multiple contacts for some of

6   these policyholders?

7        A.   I believe, but I'm not certain of that.

8        Q.   And when you say you believe so, that would

9   be multiple contacts that CAI would have records of,

10  they'd have the name of the policyholder and the

11  authorized contacts would be Jill Doe, Jane Doe and

12  Joe Doe?

13       A.   Yes.  I think it would be more typical that

14  there would be zero to one contact.  Zero being the

15  doctor practice that has not engaged in this.  One

16  being the typical average doctor practice.  And then

17  there could be some large fairly -- I'm fairly

18  confident there are some larger practices that might

19  have more than one contact.

20       Q.   Do these policyholders have access to what

21  we've called the A&R line that is available to

22  members of CAI such as Medical Mutual?

23       A.   That's what they get access to is that

24  hotline capability.  They won't get any other things

25  that come in the membership basket.

1            Let me be complete about that.  They get the

2    hotline call capability.  They get a -- I'm going to

3    say it's quarterly -- I believe it is still

4    quarterly -- newsletter for those doctor practices on

5    workplace issues.  And they get a 24-hour access,

6    Internet-based compliance-oriented web service that

7    we don't provide.  We purchase and provide it to

8    them.

9        Q.    So you used the term HR Experts is what we

10   call this service to these policyholders?

11       A.    That's what it's labeled, yes.

12       Q.    Is it actually the same thing as your A&R

13   line, or is there some distinction between those two?

14       A.    Yes, there's a distinction.  A caller may

15   get somebody that's on the A&R team, of course.  They

16   will get somebody that's on the A&R team, but they

17   will not get somebody on the A&R team to provide or

18   explain data, survey results, the learn-and-go

19   templates, the HR toolkit or legal toolkit or any of

20   those other resources that members receive.  So yes,

21   they're going to get a conversation with a member of

22   the A&R team, but it's narrower.

23       Q.    So the HR Experts is the same thing as

24   calling the A&R line and you get the A&R respondents

25   but there's limitations on those services compared to

1  the members who call the A&R line; is that a fair way

2  to look at it?

3      A.   Yes, it is.

4      Q.   Are there any other limitations other than

5  the ones you've already expressed for what the

6  HR Experts line provides as opposed to the A&R line,

7  or do you think you've summarized that fairly?

8      A.   I think we've summarized that fairly.

9      Q.   What does Medical Mutual pay for that

10 service, that is, the service of allowing some number

11 of policyholders to have access to this A&R line

12 limited services?

13     A.   Sure.  So there are several thousand

14 policyholders encompassed, and the annual cost of

15 that is about $175,000.

16     Q.   Is that paid by the policyholders or paid by

17 Medical Mutual?

18     A.   Medical Mutual.

19     Q.   At least as to CAI, it's paid by Medical

20 Mutual?

21     A.   Yes, of course.  The funds originate with

22 the policyholders.

23     Q.   You said Medical Mutual has several thousand

24 policyholders?

25     A.   Yes.

1      Q.   Do you know the number approximately of

2   policyholders who have access to the CAI services

3   under the limited A&R line process?

4      A.   In a very ballpark way, 3 to 4,000.

5      Q.   Are any of those policyholders outside of

6   North Carolina or, so far as you know, are they all

7   in North Carolina?

8      A.   Yes, some are outside North Carolina.  I

9   think it would be fair to say that this group is

10  Virginia -- primarily North Carolina, but then they

11  add Virginia, Georgia, I believe.  And I think those

12  are the three primary states.  I want to say some in

13  South Carolina, but I'm more confident of Virginia,

14  North Carolina, and Georgia.

15     Q.   In terms of CAI members, that is, not

16  Medical Mutual, not just CAI members, are any of them

17  outside North Carolina?

18     A.   CAI members?

19     Q.   Yes.

20     A.   We have -- I would say two categories where

21  that can happen.  One is where -- to give you a broad

22  answer to it, one is where a company is a member here

23  and we provide some service to a location that is

24  outside of North Carolina.  So that happens.

25          And then the only other category where I

```
 1   BY MR. DUNCAN:
 2       Q.   All right.  Does CAI report the income as
 3   taxable or tax exempt from the income it receives
 4   from Medical Mutual for the service that is provided
 5   to its policyholders?
 6       A.   Yes.  That goes in a tax-exempt category
 7   under the category of delivery of educational
 8   resources.
 9       Q.   All right.  I'm going to hand you what's
10   been marked as -- well, strike that.
11            Let me ask you one more question before I go
12   to the next exhibit.
13            Were any Medical Mutual members who were not
14   separately CAI members listed in the A&R call log,
15   Exhibit 77, that you checked on?
16       A.   Okay.  So is there anybody in Exhibit 77 or
17   any organization in Exhibit 77 that's a Medical
18   Mutual policyholder but not a CAI member?
19       Q.   Yes.
20       A.   I don't know.
21       Q.   There could be?
22       A.   Could be.
23       Q.   How would you be able to tell as you look at
24   the records?  You talked about these forms that are
25   completed electronically.  Is there something on the
```

1  form that would tell you?

2     A.    What I wanted to do was look at Exhibit 77

3  just to see if I see a reference to Medical Mutual.

4     Q.    Excuse me.  Let me give you a clean one.

5  That's my marked copy.

6     A.    Okay.  I found one responsive, I think, to

7  your question.

8     Q.    Give me a page number, please.

9     A.    Yes.  Page 16 of the version you gave me.

10    Q.    And this would be Exhibit 77?

11    A.    Yes.

12          So you'll see line 92.

13    Q.    Yes.

14    A.    Carolina Anesthesiology PA.

15    Q.    Yes.

16    A.    It's not labeled Medical Mutual anywhere I

17  can see on that line, but if you look in the text of

18  the detail it says, "Contact HR Experts or legal

19  counsel before responding when the time comes to do

20  so."

21    Q.    All right.  So HR Experts would be this same

22  A&R line with the limited services; is that right?

23    A.    As we discussed earlier, yes.

24    Q.    And the legal counsel would be -- contacting

25  a lawyer would be the reference there, would that be

1  right?

2  A.   Yes, that would be right.  And my

3  understanding is that's how that entry got into

4  Exhibit 77, because it says "legal" or "counsel" or

5  "attorney" or "lawyer."

6  Q.   And so what causes you to believe that's a

7  nonmember but a policyholder of Medical Mutual is the

8  HR Experts line?

9  A.   That and the name of the entity, Carolina

10  Anesthesiology.  So that combination makes me

11  confident that that's from that Medical Mutual

12  process.

13  Q.   You know of your own memory that's not a

14  member of CAI?

15  A.   No.  No.  But I'm putting these pieces

16  together and it gives me confidence.  It doesn't give

17  me absolute.

18  Q.   So it's your belief as you look at that as

19  an example where we could, in fact, see policyholders

20  contained in these Exhibit 77 materials that had been

21  provided?

22  A.   Yes.

23  Q.   About contacts to the A&R line?

24  A.   Yes.

25  Q.   And I'm not going to ask you to keep looking

1 but there could be others?

2     A.   Yes, there could be, yes.

3     Q.   Do you know if there are any Medical Mutual

4 policyholders who are otherwise also members of CAI?

5     A.   Yes, there are.

6     Q.   And are they eligible for both services,

7 that is, the policyholder service through their

8 Medical Mutual policyholder status as well as the CAI

9 member benefits, or are they handled some different

10 way?

11     A.   They're eligible because one is a subset of

12 the other.  So yes, they're eligible for that same

13 educational resource and that same method of

14 delivery.

15         I'm not sure, honestly, you know, if they're

16 going to continue to get that quarterly newsletter I

17 mentioned as a policyholder of Medical Mutual once

18 they become a member of CAI, I'm not sure how that

19 exactly works.  But the concept is correct that

20 they're eligible for both, one being a subset of the

21 other.

22     Q.   To your knowledge, are there, in fact, some

23 Medical Mutual policyholders that are eligible for

24 the HR Expert services that are also members of CAI?

25     A.   Yes.

Case 1:15-cv-00083-LCB-JLW   Document 113-1   Filed 05/22/17   Page 92 of 127

1    Q.    Do you have an approximate number on that?

2    A.    I could give you that same good-faith

3  ballpark estimate.

4    Q.    That's all I can ask you for here.

5    A.    I'm going to say under 10.

6    Q.    All right.  So at least one?

7    A.    Yes.

8    Q.    And no more than 10 is your best --

9    A.    That's my good-faith, ballpark estimate.

10    Q.    Just trying to make sure.

11          Let me go to Exhibit 25, which has been

12  previously marked.  Exhibit 25 was previously marked

13  in the deposition of another witness, so it's the

14  first time you've seen it.  If you need to take a

15  second.  Actually, I think you did see it during your

16  initial deposition; I take that back.

17          This says it's from you to Alice Mine as of

18  April 16, 2013; is that correct?

19    A.    Yes.

20    Q.    Did you actually prepare this entire memo or

21  was someone else involved with the preparation of it?

22    A.    I prepared 100 percent of the email in the

23  first page.

24    Q.    Okay.  What about the memo on the second,

25  third and fourth pages of this document?

```
 1      A.   My memory is that I prepared 100 percent of
 2  that with review and possible edits from John Gupton,
 3  but I'm struggling with whether John was still there
 4  and not on military leave at the time.
 5      Q.   Why was this document prepared?
 6      A.   It was prepared in response to Alice Mine's
 7  and others from her team, Tom Lunsford being one and
 8  Keith Kapp being a volunteer officer at the time, a
 9  response to their invitation to send them a set of
10  facts, send them a set of plans or potential services
11  that we wish to provide, and they, in turn, would
12  respond with ways they felt might meet that need.
13  And it was in that vein.
14      Q.   Would you consider this a follow-up to the
15  April 10, 2013 meeting that you had with Mr. Kapp,
16  Miss Mine and Mr. Lunsford?
17      A.   Yes, I would.
18      Q.   Can you generally describe for me that
19  meeting.
20      A.   Sure.  Sure.  Sure.  Sure.  I'd be glad to.
21           We met in Keith's office.  I've known Keith
22  a long time.  He had called me about this and about
23  coming to meet, and I agreed to do that.  I made it a
24  policy throughout this quest to meet with everybody
25  that wants to learn about it and wants to hear about
```

Case 1:15-cv-00083-LCB-JLW   Document 121-1   Filed 06/16/17   Page 110 of 134

394

1  it, even if they don't agree, just to make sure that

2  I've been communicative and transparent about what

3  we're trying to do and why.  This meeting was in that

4  vein as well.

