RECORD NO. 17-2218

IN THE
**UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT**

CAPITAL ASSOCIATED INDUSTRIES, INC.,

*Plaintiff-Appellant*,

v.

JOSH STEIN, in his official capacity as Attorney General of the State of North
Carolina, NANCY LORRIN FREEMAN, in her official capacity as District
Attorney for the 10th Prosecutorial District of the State of North Carolina, J.
DOUGLAS HENDERSON, in his official capacity as District Attorney for the
18th Prosecutorial District of the State of North Carolina,

*Defendants-Appellee*,

And

THE NORTH CAROLINA STATE BAR,

*Intervenor/Defendant-Appellee*

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

**REPLY BRIEF OF APPELLANT**

Reid L. Phillips
Jennifer K. Van Zant
Charles E. Coble
Craig D. Schauer
BROOKS, PIERCE, McLENDON,
 HUMPHREY & LEONARD, L.L.P.
Post Office Box 26000
Greensboro, North Carolina 27420-6000
Telephone: (336) 373-8850
*Attorneys for Capital Associated Industries, Inc.*

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ............................................................iii

ARGUMENT.................................................................................. 1

I.    THE PROHIBITION AGAINST CAI OFFERING LEGAL
SERVICES IS NOT RATIONALLY RELATED TO LEGITIMATE
INTERESTS ......................................................................... 2

II.   PREVENTING CAI FROM OFFERING LEGAL SERVICES TO
ITS MEMBERS VIOLATES THE ASSOCIATIONAL RIGHTS OF
CAI AND ITS MEMBERS ...................................................... 7

       A.    The First Amendment protects a broad array of legal
services ....................................................................... 7

       B.    Non-profit associations are entitled to First Amendment
protections .................................................................. 9

       C.    The First Amendment protects expressive group activity,
even when by corporations.......................................... 12

       D.    The First Amendment does not preclude North Carolina
from regulating CAI's attorneys ........................... 15

III.  PREVENTING CAI FROM OFFERING LEGAL ADVICE
THROUGH LICENSED ATTORNEYS VIOLATES CAI'S FREE
SPEECH RIGHTS ................................................................ 16

IV.  THE UPL STATUTES ARE UNCONSTITUTIONALLY VAGUE.......... 20

V.   THE UPL STATUTES UNCONSTITUTIONALLY PROHIBIT CAI
FROM ADVERTISING LEGAL SERVICES ............................... 24

VI.  THE UPL STATUTES CREATE AN EXCLUSIVE PRIVILEGE TO
A PARTICULAR CLASS VIOLATING THE NORTH CAROLINA
CONSTITUTION ................................................................. 24

i

CONCLUSION ....................................................................................... 26

CERTIFICATE OF COMPLIANCE ..................................................... 28

CERTIFICATE OF SERVICE ............................................................... 29

CONTENTS OF ADDENDUM ................................................Addendum 1

    N.C. R. Prof'l Conduct 5.4..............................................Addendum 2

    2013 N.C. State Bar Formal Ethics Op. 9 (Oct. 25, 2013) ..........Addendum 4

## TABLE OF AUTHORITIES

## CASES

*Boy Scouts of Am. v. Dale,*
    530 U.S. 640 (2000) ........................................................................ 9

*Brotherhood of R.R. Trainmen v. Virginia,*
    377 U.S. 1 (1964) ................................................................. 7, 8, 11

*Citizens United v. FEC,*
    558 U.S. 310 (2010) ...................................................................... 13

*Cohen v. California,*
    403 U.S. 15 (1971) ..................................................................17, 20

*Gardner v. N.C. State Bar,*
    316 N.C. 285, 341 S.E.2d 517 (1986) ........................................ 25

*Goulart v. Meadows,*
    345 F.3d 239 (4th Cir. 2003) ...................................................... 18

*Greater Baltimore Ctr. for Pregnancy Concerns, Inc. v.*
    *Mayor & City Council of Baltimore,*
    879 F.3d 101 (4th Cir. 2018) ...................................................... 22

*Holder v. Humanitarian Law Project,*
    561 U.S. 1 (2010) ................................................................ passim

*In re Certificate of Need for Aston Park Hosp., Inc.,*
    282 N.C. 542, 193 S.E.2d 729 (1973) ........................................ 26

*In re Under Seal,*
    749 F.3d 276 (4th Cir. 2014) ...................................................... 13

*Iota Xi Chapter of Sigma Chi Fraternity v. Patterson,*
    566 F.3d 138 (4th Cir. 2009) ...................................................... 12

iii

*Jacoby & Meyers, LLP v. Presiding Justices of the First,*
    *Second, Third & Fourth Dep'ts,*
    852 F.3d 178 (2017) ......................................................... 6, 18, 19

*King v. Governor of N.J.,*
    767 F.3d 216 (3d Cir. 2014) ........................................................ 17

*Lawline v. Am. Bar Ass'n,*
    956 F.2d 1378 (1992) ................................................................ 6, 9

*N.C. State Bar v. Lienguard, Inc.,*
    2014 NCBC LEXIS 11 (N.C. Super. Ct. Apr. 4, 2014) ..................... 21, 25

*NAACP v. Button,*
    371 U.S. 415 (1963) ............................................................ *passim*

*Nat'l Ass'n for the Advancement of Multijurisdiction*
    *Practice (NAAMJP) v. Lynch,*
    826 F.3d 191 (4th Cir. 2016) ................................................... 19, 20

*Ohralik v. Ohio State Bar Association,*
    436 U.S. 447 (1978) ......................................................... 3, 9, 10

*Pickup v. Brown,*
    740 F.3d 1208 (9th Cir. 2014) ..................................................... 17

*Reed v. Town of Gilbert, Ariz.,*
    135 S. Ct. 2218 (2015) .............................................................. 19

*Roberts v. U.S. Jaycees,*
    468 U.S. 609 (1984) ......................................................... 9, 12, 20

*Sanitation & Recycling Indus. v. City of N.Y.,*
    107 F.3d 985 (2d Cir. 1997) ...................................................... 12, 14

*Schware v. Bd. of Bar Examiners of N.M.,*
    353 U.S. 232 (1957) ................................................................... 2

*Schweiker v. Wilson,*
    450 U.S. 221 (1981) ................................................................... 2

*Seawell v. Carolina Motor Club, Inc.,*
 209 N.C. 624, 184 S.E. 540 (1936) ............................................25

*St. George v. Hardie,*
 147 N.C. 88, 60 S.E. 920 (1908) ...............................................25

*State v. Ballance,*
 229 N.C. 764, 51 S.E.2d 731 (1949) ..........................................24

*State v. Call,*
 121 N.C. 643, 28 S.E. 517 (1897) ..............................................25

*United Mine Workers v. Ill. State Bar Ass'n,*
 389 U.S. 217 (1967) ........................................................ 7, 8, 11

*United States v. O'Brien,*
 391 U.S. 367 (1968) ..................................................................20

*United States v. Williams,*
 504 U.S. 36 (1992) ....................................................................12

*United Transp. Union v. State Bar of Mich.,*
 401 U.S. 576, 584 (1971) ................................................. 7, 8, 13

*Volvo Const. Equipment N. Am., Inc. v. CLM Equip. Co., Inc.,*
 386 F.3d 581 (4th Cir. 2004) ....................................................12

*Wilkins v. Gaddy,*
 734 F.3d 344 (4th Cir. 2013) ......................................................5

*Williamson v. Lee Optical of Okla., Inc.,*
 348 U.S. 483 (1955) ...............................................................2, 5

*Wollschlaeger v. Governor,*
 848 F.3d 1293 (11th Cir. 2017) ................................................17

## STATUTORY AUTHORITIES

28 U.S.C. § 1915 ......................................................................16

N.C. Gen. Stat. § 84-5 ....................................................... 3, 15, 20

N.C. Gen. Stat. § 84-37. ............................................................................25

## CONSTITUTIONAL PROVISIONS

N.C. Const.art. I, § 34 ............................................................................25

## ADDITIONAL AUTHORITIES

2013 N.C. State Bar Formal Ethics Op. 9 (Oct. 25, 2013) ................... Addendum 4

## **ARGUMENT**

The mission of Capital Associated Industries, Inc. ("CAI"), an incorporated non-profit association, is to improve employment relationships. CAI expresses itself by, among other means, offering employment-related compliance guidance to its members. CAI seeks to extend these expressive activities by employing licensed attorneys to offer employment-related legal services to CAI's members. The State of North Carolina ("North Carolina" or the "State") refuses to permit this activity because it has decided that some disfavored non-profit corporations, like CAI, cannot provide legal services.