5          And we talked about -- in that meeting, we

6  talked, at least in big bucket ways, we talked about

7  our legislative activity and history on this.

8          We talked about a verbal version of this

9  memo in Exhibit 25, you know, the concepts of the

10  things that we want to do.  And my memory is that

11  prompted Alice Mine to say, well, please prepare --

12  if you're willing, prepare a more thorough, written

13  version of what we just discussed, a more complete

14  version, and we will -- I forget what she called it.

15  But we will take a look at it from an ethics or

16  ethics committee point of view and suggest ways that

17  you might do what you want to do without resort to

18  the courts and without a legislative change.

19      Q.   In fact, after you send this, did Miss Mine,

20  good to her word, commit to an ethics committee

21  review?

22      A.   Yes.  I'm not sure how to label it, but she

23  did get a review.  She had a committee look at it and

24  she sent me a response.

25      Q.   Did she also provide suggestions about how

1  perhaps you could accomplish what you were trying to

2  accomplish through, for example, legal prepaid

3  services?

4      A.  No.  She did outline legal prepaid plan, but

5  she didn't get close to what I was trying to do.

6      Q.  So would it be fair to say it's your

7  testimony that a legal prepaid plan is not close to

8  what you, CAI, want to do?  Is that your testimony?

9      A.  I would say that's fair.

10     Q.  Is this document -- I'm really referring now

11  to the three-page document.

12     A.  Yes.

13     Q.  Is that a preexisting document or was that

14  made from scratch to submit to the State Bar?

15     A.  It was made after the meeting we just

16  discussed.  So it was made from scratch in its form.

17  The concepts appear, I'm sure, in other places in

18  other ways.

19     Q.  So was there some element of cutting and

20  pasting it together from already existing information

21  or was it all completely new?

22     A.  No cutting and pasting, just pulling from

23  memory from past conversations and past writings that

24  we've seen in the discovery process here.

25     Q.  If you look in the second page of this at

1    we've seen in discovery.

2        Q.   And it shows a copy to Rick Washburne.  Who

3    is Rick Washburne?

4        A.   **Rick Washburne manages the advice and**

5    **resolution team.**

6        Q.   And the reason he's copied on this document

7    is because of the potential overlapping of services

8    related to the A&R line and the thought of having a

9    legal services team?

10       A.   **I'm sure that's one of the considerations.**

11       Q.   Do you agree with the accuracy of the

12   content of this document as you recall it?

13       A.   **I'd have to read it.  I'd really have to**

14   **read it.  I believe I feel good about the content**

15   **being John's ideas and John's opinions.**

16            **I suspect today I wouldn't support some of**

17   **these things, you know, some of these possibilities**

18   **and plans as things have developed over the years.**

19   **But to be more specific, I really need to read it.**

20       Q.   Let me ask you a different question then.

21            Did you believe at the time the memo was

22   prepared that it was a fair summary of the thought

23   process of CAI about the development of these legal

24   services efforts?

25       A.   **I think it's a fair summary of John's**

1    thought process.  Even at the time there were things

2    that I would not have agreed with.

3           I can point to an example at the bottom of

4    page 1.  The title of the leader of the section would

5    be vice president, legal services department.  I'm

6    not sure that's what we would do or would want to do

7    or that we would even want this to remain either

8    under Rick Washburne or influenced by Rick Washburne.

9           So there are some essential foundational

10   structural decisions that would have to be made if we

11   went forward.  The important thing was to start

12   talking about this and thinking about how it might

13   go, not to outline a plan that we all were behind its

14   implementation and ready to assign a calendar and

15   accountabilities to.

16      Q.    Do you know if this plan was ever approved

17   by the CAI board or presented to the CAI board?

18      A.    I do not believe that it was.

19      Q.    So your recollection is this was a document

20   that was internal to the staff of CAI?

21      A.    Internal to these recipients and to spur a

22   discussion.

23      Q.    Under organizational structure on the first

24   page of this document, it indicates that the legal

25   department would consist of one attorney at the start

```
 1   of that sentence.  It goes on to say would "obviously
 2   grow to include additional attorneys and paralegals."
 3        Do you see that?
 4   A.   Yes, I do.
 5   Q.   Would there be any employees, any other
 6   employees assigned to the legal department under this
 7   organizational structure?
 8   A.   This 2014 document, assembled and written,
 9   in part, by John Gupton was, I believe, under the
10   idea that this would be a staffed legal service.
11   That's clearly not what we have today and not what
12   we're allowed to do today.  So it would be
13   overstating this thing to describe it as a plan or as
14   an implementation if I remembered your question
15   correctly.
16   Q.   Well, I think if you look at the third line
17   of your "goal" it says, "when the laws change to
18   allow this."
19        Do you see that?
20   A.   Yes.
21   Q.   Does it appear to be forecasting the plan
22   for CAI if CAI, for example, is successful in this
23   lawsuit or is in some other manner successful with a
24   legislative initiative of some sort?
25   A.   I think that's fair.
```

1    Q.   So it's more a forecast of what you would do

2  if you were permitted to go forward with some form of

3  plan; is that a fair way to put it?

4    A.   It's a forecast of what John and Rick and I,

5  some combination, thought we could do.  I resist

6  "would do."

7    Q.   Do you have a plan of how you would go

8  forward if you were successful in this litigation or

9  of some other form of legislative process?  Do you

10  have a plan that updates this plan on what you would

11  do, this December 2014 plan?

12    A.   Right.

13      MR. PHILLIPS:  Objection to form.

14  Characterization of the testimony.

15  BY THE WITNESS:

16    A.   I would say no in any sort of formal who

17  reports to who, how many of who, where it sits, what

18  it's under, what it's above, what it's next to.  I

19  would say no, that we haven't gone further with that,

20  primarily because of the length of time and

21  complication and expense to get this to happen.

22  BY MR. DUNCAN:

23    Q.   So are all these kinds of things in the

24  to-be-determined type category?

25    A.   No, I don't think that's right.  I think

1   your question was, do I have another plan in this

2   vein, and I would say no.  I would say that we have a

3   lot of planning that talks about the end result.

4   This is what we want it to look and feel like and do

5   for these member companies.

6           Exactly who sits where and who reports to

7   who is to be determined.  I can give you an example

8   of what I mean by that, if you like.

9       Q.   Sure.

10      A.    If either a legislative solution or a

11  judge-made solution appears that allows us to staff

12  this, one or both of those solutions might have some

13  limitations or direction in it.  Certainly our bills

14  at the legislature had limitations and had

15  specifications about what could be done and not done.

16          So either of those, I expect, could impact

17  how this is actually implemented and rolled out.  So

18  it has limited value to me in planning for that until

19  I know what the parameters are of that structure.

20      Q.   So is it fair to say that under

21  organizational structure and leadership and staffing,

22  the first two categories on this first page, that CAI

23  does not have definite plans for how to proceed but

24  is rather in a posture of wanting to see what the

25  court resolution would be on this issue and/or a

1  legislative impact would be on this effort?

2     A.   I would say those two things, legislative

3  and court order perspective are very significant.

4        I think the other is at the time under the

5  circumstances at that time, with the limitations of

6  those two items you just mentioned, what's going to

7  not only keep CAI in compliance with Bar rules and

8  regulations and ethical standards, also keeps CAI in

9  compliance with tax-exemption standards and do that

10 structurally in a way that works for that, that keeps

11 us in alignment with what the board expects of us,

12 whatever governance comes from the board to help

13 maintain our compliance and our effectiveness.  All

14 those things would play into it, and I think

15 legislative and court are two good examples.

16    Q.   Do the current plans have that legal

17 department employees would also provide nonlegal

18 services to CAI employees, if there are such plans?

19    A.   My current thinking on that is best outlined

20 in the Alice Mine memo we just looked at.  I forget

21 the number.

22    Q.   Exhibit 25?

23    A.   Exhibit 25.

24        As I recall in that memo, it might be the

25 most complete description of what we want to present

     1   to members, why we need to do it through a change in
     2   the law and why something like a prepaid plan is not
     3   more than 50 percent effective.  Is it in that memo?
     4          A good example to your question is we would
     5   have staff lawyers do things other than provide legal
     6   service.  We would have staff lawyers -- again, for
     7   this cost and efficiency and sustainability point --
     8   we would have them, for example, teach programs.
     9          As I understand Alice Mine's response to my
    10   Exhibit 25 letter and memo to her, under a prepaid
    11   plan, we cannot access an attorney that works --
    12   that's authorized under the plan and works for a
    13   third-party law firm, we cannot use that attorney to
    14   teach classes, that being just another one of that
    15   long list of examples of why the prepaid plan doesn't
    16   work for us in the legal term.
    17      Q.   Would the legal attorneys also work in other
    18   CAI departments?
    19      A.   Other departments?
    20      Q.   Yes.
    21      A.   I would say no.  Work in other departments,
    22   I would say no.
    23          Do work that is managed by the departments,
    24   yes.  Training is an example of that.  But that work
    25   is managed by the learning services group.

Case 1:15-cv-00083-LCB-JLW   Document 121-1   Filed 06/16/17   Page 114 of 134

1    Q.    Would the legal department at CAI work with

2  CAI Services Corporation?

3    A.    As currently structured with the entity and

4  the work that's in Services Corporation, they could.

5  There could be some need for legal advice related to

6  background checking.