Above all else, the First Amendment means that North Carolina has no power to censor CAI's expression based on its form (group legal services), the content of the words used (legal advice), or the speaker's identity (a non-profit corporation). The Fourteenth Amendment also imposes substantive limitations on North Carolina by prohibiting the State from depriving CAI of legal services without a valid justification. North Carolina subverts these foundational principles and asks this Court to bless its prohibition against CAI's legal services because North Carolina says it knows best.

In the record before the Court, CAI has pushed through the State's defensive veneer and exposed what really is afoot. North Carolina seeks to silence, through irrational regulation, CAI's expressive activity solely because of who CAI is and

what it wants to express. The First and Fourteenth Amendments protect against such government action and require that CAI be free to offer legal services to its members.

## I. THE PROHIBITION AGAINST CAI OFFERING LEGAL SERVICES IS NOT RATIONALLY RELATED TO LEGITIMATE INTERESTS.

Rational-basis review demands that there be "an evil at hand for correction, and that it might be thought that the particular legislative measure was a rational way to correct it." *Williamson v. Lee Optical of Okla., Inc.*, 348 U.S. 483, 487–88 (1955). Thus, the Court's review of the UPL Statutes, though deferential, is far from blind deference to a legislature's defense of an enactment. *See Schweiker v. Wilson*, 450 U.S. 221, 234 (1981) ("[T]his rational-basis standard is not a toothless one." (quotation omitted)); *Schware v. Bd. of Bar Examiners of N.M.*, 353 U.S. 232, 239 n.5 (1957) ("Certainly the practice of law is not a matter of the State's grace."). The UPL Statutes, in prohibiting CAI from offering legal services through licensed attorneys, are not rationally related to any evils against which North Carolina purportedly seeks to guard. And the Court need not take CAI's word for it, as the State has said so in the record and through its legislative enactments.

North Carolina rests its defense of prohibiting CAI from offering legal services on a single pillar: CAI's attorneys supposedly would act unethically because they would be employed by a non-profit corporation. Resp. Br. 23; *see id.* 26 ("CAI's structure demonstrates a misalignment of incentives and duties between nonlawyers and lawyers."). This lone justification is belied, however, by North

2

Carolina's own testimony.  The State Bar admitted, under oath, that it presumes that all attorneys (including those working for a non-profit corporation) will comply with their ethical obligations.  (JA 805–06, 853).  In addition, the State Bar conceded that a non-profit corporation's attorney is no less ethical than a private-practice attorney, (JA 797–98, 815–16, 895), and can resist pressures exerted by non-attorneys, (JA 751–52).  In fact, attorneys are "trained to work through[,] consistent with the Rules of Professional Conduct," conflicts of interest.  (JA 745–46).  North Carolina's admissions reveal that there is no logical basis for its conclusion that attorneys at a non-profit corporation will act unethically.  The lone pillar upholding the prohibition against CAI gives way under the weight of North Carolina's confessed irrationality.[1]

North Carolina's justification for the prohibition completely collapses when the Court considers the State's approval of the legal services offered by other non-profit corporations.  *See* N.C. Gen. Stat. § 84-5.1.  The State asks the Court to pay no attention to Section 84-5.1 because, it claims, there are "significant differences" between CAI and the other non-profit corporations that North Carolina does allow to offer legal services.  Resp. Br. 30–31.  Far from being "significant," however,

---

[1] North Carolina also contends that, despite presuming that CAI's attorneys will act ethically, it should be allowed to ban CAI from offering legal services because these legal services will be immune from oversight.  *See* Resp. Br. 26–27 (citing *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447 (1978)).  That is not correct: As the State Bar elsewhere admits, it can adequately protect the public with its disciplinary power over CAI's attorneys.  (JA 696, 708–09, 762–63, 882).

3

these differences are irrelevant. They bear no relation to the State's lone justification for prohibiting CAI from offering legal services. Indeed, in terms of the "misalignment of incentives and duties between nonlawyers and lawyers," Resp. Br. 26, a public-interest law firm is indistinguishable from CAI: Just as CAI proposes to be, public-interest law firms are non-profit corporations that offer legal services to third-party clients in exchange for fees, they are controlled by non-attorney boards, and they self-impose governing structures that protect attorney independence. *See* CAI Br. 26. The State Bar has issued a formal ethics opinion that acknowledges that an attorney working under this "misalignment of incentives and duties" at a non-profit corporation can comply with the North Carolina Rules of Professional Conduct. *See* 2013 N.C. State Bar Formal Ethics Op. 9 (Oct. 25, 2013), *reprinted in* North Carolina State Bar, The 2014 Lawyer's Handbook 10-249 (2014) (acknowledging that attorneys employed and supervised by non-attorneys can comply with Rule 5.4). Yet, North Carolina welcomes legal services by one non-profit corporation (a public-interest law firm) and outlaws such services by another non-profit corporation (CAI).

North Carolina's targeting of CAI is inconsistent with the State Bar's repeated admissions that CAI's attorneys, in particular, do not pose the harms that justify prohibiting CAI from offering legal services. Each of the State Bar's three Rule 30(b)(6) designees admitted that the State Bar has not identified a particular public

4

harm with respect to CAI. (JA 695, 711, 733, 838–39). When posed a specific question about harms relating to CAI, the State Bar responded that it had *not* "identified particular areas of concern with respect to CAI" but that "[t]he *overall concern that we have with respect to the corporate practice of law* is that there is a misalignment of incentives and duties between non-lawyers and lawyers." (JA 733 (emphasis added)). The State Bar also expressly stated it is not concerned that CAI would pressure attorneys to violate the Rules of Professional Conduct. (JA 742, 862). The State Bar admitted that, rather than actually being concerned about CAI, it was concerned that CAI's provision of legal services would "change the landscape entirely." (JA 871).

Not only has North Carolina conceded that it is not concerned with the attorneys at CAI, the State ignores evidence showing that the purported harms of CAI's legal services are unfounded. North Carolina's justification for legislative enactments such as the UPL Statutes must, at a minimum, be "*rational* speculation." *Wilkins v. Gaddy*, 734 F.3d 344, 348 (4th Cir. 2013) (emphasis added). Here, even that forgiving standard is not satisfied. It is irrational to speculate that CAI's attorney will pose ethical concerns when that hypothesis is both (a) inconsistent with North Carolina's own assessment of non-profit-corporate attorneys and (b) affirmatively *disproved* by peer employer-associations in other states. (*See* JA 181–222). Furthermore, North Carolina's complete tolerance in other contexts of the harms

5

supposedly posed by CAI's attorneys, *see* CAI Br. 16–18, demonstrates that these speculative harms are not genuine "evil[s] at hand for correction." *Accord Williamson*, 348 U.S. at 487.

Brushing these flaws aside, North Carolina cites decisions in which courts have upheld unauthorized-practice-of-law statutes against challenges on other grounds. *See* Resp. Br. 20–24. North Carolina asks the Court to follow suit. However, none of the proffered cases upheld a state's prohibition on the practice of law after the state's own testimony and statutory enactments disproved the state's justification for the prohibition. For example, in *Jacoby & Meyers, LLP v. Presiding Justices of the First, Second, Third & Fourth Dep'ts*, 852 F.3d 178, 191–92 (2d Cir. 2017), the Second Circuit upheld New York's prohibition of non-attorneys investing in law firms, and in *Lawline v. Am. Bar Ass'n*, 956 F.2d 1378, 1385 (7th Cir. 1992), the Seventh Circuit upheld Illinois's prohibition of attorney–non-attorney partnerships. Notably absent from the records in those cases was testimony by either the New York or Illinois state bars establishing that the states presumed attorneys will uphold their ethical obligations when employed by non-attorneys. Most certainly, neither of these states had recently passed a law that *allowed* the purported harm to occur in an identical context.