7         But in a vigor, or kind of a broader

8  question perspective there, that's one of the kinds

9  of decisions that has to be made.  In other words,

10  does all of the staffed legal services stay under one

11  entity?  Is it shared by two, the nonprofit and the

12  for-profit subsidiary?  What is right from an ethics

13  compliance perspective?  What is right from a tax

14  compliance perspective?  What's right from a service

15  perspective?  All of those areas have to get

16  harmonized.  And they're not yet harmonized; we're

17  not there yet.

18    Q.    You noted on the second page of this

19  document, Exhibit 85, that there was a bullet point

20  listing of legal services to be provided.

21         Is that an accurate list of services that

22  CAI wants to offer?

23    A.    Let me just look at the list, okay?

24    Q.    Yes.

25    A.    I would say mostly, but there's some

1  exceptions to that.

2      Q.   When you say "exceptions to that," are there

3  some things on the list that CAI would not want to

4  offer?

5      A.   Yes.  I see one specifically that as things

6  have evolved I really don't think we want to do.

7      Q.   What is that?

8      A.   Pieces of that third bullet point,

9  representation before state and federal

10  administrative agencies; I don't think we want to be

11  involved in NLRB representation.

12     Q.   Any other piece of that third bullet point?

13     A.   I don't think so.  I think the rest of them

14  are probably still good, current intentions.

15     Q.   All right.  Anything else that would not be

16  on your list currently that is set out on this memo

17  in the bullet points?

18     A.   Yes.

19     Q.   What else?

20     A.   I would say that affirmative action

21  compliance is not something we would do through

22  attorneys.  We do that successfully and cost

23  effectively now without attorneys.  So to the extent

24  that bullet implies we would do affirmative action

25  plans with attorneys, I'd say that's not my intention

Case 1:15-cv-00083-LCB-JLW   Document 106-1   Filed 05/18/17   Page 62 of 81

405

1  today.

2      Q.    Anything else on this bullet point list that

3  would not be included based on CAI's intention today?

4      A.    Certainly some pieces of this would be in

5  that membership service side that we talked about, I

6  think, in our last meeting.  And some pieces of this

7  would be in some sort of fee-for-service side.

8           So certainly with that understanding, this

9  is not all member service oriented.  But those are

10 two that stand out to me that are not in my current

11 intention.

12     Q.    Are there any that are not on this list that

13 would be part of your CAI current intention because

14 they're not covered by the bullet points on this

15 list?

16     A.    I would say yes, and I think the best

17 document to go to for that is my memo to Alice Mine,

18 Exhibit 25.

19           I found one more.  There's one more.  Not

20 current intention?

21     Q.    Yes.

22     A.    Near the middle of the list, immigration

23 issues; we have no current intention to seek or

24 sponsor immigration visas.

25     Q.    Thank you.

1    affordable legal services at key points in time."

2    That's part of our plan and our desire and our goal.

3        Q.    Does that tell me what legal services are

4    being contemplated?  That's what I'm trying to find

5    out is what legal services CAI is contemplating and

6    that sentence doesn't seem to aid in that search,

7    does it?

8        A.    Well, I disagree with that.  I disagree with

9    that because this is -- this whole quest I'm calling

10   it, this whole desire to change the law is not just

11   about a service that we will provide but how it's

12   provided, at what cost it's provided and what

13   timeliness it's provided, the level of knowledge and

14   depth of the provider, that that's all part of what

15   we want to serve.  In fact, it's as important as any

16   particular service.

17       Q.    Well, to be real clear on this question, I'm

18   trying to find out what are the services contemplated

19   by CAI at this time to provide, which appear to be

20   contemplated by the list we were looking at on

21   Exhibit 85, and you helped refine that list further

22   in your testimony.

23             But you also pointed to Exhibit 25 for

24   services to be provided, and that's what I'm focusing

25   these questions on, specific services that would be

1  contemplated to be provided.

2        Are there any other services beyond this

3  list that are identified in 25?  Now I'm talking

4  about specific legal services.

5        MR. PHILLIPS:  Objection to form.

6  BY THE WITNESS:

7     A.   Well, let me read the list and let me see if

8  I can answer your question.

9  BY MR. DUNCAN:

10    Q.   Yes.

11    A.   I've read the 11 items on pages 1 and 2 of

12 the memo.

13    Q.   Yes, sir.

14    A.   I'd say they're a fair statement of the

15 kinds of things we'd want to do.  I would say to be

16 completely responsive and specific on anything that

17 we might do that's within this fair statement and

18 summary of 11 items, would be a long -- a long list.

19 If you really want to get granular on any one of

20 these, any one of these could have sub-bullets under

21 them.

22        For instance, even No. 1, "quick answers

23 during a short contact."  A decision needs to be made

24 now.  We can talk about fact-specific examples of

25 that.  I'm not sure you're looking for that level of

1  because it wouldn't be within the scope of the

2  services you provide?

3      A.   I agree.

4      Q.   On workplace investigations, you describe

5  some kinds of workplace investigations.  Are those

6  currently being performed, at least from time to

7  time, by CAI Services Corp?

8      A.   The only ones that I know of and that we do

9  are very limited, now back to that

10 single-digit-per-year kind of limitation, would be in

11 CAI Services and performed by a licensed private

12 investigator.

13     Q.   Would CAI Services Corp. have any

14 involvement in the kind of workplace investigations

15 that would be offered by CAI as part of its legal

16 service project as presently contemplated?

17     A.   As presently contemplated, that's not what

18 we contemplate.  I think it could happen where

19 private investigator is a good -- is the best choice

20 as the investigator.  But as contemplated, it would

21 not.

22     Q.   Would CAI intend to manage responses to

23 subpoenas in litigation settings, or a court

24 proceeding to put it more accurate?

25     A.   If you define manage as advise on what the

1  subpoena is and what the rights and obligations are,

2  yes.

3       If you mean go to court and manage the

4  results and the submissions and the objections, no.

5    Q.    Would CAI, under the present intention, plan

6  to represent members at a deposition occurring

7  pursuant to a subpoena?

8    A.    No.

9    Q.    If the court were to enter a judgment in

10 this case for CAI, should the judgment be limited to

11 those items that CAI intends to at the present time

12 practice in as set out, for example, in the second

13 page of Exhibit 85, as you have refined that list?  I

14 believe you took a couple items off the list.

15   A.    You're asking me personally?  Because I

16 don't think CAI has a position on that as an

17 organization.  If you're asking me personally, I'll

18 give you an answer.

19   Q.    Actually, I'm not interested in your

20 personal answer on this one.  I'm interested if CAI

21 has a position on that.

22   A.    I don't think CAI has a position on what the

23 judge should do.  It's in the judge's discretion.

24        I think CAI would -- has shown historically

25 in this quest, I'm calling it, flexibility,

1  as you look at this list?

2      A.    Well, a lot of things.  I think they're

3  primarily referenced in other places.

4          So things like a resource such as

5  malpractice or professional liability coverage would

6  be required.  I think training is required.  I think

7  some of the things that we talked about last time,

8  that list of eight or ten things needs to go on here.

9          I think this is limited because it's written

10  from the perspective of John Gupton thinking about

11  himself as potentially providing legal services and

12  what he would need day one, and less about what the

13  organization needs, what the members need more

14  broadly and what's required for compliance and

15  effectiveness.

16      Q.    If I'm understanding correctly your

17  testimony, and please tell me if I'm not, it's not

18  CAI's present intention for attorney employees, if it

19  would be successful, to represent members in

20  litigation matters?

21      A.    That is true.

22      Q.    And in defining "litigation," you would not

23  necessarily include proceedings before EEOC or other

24  state or federal agencies, at least right now?

25      A.    I would not include investigations by those

Case 1:15-cv-00083-LCB-JLW   Document 106-1   Filed 05/18/17   Page 64 of 81

411

```
 1   agencies, let me put it like that.  I think the
 2   question I raised earlier about what we might decide
 3   not to do would be to go further than the
 4   investigation with that agency.  The best example is
 5   NLRB.  It has its own inhouse ALJ process.  So that's
 6   one that I have no current intention to enter that
 7   world.
 8           The EEOC does not have an internal
 9   adjudicative process or something akin to litigation,
10   let's say.  It has an investigation process and a
11   mediation process.  So I've defined litigation as you
12   go in front of a trier of fact and you have a battle
13   and you have a result and a finder of fact and finder
14   of law.
15       Q.   Are you aware that there are circumstances
16   in an EEOC investigation where one of two things
17   happens.  One is the Government decides that it
18   should pursue the case against the employer.
19   Alternatively, the Government sends out a sue letter
20   to the employee and the employee is free to pursue
21   the case to a private attorney against the employer.
22   Is it fair that those are two scenarios that occur
23   out of EEOC proceedings?
24       A.   Yes.
25       Q.   If you had gone through the investigation
```

412

1 phase under your current plan, would you then take it

2 forward either in responding to the lawsuit brought

3 by the Government or responding to the lawsuit

4 brought by private counsel retained by the employee

5 against your employer who's also a member of CAI?

6     A.    No.    That is not our intent.

7     Q.    At that point, it would be turned over to

8 some outside legal counsel?

9     A.    That would certainly be the employer's

10 choice.    That would be our intent and that's what we

11 would help them to do.

12     Q.    And at that point that outside counsel would

13 have to get up to speed to whatever had occurred

14 during the investigative process?

15     A.    Yes.    Yes.    And it's certainly typical now,

16 I'd say more often than not, in that type of claim

17 that goes to court that insurance is involved, and so

18 very often is the case there's going to be a change

19 in counsel with that insurance coverage.

20     Q.    If a member called with an emergency

21 proceeding such as a temporary restraining order or a

22 rapid preliminary injunction development that

23 involved an employee-employer relationship, is that

24 something that it would be your intention to be

25 involved in?