CAI is not asking this Court to question the wisdom of a public policy choice. CAI's challenge is more fundamental: The UPL Statutes, in prohibiting CAI from

offering legal services to its members through licensed attorneys, are irrational—and North Carolina itself has proven this so. For the State to argue otherwise is like the Wizard of Oz pleading with Dorothy to "pay no attention to the man behind the curtain." For what lies behind the State's defense is a record proving that North Carolina has no rational basis for prohibiting CAI from offering legal services through licensed attorneys.

## II. PREVENTING CAI FROM OFFERING LEGAL SERVICES TO ITS MEMBERS VIOLATES THE ASSOCIATIONAL RIGHTS OF CAI AND ITS MEMBERS.

The associational freedoms embedded in the First Amendment entitle CAI to provide legal services in furtherance of the association's mission of improving employment relations. Controlling Supreme Court precedents foreclose North Carolina's attempt to say otherwise.

### A. The First Amendment protects a broad array of legal services.

The First Amendment protects the right of CAI's members to receive cost-effective legal services in furtherance of the association's expressive goals. *See, e.g.*, *United Transp. Union v. State Bar of Mich.*, 401 U.S. 576, 580, 584 (1971) (recognizing the right "to act collectively to obtain affordable and effective legal representation"); *United Mine Workers v. Ill. State Bar Ass'n*, 389 U.S. 217, 222 (1967) ("[T]he right of an association to provide legal services for its members."); *Brotherhood of R.R. Trainmen v. Virginia*, 377 U.S. 1, 5 (1964) ("constitutionally

7

guaranteed right to assist and advise each other"); *NAACP v. Button*, 371 U.S. 415, 444–45 (1963) ("[T]he Constitution protects expression and association without regard . . . to the truth, popularity, or social utility of the ideas and beliefs which are offered.").

Here, North Carolina seeks to evade these precedents by contending their holdings are limited to those cases. That is not so. The Supreme Court has twice corrected lower courts for construing *Button* and its progeny too narrowly. In *United Mine Workers*, the Supreme Court reversed the Illinois Supreme Court for attempting to limit the holdings in *Button* and *Trainmen* to the facts of those cases: "[T]he First and Fourteenth Amendments give[] petitioner the right to hire attorneys on a salary basis to assist its members in the assertion of their legal rights." 389 U.S. at 221–22. The Supreme Court elaborated that "[g]reat secular causes, [along] with small ones, are guarded" under the First Amendment, and its protections "are not confined to any field of human interest." *Id.* at 223 (internal quotations omitted). Later, in *United Transportation*, the Supreme Court reproved the lower court for giving *Trainmen* "the narrowest possible reading" and not recognizing "the *broad range of union activities* protected by the First Amendment." *United Transp.*, 401 U.S. at 579–80 (emphasis added). The Supreme Court proceeded to strike down— in its entirety—an injunction that prohibited the union "from giving or furnishing legal advice to its members or their families." *Id.* at 580.

8

Based on these admonitions, it is clear that the First Amendment's associational protections are not limited to "meaningful access to the courts." Resp. Br. 43; *see Lawline v. Am. Bar Ass'n*, 956 F.2d 1378, 1387 (7th Cir. 1992). In fact, in *United Transportation*, the Supreme Court held that the breadth of the First Amendment's protections reach beyond the workers' right to access to the courts:

> In the context of this case we deal with a cooperative union of workers seeking to assist its members in effectively asserting claims under the FELA. *But the principle here involved cannot be limited to the facts of this case*. At issue is *the basic right to group legal action*[.]

401 U.S. at 585 (emphasis added). Since then, the Supreme Court has reiterated that the First Amendment protects the "right to associate for the purpose of engaging in those activities protected by the First Amendment," *Roberts v. U.S. Jaycees*, 468 U.S. 609, 618 (1984), and that access to the courts is but one form of such protected activity. *See, e.g.*, *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 643 (2000) (holding Boy Scouts were entitled to associational rights because it was a "private, not-for-profit organization engaged in instilling its system of values in [it members]").

**B. Non-profit associations are entitled to First Amendment protections.**

North Carolina labors to exclude CAI from the associational rights recognized in *Button* and its progeny by attempting to recast CAI as a purely "commercial" business based on the fact that it generates revenue. *See* Resp. Br. 6, 36, 41–42, 50. The State then suggests that *Ohralik* and *Primus* stand for the rule that the

government has the right to interfere with associational rights when such "commercial considerations are present" (i.e., compensation for legal services). *See* Resp. Br. 40–41. Both assertions are wrong. First, CAI is not a commercial business; all non-profit organizations must generate revenue to cover the costs of pursuing their mission. As the chair of CAI's board testified, "if there is no margin, there is no mission." (JA 502). Second, *Ohralik* held only that an attorney's in-person solicitation, which proposes a commercial *transaction*, is subject to lesser judicial scrutiny. 436 U.S. at 455–57.

The controlling factor in *Button* and its progeny is that the association is a *non-profit* association, not that the association does not receive any form of compensation. With a non-profit association, even if there is some form of compensation, "no monetary stakes are involved." *Button*, 371 U.S. at 443; *accord Primus*, 436 U.S. at 428–31. North Carolina does not dispute that CAI is a non-profit incorporated association. (*See* JA 161, 163). As a non-profit corporation, CAI cannot profit from offering legal services; all fees are reinvested back into the association's mission. (*Id.*). CAI's long-term strategy to grow the size of the association ("2X"), which the State maligns, is an extension of its mission of improving employment relationships: Growing its membership and revenue allows CAI to extend the reach of its workplace assistance and advocacy. (JA 173, 430, 518–21, 523–24). In the words of CAI's president, "2X is our strategic plan . . . to

10

double our size, *our impact, our reach, our role in improving workplaces in North Carolina*. It's to double all those categories of things. . . . 2X is a shorthand for that." (JA 225 (emphasis added)).

The Supreme Court has repeatedly rejected the State's argument that compensation disqualifies an association from First Amendment protections. In *Button*, the Supreme Court established the NAACP's associational rights over the dissent's objection that NAACP attorneys, who received a salary, had a pecuniary interest that warranted the state's intervention. 371 U.S. at 457 (Harlan, J., dissenting). Likewise, in *Primus*, the Supreme Court held that the ACLU's motivation for collecting financial donations and prevailing-party fees did not exempt it from associational protections. 436 U.S. at 428–31. Finally, labor unions—such as those in *Trainmen*, *United Mine Workers*, and *United Transportation*—collect membership dues (just as CAI does) and are entitled to the same First Amendment rights afforded to the NAACP and the ACLU. Despite there being compensation in all of these cases, the Supreme Court upheld the associations' right to offer legal services. Under the view taken by North Carolina in this case, however, all those associations would be "commercial" and therefore *not* entitled to First Amendment protections.

## C. The First Amendment protects expressive group activity, even when by corporations.

These constitutional rights recognized in *Button* and its progeny are available for groups that "associate for the purpose of engaging in those activities protected by the First Amendment." *Roberts*, 468 U.S. at 618; *see Iota Xi Chapter of Sigma Chi Fraternity v. Patterson*, 566 F.3d 138, 146 (4th Cir. 2009). An association that "seeks to transmit . . . a system of values" "engages in expressive activity" that is protected by the First Amendment's associational rights. *Dale*, 530 U.S. at 648, 650. An association's values can be transmitted through "quiet persuasion, inculcation of traditional values, [and] instruction[.]" *Roberts*, 468 U.S. at 636 (O'Connor, J., concurring).