Case 1:15-cv-00083-LCB-JLW   Document 113-1   Filed 05/22/17   Page 105 of 127

413

1   why.  I wanted him to see what we were saying to our
2   members about what we're doing and why.
3      Q.   Is this letter that you sent out to friends
4   of CAI including Mr. Lunsford intended to be an
5   accurate communication?
6      A.   I intended it to be.  Maybe we're going to
7   see where I didn't meet my standard.
8      Q.   Near the bottom of this letter there's a
9   sentence in the second -- I guess it's the
10  third-to-last paragraph, "If we are successful in our
11  suit."
12         Do you see that?
13     A.   Okay.
14     Q.   "If we are successful in our suit, they will
15  no longer have to choose between the cost/time to
16  find an outside employment lawyer (and restate the
17  problem) or going on their own with a Google search
18  for samples and guides."
19         Did I read that correctly?
20     A.   Yes.
21     Q.   How much time would a CAI member typically
22  spend to discuss an issue with the A&R hotline before
23  the CAI employee would recognize that this issue
24  would be required to involve outside legal services,
25  as the system works right now?

1     A.   How much time?

2     Q.   Yes.

3        I mean, are these five-minute calls,

4 ten-minute calls, just length of time?

5     A.   So the calls to advice and resolution in

6 general can be very, very short, can be very short.

7 An example would be what is the minimum wage, what's

8 the federal minimum wage and the kind of thing that's

9 published and it's on a poster.  It can take a minute

10 or two.

11        There are calls, I'm sure, that are closer

12 to an hour that involve a difficult employee

13 relations matter that implicates no rule or

14 regulation at all.  It's just people being people and

15 misbehaving as people.  You know, what are my options

16 to help solve this people problem.

17        So, you know, I believe -- just from our

18 experience there at CAI and my own experience of

19 taking calls in my past, and what I've read in this

20 log, Exhibit 77, I think, the same thing could happen

21 with a call that implicates legal advice.  It could

22 happen very quickly, very early in the call because

23 the request was essentially for legal advice as

24 opposed to information or a reg that's published.  Or

25 it could occur, you know, somewhere in that 60-minute

```
 1   that potential hand-off because it appeared at first
 2   glance to be compliance heavy.  That's a common mode
 3   that other groups are in.
 4       Q.   I'm going to ask you to take a look at the
 5   second page of this document.
 6            First bullet point under, "Why?"  It says,
 7   "Our members ask us about 9,000 workplace-related
 8   questions each year."
 9            Did I read that correctly?
10       A.   Yes.
11       Q.   Is that the number of calls received by the
12   A&R hotline?
13       A.   Yes.  Seven to 9,000 are the numbers I've
14   seen, depending on the year, yes.
15       Q.   And does that number include the calls from
16   the Medical Mutual members to the A&R hotline?
17       A.   It probably does.  I'm not certain of that.
18   It probably does.
19       Q.   Do you have a separate count on how many
20   calls that is a year?
21       A.   We can pull that.  I don't have it in my
22   head.
23       Q.   If you look further down that page under
24   "What Legal Services Will CAI Provide," third bullet
25   point, "CAI does not plan to represent member clients
```

1  in litigation matters or extremely specialized areas

2  of workplace law."

3       Did I read that correctly?

4  A.  Yes.

5  Q.  Can you identify for me what extremely

6  specialized areas of workplace law would be referring

7  to?

8  A.  Yes.  I can give you examples.

9  Q.  Please.

10  A.  NLRB would be a good example of that.  ERISA

11  would be a good example of that.  Tax matters that

12  relate to workplace and employee needs would be a

13  good example of that.  Immigration visas would be a

14  good example of that.  The Affordable Care Act might

15  be a good example of that, or at least the deeper

16  pieces of the Affordable Care Act might be a good

17  example of that.  Those kinds of things.

18  Q.  Any others that come to mind?

19  A.  In the workplace law area, yes.  I would say

20  that executive employment agreements would be a good

21  example of that, because of the implication of some

22  of those other things I mentioned.

23       Stock options, things like that, we would

24  not attempt to staff or to offer.  Those are the

25  primary ones that come to mind.

1          (Whereupon, Clarke Deposition Exhibit 88 was

2          marked for identification.)

3   BY MR. DUNCAN:

4       Q.   I show you what's been marked as Exhibit 88

5   which is an email chain that starts on the second

6   page, actually starts at the bottom of the first page

7   from Nicole Hendron to Will Smith and Amy Hilliard --

8       A.   Yes.

9       Q.   -- dated January 29, 2016.

10          I believe this is in reference to CAI tax

11   and audit considerations; is that right?

12      A.   Yes.

13      Q.   Can you tell me who Nicole Hendron is?

14      A.   She's our VP of finance and operations.

15      Q.   Do you know who Will Smith is?

16      A.   Will works or worked at the time for

17   Dixon Hughes, our CPA audit firm.

18      Q.   Does he no longer work there?

19      A.   I'm not sure.

20      Q.   How about Amy Hilliard?

21      A.   Amy also worked for Dixon Hughes.  The

22   reason I'm not sure -- they change who they send.

23   Amy Bibby has been a consistent member of that team.

24      Q.   Okay.  Let me ask you then to look at the

25   first communication which was from Nicole Hendron to

```
 1  Will Smith and Amy Hilliard on page 2 under point 1.
 2        It says, "Earlier this year Amy Bibby and
 3  Will Smith and I chatted about legal services and
 4  whether to report these 'R & D' type expenses under
 5  CAI or CAI Services Corp.  As of now, I have them
 6  reported under CAI."
 7        Do you see that?
 8    A.   Yes.
 9    Q.   What are the R & D type expenses being
10  referred to there?
11    A.   Yes.  Those are the costs, our litigation
12  costs primarily, you know, our very reasonable and
13  understandable legal fees that we're paying our legal
14  representatives.
15    Q.   Related to this case?
16    A.   Yes, related to this case.
17    Q.   Okay.  Are there any other expenses included
18  in R & D type expenses other than the legal fees
19  relating to this case?
20    A.   We've had -- in a small way, we have engaged
21  another attorney on a submatter on this, but that's
22  still in that category of legal expenses.
23        I'm trying to think if there's anything --
24  nothing significant.  There may be some things.
25  Maybe I've gone to a conference to learn more about
```

1  this kind of thing.  Those kind of minor things.  But

2  the legal fees would be the vast majority of this.

3      Q.   And then we go back to the first page now.

4  The next email appears to be from Amy Hilliard to

5  Nicole?

6      A.   Okay.

7      Q.   At least that's what we can see from the

8  copy we've got.

9           In here it references Amy Bibby again.  Tell

10  me who that is?

11      A.   Amy Bibby -- I don't want to get my Amys

12  mixed up here -- there's two categories of service

13  that we get from Dixon Hughes.  One is audit services

14  and another is tax preparation, tax filing.

15           And Amy Bibby, unless I get my Amys mixed up

16  is the audit side; Amy Hilliard, I believe, is on the

17  tax side.  So they'll often coordinate that they both

18  understand the full story from the other and they're

19  doing the right thing for our purposes.  I think

20  that's what's going on here.

21      Q.   Does it appear under item one which I'm not

22  going to read aloud into the record that there's a

23  discussion about whether the legal expense should be

24  under CAI or CAI Services Corp.?

25      A.   That seems to be the debate, yes.

```
 1       Q.   And then if you go to the top email after
 2   that on February 2, 2016, Nicole Hendron sends an
 3   email to Amy Hendron with a copy to Will Smith
 4   starting with the second sentence, it says:
 5            [As read] Because of the unclear nature of
 6   how to treat legal services expenses, I have
 7   allocated a portion of the expense to CAI Services
 8   Corp., the same way other expense items are allocated
 9   through the quarterly entries between CAI and CAI
10   Services Corp.
11            Did I read that correctly?
12       A.   Yes, except for GL, meaning general ledger.
13       Q.   I thought that was the next sentence.
14   That's fine.  The last two letters are GL for general
15   ledger?
16       A.   Yes.
17       Q.   You're probably right, the period was just
18   for the "corp" abbreviation.  So thank you.
19            So is it your understanding from this that
20   for tax purposes, part of the expenses of legal
21   expenses have been allocated to CAI Services Corp.
22   for CAI Services Corp. purposes?
23       A.   Yes.  Some of these R & D or development
24   expenses were allocated to Services Corp.  I think
25   that, you know, could have gone either way.  I think
```

```
 1  that from what I recall from this is that that's
 2  probably the right way if we're able to staff lawyer
 3  services because some of the fee-for-service work
 4  would be taxable and therefore it could be in a taxed
 5  entity or an unrelated business income line but a
 6  tax-exempt entity.
 7           If it remains prepaid plan oriented for an
 8  extended period of time, then there is no taxability
 9  issue.  It's a membership item, and likely those debt
10  allocations would get pulled back or an entry made to
11  reverse that.
12      Q.   CAI Services Corp. is not a party to this
13  litigation; is that correct?
14      A.   Well, you'd have to tell me.  The parent
15  company is.  I'm not sure if that makes Services
16  Corp. a party in some sense.  I don't know the answer
17  to that.
18      Q.   It's not a named party, how about that?
19      A.   It's not named on the caption.
20      Q.   Has there ever been any intent stated to the
21  State Bar that CAI Services Corp. would be offering
22  legal services, to your knowledge?
23      A.   First of all, that decision has not been
24  made and it's all going to come down to compliance,
25  compliance with ethical standards, compliance with a
```

1 judge's opinion, compliance with a legislative

2 solution, tax compliance. All that will have to

3 happen and a decision be made to harmonize all of

4 those and accomplish all of those. So, no, a

5 decision has not been made to offer the service in

6 CAI Services Corp.

7 The conversation in this memo was how to

8 allocate in the best way we know how with the murky

9 statutory future is where to put these legal costs of

10 making this happen.

11 Q. You see in Miss Hendron's email at the top,

12 it characterizes "unclear nature of how to treat the

13 legal services expense."

14 Do you see that phraseology?

15 A. I do.

16 Q. What is unclear about the entity that has

17 incurred the legal expenses, in this case CAI, the

18 nonprofit tax-exempt being the entity that reports

19 those legal expenses on its tax returns?