CAI is a trade association that seeks to improve employment relationships. CAI improves employment relationships by, among other things, helping employers comply with the labyrinth of labor-and-employment laws and regulations through education and instruction. (JA 161–62, 165, 293–95, 352); *see Sanitation & Recycling Indus. v. City of N.Y.*, 107 F.3d 985, 998 (2d Cir. 1997) (finding trade association that helped members "comply with complex regulations governing [their] business" was an expressive association). Because CAI's legal services

12

would advance its mission to improve workplaces, CAI is entitled to associational rights under the First Amendment.[2]

An association is no less expressive when it is composed of corporate members. "The Court has recognized that First Amendment protection extends to corporations." *Citizens United v. FEC*, 558 U.S. 310, 342 (2010) (collecting authority). The Supreme Court rejected the argument that "corporations or other associations should be treated differently under the First Amendment simply because

---

[2] CAI did not waive this argument. Resp. Br. 34–35. On the contrary, CAI made this argument below, and the District Court ruled on it. *See Volvo Const. Equip. N. Am., Inc. v. CLM Equip. Co., Inc.*, 386 F.3d 581, 604 (4th Cir. 2004) (holding issue raised if "plainly encompassed by the submissions" or "decided by the district court"); *see also United States v. Williams*, 504 U.S. 36, 41–43 (1992) (holding issued raised if "pressed or passed upon below").

In particular, CAI pressed this argument in its Complaint, (JA 20 (¶ 16), 27 (¶ 39)), and in its summary judgment briefing, (*see, e.g.*, DE 120, at 17 ("In *Button* and its progeny, the associations were using legal services to improve civil rights or worker's rights; CAI is using legal services to improve workplaces. While the State Bar may favor the former over the latter, the First Amendment does not."); DE 125, at 11 ("CAI is a non-profit association of members seeking cost-effective legal services to further the purpose of improving employment relationships. CAI thus falls squarely within the limits of *Button* and its progeny."); *see also* DE 104, at 1–4, 19, 22–23; DE 120, at 1, 5, 7, 15, 17; DE 125, at 10–12). The District Court rejected CAI's argument. (JA 1351 (ruling CAI's legal services "would not further the collective exercise of any activity entitled to First Amendment protection")).

On appeal, CAI has offered additional legal authority supporting its argument that its activity entitles it to associational rights. *See In re Under Seal*, 749 F.3d 276, 288 (4th Cir. 2014) ("Once a federal claim is properly presented, a party can make any argument in support of that claim; parties are not limited to the precise arguments they made below." (quotation and alterations omitted)).

such associations are not 'natural persons.'" *Id.* at 343.[3]  Here, however, the State

argues that *Button* and its progeny somehow restricted the First Amendment's

protections to impoverished natural persons.  *See* Resp. Br. 45–47.  The right to

receive group legal services is not dependent on a member's inability to otherwise

afford representation.  *See, e.g.*, *United Transp.*, 401 U.S. at 579–80 ("[G]roups can

unite to assert their legal rights as effectively and economically as practicable.");

*Button*, 371 U.S. at 443–44 (finding "neither claim nor proof" that NAACP members

"have desired, but have been prevented from retaining, the services of other

counsel").[4]  Furthermore, *Button* said nothing about the characteristics of the

NAACP's members; rather, the Supreme Court held that the NAACP could offer

legal services because, like CAI, it was a non-profit association.  *See* 371 U.S. at

441–43; *accord Sanitation & Recycling Indus.*, 107 F.3d at 998 (recognizing

associational rights for business trade association).

---

[3] Overlooking *Citizens United*, North Carolina cites cases addressing corporations' rights under 28 U.S.C. § 1915 and Federal Claims Court Rule 83.1—not the First Amendment.  *See* Resp. Br. 45 n.6.

[4] These precedents also establish that there is no requirement that the members have no other options than the association's legal services, as the members in these cases had alternatives for legal services. Thus, contrary to the State's arguments, the availability of a prepaid legal services plan does not divest CAI's members of their constitutional right to receive legal services from the association itself.  Resp. Br. 47–48.

**D. The First Amendment does not preclude North Carolina from regulating CAI's attorneys.**

The Court's recognition that *Button* and its progeny protect CAI's right to offer legal services will not "negate" North Carolina's ability to regulate attorneys and protect attorney independence. *See* Resp. Br. 2. The cases establish only the right to receive cost-effective legal services from a non-profit association in furtherance of the association's expressive purpose. The cases do not forbid the State's regulation of those legal services.

*Button* and its progeny merely demand that, should the regulation interfere with CAI's expressive conduct, the regulation be subject to strict scrutiny. North Carolina can adequately regulate CAI's attorneys and legal services. The State can still, through the State Bar, regulate (1) the lawyers working for these associations and (2) the associations' manner of offering legal services. North Carolina could also enact legislation that targets any narrow harms the State might find in CAI's legal services (as it did, for example, in passing N.C. Gen. Stat. § 84-5.1, which allows other non-profit corporations to offer legal services under specific conditions).

What North Carolina cannot do is impose a *blanket prohibition* (in the form of the UPL Statutes) that criminalizes any and all legal services CAI might offer to its members. This absolute prohibition is not narrowly tailored to any particular harm. North Carolina cannot suffocate CAI's expressive activity by completely

15

banning CAI from offering its members legal services that are consistent with its mission.

### III. PREVENTING CAI FROM OFFERING LEGAL ADVICE THROUGH LICENSED ATTORNEYS VIOLATES CAI'S FREE-SPEECH RIGHTS.

The UPL Statutes censor CAI's speech whenever the content of its speech includes legal advice.[5] North Carolina argues that CAI's speech—when it contains legal advice—"is not pure speech but professional speech" and that, as such, the standard of strict scrutiny does not apply. Resp. Br. 50–51. In other words, the State asserts that it is at liberty to censor speech whenever the content contains legal advice.

To make this argument, North Carolina contends that the content of speech can somehow transform that speech into conduct. *See* Resp. Br. 51–52. This very argument has been dismissed by the Supreme Court. In *Holder v. Humanitarian Law Project*, 561 U.S. 1, 8–9 (2010), the Government defended a statute that censored the plaintiffs' speech as a generally applicable law that regulates conduct with an incidental impact on speech. *See id.* at 27–28. The Supreme Court flatly rejected this characterization: "The Government is wrong that the only thing actually at issue in this litigation is conduct[.]" *Id.* at 27. Although "[t]he law here

---

[5] In addition, CAI has shown that the UPL Statutes censor speech on the basis of the speaker's identify. CAI Br. 46–47. North Carolina's Response Brief does not contend otherwise.

may be described as directed at conduct . . . [,] as applied to plaintiffs the conduct triggering coverage under the statute consists of communicating a message." *Id.* at 28. As the Supreme Court declared, the law "regulate[d] speech on the basis of its content. Plaintiffs want to speak to [certain groups], and whether they may do so . . . depends on what they say." *Id.* at 27; *see Cohen v. California*, 403 U.S. 15, 18 (1971) ("The only 'conduct' which the State sought to punish is the fact of communication. Thus, we deal here with a conviction resting solely upon 'speech[.]'").[6]

This argument—that speech, depending on its content, constitutes conduct— has also been rejected by other circuit courts. *Wollschlaeger v. Governor*, 848 F.3d 1293, 1309 (11th Cir. 2017) (en banc) ("The *Pickup* panel, therefore, concluded that the law 'regulate[d] conduct' even though it covered the verbal aspects of SOCE therapy. There are serious doubts about whether *Pickup* was correctly decided." (citation omitted)); *King v. Governor of N.J.*, 767 F.3d 216, 224 (3d Cir. 2014) ("[T]he argument that verbal communications become 'conduct' when they are used to deliver professional services was rejected by *Humanitarian Law Project*."); *see also Pickup v. Brown*, 740 F.3d 1208, 1216 (9th Cir. 2014) (O'Scannlain, J.,

---

[6] North Carolina dismisses *Humanitarian Law Project* as upholding a law that censored speech, *see* Resp. Br. 53–54, but this was after the Supreme Court determined that the law survived strict scrutiny. 561 U.S. at 28, 39. The UPL Statutes cannot survive strict scrutiny.

17

dissenting from denial of en banc review) ("The panel, contrary to common sense and without legal authority, simply asserts that some spoken words . . . are not speech.").