20 A. Well, what's unclear is that -- is to

21 harmonize all those stakeholders that we have, all

22 those external stakeholders, is it might be the right

23 conclusion that, for example, fee-for-service legal

24 work would go into or be accounted for in a

25 for-profit subsidiary. That might be what best keeps

```
1   all these compliant stakeholders satisfied that we
2   are in compliance.  I just don't know that it will be
3   and it certainly won't be if that methodology takes
4   us out of compliance with those stakeholders.
5          This really is just about, in a good faith
6   way, what do we do today not knowing that future
7   organizational requirement, how do we allocate the
8   cost of making it so.
9          THE WITNESS:  Is it a good break time?
10         MR. DUNCAN:  It is, yes.  If you'd like to,
11  please.
12         (Whereupon, a short recess was taken.)
13         (Whereupon, Clarke Deposition Exhibit 89 was
14         marked for identification.)
15  BY MR. DUNCAN:
16    Q.  Mr. Clarke, let me ask you to take a look at
17  what's been marked as Exhibit No. 89.
18         I ask you if this appears to be a two-page
19  handwritten document with 772 and 773 CAI Bates stamp
20  numbers on it?
21    A.  Yes.
22    Q.  And it's dated February 22, 2016; is that
23  right?
24    A.  Yes.
25    Q.  Do you know who wrote this document?
```

```
1   question.  I don't know.
2       Q.   Right to the right of that, there's a note
3   "for fee and nonmember."
4           Do you see that?
5       A.   I do.
6       Q.   Does CAI seek through this litigation to
7   offer legal services to nonmembers?
8       A.   No.
9       Q.   On the second page, about a third of the way
10  to halfway down, there's a statement "be careful"
11  then there's an arrow "don't dilute tax exempt."
12          Do you see that?
13      A.   On the first page?
14      Q.   Second page.
15      A.   Sorry.
16          I see that.
17      Q.   All right.  Do you know what this comment is
18  relating to?
19      A.   I do not.
20      Q.   Is it fair to say that the tax treatment
21  providing legal services could have an effect on
22  CAI's tax status or how it reports its revenues?
23          MR. PHILLIPS:  Objection to form, but you
24  may answer.
25  BY THE WITNESS:
```

1    Q.   Would you acknowledge that prior to

2  January 23rd, 2015, the date of filing this lawsuit,

3  that you had had multiple discussions with members of

4  the staff and, in some cases, officers of the

5  North Carolina State Bar concerning the issues that

6  have been raised in this lawsuit?

7    A.   I've had multiple conversations with them.

8  I would say most of them were around the legislative

9  change process.  Some, Alice Mine's memo and email,

10 being an exception of that.

11         But primarily, we're about the legislation,

12 change the legislation and seeking either their

13 support or their reaction to that.  So, yes, I talked

14 to them mostly about the legislative angle.

15   Q.   Prior to January 23rd, 2015, did you have

16 any discussion at any time with Roy Cooper or any

17 member of his staff while he was serving as

18 Attorney General about the issues that you raised in

19 this lawsuit when you sued Mr. Cooper?

20   A.   Talk to him?

21   Q.   In his official as Attorney General, to be

22 clear.

23   A.   I would say in the legislative a bit.  I may

24 have seen him there.

25         I don't recall a conversation with

```
 1   Attorney General Roy Cooper or his legal staff until
 2   we were about to file the suit.  Then we did have a
 3   conversation, and then counsel was present, my
 4   counsel was present.
 5        Q.   Was this immediately before the suit was
 6   filed?
 7        A.   Yes.  Very soon before, yes.
 8        Q.   Who did you meet with then?
 9        A.   I don't recall the gentleman's name.  I'm
10   sure we could get that for you.
11        Q.   It was not then Attorney General, now
12   Governor Cooper?
13        A.   No, but his staff.  I don't think you
14   included his staff.
15        Q.   I did.
16             You don't recall who it was?
17        A.   No, but I'm sure we can look into it.
18        Q.   What was the purpose of that meeting?
19        A.   From my impression and what I wanted it to
20   be for was to continue this process of openness.
21   I've got no enemies here, natural other otherwise.
22             My intent is to get this to happen for, I
23   think, the right reasons, to fill a significant gap
24   that's there in delivery of legal advice to these
25   kinds of small to medium size companies primarily;
```

Case 1:15-cv-00083-LCB-JLW   Document 106-1   Filed 05/18/17   Page 69 of 81

427

1 that openness is our friend; and to start out a piece
2 of litigation by coming over there and being honest
3 about what you're doing, and why and shake somebody's
4 hand, I think, is a good process and a good way to
5 behave.
6     Q.    All right.  So basically you went over to
7 the Attorney General's office and met with a member
8 of his staff that you don't recall now and said we
9 are going to sue you as a named defendant in this
10 suit and here's why we're doing it?
11     A.    Yes.  In general, yes.
12     Q.    Did you meet with Nancy Lorrin Freeman in
13 her official capacity as District Attorney for the
14 10th District or with Doug Henderson, in his official
15 capacity as District Attorney for the 18th District?
16     A.    I did not.
17     Q.    Neither of them?
18     A.    I did not.
19     Q.    And that would be true for any time before
20 the lawsuit's been filed?
21     A.    Yes.  I mean, I met Lorrin Freeman, but I
22 have not talked to her about this case.
23     Q.    And that would be true for any time since
24 the lawsuit's been filed?
25     A.    That would be true.  I've met with

Case 1:15-cv-00083-LCB-JLW   Document 101-2   Filed 05/16/17   Page 3 of 4

```
 1   David Adinolfi quite a bit lately at these
 2   depositions.
 3      Q.   In conjunction with his defense of
 4   defendants in the lawsuit?
 5      A.   That's my belief.
 6      Q.   And his role as counsel?
 7      A.   Yes, that's my belief.
 8           (Whereupon, Clarke Deposition Exhibit 93 was
 9           marked for identification.)
10   BY MR. DUNCAN:
11      Q.   Let me hand you what's been marked as
12   Exhibit No. 93.
13           This is a one-page document produced by CAI
14   or headed "Summary of the Problem"; is that right?
15      A.   Yes.
16      Q.   Do you know who prepared this?
17      A.   I believe I primarily prepared it.  I
18   believe John Gupton may have edited or inputted to
19   it.
20      Q.   Do you know what the purpose of this
21   preparation was?
22      A.   Yes.  I believe, if I'm correct about the
23   context, from the last sentence of the document, this
24   was a conversation with our board about the next step
25   in this effort, and that next step was I was
```

1   recommending that we make a public records request to

2   the State Bar on topics related to this effort.

3      Q.   So this was prepared for a meeting of the

4   board prior to the time of filing the lawsuit?

5      A.   Yes.  That's my memory, yes.

6      Q.   Under the caption "Why Should CAI Provide

7   Limited Legal Services to Its Members?"

8      A.   Yes.

9      Q.   One of the bullet points says, "A big

10  differentiator for attention and attraction."

11         Did I read that correctly?

12     A.   Yes.

13     Q.   What does "retention" mean?

14     A.   Membership retention.

15     Q.   What does "attraction" mean?

16     A.   Membership attraction.

17     Q.   Is it CAI's testimony that by providing

18  legal services, it would assist the business of CAI

19  to retain existing members and to attract more new

20  members?

21     A.   In part, yes.

22     Q.   And the word "differentiator" was used in

23  that same sentence?

24     A.   Yes.

25     Q.   How would this differentiate CAI from, for

1  example, other providers of CAI services?

2     A.   Other marketplace-type providers, is that

3  your question?

4     Q.   Yes.

5     A.   Well, without -- I know you don't want to

6  hash or rehash all the conversations we've had about

7  how we want to present this integrated model, how

8  that's different, but that's part of the

9  differentiation.

10    Q.   I'm looking for the short version on this

11  one.

12    A.   The short version is that there's a

13  tremendous gap in service here and that this would

14  fill a significant part of that gap and that is the

15  main differentiator.

16    Q.   And so the providers that you're trying to

17  differentiate for are other marketplace providers

18  that provide the same service as CAI; is that

19  correct?

20    A.   No.  Not primarily.

21         Primarily what we're differentiating against

22  is a gap in the market, an unserved gap.  If that

23  were not the case, we would not be pursuing this

24  effort.

25         If there was not a genuine, significant need

1 from small to medium sized employers to receive a

2 service in the many ways we've outlined here for you,

3 if there was not that genuine gap here, that the

4 market was not serving and that's why it's a gap, at

5 least not effectively serving.

6      I have a good friend who talks about a bus

7 ticket and says that a $500 bus ticket is not public

8 transportation.  And in a similar way, there's a gap

9 that exists here in service.  There's a $500 bus

10 ticket available for it, but people can't or don't

11 want to and it's not effective to buy that bus

12 ticket, and that creates, in part, this huge gap.  We

13 would be different than the market by filling the gap

14 in the ways we've described.

15     Q.   Okay.

16     A.   That's the differentiator.

17     Q.   Picking up on the last part of that

18 response, I think you've acknowledged, and we've had

19 this testimony earlier which I do not want to rehash,

20 there are other market providers that do the kinds of

21 thing that you do in North Carolina?

22     A.   Well, and I believe I've said that before.

23     Q.   The kinds of things that CAI does?

24     A.   Well, I believe I've said before no.  I've

25 said no.  I've said no because of how it's provided,

```
 1        Q.   You could go from 1,200 members to 1,500
 2   members and that would have no affect on your
 3   compensation?
 4        A.   None.
 5        Q.   Similarly, you could go from 1,200 members
 6   to 800 members and that would have no affect on your
 7   compensation?
 8        A.   It might have an affect on my employment.
 9   If we, you know, are in decline in some way and I've
10   not led the organization the way it should be led.
11        Q.   So there is pressure in the business to both
12   retain and attract members, that's just a fact of
13   life?
14        A.   There's a need to do so and it's part of
15   what I'm employed to do.
16        Q.   Can you give me the names of the
17   North Carolina members of this Employer Association
18   of America who were in attendance at this meeting?
19        A.   I could give you the two that could have
20   been there and often are there.  Whether they were
21   there that day, I'm not sure.
22        Q.   Fair enough.
23        A.   All right.  One is Kenny Colbert,
24   C-o-l-b-e-r-t, from Charlotte.  And the other one is
25   Fred Reese, R-e-e-s-e, from Asheville.
```

1   separate from the Bar and just in a leadership role,

2   plus that subset of leadership in the General

3   Assembly.

4       Q.   Who are the subset of leadership in the

5   General Assembly that you're referring to as its

6   allies?