Moving past these decisions, North Carolina focuses on *Goulart v. Meadows*, 345 F.3d 239, 247 (4th Cir. 2003), where the Court held that teaching, which "involve[s] the transmission of knowledge or ideas by way of the spoken or written word," is "pure speech." The State claims that CAI's "professional speech" is different than a teacher's "instructional speech." Resp. Br. 54. North Carolina explains that CAI's professional speech is actually conduct because it has a "two-way nature": The "legal advice [i.e., speech] is based on understanding [i.e., listening and thinking] and advancing a client's particular interests [i.e., speaking to the client]." *Id.* But the instructional speech in *Goulart* has the same "two-way nature": The instruction (i.e., speech) is based on understanding (i.e., listening and thinking) to a student's questions and providing an answer (i.e., speaking to the student). *See* 345 F.3d at 247–48; *see also Humanitarian Law Project*, 561 U.S. at 10, 14–15 (applying strict scrutiny to speech with 'two-way nature'). The State accepts that a teacher's speech is pure speech, yet persists that CAI's speech is mere conduct.

North Carolina next focuses on the district court's decision in *Jacoby & Meyers*, claiming the Southern District of New York dismissed CAI's free-speech

argument as "a mockery of the First Amendment." Resp. Br. 54–55 (quotation omitted). To be clear, CAI is making the quintessential First Amendment argument that content-based restrictions of speech should be subject to strict scrutiny. *See, e.g.*, *Reed v. Town of Gilbert, Ariz.*, 135 S. Ct. 2218, 2226 (2015) ("Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests."). The plaintiff in *Jacoby & Meyers*, in contrast, argued that law firms have a First Amendment right to associate with whomever they want to provide legal services. *See Jacoby & Meyers, LLP v. Presiding Justices of the First, Second, Third & Fourth Departments, Appellate Div. of the Supreme Court of the State of New York*, 118 F. Supp. 3d 554, 568 (S.D.N.Y. 2015), *aff'd*, 852 F.3d 178 (2d Cir. 2017). The district court made the obvious declaration that the plaintiff's "plan to accept non-lawyer equity investment" was not speech but conduct. *Id.* at 570–71. The district court never once suggested that speaking legal advice was anything other than speech.

The professional-speech doctrine does not excuse North Carolina's censorship of CAI's speech from being strictly scrutinized by the Court. The professional-speech doctrine provides that "[t]he government may regulate professionals providing personalized advice in a private setting to a paying client" because "the professional's speech is incidental to the conduct of the profession."

*Nat'l Ass'n for the Advancement of Multijurisdiction Practice (NAAMJP) v. Lynch*, 826 F.3d 191, 195–96 (4th Cir. 2016) (internal quotations and citations omitted); *see also Greater Baltimore Ctr. for Pregnancy Concerns, Inc. v. Mayor & City Council of Baltimore*, 879 F.3d 101, 109 (4th Cir. 2018). The doctrine embodies the principle that content-neutral regulations that have an incidental impact on speech are subject only to intermediate scrutiny. *See, e.g.*, *United States v. O'Brien*, 391 U.S. 367, 377 (1968). The UPL Statutes, however, prohibit CAI from speaking to its members based solely on the *content* of the communication. The censorship is not based on any conduct. Because the UPL Statutes, as applied to CAI's legal advice, are not a conduct regulation with an incidental impact on speech, the censorship of CAI's speech falls outside the professional-speech doctrine and must be strictly scrutinized. *See*, *e.g.*, *Humanitarian Law Project*, 561 U.S. at 27–28; *Cohen*, 403 U.S. at 18.

## IV. THE UPL STATUTES ARE UNCONSTITUTIONALLY VAGUE.

The test for statutory vagueness is well established. *See Roberts*, 468 U.S. at 629. When a statute interferes with free speech, however, "a more stringent vagueness test should apply." *Humanitarian Law Project*, 561 U.S. at 19.

CAI does not, as North Carolina contends, have fair notice of what constitutes legal advice. North Carolina's laws do not define legal advice, they simply prohibit CAI from giving it. N.C. Gen. Stat. §§ 84-5 & 84-5. Looking beyond the statutes, the State offers no definition of legal advice in North Carolina. The lone North

20

Carolina opinion cited by the State declares that legal advice has a "generally well recognized meaning" but the opinion itself is unable to articulate that meaning. *N.C. State Bar v. Lienguard, Inc.*, 2014 NCBC LEXIS 11, at *31–34 (N.C. Super. Ct. Apr. 4, 2014). Even the State Bar—the authority that polices the practice of law— has no written definition of legal advice. (JA 667, 678, 683). Rather, the 41 members of the State Bar's Authorized Practice Committee are free to determine where the line exists by "synthesiz[ing]" their independent understandings of "sundry" cases from other jurisdictions. (JA 678–82, 684).

As the State Bar testified, there is a "spectrum" of legal advice:

> There are clearly some circumstances where . . . a statement might constitute legal advice. There are clearly some circumstances where it might not constitute legal advice, and *it's in the middle that we would have to examine it*.

(JA 673–74 (emphasis added)). The problem this poses for CAI is that it operates "in the middle" of the "spectrum," with no way to determine where the line exists.

North Carolina claims the UPL Statutes cannot be vague because CAI can identify legal advice, even when it is in the middle of the spectrum. This claim is factually wrong. North Carolina contends that CAI's president, Mr. Bruce Clarke, defined legal advice. Resp. Br. 59. To the contrary, Mr. Clarke's memorandum to the State Bar illustrates his difficulty in defining legal advice: He describes legal advice by substituting the existing vague term ("legal advice") with an equally vague

term ("legal solutions").  (JA 1000).  Mr. Clarke testified that the UPL Statutes are

"very difficult to interpret" and "can be . . . read broadly or narrowly."  (JA 457).

When asked if CAI has ever provided legal advice, Mr. Clarke said that he was

"confident in *my understanding* and *any reasonable* definition that we have not."

(JA 479–80 (emphasis added)).  Mr. Clarke never suggested that he could predict

what the State Bar would consider to be legal advice.

North Carolina then argues that because CAI has "used the term repeatedly,"

the term cannot be vague.  Resp. Br. 59–60.  The States offers six examples, which

simply show that (1) CAI is aware of the UPL Statutes, (2) CAI wishes it was free

to offer legal advice, and (3) the UPL Statutes have a chilling effect on CAI's

compliance guidance.  In order, those examples are as follows:

- CAI's staff attorneys are licensed and, if not working for CAI, could render legal advice. (JA 25–27).

- CAI understands that, as a corporation, the current law prohibits it from offering legal advice.  (JA 129–30).

- CAI trains its staff to be conservative and err on the side of not giving compliance advice if they suspect the advice could be construed as legal advice.  (JA 173, 449–450, 460).  CAI has refused to give members compliance advice when they have conservatively assumed the advice could be construed as legal advice.  (*Id.*).

- CAI understands that, as a corporation, it is unlawful for CAI to offer legal advice.  (JA 1231).

- CAI believes that its members would benefit from receiving legal advice.  (JA 1301–02).

22

- CAI wishes to be able to offer not just compliance advice, but legal advice, to its members. (JA 1233–36).

CAI is not alone in being unable to identify what constitutes legal advice. North Carolina does not dispute that the State Bar itself failed to identify legal advice when presented with hypotheticals involving rudimentary speed-limit questions, (JA 670–75), and that the State Bar's witnesses ultimately contradicted one another, (*compare* JA 670–75, *with* JA 43–44). Rather, North Carolina dismisses this failure to answer legal-advice hypotheticals because the scenarios did not involve the employment guidance CAI's members seek. But this attempt to parse only underscores the problem here: If the State Bar—the agency charged with policing the unauthorized practice of law—cannot identify legal advice when presented with simple speed-limit scenarios, then North Carolina cannot credibly contend that CAI can identify legal advice in the context of giving employment guidance.

CAI's members are not simply reading speed-limit signs (which, according to the State Bar, might or might not be legal advice). Instead, CAI's employment guidance exists in the midst of "voluminous and complex laws, regulations, and compliance challenges." (JA 164). The State Bar even acknowledged CAI's problem: The State Bar testified that a business offering compliance advice—such

23

as CAI—would not know whether it was offering legal advice "unless they consulted with an attorney who told them that they had crossed the line." (JA 686).[7]

North Carolina is dismissive of CAI's vagueness argument. The Constitution is not. *See Humanitarian Law Project*, 561 U.S. at 19 (free speech requires "a more stringent vagueness test"). CAI asks the Court to scrutinize carefully whether the prohibition of "legal advice" is sufficient to give CAI fair notice of when its employment guidance is actually criminal speech.