7       A.   I would say primarily Tim Moore and I would

8   say Leo Daughtry.  I think it's not currently there,

9   but was back at the time of our legislation.

10  Tim Moore was not speaker during part of this and

11  became speaker.

12          I think there may be some hesitancy in the

13  reaction from Phil Berger, and I think much of that

14  comes from the real estate bar and its super

15  protective nature of its practice, in so many

16  settings, not just this one.

17          And I think some of the legislatures have a

18  personal anticompetitive motive.  They think about

19  their law practice in their particularly rural part

20  of the state and how it could impact their law

21  practice of a -- not so much CAI.  I'm not sure

22  anybody has cared too much about HR advice and

23  employment advice, but other things as to your point

24  that this could be interpreted to cover or could, in

25  fact, physically cover, like estate planning services

1  if an entity like AARP. That was an example given to

2  me.

3        If AARP was to offer estate planning

4  services in North Carolina under the statutory

5  authority to do so, what would that do to a

6  small-town practice that centered on things like

7  estate planning? Would that be a competitive threat

8  to that small-town attorney?

9        I have not had one of them raise an ethical

10  issue other than officials of the State Bar and one

11  conversation with a Bar Association president.

12     Q.  Who was that?

13     A.  Catharine Arrowood.

14     (Whereupon, Clarke Deposition Exhibit 95 was

15     marked for identification.)

16  BY MR. DUNCAN:

17     Q.  I show you what's been marked as Exhibit

18  No. 95.

19        This appears to be a press release at the

20  time the lawsuit was filed?

21     A.  Yes. I think we did a press release. I'm

22  not certain. I know this was meant to be released to

23  at least to the members in general, perhaps a press

24  release.

25     Q.  Do you know who prepared it?

1  General Assembly to -- I honestly don't know if it

2  was broadly distributed there or just distributed to

3  those other lobbyists and other legislatures and

4  sponsors of our prior bills as information.

5       Q.    So let me just ask you a question.  I think

6  now that you said you were the one who drafted it, I

7  think I know the answer.

8            Do you agree with all the statements that

9  are set out in this press release?

10      A.    Let me just scan it.

11      Q.    Sure.

12      A.    I see a typo.  Other than that, I believe

13  it's accurate.

14      Q.    Thank you.

15      A.    It's limited but accurate.

16      Q.    Can you describe the process for me that led

17  to CAI's supporting legislation in 2011?

18      A.    That led to the decision?

19      Q.    Yes, the process that led to decision for

20  CAI to support legislation in 2011.

21      A.    Yes, in 2011.

22      Q.    This is not an exhibit-related question.

23      A.    2011, so that was, as I recall, our first

24  legislative bill.

25            And what motivated that really goes back to

```
 1   the gap, this gap in service that these small to
 2   medium size employers endure.  They continue to
 3   endure new laws, new regulations, new things that
 4   complicate their world, in some cases overcomplicate
 5   their world.  And we as a society and as a state have
 6   a statute preventing them from getting ready access
 7   to resources to help them cut through the maze and
 8   that thicket and do a job being in compliance and
 9   have a good workplace.
10          So that really is just the overlying
11   motivation.  I don't want to leave it out.  I can't
12   leave it out in answering your question because it's
13   so central to what we did.
14      Q.    I'm not asking for the motivation.  I'm
15   asking for the process, mechanically within the
16   organization.
17      A.    So mechanically, I don't have the date in
18   front of me, but the board would know about it and be
19   aware.  I wouldn't do that sort of public thing
20   without the board knowing and being aware.
21          And then our contract lobbyist, who is
22   primarily Connie Wilson, and John Gupton and I
23   drafted a bill, the beginnings of a bill.  Connie
24   helped to find a sponsor that was interested in the
25   bill and wanted to file the bill.
```

437

1    Q.   Who was that?

2    A.   That was John Torbett.

3    Q.   Thank you.

4    A.   And I believe, I'm not certain, I think John

5 may have had some involvement in amending that draft

6 and getting it to bill drafting and getting it in a

7 format and then we filed it.

8    Q.   And that bill ultimately was unsuccessful?

9    A.   Ultimately unsuccessful.

10    Q.   And you had Miss Wilson and many her

11 colleagues supporting it from a lobbying standpoint?

12    A.   I did.

13    Q.   And that was with the consent of the board

14 as well as your approval and authorization?

15    A.   Yes.

16    Q.   Is the process the same for 2013, the

17 legislative effort in 2013 or were there distinctions

18 between 2011 and 2013?

19    A.   There were distinctions.  What we learned

20 from the 2011 process -- and here's the reason I'm

21 telling you this -- is that in the 2011 process, we

22 actually were voted out favorably by the house

23 judiciary committee.  The committee voted a majority

24 in favor of the bill as it then existed and was

25 amended and reported it favorably to the House floor.

Case 1:15-cv-00083-LCB-JLW   Document 106-1   Filed 05/18/17   Page 76 of 81

438

```
 1   What happened there affected our 2013 strategy.
 2           What happened there on the floor was that
 3   one or two of the allies I speak of that had an
 4   anticompetitive motivation put that bill in their
 5   pocket.  And it's not like you learn in high school
 6   where a bill comes out of a committee and goes to the
 7   floor.  It could go in the pocket of a powerful
 8   legislator.  That's what happened.
 9           So there was no consideration by the
10   General Assembly whether this was a good idea or bad
11   idea.  There was a consideration by a legislature
12   motivated by personal desires as well as desires of
13   some of his fellow members of the real estate bar and
14   others.
15       Q.   Who specifically are you referring to?
16       A.   I'm referring to Leo Daughtry and Tim Moore
17   primarily.
18       Q.   All right.
19       A.   So that said, in 2013 we've got to do this
20   differently.  That would affect the process.
21   Otherwise, we'll have the same outcome, and that's
22   that definition of insanity.
23           So, therefore, we worked to get an attorney
24   sponsor this time, one that we met during the 2011
25   process and who was very interested and very
```

439

```
 1   professionally aware of the need for what we were
 2   trying to do and it was going to be good, we thought,
 3   to have an attorney primary sponsor.  John Torbett is
 4   not an attorney.  So that's why the process changed.
 5   That's why we didn't have John Torbett as our primary
 6   sponsor.  He signed on to it, but not as the primary
 7   sponsor.
 8        So we went about it differently.  We put
 9   additional time into it.  I think that's the session
10   where Tammy Fitzgerald also helped Connie, if I've
11   got my years correct there.
12        So it was different in that sense.  It was
13   similar in the sense that we got a sponsor and filed
14   a bill.
15   Q.   And the result ultimately was the same, the
16   bill was unsuccessful?
17   A.   The result ultimately was that Speaker Moore
18   sent the bill to the eight sequential committees in a
19   plain and clear message to us that this will not get
20   through any door here in this building.  My
21   interpretation of that was our only reasonable
22   alternative is to go away or file suit.
23   Q.   You said Speaker Moore in 2013.
24        Was Speaker Moore Speaker More in 2013, or
25   was he Representative Moore?
```

Case 1:15-cv-00083-LCB-JLW   Document 106-1   Filed 05/18/17   Page 78 of 81

440

1      A.    He was Speaker Moore, I think.

2      Q.    My recollection is Senator Tillis got

3 elected in 2014 and he had been the Speaker up until

4 the time he was elected to the Senate in 2014?

5      A.    That would be right.  Perhaps what happened

6 was he was rules committee chairman.  I may be

7 confusing the two.

8      Q.    To answer my question, he was not

9 Speaker Moore in 2013?

10     A.    The record or the calendar would speak for

11 itself, right.

12     Q.    I thought perhaps it jogged your memory.

13     A.    I think you're right.  I think you're right.

14 I'm trying to think whether he was Speaker Pro

15 Tempore.  I'm not sure.

16     Q.    Has CAI pursued legislation in any other

17 legislative session since that time, since 2013?

18     A.    We have elected not to.  We've had

19 conversations electing not to file it.

20     Q.    And without going into the detail of all

21 those conversations, I assume they're at a board

22 level?

23     A.    Well, at a legislative level with the

24 sponsor.

25     Q.    So the board would still be favorable to

 1  going forward with legislation, but the decision has

 2  been made that there's not sufficient support for it

 3  at this point?

 4      A.   The board would support a legislative effort

 5  and solution.  At this point, the roadblock to

 6  progress is still there.

 7      Q.   I think we talked about the relationship

 8  between Employers' Coalition of North Carolina and

 9  CAI in your previous testimony.

10      A.   Yes.

11      Q.   Just so I'm clear, does ECNC do anything

12  other than lobbying work, to your knowledge?

13      A.   Not really, but you could say yes.  That's

14  that same entity that ECNC is an unincorporated group

15  under.  It's called NCAI, NC Associated Industries.

16  And that entity primarily is ECNC, but it does an

17  additional thing primarily which is publishes an

18  annual guide to employment law in North Carolina and

19  federal law and we distribute that to the members.

20      Q.   Have you had any discussion with either ECNC

21  or NCAI about whether either of those organizations

22  has any interest in offering legal services?

23      A.   I haven't presented it.  I can't imagine

24  that there would be that interest.  They're not

25  really operating entities.  They are a public policy

```
1  arm.
2         (Whereupon, Clarke Deposition Exhibit 96 was
3         marked for identification.)
4  BY MR. DUNCAN:
5     Q.   I hand you what's been marked as Exhibit 96.
6          This appears to be an email from
7  Connie Wilson to Jacqueline Schaffer, with a copy to
8  representative Chuck McGrady as of March 14, 2013.
9     A.   Okay.
10    Q.   It appears you were blind copied on this,
11 and I say this because you printed it from your
12 printer although it doesn't show a blind copy of what
13 you received.
14         Does that appear to be accurate?
15    A.   It seems to be true.
16    Q.   It says ECNC is a 501(c)(6), about the third
17 line down?
18    A.   Okay.  I see that, yes.  ECNC is not a
19 501(c)(6); it's an unincorporated public policy arm
20 of NCAI.
21         This is a great point.  This is where I
22 think our board or others would say, is this a CAI
23 bill to change the law or is it an ECNC bill?
24         CAI, in fact, has done most of the work to
25 make this occur and is paying 100 percent of the
```

1   legal cost of doing so.