## V. THE UPL STATUTES UNCONSTITUTIONALLY PROHIBIT CAI FROM ADVERTISING LEGAL SERVICES.

North Carolina concedes that CAI will be permitted to offer advertisements of lawful legal services.

## VI. THE UPL STATUTES CREATE AN EXCLUSIVE PRIVILEGE TO A PARTICULAR CLASS VIOLATING THE NORTH CAROLINA CONSTITUTION.

A professional regulation that is not reasonably necessary to prevent a public harm violates North Carolina's Monopoly Clause, particularly where the regulation is instead "addressed to the interests of a particular class . . . and tends to promote a monopoly in what is essentially a private business." *State v. Ballance*, 229 N.C. 764,

---

[7] The State Bar's suggestion that CAI "also could determine [the definition of legal advice] for themselves if they read the statute" is an empty solution. (JA 687) The statutes do not define legal advice. Even the State Bar itself looks to a "synthesi[s]" of "sundry" cases from other jurisdictions to define legal advice. (JA 684).

772, 51 S.E.2d 731, 736 (1949); *see* N.C. Const. art. I, § 34.  North Carolina does not defend the purported rationales underlying the UPL Statutes being applied to CAI.  Rather, the State claims that courts have already upheld the UPL Statutes under the Monopoly Clause.  The cases it cites do not go that far.

- *Gardner v. N.C. State Bar*, 316 N.C. 285, 286, 341 S.E.2d 517, 518 (1986), concerned whether an insurance company's attorney can represent an insured. At the end of the opinion, the court held that Section 84-5 did not violate the in-house counsel's due process rights because he had other options to practice law.  *Id.* at 295, 341 S.E.2d at 523.  The question of whether the UPL Statutes violated the Monopoly Clause was not raised or decided.

- *Seawell v. Carolina Motor Club, Inc.*, 209 N.C. 624, 630, 184 S.E. 540, 543 (1936), addressed whether certain actions constituted the practice of law. The question of whether the UPL Statutes violated the Monopoly Clause was not before the court.

- *St. George v. Hardie*, 147 N.C. 88, 95–97, 60 S.E. 920, 923 (1908), held that an agency regulating riverboat pilots did not violate the Monopoly Clause while operating within its statutory powers, but never examined the Monopoly Clause's limitations on those statutory powers.

- *State v. Call*, 121 N.C. 643, 645–46, 28 S.E. 517, 517 (1897), upheld the licensing of medical professionals based on the state's right to ensure competency.

- *Lienguard, Inc.*, 2014 NCBC LEXIS 11, at *39–40, concerned the State Bar's injunction authority under N.C. Gen. Stat. § 84-37. The court merely held that the injunction authority does not violate the Monopoly Clause so long as the authority is exercised in compliance with the statute's procedures. *See id.* at *39–42. The *Lienguard* court did not address the question of whether the UPL Statutes create an illegal monopoly in the first place.

None of these decisions address whether the prohibition against a non-profit corporation offering legal services *through competent, licensed attorneys* was

reasonably necessary to prevent a public harm. *See In re Certificate of Need for Aston Park Hosp., Inc.*, 282 N.C. 542, 551–52, 193 S.E.2d 729, 736 (1973). Moreover, none of these courts were presented with a record in which North Carolina admitted facts that establish the irrationality of its prohibition and had enacted a law (and passed an ethics opinion) that condones the purportedly harmful conduct. Because the UPL Statutes, as applied to CAI, are not reasonably necessary to prevent a public harm, they necessarily promote an unlawful monopoly for lawyers.

## **<u>CONCLUSION</u>**

For the foregoing reasons, CAI respectfully requests that this Court reverse the order of the District Court and remand for entry of summary judgment in favor of CAI.

This the 1st day of March, 2018.

/s/ Reid L. Phillips
Reid L. Phillips
  N.C. State Bar No. 7968
  Email:  rphillips@brookspierce.com
Jennifer K. Van Zant
  N.C. State Bar No. 21280
  Email:  jvanzant@brookspierce.com
Charles E. Coble
  N.C. State Bar No. 25342
  Email:  ccoble@brookspierce.com
Craig D. Schauer
  N.C. State Bar No. 41571
  Email:  cschauer@brookspierce.com

*Attorneys for Capital Associated Industries, Inc.*

OF COUNSEL:
BROOKS, PIERCE, McLENDON
 HUMPHREY & LEONARD, L.L.P.
Post Office Box 26000
Greensboro, North Carolina 27420-6000
Telephone: (336) 373-8850

## <u>CERTIFICATE OF COMPLIANCE</u>

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2) or 32(a)(7)(B) because:

[X]    this brief contains 6,370 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

[ ]    this brief uses a monospaced typeface and contains [*state the exact number of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

[X]    this brief has been prepared in a proportionally spaced typeface using [*Microsoft Word 2007*] in [*14 pt Times New Roman*]; or

[ ]    this brief has been prepared in a monospaced typeface using [*state name and version of word processing program*] with [*state number of characters per inch and name of type style*].

Dated:  March 1, 2018

/s/ Reid L. Phillips

28

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this day I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

This the 1st day of March, 2018.

<u>/s/ Reid L. Phillips</u>

- Addendum 1 -

# <u>CONTENTS OF ADDENDUM</u>

Addendum Page

N.C. R. Prof'l Conduct 5.4 ........................................................................ 2

2013 N.C. State Bar Formal Ethics Op. 9 (Oct. 25, 2013) ........................................ 4

- Addendum 2 -

# N.C. Rules of Professional Conduct
## Rule 5.4
### *Professional Independence of a Lawyer*

(a) A lawyer or law firm shall not share legal fees with a nonlawyer, except that:

> (1) an agreement by a lawyer with the lawyer's firm, principal, or associate may provide for the payment of money, over a reasonable period of time after the lawyer's death, to the lawyer's estate or to one or more specified persons;

> (2) a lawyer who purchases the practice of a deceased, disabled, or disappeared lawyer may, pursuant to the provisions of Rule 1.17, pay to the estate or other representative of that lawyer the agreed-upon purchase price;

> (3) a lawyer who undertakes to complete unfinished legal business of a deceased lawyer or a disbarred lawyer may pay to the estate of the deceased lawyer or to the disbarred lawyer that portion of the total compensation that fairly represents the services rendered by the deceased lawyer or the disbarred lawyer;

> (4) a lawyer or law firm may include nonlawyer employees in a compensation or retirement plan even though the plan is based in whole or in part on a profit-sharing arrangement; and

> (5) a lawyer may share court-awarded legal fees with a nonprofit organization that employed, retained or recommended employment of the lawyer in the matter.

(b) A lawyer shall not form a partnership with a nonlawyer if any of the activities of the partnership consist of the practice of law.

(c) A lawyer shall not permit a person who recommends, engages, or pays the lawyer to render legal services for another to direct or regulate the lawyer's professional judgment in rendering such legal services.

(d) A lawyer shall not practice with or in the form of a professional corporation or association authorized to practice law for a profit, if:

- Addendum 3 -

(1) a nonlawyer owns any interest therein, except that a fiduciary representative of the estate of a lawyer may hold the stock or interest of the lawyer for a reasonable time during administration; or

(2) a nonlawyer has the right to direct or control the professional judgment of a lawyer.

**Comment**

[1] The provisions of this Rule express traditional limitations on sharing fees. These limitations are to protect the lawyer's professional independence of judgment. Where someone other than the client pays the lawyer's fee or salary, or recommends employment of the lawyer, that arrangement does not modify the lawyer's obligation to the client. As stated in paragraph (c), such arrangements should not interfere with the lawyer's professional judgment.

[2] This Rule also expresses traditional limitations on permitting a third party to direct or regulate the lawyer's professional judgment in rendering legal services to another. See also Rule 1.8(f) (lawyer may accept compensation from a third party as long as there is no interference with the lawyer's independent professional judgment and the client gives informed consent).

[3] Although a nonlawyer may serve as a director or officer of a professional corporation organized to practice law if permitted by law, such a nonlawyer director or officer may not have the authority to direct or control the conduct of the lawyers who practice with the firm.