2           Connie Wilson is a registered lobbyist for

3   ECNC.  So those two will overlap and overcross.  So

4   the we are a 501(c)(6) means CAI, the employer

5   association.

6       Q.   And not ECNC which is not a 501(c)(6); is

7   that right?

8       A.   That's right.

9       Q.   Who is Jacqueline Schaffer?

10      A.   I'm not sure.  I can say what I believe.

11      Q.   What do you believe?

12      A.   I believe Jacqueline Schaffer is in bill

13  drafting.  I believe that; I'm not certain of that.

14      Q.   So she works for the General Assembly?

15      A.   If she was in bill drafting, yes.

16      Q.   That's what I meant, that's what you were

17  intending to mean?

18      A.   Yes.

19      Q.   Do you know what the tax category is for

20  NCAI; that is, is it a 501(c)(6) if you know?

21      A.   Yes, it's a 501(c)(6).  It doesn't have the

22  revenues, but yes.

23      Q.   After getting a blind copy of this, did you

24  do anything to reach out to Miss Wilson to indicate

25  that -- it appears from someone not otherwise

1    knowledgeable would read this -- that the assertion

2    was being made that ECNC was a 501(c)(6)?

3         A.    No.   I'm sure I did not talk to her about

4    that, because it's so common that there are -- in

5    contract lobbying, that "we" is a bigger "we" than

6    what's on the name tag.   It was constituents of those

7    things on the name tag.   So that would not have made

8    me think twice about it.

9         Q.    Is it your testimony that ECNC lawyers do

10   not provide legal services to ECNC members, to your

11   knowledge?

12        A.    Right.   There's no staff to do that.

13   There's an administrative person that works part-time

14   on administrative duties, but there's no professional

15   staff.

16        Q.    So when it says in here, "ECNC has

17   approximately 2,000 employers across the state that

18   rely on us for HR training and hotline help for

19   problems" --

20        A.    Right.

21        Q.    -- that's inaccurate, isn't it?

22        A.    No.   It's just incomplete.   It's those three

23   associations I named for you earlier that make up

24   ECNC, WCI, the Employers Association and CAI.   That's

25   where you get this 2,000-plus members.   It's the

```
1  procedures if we don't agree.  If we feel we need to
2  do something about it, we'll use those.
3  BY MR. DUNCAN:
4     Q.   Were there calls when a member was referred
5  to a lawyer but the inquiry was not logged, to your
6  knowledge?
7     A.   Yes.
8     Q.   And how would that happen?
9     A.   Well, I would -- I'm just confident I
10 wouldn't be able to give you an example.  I'm just
11 trying to be fair with you about that that could
12 happen, that the person just did not write that down
13 in their notes.
14         It could either be because they didn't use
15 the word "lawyer" like on line 6 of page 1, although
16 Matt Keen is a lawyer.  And then it showed up in
17 attorney, a-t-t-y, over there this column F.  And it
18 showed up in reason code "attorney."
19         So there's, I'm sure, going to be times
20 where we've suggested they see a lawyer and somebody
21 didn't write down they told somebody to go see a
22 lawyer.  I'm confident that's happened.
23         This document is our attempt to pull what
24 was recorded and, in as complete a way as we could,
25 present it, yes.
```

Case 1:15-cv-00083-LCB-JLW   Document 121-1   Filed 06/16/17   Page 126 of 134

446

1    Q.    So it's your belief on behalf of CAI that

2  that has happened, but you cannot cite me to any

3  examples about it, as you sit here right now; is that

4  a fair summary?

5    A.    As to the A&R team, that's true.

6          As to me, if I get direct calls from a

7  member and I might send them to a lawyer, I'm the

8  worst offender to not log the call.  I'm not part of

9  that team, but ideally I should log a call.  I'm sure

10 there are conversations I've had where I've sent

11 somebody out and have not logged it.

12         There are going to be some, but I'm sure

13 it's in that under 10 percent category.

14   Q.    All right.  So I think you've described the

15 process already for logging these calls.  Generally

16 speaking, it's in electronic format and you've

17 included some of the information from that electronic

18 format in this document, not all of it, as we've

19 already discovered as we've asked a few questions

20 today?

21   A.    Yes.

22   Q.    But that's the process for how the record is

23 maintained; is that fair?

24   A.    Yes, that's fair.

25   Q.    And I think you said you get somewhere

1 between 7,000 and 9,000 calls you a year?

2     **A.   Yes.   Calls, live chats, emails to advisers.**

3     Q.   So this time frame we'd be looking at

4 something like 21,000 to 27,000 calls?

5     **A.   Somewhere in that range.**

6     Q.   And the number where a key term was clicked

7 off was 517, if you look at the last page.  That's

8 the last numbered entry.

9     **A.   Okay.   That's what it appears to be without,**

10 **you know, checking every page, yes.**

11     Q.   And I take it CAI's goal in this A&R line is

12 to respond to the member's specific situation by

13 getting sufficient details to provide a response,

14 which details are then completed into the log that's

15 maintained?

16     **A.   It's really not.   It's a little more basic**

17 **than that.**

18         **We are not talking to a member about details**

19 **so that we can come to a detail-related conclusion**

20 **with them.**

21         **We're getting details enough to know what**

22 **the topic zone is and what they need in response in**

23 **order to make a good decisions themselves.   Our**

24 **internal phraseology is to give them the confidence**

25 **they need to take the next step.   So that's what**

```
 1      Q.   Who was the manager of that team who's
 2  scanning for that as part of their job
 3  responsibilities?
 4      A.   Rick Washburne.
 5      Q.   If the CAI employee -- I think you were
 6  getting into this a moment ago -- is receiving a call
 7  and being asked to address an issue and they're not
 8  sure whether or not it's appropriate to do so under
 9  the A&R line with respect to whether it gets toward
10  legal advice, is there a written protocol or process
11  set up for those employees as to what they are
12  supposed to do?
13      A.   There's not as SOP type thing, or standard
14  operating procedure or protocol, in the way that I
15  perceive an SOP, or protocol, to be.
16           There is training and there are examples
17  used in training and then there is a culture of
18  conservatism among that team.
19           So more often than not, when an issue is
20  brought to me as to that line that you mentioned, or
21  to other things unrelated to a legal referral such
22  as, you know, is this even an area of expertise of
23  ours, is this something that we should stretch in
24  order to find an answer outside of us and provide
25  that to a member, those kinds of scope and subject
```

1  matter kinds of questions, they're very conservative,

2  in my opinion, about bringing those and probably

3  sooner than they need to.

4        So it's a cultural thing.  It's a raise your

5  hand thing based an A&R team member raising their

6  hand.  It's a review by Rick Washburne of the content

7  of some of these calls.

8     Q.   If successful in this litigation, would CAI

9  continue to log calls to the A&R line as it has

10 historically done?

11    A.   We would do whatever was required to be in

12 compliance with all the stakeholders' requirements.

13       I believe and expect that would allow us to

14 for an HR advisor to log a call and that there's

15 utility in that.  Somehow if we were prevented or

16 that that was not good practice, particularly where

17 items might be referred on to lawyers, then we would

18 revisit that process.

19    Q.   If you were to refer a call to an inside

20 employees, that is, an employee of CAI, would that be

21 noted on the electronic recordkeeping system?

22    A.   I think it would be, yes.

23    Q.   If the determination was made to refer the

24 member to an outside attorney, that is, not somebody

25 who is a CAI employee, would that notation be kept on

```
 1   the internal electronic recordkeeping system of
 2   calls?
 3       A.    I would think it would be if it's allowed.
 4             I've learned in the prepaid plan process
 5   that the Bar's interpretation of some of that kind of
 6   data can be very specific and narrow, and we've
 7   worked to be in compliance with that and made
 8   adjustments in our prepaid plan process there.
 9             The some kind of thing would happen there.
10   If there was an interpretation that checking a box of
11   a member's record that they would refer to staff
12   counsel, if that somehow was a confidential issue, we
13   would resolve that and change that process.
14       Q.    Led me ask you to look at entry 481 just for
15   a moment.   This is the bottom of page 77.
16       A.    Okay.
17       Q.    Is this an example of a call in which
18   there's not a specific referral to a lawyer being
19   made but rather the A&R line personnel are saying to
20   the member, just suggesting that they may need legal
21   counsel?
22       A.    Yeah.   The reason code is "general
23   question."   So that tells me that that box was not
24   checked for referral.
25       Q.    Yes.
```

```
1        Q.    So it left up in the air how the member may
2   take any further action, correct?
3        A.    Sure.  It's always their decision.
4        Q.    You indicated, I think, March was the
5   proposed target date to begin the prepaid legal
6   services plan for the A&R line?
7        A.    Yes.
8        Q.    Are there any processes and procedures in
9   place for how that's going to be operated for a call
10  that comes in?
11       A.    Yes.
12       Q.    And are they written?
13       A.    Yes.  A number of them are, yes.
14       Q.    And when were they written?
15       A.    In different time frames.  The original
16  writing was prepared and submitted to the Bar back in
17  July-ish time frame of 2016 that outlined --
18       Q.    The application?
19       A.    Yes, the application.  That includes the
20  contractual agreement with the provider law firm,
21  that talks about process.
22       Q.    Is there anything beyond that that's been
23  done?
24       A.    Yes.
25       Q.    In writing?
```

1  is that somebody can be a former -- used to work for

2  a member of CAI and be either retired or in between

3  jobs or working for a nonmember, and they could be an

4  ambassador and that would be individual. I believe

5  when they're working for a member company that the

6  organization is tagged as ambassador, but I'd have to

7  confirm that.