- Addendum 4 -

## 2013 N.C. State Bar Formal Ethics Op. 9 (Oct. 25, 2013)

### *Role of Lawyer for Public Interest Law Organization*

Opinion provides guidance to lawyers who work for a public interest law organization that provides legal and non-legal services to its clientele and that has an executive director who is not a lawyer.

Facts:

Attorney A is a staff lawyer for Immigrant Aid Corporation (IAC), a public interest, nonprofit corporation that provides services to immigrants with limited income. Public interest law firms are subject to the requirements of NC Gen. Stat. §84-5.1.

IAC is tax exempt under 26 U.S.C. §501(c)(3). A nonlawyer is the executive director of IAC. IAC has satellite offices that are managed by nonlawyers. The services provided by the organization to immigrants include legal assistance with immigration matters. These services are provided by staff lawyers and by Board of Immigration Appeals (BIA) representatives. BIA representatives are nonlawyers who are authorized by the federal government to handle certain immigration matters.

IAC charges its clients nominal fees for the legal services it provides. There is a separate, predetermined fee for each separate aspect of a case or task to be performed by a lawyer or a BIA representative. The organization does not have income qualification guidelines and does not use a sliding income scale to determine what a client will pay for a service.

A new client of the corporation is asked to sign a document entitled "Retainer Agreement" for the services to be provided by staff lawyers. The agreement states that "if the process to obtain the benefit I seek requires more than one step, each step will be a separate case with a separate fee and separate service plan." A schedule of the separate fees is not provided with the agreement. Instead, the agreement specifies a total fee, which is the aggregate of the fees for the various legal services that it is anticipated the client will need.

The Retainer Agreement states that the executive director or the office manager will determine the outcome of a client's request for a waiver of a legal fee, a client's complaint regarding legal services, and any dispute regarding legal fees. In the case of a fee dispute, a disgruntled client speaks first to a supervising staff lawyer, then,

- Addendum 5 -

if the dispute is not resolved, to an office manager who is not a lawyer, and finally to the executive director.

When a client pays a fee by cash or check, the cash or check is locked in a staff member's desk until the funds can be deposited in IAC's operating account.

Inquiry #1:

Are North Carolina lawyers who work for IAC subject to the North Carolina Rules of Professional Conduct although they are not employed by a law firm?

Opinion #1:

Yes. The North Carolina Rules of Professional Conduct apply not only to lawyers working at law firms, but also to lawyers working in-house at public and private companies and for non-profit organizations. See Rule 1.0(d) ("'Firm' or 'law firm' denotes a lawyer or lawyers in a law partnership, professional corporation, sole proprietorship, or other association authorized to practice law; or lawyers employed in a legal services organization or the legal department of a corporation, government entity, or other organization.") See also Preamble, Rule 0.1 ("Every lawyer is responsible for observance of the Rules of Professional Conduct").

Inquiry #2:

Is a North Carolina lawyer allowed to work for a 501(c)(3) corporation in which a nonlawyer serves as the executive director or as the manager of the satellite office where the lawyer works?

Opinion #2:

Yes. Pursuant to NC Gen. Stat. §84-5.1, a nonprofit corporation, tax exempt under 26 U.S.C. §501(c)(3), organized or authorized under Chapter 55A of the General Statutes of North Carolina, and operating as a public interest law firm as defined by the applicable Internal Revenue Service guidelines, may render legal services provided by lawyers licensed to practice law in North Carolina for the purposes for which the nonprofit corporation was organized. "The nonprofit corporation must have a governing structure that does not permit an individual or group of individuals other than an attorney duly licensed to practice law in North Carolina to control the manner or course of the legal services rendered and must continually satisfy the criteria established by the Internal Revenue Service for 26 U.S.C. §501(c)(3) status,

- Addendum 6 -

whether or not any action has been taken to revoke that status." NC Gen. Stat. §84-5.1(a). See also Rule 5.4, cmt. [3] (nonlawyer may serve as a director or officer of a professional corporation organized to practice law if permitted by law).

Inquiry #3:

If the answer to Inquiry #2 is "yes," to what extent may the executive director or office manager supervise or instruct the staff lawyers in the performance of legal services?

Opinion #3:

The nonlawyers associated with the IAC may not "direct or regulate" the staff lawyer's professional judgment in rendering legal services. Rule 5.4(c). As required by NC Gen. Stat. §84-5.1, the IAC "must have a governing structure that does not permit an individual or group of individuals other than an attorney duly licensed to practice law in North Carolina to control the manner or course of the legal services rendered."

Inquiry #4:

The fees to be charged for a legal service performed by a staff lawyer or by a BIA representative are finally approved by the executive director. May a staff lawyer permit a nonlawyer to have final approval authority for fees to be charged for the lawyer's work?

Opinion #4:

A nonlawyer may have final approval authority for fees to be charged for the lawyer's work only if the approval process does not interfere with the staff lawyer's exercise of professional judgment and there is a method for the lawyer to object if the fee is clearly excessive in violation of Rule 1.5(a).

Inquiry #5:

By allowing IAC to collect and retain legal fees, is a staff lawyer participating in fee-sharing with a nonlawyer which is prohibited by Rule 5.4?

- Addendum 7 -

Opinion #5:

No. As noted in comment [1] to the Rule 5.4, the traditional limitations on sharing fees prevent interference in the independent professional judgment of a lawyer by a nonlawyer. NC Gen. Stat. §84-5.1 prohibits a nonprofit public interest law corporation from having a governing structure that permits such interference. So long as IAC is complying with the statutory requirements, the fee-splitting prohibition is not triggered by this arrangement.

Inquiry #6:

If money is collected in advance from clients of IAC to pay for legal services to be provided by staff lawyers, does the staff lawyer have to insure that money is deposited into a trust account established and managed pursuant to Rule 1.15 of the Rules of Professional Conduct?

If money is collected for a consultation with an IAC client at the time of the consultation, does the staff lawyer have to insure that the money is deposited into a trust account or may it be deposited into the corporation's operating account?

Does the title "Retainer Agreement" allow the staff lawyer to consider the payment a true retainer, which is earned upon payment, and which may be deposited in IAC's operating account?

Opinion #6:

If money is collected for a staff lawyer's services, the lawyer must insure that IAC handles the money in a manner that is consistent with the lawyer's duty to safekeep client property. Rule 1.15. Comment [2] to Rule 1.15 provides that "[a]ny property belonging to a client or other person or entity that is received by or placed under the control of a lawyer in connection with the lawyer's furnishing of legal services or professional fiduciary services must be handled and maintained in accordance with this Rule 1.15." Pursuant to Rule 1.15-2(b), "[a]ll trust funds received by or placed under the control of a lawyer shall be promptly deposited in either a general trust account or a dedicated trust account of the lawyer." "Entrusted property" includes "trust funds, fiduciary funds, and other property belonging to someone other than the lawyer which is in the lawyer's possession or control in connection with the performance of legal services or professional fiduciary services." Rule 1.15-1(e).

- Addendum 8 -

The title of the representation agreement, in this case "Retainer Agreement," does not determine the actual nature of the agreement. Whether money paid in advance by a client is "entrusted property" that must be placed in a trust account will depend on the nature of the advance payment (advance fee, general retainer, flat fee, or minimum fee) and whether the fee is earned upon payment. The IAC must follow the guidelines set out in 2008 FEO 10 as to fees paid in advance and place any fees that are not earned immediately into a trust account.

Inquiry #7:

If money is collected for costs that may be incurred in conjunction with the provision of legal services, should the staff lawyer insure that the money is deposited into a trust account?

Opinion #7:

Yes. Any portion of a payment that is intended to cover costs must be deposited in a trust account. If IAC receives a check from a client that represents costs and fees, the check must be deposited in a trust account before IAC may withdraw that portion of the funds that constitutes immediately earned legal fees. See RPC 158.

Inquiry #8:

Until the money is deposited in a bank account, may a client's cash or check be locked in a staff member's desk?

Opinion #8:

A lawyer has a duty to safekeep client funds and property. Rule 1.15-2. Rule 1.15-2(b) provides that"[a]ll trust funds received by or placed under the control of a lawyer shall be promptly deposited in either a general trust account or a dedicated trust account of the lawyer." Any check representing any portion of legal fees that are not earned immediately must be promptly deposited in a trust account. In the event that trust funds cannot be immediately deposited in a trust account, the funds should be securely maintained until they can be deposited.