8      Q.  All right.  If you look at 108 on page 20.

9  Under the detail it says, "Spoke with Phil Strach.

10 Discussed equitable estoppel."

11          First of all, is Phil Strach the member or

12 is that an attorney?

13     A.  He's an attorney.

14     Q.  In about four lines down or five lines down

15 it says, "It's probably in the best interest at this

16 point to order FMLA to the employee."

17          If you go all the way down, "This is all

18 based up what is referred to in legal terms as

19 equitable estoppel per our attorney partner who

20 called me back today."

21          Do you see that?

22     A.  Yes.

23     Q.  Is it an and A&R function to relay attorney

24 advice through the A&R line?

25     A.  They have.  I say legal advice; whether or

1   not a specific conversation is legal advice or not is

2   off to the side in a way.  But they have relayed what

3   other experts tell them; that is, that happens.  Yes,

4   that happens.

5        Q.   To do that, the CAI employee would have had

6   to first provide the outside attorney with the

7   necessary factual information to be in a position to

8   assess what would be appropriate legal advice; isn't

9   that true?

10       A.   Well, I'm not going to say -- I'm not really

11  interpreting this so much as legal advice as I am

12  that they called a lawyer and asked for his opinion

13  on this FMLA compliance question.  I'm not really

14  going there, that there is legal advice.

15            What I'm going to say is that what would be

16  normal and typical in a scenario like this, even when

17  the advisor might call a nonlegal resource, is that

18  they would not reveal who the organization is.

19       Q.   This detail entry does not indicate that the

20  client in this case, the digital office, was actually

21  referred to an attorney.  It just indicates the

22  relaying of the advice from Mr. Strach, who

23  apparently is an outside attorney; isn't that right?

24       A.   I'm looking at it.  I don't see in the text

25  that I referred them to Phil Strach.  I'm confident

1    Q.    Who is Gports_CAIInc?

2    A.    George Ports.

3    Q.    Is George Ports a lawyer, to your knowledge?

4    A.    No, he's not.

5    Q.    Are you aware of any qualifications he has

6    to determine what would be admissible into evidence

7    or not?

8    A.    Yes.  I'm not saying that that's what he

9    said or who said it.  I don't know.

10          He would know and does know what a really

11   good HR person knows, and that often involves when

12   you get into agency discussions -- a great example is

13   unemployment insurance.  There's a lot of training

14   that that agency does of HR people, a lot instruction

15   they give HR people about what needs to be in a

16   record in order to have an effective presentation of

17   your case.  Much of that's around admissibility.

18          From an HR practitioner's perspective, he is

19   aware of those kind of concepts.  He's not a lawyer

20   and wouldn't provide legal advice on that.

21   Q.    What does "meaningful access to the courts"

22   mean to you?

23   A.    Well, meaningful access to the courts can

24   mean one of several things.

25          It can mean, in a classic sense, the ability

1  to be a plaintiff and press a case in court.  It can

2  mean, from a defense perspective, to have success in

3  court or to have your position presented in court.

4  It can be, particularly from a defense or employer

5  perspective, access to a lawyer or legal counsel, to

6  help prevent the legal conflict that might lead to

7  court.  It can mean from an employer perspective,

8  regardless of the legal counsel question, just the

9  ability to maximize their compliance pre-legal

10  advice, just their compliance in order to stay away

11  from the need for legal advice and therefore the need

12  to be in court as a defendant.

13       So all that wide range of things, to me,

14  relates to meaningful access to court.  Access is not

15  just going in the door.  Access is doing a good job,

16  never to have to enter that door as well.

17       Q.  CAI does not propose to represent members in

18  litigation matters; is that correct?

19       A.  That is true.

20       Q.  As you're aware from your experience as a

21  lawyer, litigation matters are typically resolved or

22  go to court?

23       A.  No.  Most of them do not.

24       Q.  Most litigation matters do not go to court?

25       A.  Most -- in the employment law arena, let me

Case 1:15-cv-00083-LCB-JLW  Document 121-1  Filed 06/16/17  Page 130 of 134

1    unauthorized practice of law?

2        A.    Yes.    Certainly that would be a place to

3    start is that chapter, 84, 85, that region of the

4    statute.

5            And the statute, in my reading of it, gives

6    several very specific kinds of things that are legal

7    advice and must be provided by a lawyer.    Those are

8    my paraphrasing of that.    There's certain actions.

9            There's a real estate action in there.

10   There's, I think, a drafting of wills and such as

11   that.    There are several items listed there.    I'm

12   going to say six, seven, eight or ten specific

13   must-be-done-by-a-lawyer type of situations.

14           Then there's some, I think, very difficult

15   to interpret and circular language that can be

16   written or read broadly or narrowly.    I think fairly

17   either way.    Because there's circular language in

18   there about, in essence, it's a legal service when

19   you give legal advice.    That type of circular kind of

20   reasoning that I think leaves any member of the

21   public, lawyer, nonlawyer, employer, employee, and

22   State Bar officials with a lack of clarity around the

23   definition of "legal service" or "legal advice."

24           So I think that's, to a degree, where the

25   statute leaves us.    And so my whole effort here is we

1    work hard to keep our advice to an HR to HR.  We work

2    hard to keep our advice to what HR people do for

3    their employer now.

4              If you're an HR person in an organization,

5    you're aware of rules.  You know what the minimum

6    wage is.  You know there is something called the

7    FMLA.  You know those things.  And that's where we

8    limit our discussion and our advice as to what an

9    HR person gives to their own organization.

10             Could somebody?  Could?  Maybe, perhaps

11   someone, someone particularly at the State Bar or

12   somewhere else use that circular definition to say

13   that any time a law or rule is mentioned where we've

14   entered legal advice, I think they might or they

15   could.  And that leaves us in this very difficult

16   scenario.

17             They're in a very difficult position of

18   self-limiting, really short of pre-limiting our

19   behavior and our speech in an anti-constitutional

20   method so that we stay within these both -- try to

21   stay both within the narrow and broad definitions of

22   that.

23        Q.   Does that complete your response to what

24   reviews CAI has undertaken to determine whether or

25   not it's engaged in the unauthorized practice of law?

1    A.   No.

2    Q.   Is there anything CAI has undertaken?

3    A.   Sure.

4    Q.   I didn't hear much in that answer, to be

5 honest.  I heard a lot of other things.

6        Has CAI done anything to undertake a review

7 beyond what you said?

8    A.   Well, I'm sorry that you don't believe that

9 my review of the statute and how I view it and the

10 issues I have with knowing where that topic lands,

11 I'm sorry you don't view that as responsive.

12        There are many other things we've done to

13 try to figure out that topic, from legal advice we

14 received to readings that we've done to just our

15 general approach here, which is to be very up front

16 about this and go and create abundant clarity,

17 provide people something they are not now getting in

18 that gap and do it in an on-the-table, aboveboard way

19 as opposed to what I think happens largely in the

20 marketplace that's not as much on top of the table.

21    Q.   Does that now complete your response?

22    A.   Yes.

23    Q.   Are you confident Exhibit 77 does not call

24 where CAI gave legal advice to a member?

25    A.   I'm confident in my understanding and any

```
 1    reasonable definition that we have not.
 2        Q.    Does CAI maintain any internal resources it
 3    defined for its employees the term "legal advice" for
 4    their use, including on the hotline?
 5        A.    Yes, in the ways we've discussed earlier.
 6    Yes, in terms of how we both train as well as monitor
 7    as well as regularly discuss the topics and calls.
 8        Q.    Are there any written materials for that
 9    training and monitoring of policies and procedures
10    for it that are written?
11        A.    Yes.
12        Q.    Do you know if you've produced written
13    training materials?
14        A.    Yes, there are and I have mentioned them
15    already in other responses.
16        Q.    To your knowledge, has CAI ever engaged in
17    the unauthorized practice of law?
18        A.    No.
19        Q.    So it's your testimony that CAI has been
20    able to conform its current conduct to the
21    requirements of the law with respect to the
22    unauthorized practice of law?
23        A.    We've done so, and we've done so by being
24    conservative by refusing and failing to provide
25    advice that our members request.
```

```
 1      Q.   Give me one second here, please.
 2           Would you have like an Outlook, any sort of
 3   documentation so we could further get some
 4   clarification about who you spoke with?  Did you use
 5   Outlook in your email calendar?
 6      A.   Sure, I do.  I suspect Reid Phillips would
 7   be able to provide that mechanical information about
 8   who and when.
 9           MS. SHIELDS:  Okay.  If there is
10   documentation, we would like to have a copy of it
11   forwarded it as soon as possible?
12           MR. PHILLIPS:  To be clear, I think the only
13   thing he is likely to know or have is the date of the
14   meeting.
15           MS. SHIELDS:  That would be helpful as well.
16           MR. PHILLIPS:  Or documents exchanged at the
17   meeting other than perhaps to leave the courtesy copy
18   of the complaint.
19           MS. SHIELDS:  If we could get a copy of any
20   sort of documentation, that would be great.
21           That's really all I have.
22                        EXAMINATION
23   BY MR. PHILLIPS:
24      Q.   You were asked some questions about
25   Exhibit 85, the memorandum of that Mr. Gupton
```

1    prepared on or about December 18, 2014.

2         Do you recall that?

3    A.    I do.

4    Q.    That was not a document that was shared with

5    the board of directors, correct?

6    A.    It was not shared with the board of

7    directors.

8    Q.    That was Mr. Gupton's document, not your

9    document; is that correct?

10   A.    That's true.

11   Q.    And you said, I believe, that Exhibit 25,

12   which is your email to Alice Mine with the attachment

13   is a document that, by contrast, you prepared,

14   correct?

15   A.    True.

16   Q.    And gave your view of the scope and type of

17   legal services that might be offered by CAI, correct?

18   A.    Yes.

19   Q.    So it would not be accurate for the

20   State Bar to represent to the Court in this case that

21   the December 18, 2014 memorandum was a final plan or

22   the definitive outline of plans or intentions of CAI

23   with respect to legal services, would it?

24   A.    That would be inaccurate.

25        MR. PHILLIPS:  Thank you.  That's all I