- Addendum 9 -

Inquiry #9:

Should a staff lawyer require that a schedule of the fees for services be included in the Retainer Agreement or discussed with the client at the time of execution of the agreement?

Opinion #9:

Yes. Rule 1.4(b) provides that a lawyer shall "explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation." In this scenario, the client cannot make an informed decision about entering into the representation agreement without sufficient knowledge of the legal fees being charged for each specific service.

Inquiry #10:

May the agreement include the following statement: "If I decide not to continue a case with the agency and the service I requested has been performed or completed, I will not be entitled to a refund, full or partial, of the fee"?

Opinion #10:

The use of the term "nonrefundable fee" in fee agreements is prohibited because a fee is always subject to refund, in whole or in part, if the fee is clearly excessive under the circumstances. 2008 FEO 10. Therefore, a fee agreement may state that a client "will not be entitled to a refund of any portion of a fee unless it can be demonstrated that the total fee was clearly excessive under the circumstances." See "Model Fee Provisions" in 2008 FEO 10.

Inquiry #11:

May a staff lawyer ask a client to sign the "Retainer Agreement" if it states that IAC "is not obligated to continue representing me in all steps of the legal process, and may withdraw its representation and close my case upon written notification to the client and to the administrative law agency"?

- Addendum 10 -

Opinion #11:

No. The statement in the Retainer Agreement misrepresents the ethical duties owed by the staff lawyer to the client and the administrative law agency or tribunal by the staff lawyer.

Pursuant to Rule 1.2(c), "[a] lawyer may limit the scope of the representation if the limitation is reasonable under the circumstances." When the scope of representation is limited, it is appropriate to define the scope of representation in the representation agreement. The agreement should set forth the "steps of the legal process" for which IAC will provide a lawyer to represent the client. The representation may be limited to those "steps" if reasonable under the circumstances.

If the staff lawyer withdraws from the matter before completing the "steps," the lawyer must comply with Rule 1.16(c) requiring notice to or permission of the tribunal, consistent with applicable law, when terminating a representation. In addition, Rule 1.16(d) requires a lawyer to "take steps to the extent reasonably practicable to protect a client's interests, such as giving reasonable notice to the client, allowing time for employment of other counsel, surrendering papers and property to which the client is entitled, and refunding any advance payment of fee or expense that has not been earned or incurred."

Inquiry #12:

May a staff lawyer agree to or participate in IAC's process for resolving fee disputes with clients? Should the agreement reference the fee dispute resolution program of the State Bar required by Rule 1.5(f) of the Rules of Professional Conduct?

Opinion #12:

The IAC may establish an internal mechanism for reviewing clients' complaints about legal fees. However, that mechanism will not replace the obligation of a North Carolina lawyer to participate in the North Carolina State Bar's fee dispute resolution program. Participation in the fee dispute resolution program of the North Carolina State Bar is mandatory for the lawyer when a client requests resolution of a disputed legal fee. Rule 1.5(f).

- Addendum 11 -

Inquiry #13:

If a client disputes a fee, should the amount of any fee previously paid by the client and converted to IAC's use be deposited in a trust account?

Opinion #13:

No. If fees have been deposited in IAC's operating account based on a contract providing that the fees were earned upon receipt, there is no requirement to deposit the funds into a trust account pending the resolution of a fee dispute.

Inquiry #14:

A lawyer who is not a director, officer, or manager of IAC is designated as the supervising lawyer for the other lawyers on the staff. Is the supervising lawyer responsible for IAC's compliance with the Rules of Professional Conduct?

Opinion #14:

Pursuant to Rule 5.1(a), "[a] lawyer who individually or together with other lawyers possesses comparable managerial authority, shall make reasonable efforts to ensure that the firm or the organization has in effect measures giving reasonable assurance that all lawyers in the firm or the organization conform to the Rules of Professional Conduct." Pursuant to Rule 5.1(b), "[a] lawyer having direct supervisory authority over another lawyer shall make reasonable efforts to ensure that the other lawyer conforms to the Rules of Professional Conduct."

Inquiry #15:

What are the duties and responsibilities of the subordinate lawyers in the organization relative to compliance with the Rules of Professional Conduct?

Opinion #15:

Rule 5.2 sets out the responsibilities of subordinate lawyers regarding compliance with the Rules of Professional Conduct. Rule 5.2(a) states that a lawyer "is bound by the Rules of Professional Conduct notwithstanding that the lawyer acted at the direction of another person." However, Rule 5.2(b) states that a subordinate lawyer does not violate the Rules of Professional Conduct "if that lawyer acts in accordance

- Addendum 12 -

with a supervisory lawyer's reasonable resolution of an arguable question of professional duty."

Inquiry #16:

IAC maintains a referral list of private lawyers to use when it is necessary to refer a person elsewhere. At the request of management, may a staff lawyer refer an inquiring person to one or two specific lawyers on the list?

Opinion #16:

Yes, if the lawyers are qualified to handle the client's matter and nothing of value has been given by the lawyers for the referral. Rule 7.2(b).

Inquiry #17:

A BIA representative is designated by IAC as an "Immigration Specialist" on business cards, email, and other written communications to clients and prospective clients. Is a staff lawyer required to take any action to prevent or challenge such designation?

Opinion #17:

Rule 5.5(d) provides that a lawyer "shall not assist another person in the unauthorized practice of law." If, in the context of IAC's operations, the use of the term "Immigration Specialist" by a BIA representative is misleading as to the representative's authority to practice law in North Carolina, then a staff lawyer must take steps to remedy the misrepresentation.

Inquiry #18:

IAC advertises that its legal services are provided at "reasonable prices" without explanation or clarification. Does such a statement violate the advertising rules for lawyers?

Opinion #18:

The statement that legal services are provided at "reasonable prices" is permissible so long as it is truthful. Whether a fee is reasonable depends upon a number of

- Addendum 13 -

factors, including the current rates in the particular community. See also Rule 1.5(a) (listing factors to be considered in determining whether a fee is clearly excessive).

Inquiry #19:

What duty does a staff lawyer or a supervising lawyer have to review notices that IAC places in newspapers and social media about its legal services for compliance with the advertising rules?

Opinion #19:

A lawyer employed by IAC has a duty to ensure that the content of any information IAC provides to prospective clients about the lawyer or the lawyer's services is truthful and not misleading. Rule 7.1; 2004 FEO 1.

Inquiry #20:

IAC posts the following announcement on Facebook: "IAC will be hosting a FREE citizenship workshop on [date] at [address]. We will help applicants fill out their applications for citizenship and a lawyer will review each application. If you or a friend are interested in getting help with your citizenship application at the workshop, please contact [lawyer]." Does this announcement violate the advertising rules for lawyers?

Opinion #20:

No. IAC may conduct educational workshops for non-clients and may offer to provide free legal services. See RPC 36. IAC may advertise the seminars so long as the advertisements comply with the Rules of Professional Conduct. 2007 FEO 4. To comply with the rules, it may be necessary for the announcement to include any limitations on the free services IAC will provide.

Inquiry #21:

If a staff lawyer concludes that IAC's current fee structure violates IRS and BIA regulations, what should the staff lawyer do?

- Addendum 14 -

Opinion #21:

Pursuant to Rule 1.13(b), if a lawyer for an organization knows that an officer, employee, or other person associated with the organization is engaged in action that:

is a violation of law which reasonably might be imputed to the organization, and is likely to result in substantial injury to the organization, then the lawyer shall proceed as is reasonably necessary in the best interest of the organization. Unless the lawyer reasonably believes that it is not necessary in the best interest of the organization to do so, the lawyer shall refer the matter to higher authority in the organization, including, if warranted by the circumstances, to the highest authority that can act on behalf of the organization as determined by applicable law.

Rule 1.13(c) further states that:

If, despite the lawyer's efforts in accordance with paragraph (b), the highest authority that can act on behalf of the organization insists upon action, or a refusal to act, that is clearly a violation of law and is likely to result in substantial injury to the organization, the lawyer may reveal such information outside the organization to the extent permitted by Rule 1.6 and may resign in accordance with Rule 1.16.